HOLME ROBERTS & OWEN LLP
Blaine J. Benard, #5661
Carolyn Cox, #4816
299 South Main Street, Suite 1800
Salt Lake City, Utah  84111-2263
Telephone:  (801) 521-5800
Facsimile:  (801) 521-9639

*Attorneys for Defendants San Juan Health Services District, Roger Atcitty,*
*John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday*

SNOW CHRISTENSEN & MARTINEAU
Robert R. Harrison, # 7878
10 Exchange Place, 11th Floor
Salt Lake City, Utah  84145
Telephone:  (801) 521-9000
Facsimile:  (801) 363-0400

*Attorneys for Defendants San Juan Health Services District, Cleal Bradford,*
*Dr. James Redd, Dr. L. Val Jones, Dr. Manfred Nelson, Marilee Bailey,*
*Ora Lee Black, Lori Wallace, Carla Grimshaw, Gloria Yanito, Julie Bronson,*
*Laurie Schafer and Reid Wood*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| DR. STEVEN MACARTHUR, DR. NATHANIEL PENN, MICHELE LYMAN, HELEN VALDEZ, CANDACE LAWS, LINDA CACAPARDO, SUE BURTON, AMY TURLOCK, ALISON DICKSON, CANDACE HOLIDAY, NICOLE ROBERTS, DONNA SINGER, and FRED RIGGS, | ) ) ) ) ) ) ) ) ) ) | **PRETRIAL ORDER** |
| | ) | Case No. 2:00CV-0584BSJ |
| Plaintiffs, | ) ) | Judge Bruce S. Jenkins |
| v. | ) ) ) | |
| SAN JUAN COUNTY, SAN JUAN HEALTH SERVICES | ) ) | |

#124457 v1

DISTRICT, COMMISSIONER TYRON          )
LEWIS, COMMISSIONER BILL REDD,        )
CRAIG HALLS, COMMISSIONER             )
MARK MARYBOY, REID WOOD,              )
CLEAL BRADFORD, ROGER ATCITTY,        )
JOHN LEWIS, JOHN HOUSEKEEPER,         )
KAREN ADAMS, PATSY SHUMWAY,           )
DR. JAMES REDD, DR. JONES,            )
DR. NELSON, RICHARD BAILEY,           )
SAN JUAN FOUNDATION, MARILEE          )
BAILEY, ORA LEE BLACK,                )
GARY HOLLIDAY, LAURIE WALKER,         )
FARMER'S/TRUCK INSURANCE,             )
ST. PAUL'S INSURANCE, CARLA           )
GRIMSHAW, GLORIA YANITO, and          )
JULIE BRONSON, and their assigns,     )
 principals, corporations or associations,  )
known and unknown, incorporated or    )
unincorporated, and other John and Jane  )
Does as yet to be identified each in their  )
individual and official capacities,   )
                                      )
                    Defendants.       )

## TABLE OF CONTENTS

1.  **JURISDICTION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    a.  **Plaintiffs' Statement of Jurisdiction**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    b.  **Defendants' Statement of Jurisdiction**  . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2.  **VENUE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    a.  **Plaintiffs' Statement of Venue**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    b.  **Defendants' Statement of Venue**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3.  **GENERAL NATURE OF THE CLAIMS OF THE PARTIES**  . . . . . . . . . . . . . . . 3

    a.  **Plaintiffs' Statement of the Claims**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    b.  **Defendants' defenses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4.  **UNCONTROVERTED FACTS**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5.  **CONTESTED ISSUES OF FACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    a.  **Plaintiffs' Statement of Contested Issues of Fact**  . . . . . . . . . . . . . . . . . . 12
    b.  **Defendants' Statement of Contested Issues of Fact**  . . . . . . . . . . . . . . . . . 67

6.  **CONTESTED ISSUES OF LAW**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

    a.  **Plaintiffs' Statement of Contested Issues of Law**  . . . . . . . . . . . . . . . . . . 73
    b.  **Defendants' Statement of Contested Issues of Law**  . . . . . . . . . . . . . . . . . 82

7.  **EXHIBITS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

8.  **WITNESSES**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

9.  **REQUESTS FOR INSTRUCTIONS**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

10.  **AMENDMENTS TO PLEADINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

11.  **DISCOVERY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

12.  **TRIAL SETTING** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

13.  **POSSIBILITY OF SETTLEMENT**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

This matter came before the Court on November 14, 2002, at a pretrial conference held before Judge Bruce S. Jenkins, pursuant to Rule 16 of the Federal Rules of Civil Procedure. Susan Rose, having appeared as counsel for plaintiffs Dr. Steven MacArthur, Michele Lyman, and Helen Valdez; Blaine J. Benard and Carolyn Cox, having appeared as counsel for defendants San Juan Health Services District (the "Health District"), Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday; and Robert R. Harrison, having appeared as counsel for defendants San Juan Health Service District, Cleal Bradford, Dr. James Redd, Dr. L. Val Jones, Dr. Manfred Nelson, Marilee Bailey, Ora Lee Black, Lori Wallace, Carla Grimshaw, Gloria Yanito, Julie Bronson, and San Juan County, Craig C. Halls, William B. Redd, Richard M. Bailey and J. Tyrone Lewis, and the following action was taken:

## SCOPE OF THIS ORDER[1]

This Order pertains only to the claims of Dr. Steven MacArthur, Michele Lyman and Helen Valdez.  The claims for enforcement of the Navajo Court order are before the 10th cir. court at this time and this order does not deal with those Navajo Court enforcement issues.

1.    **JURISDICTION.**

    a.    **Plaintiffs' Statement of Jurisdiction:**

*Subject matter jurisdiction*: Jurisdiction of this Court over this matter is found in Article III of the United States Constitution,  28 U.S.C. §1331. Plaintifffs also assert this Court's jurisdiction under 28 USC  §1391, 15 USC 4 et seq, 42 USC 1981 et seq, 18 USC 1961-1964,

---

[1]    Plaintiffs requested that this "Scope of the Order" section be included in the Pretrial Order.

and the Court has authority to grant declaratory judgment relief sought herein under 28 USC 2201 and 2202.

*Personal jurisdiction*: Plaintiffs assert the Court has jurisdiction over the persons of defendants who reside in Utah, as the damages sought will exceed $75,000.

*Pendant/Ancillary Jurisdiction*: Plaintiffs assert the jurisdiction for State claims is found in 28 USC 1367 and the ancillary and pendant powers of the Court, and the Court's inherent equity powers, ancillary and pendant powers of the Court and the U. S. Constitution's Supremacy Clause.

   b.  **Defendants' Statement of Jurisdiction.** This is an action by plaintiffs for monetary damages. Plaintiffs also claim to seek injunctive relief. Jurisdiction of the Court is invoked under 28 U.S.C. § 1331. The jurisdiction of the Court under 28 U.S.C. § 1331 is not disputed and is hereby determined to be present. Plaintiffs also assert that the Court has supplemental jurisdiction for state claims under 28 U.S.C. § 1367 and the ancillary and pendant powers of the Court. Defendants do not currently contest the Court's pendent jurisdiction over the state law claims but reserve the right to challenge such jurisdiction if plaintiffs' federal claims are dismissed.

   2.  <u>**VENUE.**</u>

   a.  **Plaintiffs' Statement of Venue.** Venue is proper in this Court under 28 USC sec. 1391 and 18 USC 1965 and 15 USC 1 et seq. is proper within the Central Division of the District of Utah under 28 U.S.C. § 125.

b.      **Defendants' Statement of Venue.**  Venue was determined by the Court to

be proper pursuant to 28 U.S.C. § 1391.  Venue is laid in the Central Division of the District of

Utah.  *See* 28 U.S.C. § 125.

3.      <u>**GENERAL NATURE OF THE CLAIMS OF THE PARTIES.**</u>

a.      **Plaintiffs' Statement of the Claims**:

*Plaintiffs Dr. MacArthur and Michele Lyman*

i.      The Plaintiffs Dr. Steven MacArthur, Michele Lyman, Physician's

Assistant bring this complaint involving injuries from the defendants' by way of

(1)      42 USC 1983 civil rights violations regarding freedom to

contract,  free speech, free association, including 1985 conspiracy;

(2)      retaliation for speaking and association,

(3)      due process violations as guaranteed to the Plaintiffs Dr.

MacArthur and   Michele Lyman  by way of 42 U.S.C. 11112 and 42 USC 1983, the U. S.

Constitution Fifth and Fourteenth Amendment, and Utah's Constitution Article 1, Section 1,

Section 7,  Section 22, Section 26 and 27;

(4)      15 USC 15 *civil* anti-trust violations,

(5)      18 USC 1961 et seq. *civil* RICO violations,(a) mail fraud

18 USC 1341; (b) witness tampering 18 USC 1512; (c) interference with commerce by threats 18

USC 1951; (d) illegal destruction or tampering with confidential  documents in a federally

contracted facility; (e) intimidation of witnesses for monetary gain;

(6)	state *common law* defamation ( also a U. S. Constitutional right to reputation as guaranteed by the Ninth Amendment), negligent and intentional infliction of emotional distress, and fraud,

(7)	violations of privacy rights and statutory entitlements to have their credential files and patient files accurately kept by the district under Medicaid and Utah Health Department statutes and regulations,

(8)	interference with the patients' and Dr. and P. A.'s ability to freely contract for services with the District, with each other, with patients as guaranteed by the Fourteenth Amendment, Utah unfair Practices Act, and federal common law,

(9)	denial of State license entitlements,

(10)	denial of Medicaid entitlements,

(11)	bad faith void contracts that lack fair dealing, and

(12)	denial of their entitlement to a contract with the District that is based upon principles of good faith and fair dealing, with adequate consideration.

(13)	conspiracy to deprive the Plaintiffs of their legal entitlements of due process, equal protection, privacy, rights of association, rights to contract.

(14)	conspiracy to deprive the Plaintiffs' of their above stated rights and entitlements

(15)	violation of the Utah Unfair Practices Act,

(16)	violation of the guarantees found in the Health Quality Improvement Act, 42 USC 11112,

(17)    18 USC  248 denial of local patients to contract freely with Dr. MacArthur and Michele Lyman's for  reproductive health care and free speech violations.

(18)    violations of Federal common law and Utah contract common law and statutory provisions that prohibit contracts of adhesion, bad faith, and lack of fair dealing. Utah Code Ann. §§ 78-12-25(1) (1996)

(19)    were denied an accurate record of hearings pertaining to them, and denied all records of meetings that meet the open meetings definition of Utah Code Ann.  58-4-1-7.5, in order to verify their claims of conspiracy and complicity between the County and District in deliberate refusal to take actions to enforce and uphold free competition in the area and protect their civil rights.

*Mrs. Valdez Claims*

(20)    violation of Mrs. Valdez' Medicare Patient Bill of Rights to see the medicare provider of her choice;

(21)    violation of Mrs. Valdez' 42 USC 1983 civil rights and equal protection;

(22)    violation of Mrs. Valdez' state right to receive services equally with all other patients as found in Utah Code Ann. 13-7-2.

(23)    violation of Mrs. Valdez' entitlement to an equal standard of care and to be examined upon her presentation to the emergency room of the hospital as mandated by 42 USC 1395dd and Utah's Nurse Practioner Act;

(24)    violation of Mrs. Valdez' Utah Constitutional rights under Article 1 sections 1, 7, 25, 26, 27;

(25)    violation of Mrs. Valdez' U. S. Constitutional rights under the Fifth and Fourteenth Amendments to freely contract and associate with the provider of her choice as found in 42 USC 1395a; to have due process of law if she is denied that right.  At all times the defendants, jointly and severally, privately and officially, displayed deliberate indifference to the Plaintiffs' injuries.  After Mrs. Valdez' harm, her ability to contract with local providers was chilled.

b.    **Defendants' defenses.**

ii.    Many of Plaintiffs' claims fail to state a claim upon which relief can be granted.

iii.    Many of Plaintiffs' claims fail because Plaintiffs lack standing to assert them and the claims are not asserted on behalf of the real parties in interest.

iv.    Many of Plaintiffs' claims fail because Plaintiffs failed to plead the claims in the Complaint, and Plaintiffs are attempting to raise them for the first time in this Pretrial Order.  Claims to which no reference is made in the Complaint include, but are not limited to (1) the Health Quality Improvement Act; (2) 18 U.S.C. § 248, which prohibits, *inter alia*, interference by force or threat of force with a person obtaining reproductive health care; (3) 42 U.S.C. § 1395a; (4) 42 U.S.C. § 1395dd; and (5) 18 U.S.C. § 1951 as a predicate act for Plaintiffs' purported RICO claim.

v.    Many of Plaintiffs' claims as stated by Plaintiffs are barred because they are stated defectively and fail to plead the elements of the purported causes of action.

vi.    Many of Plaintiffs' claims as stated by Plaintiffs fail because no private cause of action may be based upon the statutes or constitutional provisions cited.  These

claims include, but are not limited to, those based on the Nurse Practice Act, Utah Code Ann. §

58-31b-801 *et. seq.*, the Ninth Amendment to the United States Constitution, Sections 1, 25, 26

or 27 of the Utah Constitution, and 42 U.S.C. § 1395a.  Plaintiffs also cannot bring a private

cause of action based on 42 U.S.C. § 1395dd because the statute protects only the rights of

indigents who are denied treatment for economic reasons.

       vii.    With respect to each of the plaintiffs' discrimination and due

process claims, San Juan County, the Health District, Roger Atcitty, John Lewis, John

Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday are not liable because

respondeat superior liability does not attach for purposes of 42 U.S.C. § 1983 unless the adverse

treatment resulted from a policy or custom of the Health District, of which there is no evidence in

this case.

       viii.    Plaintiffs have not alleged any discriminatory conduct on the part

of a number of defendants, including Roger Atcitty, John Lewis, John Housekeeper, Karen

Adams, Patsy Shumway, Gary Holliday, Dr. L. Val Jones, Dr. Manfred Nelson, Marilee Bailey,

Ora Lee Black, Lori Wallace, Carla Grimshaw, Gloria Yanito, Julie Bronson or Reid Wood.

Accordingly, plaintiffs may not assert claims based on 42 U.S.C. § 1983 against them.

       ix.    Because case law does not support claims of associational

discrimination with respect to gender or religion, plaintiffs' claims based on those theories fail.

       x.    Dr. MacArthur's claim that he was discriminated against on the

basis of age in connection with his application for privileges is barred in whole or in part because

it is preempted by the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634.

xi.     Dr. MacArthur's claims are barred because he intentionally and knowingly waived his right to bring such claims against defendants when he was granted temporary privileges, which, according to the application he signed and to the Medical Staff Bylaws, released from any liability representatives of the hospital and the medical staff for acts taken in connection with the evaluation of his application.

xii.    With respect to Lyman's claims, San Juan County and the Health District cannot be held liable for any allegedly discriminatory acts by Dr. James Redd or Cleal Bradford before they began working for the Health District, regardless of whether respondeat superior applies.  Such claims are also barred by applicable statutes of limitation.

xiii.   Plaintiffs' due process claims are barred because plaintiffs were not deprived of a liberty or property interest.

xiv.    None of the plaintiffs can show that any of their allegedly adverse treatment was a result of their membership in a protected class.

xv.     Plaintiffs' claim of defamation fails because truth is an absolute defense to the claim.

xvi.    Plaintiffs' claim of defamation fails for lack of particularity because they cannot identify any individual who allegedly made a defamatory statement nor can they identify with particularity the alleged defamatory statement.

xvii.   Plaintiffs' claim of defamation fails because there is no allegation or evidence that the alleged defamatory statement was published.

xviii.  Plaintiffs' claim of defamation fails because they have not suffered any actual harm as a result of the allegedly defamatory statements.

xix.     Plaintiffs' claim of defamation fails because defendants' alleged statements are subject to a qualified privilege.

xx.     Plaintiffs' claim of defamation fails to the extent any alleged defamatory statement was made during the course of a legislative proceeding such as a meeting of the County Commission or the Health District Board of Trustees pursuant to Utah Code Ann. §§ 45-2-3 and 45-2-10.

xxi.     Pursuant to the Utah Governmental Immunity Act, jurisdiction over Plaintiffs' claim of defamation is vested exclusively within the District Courts of the State of Utah.  *See* Utah Code Ann. § 63-30-16.

xxii.     Plaintiffs' defamation claim is barred by the Utah Governmental Immunity Act, Utah Code Ann. § 63-30-1 *et seq.*, including but not limited to §§ 63-30-3 and 63-30-10.

xxiii.   Plaintiffs lack standing to assert an antitrust claim.

xxiv.   To the extent Plaintiffs have stated an antitrust claim, the claim fails under the state action defense.

xxv.   Plaintiffs' purported antitrust claim fails because any alleged activity did not occur in or affect interstate commerce, so antitrust jurisdiction is not present.

xxvi.   Plaintiffs' purported antitrust claim fails because there is no agreement in the form of a contract, combination or conspiracy to restrain trade.

xxvii.   Plaintiffs' purported antitrust claim fails for lack of antitrust injury.

xxviii.  Plaintiffs' purported antitrust claim fails due to the lack of an unlawful motive on the part of Defendants.

xxix.   Defendants are immune from Plaintiffs' purported antitrust claim under the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-152.

xxx.   Plaintiffs' purported claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") fails because Plaintiffs have failed to specify what provision of the RICO statute they claim Defendants violated.

xxxi.   Plaintiffs' purported RICO claim fails because Defendants were not engaged in and none of Defendants' alleged activities affected interstate commerce.

xxxii.   Plaintiffs' purported RICO claim fails because Defendants did not commit any of the predicate acts alleged by Plaintiffs.

xxxiii.  Plaintiffs' purported RICO claim fails because Defendants did not engage in a pattern of racketeering activity.

xxxiv.  Plaintiffs' purported RICO claim fails because Plaintiffs have failed to identify an enterprise.

xxxv.   Plaintiffs' purported RICO claim fails because Defendants have not received any income from, acquired any interest in, or conducted or participated in the conduct of an enterprise.

xxxvi.  Because San Juan County and the Health District are political subdivisions of the State of Utah and the alleged acts and/or omissions by County commissioners, officials or employees or Health District trustees, employees or staff members, about which plaintiffs complain, were carried out within the scope of and pursuant to their official duties as trustees, employees or staff members of the Health District, plaintiffs' claims are barred by the doctrine of qualified immunity, including but not limited to the provisions of the

Utah Governmental Immunity Act, Utah Code Ann. § 63-30-1 *et seq*, including but not limited to § 63-30-3 and § 63-30-10.

xxxvii.     Plaintiffs' claims are subject to the equitable defenses of unclean hands, laches, waiver and estoppel.

xxxviii.     The activities alleged in the Complaint are not actionable because they conformed with and were undertaken pursuant to statutes, government regulations and industry standards based upon the state of knowledge existing at the time of the activities.

xxxix.  Plaintiffs have not proved any facts showing that the conduct of defendants was the proximate cause of some or all of the alleged damages in the Complaint.

xl.     Plaintiffs have not proved any facts showing that the conduct of defendants was the cause-in-fact of some or all of the damages claimed in the Complaint.

xli.     The alleged actions of which plaintiffs complain do not support an award of punitive damages.

xlii.     Plaintiffs' claims are barred by the applicable statutes of limitation, including but not limited to Utah Code Ann. §§ 63-30-15,78-12-25(3), 78-12-29(4) and 78-12-30.

xliii.     Plaintiffs have failed to mitigate their damages, if any.

xliv.     Plaintiffs claims' for damages are remote, speculative and/or unavailable as a matter of law.

xlv.     Plaintiffs' damages, if any, were proximately caused by their own fault and/or the fault of persons other than defendants.

xlvi.    Plaintiffs' damages, if any, are limited in accordance with the provisions of Utah Code Ann. § 63-30-22.

xlvii.   Defendants are entitled to reasonable attorneys' fees pursuant to 28 U.S.C. § 1927 because the proceedings in this action have been multiplied unreasonably and vexatiously.

xlviii.  Defendants are entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988.

4.    **UNCONTROVERTED FACTS.**  The following facts are established by admissions in the pleadings, by order pursuant to Federal Rule of Civil Procedure 56(d), or by stipulation of counsel:

a.    Plaintiff Helen Valdez was a resident of Monticello, Utah at all relevant times.

b.    Plaintiff Dr. Steven MacArthur is a medical doctor who specializes in obstetrics and gynecology ("Ob/Gyn").

c.    Plaintiff Michelle Lyman is a physician's assistant who resides in Blanding, Utah.

5.    **CONTESTED ISSUES OF FACT.**

a.    **Plaintiffs' Statement of Contested Issues of Fact:**

*Summary of the Material Facts*

Dr. MacArthur was a qualified physician in good standing with the State of Utah. Michele Lyman, was a Physician's Assistant, in good standing with the State of Utah.  Both of these medical providers were denied privileges at the only hospital and District facilities for

miles around either by way of staff actions San Juan County and San Juan Health District displayed deliberate indifference toward resolving or by affirmative actions by the District and County personnel.  Both received no due process hearing.  Records of hearings are either incomplete or not  recorded or not audible.   Both had no avenue for having an impartial hearing to which they could appeal district staff actions.  Both had to put up with negative and interfering nursing attitudes, false rumors, statements undermining their abilities in the site of their patients, and their patients recieving less of a standard of care than was required by the State and Federal regulations.  Dr. MacArthur was subjected to a false incident report.  Mrs. Lyman was subjected to false rumors directly related to the health care of her patients.  Mrs. Lyman had patient files disappear, and patients confidentiality breached.  Dr. MacArthur had to work with broken or at times, unsterile instruments, and the nursing staff refused to purchase equipment that would be paid by the patients' insurance to be used in the best interest of patients.  Both suffered from missing documents in their credentialing packets.  Mrs. Lyman suffered from altered documents in her packet.

Helen Valdez

Helen was a patient entitled by federal and state regulations to a certain level of care.  She presented to the emergency room of San Juan Hospital asking to see a dr. as she was sick.  She was not asked what was wrong, how long she had been ill, nor was she given an examination. She was in the bathroom and Laurie Wallace, R. N. told the clerk to tell her to go to Dr. Penn's clinic.  She was Dr. Penn's patient.  The state found that Dr. Penn was not always told of the presence of his patients in the hospital.  As a pattern and policy of practice, the hospital had problems with turning people away or sending them from one facility to another facility of lesser

care to suit the convenience of a doctor.  The State Medicaid officer Royale Simpson oversaw

classes he mandated District personnel to attend.

Other older people in the area suffered from not receiving adequate care.

The District employees as a pattern sought to restrain competition, there was inadequate

impartiality in 'peer review' or in issuing privileges since the people issuing the privileges are

usually in economic competition with those they are giving privileges.  Privileges for Mrs.

Lyman were de facto denied by nursing personnel and medical staff without any action by the

District governance board.

The governance board displayed a pattern of not holding doctors or others accountable for

interfering in doctor /patient relations.  The County was aware of the problems and did nothing to

investigate, hold hearings, or resolve the provider and patients' and public's concerns as

evidenced in petitions with hundreds of signatures.

Mrs. Valdez, Dr. MacArthur, Mrs. Lyman informed the District of their problems and to

no avail.  Dr. MacArthur and others reporting problems to Board member Patsy Shumway and

John Housekeeper were labeled either troublemakers or Dr. Redd detractors.

One of the largest problems in this small, isolated area is the fear of patients to testify for

fear they or their children or grandchildren might be turned away in an emergency.   Mrs. Lyman

is looking at the threats of non treatment in an emergency against her patients as extortionate in

nature to obtain their accounts, forged documents were sent in the US mail to harm her

reputation with the American Heart Association who oversees the cpr classification certification

programs Mrs. Lyman is obligated to pass.  Mrs. Lyman taught them and signed Laurie Shafer's

card.  The type of rumors Mrs. Lyman was subjected to would per se disparage people from coming to her for care.

The damages for Mrs. Lyman and Dr. MacArthur are treble with compensation for federal antitrust and RICO claims. They are also seeking damages for civil rights and other common law and statutory and Constitutional claims.

_Congressional and State Designs to Foster Economic Competition_

1.      The State of Utah legislatively made findings that free economic competition is in the best interest of citizens of the State. Utah Code Ann. 76-10-912; 76-10-923, 13-5-17, and binds itself to fostering free enterprise in its procurement contract.  Utah Code 63-56-1.

2.      "The attorney general shall have the authority and responsibility to advocate the policy of competition before all political subdivisions of this state and all public agencies whose actions may affect the interests of persons in this state. " Utah Code 76-10-923. See also Unfair Practices Act Title 13 Chapter 5 fostering economic competition.

3.      Congress through RICO and Antitrust statutes fosters free competition in the United States. "In assessing the likelihood that efficiencies will be realized, the Agencies recognize that competition is one of the strongest motivations for firms to lower prices, reduce costs, and provide higher quality. Thus, the greater the competition facing the network, the more likely the network will actually realize potential efficiencies that would benefit consumers. " Statement of Antitrust Enforcement Policy in Health Care, Department of Justice and Federal Trade Commission, August, 1996.

4.      Congress and Utah acknowledge a problem of the shortage of health care professionals in rural areas.

5.      Congress and Utah have enacted various regulations and statutes to raise the number of medical providers in rural areas through educational loan payback programs, J-1 immigration waiver programs, Community Impact Board grants and loans, and so forth.

6.      Physician Assistants in Utah can operate and independently own health clinics in HPSA areas under Medicaid and Utah licensing divisions, as long as the supervising physician is available by phone, even though many miles away.

7.      Utah Department of Professional Licensing (DOPL) approved Michele Lyman's Blanding Family Practice as a rural off-site clinic.

*Nature of the County and District*

8.      The County is organized as a political subdivision of Utah under Utah's constitution and Title 17 of the Utah Code.

9.      The District is organized as a special service district under the Utah Code 17A-2-1304.

10.     In 1997, the District showed a profit.

11.     At nearly all times, the District is supported in part by public tax funds.

12.     Many private companies own, manage, and operate rural hospitals and health care clinics.

13.     Private companies have managed the District in the past.

14.     Revenues, not profits, exceed $50,000 a year.

15.     The District hospital  provides a substantial tax supported economic base for Monticello.

16.      The District operated Blanding Urgent Care Center, Blanding Birthing Center, Monument Valley Clinic, Monticello clinic and San Juan Hospital.

17.      Dr. Redd became a district employee in or about the spring of 1999.

18.      When Dr. Redd sold his practice to the District, Blanding Clinic also came under San Juan Distict's control.

*Geographic market*

19.      San Juan County is recognized formally as a Health Professional Shortage Area (HPSA).

20.      San Juan County fits the State and Federal definition of rural and sometimes frontier health areas. "A county whose population density meets the "rural"(between 7 and 100 people per square mile) or the "frontier" (6 or fewer people per square mile) definition.     Utah R432-106-3

21.      San Juan District boundaries coincide with San Juan  County's boundaries.

*Product Market for Medical Services*

22.      San Juan County's population is about 13, 836 for the U. S. Census 2001 estimate.

23.      50.1% of the County's population according to the 2000 census are female or 6392 female persons. id.

24.      49% of these female persons are estimated to be under 18 years old, leaving 3397 persons who qualify for female reproductive, obstetrical and gynecological health care.   Id.

25.      The largest population of the county is found in Blanding (approximately 3500 or so) and points south (about 8000). U. S. Census figures.

26.     For Dr. MacArthur's claims, District employee doctors and Dr. Jones who was contracted with the District constituted about 80% or greater of the competing doctors in the area.

27.     At all times, Dr. MacArthur and Michele Lyman were subject to District policies regarding their privileges as written and accepted by medical providers and physicians who economically competed with them.

28.     For Mrs. Lyman's claims, at times the medical staff consisted of Dr. Penn, Dr. Mena, Dr. Jones, Dr. Nelson, Dr. Cook, Dr. Redd.

29.     Dr. Penn and Dr. Mena either did not seek renewal of privileges or withdrew their application.

30.     Drs. Penn and Mena claimed they did not seek further privileges or renewal of privileges due to hostile working conditions among other conditions.

31.     Though Dr. Penn and Dr. Mena were staff members, Michele Lyman did not enjoy full privileges while supervised by them.

32.     Dr. Redd and Dr. Jones and Dr. Cook and Dr. Nelson did not approve Mrs. Lyman having privileges unless her doctor was a medical staff member and then only if the physician was in the same town as she.

33.     While the policy for P.A.s appears neutral, it effected only Michele Lyman in how it was applied, monitored, and carried out.

34.     Mrs. Lyman had no other place to apply for hospital privileges.

35.     Mrs. Lyman's patients at times stopped going to her as they needed to use the District emergency facilities for ailments and were told they could not.

*Interstate Commerce*

36.     San Juan District provides medical services to people living in Arizona, Colorado, New Mexico and other states.

*Sole Provider of Hospital Services*

37.     San Juan Hospital and Blanding Birthing Center are the only facilities in San Juan County for births and are operated solely by San Juan Health Services District.

38.     Nearly all emergency ambulance deliveries are made to San Juan Hospital.

39.     The next nearest hospital facility to San Juan Hospital in Monticello, Utah is about 65 miles away in either a north (Moab) or east (Cortez, Co.) direction, and about 85 miles from Blanding.  Shiprock hospital is between 65 to 85 miles from southern areas of San Juan County in Shiprock, New Mexico.

40.     San Juan Hospital is the sole provider for those persons with insurance but without transportation to go outside the county or with physical conditions requiring ambulance transportation.

*Necessity of Hospital  Services for Independent*

*Physicians and independent clinics*

41.     Any physician delivering babies in San Juan County would need to use the closest  San Juan District facilities for patients in active labor.

42.      Dr. MacArthur's limited temporary privileges preventing him from fully using the District facilities provided his patients with limited options in where they could receive their care, and prevented some from becoming his patient.

43.     With the exceptions of Dr. Jones and a Monument Valley clinic doctor, all other physicians and P.A.'s within San Juan District are employees of San Juan District.

44.     No physician specializing in obstetrics was practicing during the times pertinent, within San Juan District.

45.     Without Dr. MacArthur and Michele Lyman to treated obstetric patients, the patients if they wished a local delivery when they went into labor, had to go to a doctor not specialized in the area of obstetrics.

46.     Dr. Redd receives pay for baby deliveries within San Juan District facilities over and above his base salary.

47.     Dr. Jones receives contract pay for doing on call deliveries.

48.     Dr. MacArthur's practice was in direct competition with District and District associated General Practioners who delivered babies.

49.     In making the determination of granting privileges, the medical staff and CEOs would analyze the effect of the independent practices of Dr. MacArthur and Michele Lyman upon their income outside any formal 'peer review' context and in regards to them obtaining privileges.

*Formal  and de facto Policies of the County and District*

50.     In areas of health care, Commissioner Ty Lewis is against a private entity that would or will compete with the District.

51.     The District medical staff director, Dr. Redd has a long standing policy of animus toward women both as employees and as patients.

52.     The County and District had a de facto policy of deliberate indifference to those who complained of suffering from Dr. Redd and other District staff members.

53.     The County and District had a policy of harming the reputations of persons in retaliation for  challenging their authority.

54.     The District policy manuals are so ambiguous and without definitions as to be little understood.

55.     Doctors who practice in the area are given these medical staff manuals that try to remove from the doctors all rights.

56.     The medical staff manual as given to Dr. MacArthur had no page numbers, no board or ceo signatures, no due process hearing procedures for those persons seeking and obtaining temporary privileges from the CEO and not the governance board, they could  be altered at will, had no evidence showing governance board approval, were drafted by a District employee.

57.     A doctor wishing privileges has little choice but to sign for one.

*Nepotism as a practice and policy*

58.     Dr. Redd is the nephew of County Commissioner Bill Redd.

50.     Some District Board members were relatives of the County Commissioners.

51.     County Attorney Craig Halls is the brother in law of Rick Bailey, District CEO and County Commission administrator.

52.     The District CEO directly supervised his wife, Marilee Bailey, R. N. for a time, and then resigned noting this supervision as a reason.

53.     San Juan District employees work in an 'at will' status.

*Mrs. Valdez' rights of association, equal protection, Medicare Bill of Rights, and rights to*

*contract under State and Federal statutory and common law.*

54.　　Mrs. Valdez was Dr. Penn's patient.

55.　　Mrs. Valdez presented herself to the San Juan Health District emergency room.

56.　　The District nursing staff had failed to tell Dr. Penn of the presence of his

patients from time to time.

57.　　Mrs. Valdez had two forms of identification.

58.　　Mrs. Valdez filled out an application with insurance information.

59.　　Mrs. Valdez was not asked what the problem was, what her symptoms were or

spoken to about anything.

60.　　Mrs. Valdez was with her sister in law, Charlene Gonzalez.

61.　　Mrs. Valdez went into the bathroom.

62.　　Mrs. Valdez was having an attack of diverticulitis.

63.　　Mrs. Valdez was suffering from vomiting, cramping, diarrhea and pain.

64.　　Mrs. Valdez alleges she was passing blood and was very weak and tired.

65.　　Mrs. Valdez' sister-in-law was told by nurse Laurie Wallace that she and Helen

could leave now and go to Dr. Penn's clinic.

66.　　Mrs. Valdez' neighbor who was a white young male and had not insurance was

seen immediately.

67.　　Mrs. Valdez went home to suffer and sleep and try to calm her stomach down.

68.　　Mrs. Valdez went to Blanding Urgent care clinic a day or two later.

69.　　Mrs. Valdez was given oral antibiotics.

70.     Mrs. Valdez then went to Cortez where she was hospitalized with IV fluids.

71.     Mrs. Valdez then, a week or two after leaving Cortez, went to the University of Utah hospital wherein about 18" of bowel was removed.

72.     Diverticulitus was a long standing problem with Mrs. Valdez.

73.     Mrs. Valdez was not examined to determine the severity of the situation.

74.     Mrs. Valdez was not given the same standard of care as other patients.

75.     The District nurses were  required to take EMTALA courses under the direction of Royal Simpson to prevent other patients from being turned away and to give patients equal care.

76.     Valdez was accompanied by her sister-in-law Charlene Gonzalez and arrived at the hospital prior to 8 a.m.

77.     At no time was an examination performed or questions asked to determine Mrs. Valdez' problem.

78.     Mrs. Valdez did not specify anyone to see her.

79.     Mrs. Valdez did state she was sick and wished to be seen.

80.     Mrs. Valdez was not taken to an examination area in the ER.

81.     Mrs. Valdez was told by Mrs. Gonzales that Nurse Wallace had told the receptionist that Dr. Penn's clinic was open and Mrs. Valdez should go to the clinic.

82.     After receiving treatment in the Cortez hospital for several days, Mrs. Valdez returned home and within a few days was sick again.

83.     Mrs. Valdez went to the University of Utah and was operated upon for her diverticulitis.

*Facts pertaining to Dr. MacArthur*

84.     Dr. MacArthur is a physician.

85.     Dr. MacArthur at all times pertinent was a physician in good standing with the Utah State Department of Professional Licensing.

86.     Dr. MacArthur applied for privileges with the District first in or around October of 1999, then again on or about December 9, 1999.

87.     Dr. MacArthur was in the operating room watching and consulting with Dr. Nelson in a c-section within about the first two weeks of November, 1999.

88.     Dr. MacArthur would have had to have had minimally temporary privileges to actively participate in this c section delivery.

89.     Dr. MacArthur submitted a packet of documents in support of these applications both times.

90.     Dr. MacArthur submitted an application and a packet of documents to the District prior to December 9, 1999.  This first application can not be found.  Dr. MacArthur submitted another application on or about December 9, 1999 with a packet containing minimally his medical license and DEA license.

91.     Dr. MacArthur maintains that the District received his medical license and DEA license and he would not have received privileges without Dr. Redd and Cleal Bradford knowing those valid documents existed.

92.     The District gave Dr. MacArthur temporary privileges.

93.     On or about February 2, 2000, the District did not renew Dr. MacArthur's temporary privileges.

94.     Dr. MacArthur was not informed by the District at any time prior to the District's lack of renewal of his temporary privileges on or about  February 2, 2000, that his privileges application packet of documents  lacked a medical license or DEA license.

95.     Dr. MacArthur was subjected to rumors that he was a felon, had lost his license, and had spoken vulgarly about one of his obstetric patients.

96.     Dr. MacArthur had an incident report allegedly filed against him by Marilee Bailey, Julie Bronson, Laurie Shafer, Cleal Bradford that was never discussed with him or placed in his District file, and is a report  that he considers to be untrue.

97.     Dr. MacArthur associated with Michele Lyman as her supervising physician when he had temporary privileges.

98.     When CEO Mr. Bradford was discussing the initial grant of temporary privileges, Mr. Bradford asked Dr. MacArthur how many patients he was seeing and that he had to have a number.  Dr. MacArthur said he could not predict if a woman might show up at the office having a miscarriage or something. Cleal Bradford said he could pad the number a little bit.  Dr. MacArthur was never told he could make the number as large as he wished to take in any and all conceivable patients he might see.

99.     Mr. Bradford and Dr. MacArthur understood this number to be a 'cap' or 'limit' for the patients Dr. MacArthur could see.

100.     Dr. MacArthur said he was seeing five(5).

101.     When Dr. MacArthur's privileges were extended through January 25, 2000, Mr. Bradford noted that Dr. MacArthur was seeing his sixth patient and the number limit would have to be changed to reflect this fact.

102.     Less than 24 hours prior to the February 2, 2000 medical staff meeting, Carla Grimshaw called  Mrs. Lyman's office to invite Mrs. Lyman and Dr. MacArthur to that meeting.

103.     Dr. MacArthur's wife was scheduled for an angiogram on February 2, 2000.

104.     No one from the District notified Dr. MacArthur directly of the February 2, 2000 meeting.  Dr. MacArthur did not receive any letter written by Cleal Bradford notifying him that on February 2, 2000 his privileges would be reviewed by the medical staff for provisional or more permanent approval.

105.     Mr. Bradford did not attend the February 2, 2000 meeting.

106.      Dr. MacArthur was never charged criminally or civilly  with being a tax protestor.

107.     Dr. MacArthur resolved his tax issues with the IRS approximately a year prior to applying with San Juan District.

108.     Dr. MacArthur paid malpractice insurance premiums while he was seeing patients in Blanding, Utah.

109.     Reid Wood and Rick Bailey did nothing to assist Mrs. Lyman in exercising privileges with the District that the District Board never officially and formally terminated.

110.     Reid Wood, Cleal Bradford, and Rick Bailey as CEOs  never held the medical Staff chiefs accountable for policies effecting services of P.A.s, whether written or de facto.

111.     Reid Wood, Cleal Bradford, and Rick Bailey as CEOs  never contradicted  the medical Staff chiefs  for policies effecting services of Michele Lyman,  whether written or de facto.

112.     No one at the district, prior to the lack of medical staff renewal of his temporary privileges, told Dr. MacArthur that anything was missing from his application packet, though there was ample opportunity for doing so and he could have so provided the documentation.

    a.     Dr. MacArthur maintains that someone illegally stole the medical license and DEA license, conspired to keep any problem with a lack of records a secret, denied him 'notice' as to any problem with credentials, and did so for their own profit and gain."

    b.     The Defendant community leaders Rick Bailey, Ty Lewis, John Lewis, Karen Adams, Cleal Bradford,  with the power and authority over the entire district, did nothing to investigate, find and hold accountable the responsible parties, and carried out a state identified de facto policy that diminished the standard of care for the patients.

*Facts pertaining to Mrs. Lyman*

113.     Michele Lyman was a Physician's Assistant in good standing with the State of Utah Department of Professional Licensing.

114.     Mrs. Lyman had sought privileges ever since they were de facto terminated by district policy after she began working for Dr. Penn, having left the practice of Dr. Redd.

115.     Michele Lyman at the same time Dr. MacArthur had temporary privileges, was making application for privileges.

116.     The District did not grant Mrs. Lyman privileges.

117.     While working for Dr. Redd, Mrs. Lyman applied for and received privileges with the District, with the same scope of privileges as Dr. Redd.

118.     Since March, 1999, Dr. Redd has been a District employee of the Health District.   Since March, 1999, Dr. Redd has been a District employee and District pays his malpractice insurance.

119.     In approximately October 1998, Mrs. Lyman was approached by the District to work in the Monticello clinic and to do ER coverage.  Mrs. Lyman did so.

120.     Dr. Redd did not formally end the designated services agreement with Mrs. Lyman.

121.     In about December, 1999, Mrs. Lyman applied for privileges with the hospital.

122.     In about December, 1999, Mrs. Lyman began working under the supervision of Dr. MacArthur.

123.     Patients sought the care of Dr. MacArthur for reproductive health issues.

124.     Patients sought the care of Mrs. Lyman for reproductive health issues.

125.     After quitting work for Dr. Redd, Mrs. Lyman associated with Dr. Penn, Dr. Mena, and Dr. MacArthur.  Each of these doctors was subjected to a hostile work environment within the hospital and district and either withdrew their application for privileges, or let them lapse, or was denied renewal for lack of documents the Dr. never had a chance to supply to the district because he was not told what was missing.

126.     CEO's Cleal Bradford, Reid Wood, and Rick Bailey did nothing to help these doctors have improved working conditions within the district, or renew their licenses or privileges.  All three doctors were not employees of the District when supervising Mrs. Lyman.

127.     Without having privileges, these patients of Dr. MacArthur and Mrs. Lyman went other places for their reproductive health care.

128.     The District medical staff discussed the economic ramifications upon themselves if full privileges were given to Dr. MacArthur and Michele Lyman.

129.     Mrs. Lyman's CPR cards were forged.

130.     Mrs. Lyman's forged cards were mailed to the American Heart Association.

131.     The U. S. mail was used to mail the cards while the local doctors and medical providers could profit from limiting Mrs. Lyman's competition and reputation with the American Heart Association.

132.     In approximately the last half of 1996 and in 1997,  Mrs. Lyman covered the Blanding Urgent care center that was being operated like an emergency room, the Monticello hospital ER, the Blanding Birthing Center, the clinic she regularly worked at, and at times worked in the Blanding nursing home, for  "

133.     At all times the medical staff was aware of the approximate numbers of patients Mrs. Lyman was seeing and approximately how many might otherwise see the local doctors if Mrs. Lyman was not practicing in the area.

134.     CEO Cleal Bradford made the determination in granting Dr. MacArthur limited temporary privileges that it was best for the District if referrals to the District facilities came from District doctors.  Dr. MacArthur was not employed by the District.

135.     County Commissioner Ty Lewis made the statement and determination in a public meeting that the County would drive out qualified private competitors.

136.     The State Department of Professional Licensing found the District was out of compliance with its own by-laws, did not have an adequately qualified CEO operating the District, that the Director of Nursing/Patient Care Director had interfered in the patient care of

Dr. Penn and Dr. Mena and that conflict conditions between the doctors and nurses was such that

patient care was suffering, that two R.N.s who were not qualified were working in the ER of the

hospital, that the Blanding Urgent Care Center could no longer operate as an emergency room.

      a.      The District worked a P.A. Bruce Bryant 24/7's at the Blanding Urgent Care

            Center at times without a physician in the same town

      137.      Dr. Redd, chief of medical staff, as compared to the other doctors, has about

half a dozen malpractice claims suits filed against him that he has settled.

*Anti-Competitive Effect*

      138.      The likely and logical *per se* effect of not granting District privileges to Michele

Lyman and Dr. MacArthur is that patients would not be able to choose Michele Lyman or Dr.

MacArthur as providers if they wished to receive to receive their care at the hospital.

      139.      Patients of Michele Lyman were subjected to (1)  threats of not being able to

receive emergency care, threats of having to travel 25 miles to the Monticello District hospital

rather than receive lab services readily available  in Blanding, (2) threats of having no one to

deliver their baby if Dr. MacArthur was not immediately in town, (3) breach of confidentiality of

any medical treatment they did receive in the District facilities, (4) missing files, (6) false rumors

as to their medical conditions, (7) threats of the possibility of their children or grand-children not

being treated in an emergency, (8) Threats of not being seen when delivering as from women

who had been denied birthing center care as Dr. MacArthur's patients.

      140.      There is no evidence that the District  employee doctors and District contracted

doctors, such as Dr. Jones and Dr. Walker, were inclined to send patients to any other facility

outside the local county district, except for Shiprock, New Mexico, or Cortez or possibly Moab

for testing or procedures unavailable at San Juan Hospital.

141.    Dr. MacArthur, though he had privileges, was on his way to deliver a baby.

142.    Dr. MacArthur's patient was not admitted to the birthing center.

143.    Dr. Redd refused to cover for Dr. MacArthur though he was just next door in the

Blanding Clinic or Urgent Care clinic.

144.    Dr. MacArthur's patient was due a standard of care wherein the patient would

be examined by the admitting nurse. This examination was not done.

*Private Capacity Actions*

145.    The staff who competes with Mrs. Lyman and Dr. MacArthur control the

privileges to which their competitors will be entitled, realizing those privileges are essential

components of their business practices.

146.    The County Commission and District Board, by not policing and supervising the

medical staff and leaving carte blanch decisions on who gets on staff and does not get on staff,

contributes directly to the private use of the staff's use of the governmental processes.

147.    Staff members discussing a person seeking privileges in a negative fashion,

poisons the staff members opinion as to whether privileges should or should not be granted.

148.    The governmental processes in this instance are used to limit competition and

prevent those seeking privileges from having a fair and impartial hearing.

*Nonfeasance and Private Action*

149.    District Board members and CEOs stated they entrusted medical staff

privileging to the medical staff or head of medical staff.

150.    The lack of the District Board or County Commission in taking action to supercede medical staff and head of medical staff privilege-granting decisions, and deliberate indifference to investigating complaints, holding hearings, and exercising their government authority to foster economic competition as mandated by statutes, falls outside any 'political' action, and directly is intended to control the business processes of competitors of District employee physicians and P. A.s and those medical staff physicians directly contracting with the District.

151.    Cleal Bradford and James Redd had access to District board members and County Commissioners and the County Attorney as relatives and close friends, in a highly rural and isolated area.

152.    Dr. MacArthur and Michele Lyman did not have this familial and close friend relationship with Commissioners and District Board members.

153.    Cleal Bradford who signed off on privileges as the District CEO lobbied the Board and County Commission, and medical staff, in meetings with a plurality of the decision-making body, without Mrs. Lyman or Dr. MacArthur being present.

*Credentialing Document Problems*

154.    CPR educational cards are essential to obtaining privileges in San Juan District.

155.    The district alleges Mrs. Lyman's CPR cards were not dated properly.

156.    Mrs. Lyman and Carla Grimshaw, custodian for the records, acknowledge the CPR cards were missing from Mrs. Lyman's credentialing files while in the District's custody.

157.    Cleal Bradford does not recall any missing documents in Mrs. Lyman's file.

158.     Having a Medical License and DEA license are essential for physicians to have medical privileges at the District Hospital.

159.     The district alleges Dr. MacArthur was missing his medical license and DEA license and that Dr. MacArthur filed no application or packet of documents in support of the application prior to December 9, 1999.

160.     In both Dr. MacArthur and Mrs. Lyman's cases, documents essential to obtaining privileges were found to be missing from their credential files.

*Lack of Notice and Due Process*

161.     Carla Grimshaw delivered copies of Mrs. Lyman's file to her.

162.     Mrs. Lyman, upon finding the cards missing from her file agreed to fax them back to the Health District for her file.

163.     Mrs. Lyman faxed back the cpr cards without noticing the dates.

164.     Mrs. Shafer noticed the dates were in error in medical staff meeting.

165.     The Medical staff and Cleal Bradford and Laurie Shafer discussed Mrs. Lyman's CPR card problems of wrong dates without Mrs. Lyman being present.

166.     October 19, 1998- Mrs. Lyman took a basic life support class with Laurie Shafer, Laurie Vellario, Bobby Hazelwood, Mitch Bailey and Holly.  Mrs. Lyman also taught the class.  Belina Asbury was also an instructor. (cmplt. 113).

167.     Mrs. Lyman's cards were altered.

168.     Mrs. Lyman's cpr cards were altered while in the possession of the Health District.

169.     Mrs. Lyman's cpr cards were removed from her file on more than one occasion, while her credentialing file was under the sole care and custody of the District.

170.     Mrs. Lyman's CPR cards were reviewed and found to be appropriate on more than one occasion by Carla Grimshaw and Laurie Shafer.

171.     Approximately six months after Mrs. Lyman's cpr cards were reviewed and approved by the District, a problem as to dates was identified when Mrs. Lyman was requesting a renewal of privileges.

172.     Mrs. Lyman taught cpr classes, signed of as the instructor for Laurie Shafer, and attended local classes for which there was a role of her attendance available.

173.     The District refused to ask for a criminal investigation though Dr. Cook suggested such an investigation.

174.     The medical staff and Cleal Bradford and Laurie Shafer unanimously decided to publish the altered cards to the American Heart Association by vote of the medical staff, who was considering privileges for Mrs. Lyman,  without Mrs. Lyman being present.

175.     The cpr cards were mailed via the U. S. Mail.

176.     Mrs. Lyman was known to be a very popular medical provider.

177.     The medical staff discussed the numbers of patients Mrs. Lyman was seeing.

178.     The medical staff discussed the economic impact of Mrs. Lyman's practice on the District and their practices.

179.     The medical staff discussed the economic impact of Dr. MacArthur on their practice.

180.     Cleal Bradford stated it was necessary to assure there were enough patients to support the doctors in the area.

181.     Having a Medical License and DEA license are essential for physicians to have medical privileges at the District Hospital.

182.     The medical staff, Cleal Bradford, Laurie Shafer, Carla Grimshaw failed to notify Dr. MacArthur of any missing documents in his application packet.

183.     Dr. Redd stated he saw Dr. MacArthur's medical license prior to giving Dr. MacArthur temporary privileges.

184.     Carla Grimshaw, records custodian, stated that the medical license and DEA license was missing.

185.     Dr. MacArthur's medical license was missing after it was submitted to the District while under the control of the District.

186.     Dr. MacArthur's medical and DEA license were available by fax from Utah Department of Professional Licensing and his medical license was in a wallet form on his person at all times, available for the asking.

187.     Dr. MacArthur sent in his application forms at least a month ahead of December 9, 1999.

188.      Dr. MacArthur maintains he mailed a complete application packet. The defendants Bradford, Shafer, and Grimshaw,  deny Dr. MacArthur did so.

189.     Dr. Redd said he saw Dr. MacArthur's medical license, or he would never have signed off on Dr. MacArthur's temporary privileges without seeing the medical license.

190.     Mr. Bradford stated he knew Dr. MacArthur had his license and never looked at the Dr.'s file.

191.     Carla Grimshaw allegedly wrote a note to Mr. Bradford  saying Dr. MacArthur was missing only his DEA license and State of Utah  Medical License.

192.     Mr. Bradford and Dr. Redd  signed temporary privileges verbally ordering Dr. MacArthur to see very limited number of ob/gyn patients,  stating to Dr. MacArthur  no reason for doing so other than they needed  some additional background research.

193.      Mr. Bradford admitted to the effect that the District had to make sure the patient base could financially support the doctors in the District and Cleal stated it was better for the district,  if referrals to the hospital came from 'district doctors's.

194.     No defendants recall telling Dr. MacArthur that the allegedly missing Medical license or DEA license documents were the reason for his not getting privileges. Dr. MacArthur was given less than 24 hours notice, for a staff meeting deciding his application for SJHSD , when Mr. Bradford who must authorize privileges was out of town during that meeting.

195.     Mr. Bradford did not inform Dr. MacArthur of his missing documents.  The missing documents were readily available and on file with the Utah State Department of Professional Licensing.    After Dr. MacArthur missed this February 2000 meeting, Cleal Bradford, Laurie Shafer, Dr. Redd met with San Juan Record editor Bill Boyle and discussed Dr. MacArthur's privileges with Mr. Boyle.  Dr. MacArthur's privileges was private information.

196.     Dr. MacArthur's credentials and qualifications were reviewed by Dr. Redd and others in the community.  Dr. MacArthur had an excellent reputation with his patients and only one or two potential lawsuits over his about twenty years as a ob/gyn doctor.  The idea that he

was denied his ability to contract with as many patients has he pleased, and over constant two

week renewal periods, just due to a lack of his medical license and DEA narcotics license is

ludicrous.

197.     When Dr. Fisher was seeking to contract with SJHSD as an employee, Cleal

Bradford actually went to DOPL to pick up Dr. Fisher's credentials.

198.     Dr. MacArthur was subject of a totally false medical incident report. People in

the community were told by SJHSD personnel that he was a felon, had lost his privileges

previously, and that he made a very vulgar remark about one of his ob/gyn patients.  No one in

the District discussed these issues with Dr. MacArthur.  Dr. MacArthur was asked his age by Dr.

Redd in staff meeting and asked how long he intended to live in the area.

199.     After denial of his privileges, and considering the seriousness of the rumors and

the possibility that he might falsely be reported to the doctor's database, the broken equipment,

the refusal of nurses to follow his orders in treatment of his patients, Dr. MacArthur found a

position in Ely, Nevada and left the area.

*Rights of Speech and Association*

200.     On or about 22 December '99 Dr. MacArthur attended the SJHSD governance

board meeting.

1.     The SJHSD governance board  met privately over other issues

involving privileges for Dr. Penn, Dr. Mena, and Michele Lyman.

2.     Dr. MacArthur stated in the recorded SJHSD executive session that

Dr. Redd had referred to Dr. Penn as the "little New York Jew".

3.      Dr. MacArthur  explained the board could ask him any questions they like about MacArthur's background, that he made  good healthy babies, and if they wished to contact anyone he was happy to assist them.

4.      Dr. MacArthur was informed after the meeting that the SJHSD governance board was concerned that Dr. MacArthur was a felon, and had previously lost his privileges, and had served time in prison.  The SJHSD governance board never disclosed this rumor to Dr. MacArthur at the time of his meeting with them, nor have they ever disclosed the source of this most spurious and fallacious  rumor.

5.      Dr. MacArthur admits freely to having once been  put in jail for contempt of court because he wished to exercise his fifth amendment rights in a civil tax matter. Dr. MacArthur has NEVER lost his privileges and admitted his contempt jailing to the SJHSD's counsel, through his attorney.  The civil tax matter was amicably resolved without any impairment of Dr. MacArthur's privileges. The SJHSD governance board and medical staff did not confront Dr. MacArthur with these accusations when Dr. MacArthur requested them to ask him anything and discuss any questions or concerns on Dec. 22,1999.  (Cmplt.#52).

*Limitation of Dr. MacArthur's  Privileges*

125.      On 28 Jan 00 Dr. MacArthur met with Mr. Bradford.  Bradford said that Dr. MacArthur was seeing his 6th patient and so the District needed to extend his temporary privileges until the next board meeting.  Bradford apparently  had forgotten that MacArthur's number 5 for patients to be seen was just an estimate for December and not January and was not intended to limit his ability to see more.  Dr. MacArthur put Mr. Bradford on notice for the following issues: 1.  That Dr. MacArthur expected to be treated the same as any other physician

who came to San Juan County hospital. 2.  That Dr. MacArthur had been questioned as to his age

at the staff meeting and that he understood that was against the law.  3. That the nurses comments

about his orders as being "outdated" and "old fashioned" were also age discrimination and that

Dr. MacArthur wouldn't tolerate that. 4.  That Dr. MacArthur expected the nurses to help Dr.

MacArthur care for patients instead of trying to hinder Dr. MacArthur in everything Dr.

MacArthur tried to do.  5. Dr. MacArthur told Bradford that Bradford was responsible for the

nurses' conduct.  6. Bradford said they have meetings about that all the time. (Cmplt. #65)

_Scope of Mrs. Lyman's Practice Limited to Near Zero After Dr. Redd_

126.    Mrs. Lyman continued to work for Dr. Redd  through 1996 and her duties

included working at the Blanding clinic, covering the nursing home and covering the emergency

room.

127.    Mrs. Lyman's scope of privileges was originally for duties equal to Dr. Redd's.

_Drs. Assigned Mrs. Lyman Coverage of the ER Alone_
_in Violation of Medical ByLaws and State laws and regs._

128.    In approximately the last half of 1996, Mrs. Lyman covered the emergency room

for

1.    Either Dr. Redd or Dr. Jones whenever they  needed coverage; and,

2.    For her own coverage and her own responsibilities; and,

3.    For both doctors when they they were both out of town.

129.    During this time Mrs. Lyman did the following patient procedures:

a)    Took care of acute head trauma's; and,

b)    Put in chest tubes; and,

c)  Delivered a couple of babies; and,

d)  Sutured cuts; and,

e)  Dealt with heart attacks; and,

f)  Informed families of tragedies; and,

g)  Ordered tests; and,

h)  Prescribed medications and shots; and,

i)  Prescribed tests to be run on the patients; and,

j)  Admitted and discharged patients; and,

k)  Consulted other specialists by phone; and,

l)  Treated  patients with infectious diseases; and,

m)  Referred patients to the San Juan Hospital and to the other district

facilities,

all without a Dr. at her side and without on site supervision, and with no Dr. even in town

available for assistance.

130. Mrs. Lyman and Dr. Key, before he left, informed Dr. Redd and Dr. Jones that

this practice of leaving Mrs. Lyman without either Dr. on call was wrong, and that the practice

should be changed.

131. Until Mrs. Lyman quit working for Dr. Redd, he continued this practice.

(Cmplt. # 80-83)

*Age Discrimination*

132. Dr. MacArthur alleges he was asked his age by Dr. Redd in medical staff.

133.    On 16 December '99 Dr. MacArthur met with Dr. Redd, the then head of medical staff  in Blanding at the Blanding clinic.

The following took place at that meeting:

A.    Dr. Redd  said that Dr. MacArthur was applying for privileges all wrong as Dr. MacArthur  hadn't come and talked with the medical staff before he applied for privileges.

2.    Dr. MacArthur  told Dr. Redd that he  hadn't met with the medical staff prior to applying for medical privileges at Utah Valley 19 years ago and didn't know that was a requirement.

C.    Dr. Redd stated three different times how financially threatening it was to him for Dr. MacArthur  to practice his OB/gyn care in the area.

D.    Dr. Redd said what a problem Michelle Lyman was "playing doctor" down in her little clinic making $50,000 a year.

E.    Dr. Redd told Dr. MacArthur that Mrs. Lyman was making "terrible medical mistakes."

F.    Dr. Redd called Dr. Penn a "little New York Jew" that they had to get rid of.

G.    Dr. Redd  threatened , "I guess because you come from a big hospital that we are all supposed to fall down and give you privileges but it wasn't going to be that way." (cmplt. #51.)

134.    Dr. MacArthur alleges that District nurses referred to his techniques as old fashioned in front of his patients.

135.    Dr. MacArthur alleges he was asked how long he intended to be in the District.

*More Violation of Rights of Association*

136.     Mrs. Lyman was asked to open a clinic, after she left Dr. Redd's employ, to compete with Dr. Penn.

137.     Mrs. Lyman was told that her friendship with Laurie Shafer would be over as she knew it if Mrs. Lyman associated herself with Dr. Penn.

138.     Mrs. Lyman states that Dr. Penn was referred to as a 'stupid little Jew'.

139.     Mrs. Lyman associated herself with Dr. Mena.

140.     Dr. Mena was challenged as to his capabilities due to having done his clinic training in Mexico.

141.     Dr. MacArthur associated with Mrs. Lyman.

142.     Dr. MacArthur was investigating associating with Dr. Penn on a part time basis.

*Chief of Medical Staffs' long standing de facto policy of Sex discrimination*

143.     Chief of Medical Staff has a long standing animus toward women.

144.     Dr. Redd  began inspecting her federal medicaid and Medicare  'superbills' and demanding that Mrs. Lyman charge more for certain services or add items on to her fee sheets. (Cmplt. #86-101 below)

145.     If Mrs. Lyman refused to charge for follow up appointments for such things as ear infections, he would get angry and call Mrs. Lyman an, "idiot".  Office personnel were usually present when he would begin yelling and calling Mrs. Lyman names such as 'stupid' and 'idiot'. At about this same time, Dr. Redd was often quite irritated with the billing department and the nurses.

*"Incompetent Bitch"*

146.     On several occasions Dr. Redd would refer to Kathy Johnson as an, "incompetent bitch" in Mrs. Lyman's presence.

147.     Dr. Redd also frequently had the nurses upset or crying due to his fits of anger and name calling.

148.     He appeared to delight in pitting the nurses against each other often telling one nurse something negative about another until they became angry and untrusting of each  each other.

149.     Mrs. Lyman observed that each nurse, in order to avoid  Dr. Redd's tirades would turn on each other or disassociate with the person who Dr. Redd targeted that day.

150.     Thus, an atmosphere of distrust and hostility permeated the office creating a hostile work and patient environment.

### *Reporting Dissatisfaction to District Administrator*

151.     Mrs. Lyman *often* heard Dr. Redd degrading Dr. Jones, Dr. Porter, and Judy Berry, FNP to Craig Ambrosiani.  If he was not happy with something that occurred between himself and one of the above providers, he would simply call Craig Ambrosiani and tell him he wanted  something done about the situation.

152.     Mr. Ambrosiani usually attempted to calm Dr. Redd down and appease him.

### *"Dumb Bitches"*

153.     In her presence,  Dr. Redd also rather constantly told his staff how much he hated Monticello and frequently  referred to the nurses as "dumb bitches" and 'fat bitches'.

154.     Dr. Redd stated numerous times that whenever he drove through Monticello with his family, he would tell his kids to roll down the windows and dispose of any trash that might be in the vehicle.  He stated several times that he would never work for those "SOB's".

*"Stupid Bitches"*

155.     On one occasion, Dr. Redd called  his nurse Christine Singer into his office for treating a brother from whom he was estranged..  He yelled and called her a "stupid bitch" and threw  missles from off his desk at either side of her head, including a clipboard,  as she sat across from him.  He stood up and walked over and shut the door as I was looking in after he threw the clipboard.  He continued yelling at her for sometime while threatening her if she ever treated his brother or his family again.

*"Bitches" "Whores" and remarks*
*Concerning Peritoneal Examinations*

156.     In Mrs. Lymans' and other personnel's presence, Dr. Redd often called women patients names such as "bitches" and "whores", he made fun of their appearance, and made remarks concerning their odor after a peritoneal exam. These instances were on such an ongoing and common basis it would be difficult to list each and every time they occurred.

157.     The tirades and name calling were regular and consistent, but some instances were so outrageous that Mrs. Lyman kept note of them in her daytimer.

158.     April 23, 1997- Mrs. Lyman began preparing to give testimony in a rape case in behalf of young lady she had examined.  It was a young adolescent whose physical examination showed her to be a virgin at the time of the rape.  Mrs. Lyman explained to Dr. Redd that she would have to have June 23-24 off so that she could testify since she had been subpoenaed to

court.  Dr. Redd became very angry stating that he did not pay Mrs. Lyman to defend "whores".

He referred to her as a slut without examining  her as a patient or having examined her.

*"Incompetent Idiots"*

159.      April 23, 1997- Dr. Redd and Mrs. Lyman began discussing trading nurses.

Christina Brandt thought that her nurse was not working as effectively as she should and felt that

if Dr. Redd were to take her for awhile that he could probably make her work better.  While Dr.

Redd and she discussed this option, he stated that it wouldn't matter because they were both

"incompetent idiots".

*A Woman Told Not to Come to the Clinic*

160.      May 19, 1997- Patient #15[1] is nervous about coming back into the clinic to have

a hurt shoulder looked at because she states that Dr. Redd had told her family never to return to

the clinic again.  Mrs. Lyman assured her that she was welcome to see her and that she had never

been told by Dr. Redd to refuse her service and she would not. (Cmplt. # 86-101).

161.      August 18,1997- A woman patient 15A had been to see Dr. Redd due to rib

pain.  Pt. had injured herself in an accident and could not get relief from the pain.  Xrays were

ordered by Dr. Redd and pt. was told that she was fine. Pt. then returned to the clinic several days

later and told Mrs. Lyman that she was in terrible pain and had been unable to sleep.  Mrs.

Lyman ordered another set of xrays.   Mrs. Lyman noted that there were fractures and told Dr.

Redd.  He stated that Mrs. Lyman shouldn't tell the patient because there was nothing they could

do for rib fractures anyway.  (Cmplt. #102).

162.      October 30,1997 -Dr. Redd's brother, Kirk Redd became very ill and came to

see Mrs. Lyman at the clinic.  Mrs. Lyman treated him and had her nurse draw his blood.

Christine Singer was her nurse at the time.  Dr. Redd found out that Mrs. Lyman had seen his

brother and began yelling at Mrs. Lyman and Christine and told them they were both  "dumb

assholes".  He proceeded to take Christine in his office wherein he yelled at her for some time

and threw things across his desk to the right and left of her head.  Mrs. Lyman saw this tirade

since the door was open and Mrs. Lyman was in the hallway. Dr. Redd threatened Ms. Singer's

job because supposedly she knew of the long standing contention them and that  if she ever

deceived him again that he would have her job.  She was very shaken from this experience and

talked of quitting after this.  He then proceeded to tell Mrs. Lyman that she would never work

again if she ever saw, "that son of a bitch" again.  Dr. Redd then demanded that Mrs. Lyman

write a letter to Kirk and Kathleen Redd and tell them that Mrs. Lyman would never see them

again.  Mrs. Lyman refused. (Cmplt. #102)

163.    July 13, 1998 -Dr. Redd called Mrs. Lyman into his office and told her to shut

the door.  He stated that he was considering firing Kathy Johnson.  When Mrs. Lyman asked him

why, he stated that she was an "incompetent bitch" and that he had to call her that morning "to

find out what the hell she's doing with her money". (cmplt. #107).

*Dr. Redd Not Available for Female Emergency*

164.    October 6- Dr. Redd did not come to the office today.  Instead he was out deer

hunting.  He told Mrs. Lyman could reach him by cell phone if she needed him.   Mrs. Lyman

was covering the clinic and E.R.  About noon, a patient in her last trimester of pregnancy

presented to the E.R. with severe headache and syncope.  The patient stated that she was Dr.

Redd's patient and that her blood pressure had been going up over the last couple of weeks.  The

patient stated her blood pressure was so high the day before that Dr. Redd had told her to come to

the clinic and he would induce her on the 6th.  Dr. Redd told Mrs. Lyman about this patient and

Mrs. Lyman had not seen her before.  Mrs. Lyman asked the birthing center to admit her and

place her on a fetal monitor and monitor vital signs until Mrs. Lyman could get Dr. Redd.   Mrs.

Lyman tried his cell phone many times and could not get him so Mrs. Lyman tried contacting his

wife at home to see if perhaps his wife could tell Mrs. Lyman where he had gone hunting.  Mrs.

Redd did not know but promised to notify Dr. Redd of the problem if she heard from him.   Mrs.

Lyman then contacted a perinatologist in Salt Lake City and consulted with him, and diagnosed

and treated the patient.

*"Absolute idiot", "retard", profanities,*<br>*threats, "bitch"*

165.     Mrs. Lyman called Dr. Redd's home again after trying his cell phone again

several times just to let him know that she had admitted the patient to the birthing center.  Dr.

Redd called Mrs. Lyman after she had returned home after work, and proceeded to give Mrs.

Lyman the worst verbal abuse she had yet received by him. Dr. Redd commanded her to  never

call his house, never talk to his family about his activities and never call a specialist to make him

look bad. Dr. Redd then proceeded to tell Mrs. Lyman that she was an "absolute idiot" and any

"retard" would know what to do. Dr. Redd stated that Mrs. Lyman should have called Dr. Jones.

When Mrs. Lyman explained that  Dr. Jones was in Montezuma Creek and that he was then

leaving town, Dr. Redd became even more angry.  Dr. Redd stated  he wanted to talk to "the

idiots at the birthing center" and that he would call Mrs. Lyman back.  Mrs. Lyman and her

husband were upstairs tucking their children into bed when Dr. Redd called back.  Dr. Redd was

angry when the Lymans did not pick up the phone and began yelling profanities into the

answering machine telling Mrs. Lyman to pick up the phone or he would be over to her home. Mrs. Lyman's husband said if Dr. Redd continued to verbally abuse Mrs. Lyman that she would not return to work.  Mrs. Lyman picked up the phone, and Dr. Redd proceeded to call her a "bitch" saying,"I swear, I am surrounded by them" (Meaning bitches). (cmplt. #108-109).

166.     Dr. Mena reported to the District governance board on December 22, 1999, how he heard Mrs. Lyman referred to as a fat cow or bovine of some type by Dr. Redd.  Dr. MacArthur stated to the Board how he had heard Cleal Bradford and Dr. Redd refer to Dr. Penn as a 'Jew'. (cmplt. #131).

## Pattern and Policy of Denying Mrs. Lyman privileges

167.     Mrs. Lyman later signed up with three other Doctors that had some form or fashion of privileges at SJHSD. Dr. Penn, Dr. Mena, and Dr. MacArthur.

168.     All three doctors worked under conditions they alleged to be hostile after associating with Mrs. Lyman.

169.     Mrs. Lyman could not admit or  discharge patients without first her supervising doctor initially and officially and physically  signing off on the patient's admit or discharge. Their OB patient was not allowed be admitted to the Blanding Birthing Center by the District Doctor on call, Dr. Redd, and the patient was not examined and left.

170.     December 16, 1998 - On this day, Ms. Lyman attempted to send a patient to the E.R. in Blanding for treatment.  As soon as the patient got to Blanding, Christine Singer (who began working for Dr. Penn in December 1998)  took a call from Gloria Yanito, RN at the Blanding Urgent Care.  Ms. Yanito stated that Ms. Lyman did not have privileges and that Ms. Lyman "can not give orders of any kind or use any of the county facilities".  Ms.Singer then told

Ms. Lyman,  with several witnesses sitting in the office.  Ms. Lyman immediately called Ms.

Yanito back and asked Yanito to repeat the Message.  Yanito repeated, "you do not have

privileges. We are not supposed to take any orders from you and you are not allowed to set foot

in any of the county facilities". Ms. Lyman asked Ms. Yanito who gave her this order and she

stated that Laurie Schafer and Dr. Redd.   Ms. Lyman then attempted to call Laurie Schafer and

was told she was not in.  Ms. Lyman spoke with Carla Grimshaw and told her she wanted this

order in writing, Grimshaw stated that she would let Laurie know.  Ms. Lyman also attempted to

call Reid Wood, he was not in.(Cmplt. #130)

185.     Later, that same day, Ms. Lyman had a patient with a cardiac abnormality and

decided to place a Holter monitor on her.  Dr. Walsh had left a monitor at Dr. Redd's office for

county residents to use when ordered by their health care providers. Mrs. Lyman requested that

Christine call Dr. Redd's office and request the monitor but was told no.  Ms. Lyman then called

and requested the monitor and was told no.

186.     Laurie Schafer called later in the day and stated that Ms. Lyman could use the

lab and xray *only during Dr. Penn's office hours*, otherwise Ms. Lyman did not have privileges.

*Hostile Work Environment*

187.     Ora Lee Black, as manager of Blanding clinic and birthing center, posted a

paper on the walls within site of the patients stating that Mrs. Lyman had no privileges at SJHSD.

Later the limited privileges of lab and exray were extended to her for her patients as required by

State law.

188.     Reid Wood and all other CEO'S in this complaint, ignored Mrs. Lyman's

attempts to rectify her situation, or exacerbated it.

189.     December 8, 1998 - Mrs. Lyman requested Medical records on a patient and the Blanding clinic refused to send any records. Release of Medical records had been signed by patient. (cmplt. 123-126)

*Administrator Reid Wood Does Not Return Calls*

190.     December 10,1998 - Mrs. Lyman called SJHSD administrator Reid Wood twice to see if she could resolve some of the issues she was having with the nurses at the hospital since joining Dr.Penn and to resolve some of the problems with the clinic.  Reid Wood did not return her calls.  The third Mrs. Lyman called she was told by Carla Grimshaw that he was out of the office.

191.     Jim Fraser, drug representative went to Dr. Redd's office and asked where Mrs. Lyman's new office was and was told by Karen Lee that Mrs. Lyman moved out of the county.

192.     Mrs. Lyman called AAPA and called Department of Professional Licensing (DOPL)  informing them that she had a new supervising physician and asked DOPL to please send a packet for change of supervising physician.  She also called Reid Wood again to try and talk to him.

*Dr. Redd was Withholding Pts. Reports From Mrs. Lyman*

193.     December 14, 1998 -Blanding Clinic again refuses to fax any Medical records that are requested.  Christine Singer just before quitting, took her mail off of Dr. Redd's desk that he had been holding including reports addressed to Mrs. Lyman  on patients from a gastroenterologist, pulmonologist, urologist and several publications and brought them to Mrs. Lyman .

*Dr. Redd Charges for Medical Records*

*Refuses to Mail  them*

194.     December 15, 1998 -Medical records again requested and refused by Blanding

clinic.  Dr. Redd begins charging Mrs. Lyman's/Dr. Penn's patients $15.00 for all Medical

records copied regardless of size and insists that all of their patients  that intend to transfer their

records go to his office to pick them up.  He will not mail or fax them.

*Medical Staff Attributes Patient Death to Mrs. Lyman*
*And Missing Patient Records*

195.     The District Medical Staff discussed a person who had died.  They stated that

the patients' death was partly attributed to the patient not having one of medical staff as her

doctor.  Some of Michele Lyman's patient records were missing.  Confidentiality of her patients

was broken on more than one occasion by medical staff and other SJHSD personnel.

*Horn Honking, flattened tires, and followed child*

196.     Dr. Redd was witnessed by others as driving by Mrs. Lyman's home, frequently

honking.

197.     Mrs. Lyman reports that  Dr. Redd followed Mrs. Lyman's about 10 year old

daughter in his car for a period of time, frightening the daughter.

198.     Mrs. Lyman and her nurse Christine Singer, experienced numerous flat tires

over a two week or so period, with no foreign items found in the tires.  These flat tires occurred

at the office and at their homes.

*Patient Encouraged to Sue Mrs. Lyman*

199.     Patient L. S.  of Mrs. Lyman were encouraged to sue her by at least Dr. Redd

who drafted threatening letter in the patient's behalf.  The patient had been referred to a

specialist.   Mrs. Lyman would very frequently, usually multiple times a day refer patients to

specialists outside the local area and/or consult with specialists outside the area . If a patient had

a life threatening situation, at times, the local medical community would attribute that problem to

Mrs. Lyman's care of the patient, even though the patient would claim that Mrs. Lyman's

treatment of them is what saved them. To this day, SJHSD has at times, turned away Mrs.

Lyman's patients.

200.     December 29, 1998 - Patient #2[2] had to utilize the Blanding Urgent Care Clinic

(ER) on this day.  She was told by Dr. Redd that she should go to Monticello as Dr. Penn was her

physician and was told not to utilize the (SJHSD tax supported ) Blanding Medical Clinic.  The

Blanding Medical Clinic is owned and operated by a governMental Special District, and Dr.

Redd, though contracting with the District, was not yet their employee. The patient wrote a letter

to SJHSD governance board about this treatment and received no reply.     (Comp. 137-145)

1999

201.     January 13, 1999 - Patient #3[3] was on planned parenthood when Ms. Lyman left

Dr. Redd's office.  Typically, planned parenthood would send a patient's pills for the year and

the medical provider would give them to the patient.  When Ms. Lyman moved to Dr. Penn's

office, some of the planned parenthood patients that followed her.  When the patients requested

their birth control, Ms. Lyman would send them to Dr. Redd's office to get their birth control

pills.  Dr. Redd refused to give several patients their birth control pills.  Patient #3 was one of

those patients.

202.     January 20, 1999- Patient #4[4] was another patient who was refused her birth

control  pills by Dr. Redd.

203.     April, 1999, after working in Monticello under Dr. Penn, Ms. Lyman began a new practice *in Blanding* under the off-site direction of Dr. Nathaniel Penn.

204.     DOPL approved this office as an 'off-site' facility.

### DOPL and Anonymous Complaints

205.     May 4, 1999 -Gail Oliver from DOPL called to say that he had an anonymous complaint faxed to him that said Ms. Lyman was practicing without direct supervision and quoting PA practicing guidelines.  He also stated that the letter stated that Ms. Lyman was misrepresenting herself .  Because it was not signed, Gail stated he would not take this seriously.

### Mrs. Lyman's Clinic is Approved for an Off Site Facility

206.     May 16, 1999 Ms. Lyman spoke with Karen Rheimer.  Ms. Rheimer stated that Ms. Lyman was okay with the State as Ms. Lyman had been approved for an off-site facility.

### Certifications are Reviewed and Placed in Her File

207.     May 5, 1999- Andrea Bianchini (Ms. Lyman's secretary) faxes Ms. Lyman's ACLS, PALS and BLS heart resuscitation American Heart Association certification cards to Judy at the hospital at the administration's request.  Dr. Penn and Ms. Lyman have been requesting her privileges be restored through Reid Wood.  Andrea also called Carla Grimshaw to make sure that the certifications have reached her.  Grimshaw states that the faxed cards have arrived and that Medical staff reviewed the certifications, found them in order,  and the packet has been placed in her personnel file.

*Female Patient Told To go to Dr. Redd as Provider – Under threat.*

208.     June 1999- Patient #6[5] came to Ms. Lyman's office very apologetically today and was crying.  The patient stated that last night she had to use the E.R. and was told by Dr.

Redd that she must choose between Ms. Lyman/Dr. Penn and Dr. Redd as a health care provider. The patient was told  that if the patient chose Ms. Lyman, the patient could never use the E.R. again.  Dr. Redd then proceeded to tell the patient that she had a lot of Medical problems that would require the E.R. and that Ms. Lyman did not have privileges. Ms. Lyman told patient #6 that Ms. Lyman would not be offended if the patient thought she had to choose Dr. Redd.  Ms. Lyman told her pain relief and use of the ER for her welfare was most important.

*Privileges Severely Limited by Dr. Redd and Dr. Jones*
*With No Action by the Board of Directors*

209.     Dr. Penn and Ms. Lyman attended the Medical staff Meeting for June, 1999. Dr. Penn and Ms. Lyman requested full privileges be restored and Dr. Redd and Jones both stated that only if Dr. Penn was willing to sit in Blanding with Ms. Lyman while Ms. Lyman took ER call and they would not supervise me. Mr. Bryant as a P.A. working under Dr. Jones while Dr. Jones was not in Blanding, had no such restraints.   Mrs. Lyman pointed out that she  covered the ER (Blanding urgent care clinic) in Blanding by herself on many occasions.  There was no response.  (Cmplt. 137-145)  Staff had previously voted for her privileges and then the County, Board, and medical staff did nothing while District staff Ora Lee Black, Dr. Redd, Gloria Yanito denied her the same.  Some privileges as to labs and exrays were eventually restored.

210.     Dr. Penn then suggested to medical staff that the only reason that Dr. Redd was against Ms. Lyman's privileges was because Dr. Redd was mad at Ms. Lyman for quitting Dr. Redd and Dr. Redd couldn't take it.  To this Dr. Redd responded,"So what"!  Dr. Jones then made the  comment that Ms. Lyman had a rather large following of patients and that when he was taking ER call he didn't want Ms. Lyman to be able to see her patients at will and thus "dip into

his ER money". They left with the staff's edict that Ms. Lyman could call into the ER (Blanding Urgent Care) for shots. However, Ms. Lyman tried on several occasions to call in injections to the ER (Blanding Urgent Care Clinic) and was denied every time. Ms. Lyman always had to call Dr. Penn's office and have him call the order in. [6] (Cmplt. 146)

211.    September, 1999 first part of September, Patient #7, a patient from Bluff inquired at the clinic as to where he could find Ms. Lyman. He also told them that he needed some labs performed and wanted Ms. Lyman to order these for him. The patient was told Ms. Lyman could not order any labs and would not be provided any lab service. The patient wrote a letter to SJHSD to no avail.

213.    September 16, 1999 -Etta ( Ms. Lyman's secretary) was told by Ora Lee Black that Ms. Lyman would not be allowed to order labs until Ms. Lyman sent a letter to Dr. Redd stating who her supervising physician was. ( Ms. Lyman had already sent a letter to administration stating that the State DOPL had approved Dr. Penn in Moab as her supervising physician and Dr. Robert Dr. Mena in  Monticello as her back up supervising physician as he was closer that Dr. Penn and could back up any emergencies for admits for Ms. Lyman at the San Juan Hospital). By then, Dr. Dr. Mena had quit the San Juan Health Care Services as an employee and had started a private practice. (cmplt. #149).

214.    Without district governance board action, there is no' adverse action' to require a hearing in the medical staff bylaws.

*Mrs. Lyman associates with Dr. Mena-rumors start about Dr. Mena*

215.     Patient 2A[7] voices her concerns to Ms. Lyman asking if she will be safe delivering with Dr. Mena as she has heard terrible things about him.  She later writes a letter on behalf of Dr. Mena stating that she was more than satisfied with his care.

216.     November 7, 1999 Dona Arthur stated that she had heard terrible things about Dr. Mena and Dr. Redd told her that Dr. Mena was incompetent.  She also tells Christine Singer that Ms. Lyman is slandered at the birthing center by nurses and Dr. R 1edd.   Dona Arthur also states that Dr. Redd told her he didn't understand why anyone would want to go to Ms. Lyman as a provider. (cmplt. # 156-158).

217.     November 3, 1999 Christine Singer, Ms. Lyman's staff nurse, called the Blanding Birthing Center to get information on one of Ms. Lyman's/Dr. Penn/Dr. Mena's patients and was told that they could not release any information to Ms. Lyman.  It could only be released to the doctors.  Dr. Mena confirms this stating that this latest medical staff edict that was discussed in Medical staff Meeting.  Etta also states that she was told this in a staff Meeting at Blanding Medical Center. (Cmplt. 162-168)

218.     Again the SJHSD governance board had no meeting or hearing on this new 'policy'.

219.     On December 1, 1999  Patient #12[8] is sent to lab for HGB electrophoresis checking for sickle cell trait.  She was refused a blood draw and told they were much too busy at BMC although the patient reported that the nurses were just sitting around in the nurses station.  The patient wrote a letter to SJHSD and noted to Ms. Lyman that she was treated rudely by Dr. Redd as soon as he realized that the patient had seen Ms. Lyman before coming to the ER (BUCC).

220.     Dr. Redd announces in Medical staff Meeting that Ms. Lyman was rude to him on the phone when calling him about details of a heart attack patient  that Ms. Lyman was sending to the BUC.  Dr. Redd stated in Medical staff Meeting that if Ms. Lyman did not become "a lot nicer " to him that he would not take any more emergencies from Ms. Lyman in the BUC.

221.     December 4, 1999 Patient 13[9] is admitted to the Blanding Birthing Center having contractions.  She was told that Dr. Mena would be notified but was later told that Dr. Mena did not have privileges because he would not fill out "proper paperwork" she was then told that Dr. Redd would have to deliver and the patient refused and drove to Provo to deliver there. Pt. has sent a letter to health care board.

222.     December 5, 1999 Ms. Lyman requested that  Christine Singer call the Blanding Birthing Center to check on Patient 13's status. Ms. Singer was told that the patient was there but that the Blanding Birthing Center staff could not release information to Ms. Lyman.  Ms. Lyman called back and was told that they were about to deliver twins and they were much too busy to transfer her call to Patient 13.   Called back later and found out that the patient was never there in the first place.  She had left for Provo while in active labor- a four hour drive.

223.     December 21, 1999 Ms. Lyman  Attended San Juan Health Care Services board Meeting to discuss and attempt to resolve her problems with SJHSD staff with the SJHSD board. She requested to have a public meeting so the public could fully understand the issues involved in the health care system their tax dollars support.

224.     SJHSD governance board chairman Roger Atcitty stated that he and SJHSD Patsy Shumway and SJHSD Karen Adams had discussed the situation before the official meeting and had decided that the grievance meeting with SJHSD governance board would be private.

Such a decision being made before the meeting and without public input appears to be in violation of Utah's Open Meeting law. (cmplt. #162-168).

225.     December 25, 1999 Patient #14[10] went to the emergency care center in the Blanding Medical Care center because she was sick.  ER staff was asked if Ms. Lyman  could come up and see the baby and was told no because Ms. Lyman did not have privileges.

*No Privileges under Dr. MacArthur*

227.     January 30, 2000  Dr. MacArthur and Ms. Lyman have a patient that delivers at San Juan Hospital.  Dr. MacArthur calls the hospital and tells them that Ms. Lyman will be discharging this patient and baby under him care tomorrow.  He writes this fact in the patient's chart.  The staff tell him there is no problem.  Ms. Lyman drives to Monticello in an attempt to see baby and mom the next day and is told that Dr. MacArthur must write the order. (cmplt. #184-187)

228.     January 31,2000- Louisa Lyman, of the Utah State Public Health system calls Ms. Lyman's office and states that nurse Julie Bronson has said that Dr. MacArthur lost his privileges to perform epidurals due to a felony conviction, that during a delivery the nurse came to Dr. MacArthur in the Dr's lounge and told him that the OB was ready to push and he purportedly said,"I'm going to have an orgasm", and that Dr. MacArthur spent time in prison for tax evasion– All of which is totally untrue and without any foundation whatsoever. Louisa called her office and first spoke to Christine. Ms. Lyman called back and Louisa Lyman repeated this story. Ms. Lyman stated the story was untrue.

229.     February 1, 2000 Carla Grimshaw calls Ms. Lyman's office to say that Ms. Lyman and Dr. MacArthur need to be at Medical staff Meeting in the a.m. at 0800.  Ms.

Grimshaw states nothing about their privileges being an agenda item, or that medical staff would

making any decisions about those privileges.

230.     On or about February 9, 2000 San Juan Record reports that Dr. MacArthur's

privileges are not renewed because he did not show up for Medical staff Meeting.  SJHSD

governance board has taken no action as to Dr. MacArthur's or Ms. Lyman's privileges.  *No one*

*knows who voted to not renew the privileges because the notes of the event are not in the staff*

*Meeting minutes*.  Cleal Bradford, who must sign Dr. MacArthur's privileges is not there.  Dr.

MacArthur hears from Blanding City Counsel a rumor that his application is missing documents.

No one from the district has told him documents are missing, and no one  is telling him which

documents are missing.  Ms. Lyman is  still missing documents from her file and having moved

four times is not able to find the original cards.

### HELEN VALDEZ FACTS

*42 USC 1983, denial of rights of association, equal protection, pt./ dr. relationship, and right to*

*contract, and the denial of uniform and considerate care.*

231.     Helen Valdez is a patient.  She was being seen regularly by Dr. Penn. She went

to the emergency room to be seen for symptoms consistent with divurticulitis.

232.     She had two forms of insurance. She was turned away, when accompanied by

her Mexican-American appearing sister-in-law, by nurse Laurie Wallace.  She was bleeding from

the bowel and in severe pain, and very weak.

233.     The white young male with no insurance in the ER waiting area was seen by Dr.

Penn almost immediately after Mrs. Valdez left.   Dr. Penn was not notified of Mrs. Valdez'

being at the hospital until Mrs. Valdez so informed him.

234.     The State Health Department found that SJHSD staff would at times not tell Dr. Penn when one of his patients would come to see him at the hospital.

235.     The Utah department of Health found that Mrs. Valdez had been turned away. Mrs. Valdez had an entitlement to be seen under the federal laws of EMPTALA and COBRA.

236.     The Health District and County Commissioners were informed of these problems in a Board meeting, with an executive session attended by Commissioner Bill Redd and County Attorney Craig Halls.

237.     The Health District and the County did not did not reprimand Dr. Redd or any other medical staff member for their treatment of Mrs. Lyman or Dr. MacArthur, or Helen Valdez.

*A Pattern of Patients being Punished for going to*
*Providers not employed by the District*

238.     The patients and prospective patients of Dr. MacArthur and Michele Lyman by way of threat and rumors were subjected to a) the threat or actual denial of use of SJHSD facilities, b) being threatened with being turned away in times of emergency and imminent labor in violation of EMPTALA and COBRA statutes, c) not being treated equally with those friends and patients of Dr. Redd, Dr. Jones and Dr. Nelsen, d) and being deprived of their records. Rumors of such treatment readily and rapidly travel among people in such a small isolated community.

**239.**     The State found that nurses interfered between the patients of Dr. Penn and Dr. Mena to the detriment of the patients.

*Pattern of anger by Dr. Redd after he is a District employee*

240.     A District employee witnessed Dr. Redd have a tirade calling all the women

names.

241.     Dr. Redd went to the head of the Blanding Health Board and in anger was

yelling that the Board stop Mrs. Lyman from practicing in the area.

242.     Dr. Redd kicked and punched Dr. Cook, a family member.

243.     Dr. Redd with Mr. Hart apologized to Dr. Cook, no formal District board action

was taken.

*Intimidation of witnesses*

244.     Dr. Redd informed the head of the local nursing home that the nursing home

patients would no longer see Dr. Cook as a result of making a witness statement.

245.     Witnesses have requested that they not be used to give testimony due to fear of

retaliation and loss of jobs.

246.      One witness has stated she is petrified her relatives will not stay

employed or her children will not be seen at District facilities if she testifies.

*Standards as set by the Chief of Medical Staff Dr. Redd*

247.     The Board has a responsibility to make the Drs. accountable and monitor them

for any possible malpractice or unprofessional conduct that might result in a suit.  The State

found they have not been doing so in the time in question.

248.     Dr. Nelson sent a letter severely criticizing Mrs. Lyman and he is on Medical

Staff and has never met her, spoken to her, or worked with her.  His writings are the best

evidence of the types of rumors he was being told, and the damages the medical staff were

seeking to inflict upon Mrs. Lyman.

249.    Dr. Redd never finished a normal year or two year residency, has had about a half a dozen malpractice cases that either went to court or he settled.

250.    Dr. Redd cut the nipples off of a mentally retarded gentleman in his office. If Dr. MacArthur would have done such a thing, he would probably not obtain privileges anywhere and would probably have his name on the National Physician Database.  The patient was Native American so maybe the Board does not view them of equal value as a white man.  No follow up was done on this patient, especially necessary since he was retarded, and so months later he presented to Mrs. Lyman with two 11 cm cuts that were repugnantly infected and draining.

251.    Mrs. Lyman has treated a boy with a brain bleed that had fallen on his head in wrestling, that Dr. Redd diagnosed with an ear infection to account for the child's dizziness. Other misdiagnosis of patients has occurred that Mrs. Lyman caught and assisted in treating, usually with a specialist.

252.    One lady patient complained of chest pains.  She was given shot upon shot of morphine.  She passed out, her heart stopped in Dr. Redd's office, she was taken next door to the Urgent Care Center and revived by Dr. Jones. There are no BUC records of this incident.  Dr. Jones does not appear to remember it, and Dr. Redd denies it happened.

*ONGOING DAMAGES*

The damages to Mrs. Lyman is ongoing, and her patient's standard of care via ability to use District facilities is still in question.

253.    Within the last 14 or so days, a patient of Dr. Jones and Michele Lyman's was told, when she called the Birthing Center in labor, that the Birthing Center was shut and she would just have to travel to Monticello.  Dr. Jones' staff verified that indeed the BCC was

claiming they were SHUT.   The patient presented at Blanding Family Clinic, now owned by

Utah Navajo Health Systems, and was found to be too far progressed to travel anywhere.  Time

was of the essence.  Mrs. Lyman's supervising physician was denied patient care by the District

he has full privileges with.  The lady delivered in the Blanding Family Clinic and was then

transported to Monticello for observation.  The Blanding Family Clinic is taxpayer supported.

There is no record of this type of patient of a Dr. Redd being told the Birthing Center was shut.

254.     In another instance, a woman in labor was bleeding to death and she and the

baby were in a very dangerous situation.  Dr. Jones and Mrs. Lyman transported the woman to

the Birthing Center and did an immediate c section on the unconcious or nearly unconcious

mother.  Both mom and baby were saved. As Dr. Jones was cleaning up, Dr. Fisher and Laurie

Shafer were telling Mrs. Lyman and another nurse of Dr. Jones that they would have to leave.

Mrs. Lyman and the nurse finished caring for the patient.  This incident occurred prior to the

Clinic being 'shut' when Michele's next patient was in labor and delivered in a clinic.

255.     RICO CLAIMS- Mrs. Lyman's cpr cards, a necessary component of her ability

to obtain privileges were altered purposefully, she was not notified immediately that her cards

were in some way in error, the cards were stolen from her file at least on two if not three

occasions, the forged documents were mailed to the American Heart Association, the doctors

would have profited from Mrs. Lyman not being able to work, her patients were told that even in

an emergency they would not be seen by the District if they continued to visit Mrs. Lyman for

health care.  Mrs. Lyman believes threatening patients that emergency care will be denied in an

emergency is extortion of the lowest kind.  Mrs. Lyman lost some patients as a result of these

threats.  Since these patients are also potential witnesses, the threats also prevent persons from

testifying accurately as to what occurred for further fear they will be subjected to such treatment.

These acts were done to obtain an economic advantage in competing in business with Mrs.

Lyman.


*Damages for Dr. MacArthur and Mrs. Lyman*

Under the Antitrust laws and RICO laws (for Mrs. Lyman) they are seeking attorneys

fees, compensatory damages, and treble damages.

Dr. MacArthur paid thousands of dollars in UMIA malpractice insurance in order to

practice in the Blanding area, lived away from his home in Springville part of the time, with little

or no profitable income,  due directly to the continual limits on his privileges both in time and

number of patients to be seen and the District Board and County Commissioners' total deliberate

indifference to the needs of patients, particularly female patients who would enjoy going to a

specialist in the area, and deliberate indifference to a physician and state authorized physician's

Assistant,  who were competing with their relatives or good friends.

Each time Dr. MacArthur received temporary privileges limited in time and

number of patients is a separate individual claim. Each time a rumor was stated about him being

a felon is a claim.  Each time a rumor about him talking vulgarly was stated there is a claim.

Every time he was given a contract in bad faith with amibuities upon which he relied, he has a

claim.

Dr. MacArthur is earning about 175,000 dollars gross at this time working at the William

B. Ririe hospital in Ely, Nevada.  Had Dr. MacArthur delivered about 20 babies a month at about

800 dollars net for each delivery, he would have earned 160,000 a year, and that does not include gyncological work that would added possibly about another 30,000 or so estimated a year.  Dr. MacArthur would likely have practiced in the area for about ten years.

Dr. MacArthur also suffered *per se* emotional strain and damages from the rumors circulated about him and from not knowing how he was to survive economically with the restrictions he was under, or if he would be threatened with being placed on the Physician's National Database for some small or insignificant event that did not measure up to 'their' standards as ill- defined and ambiguous in the medical staff bylaws.  Dr. MacArthur is seeking damages in excess of $3.5 million dollars and attorney fees.

*Mrs. Lyman's damages*

Mrs. Lyman, in order to continue living in her community and working, eventually opened a clinic with Dr. Penn that she eventually bought out making it her own state approved off-site  independent rural clinic. Mrs. Lyman showed no profitable income for about three years until she sold her practice and then the profit if any was minimal. Mrs. Lyman was deprived of money but also peace of mind in knowing she was safe from a Doctor (1) who had ranted at her, her nurse, his staff, and the Blanding Health board president, (2) followed her child creeping along in a car while the child walked the dog, (3) seeing this Doctor's car outside her clinic at about midnight or one a.m. when she was alone, (4) being subjected to horn honking outside her home, (5) and flattened tires, (6) witnessing the distress this Doctor brought to his own brother and sister-in-law including understanding that there were dead animals placed around the parameters of his brother's yard and a hole large enough to potentially kill the brother dug in a dirt road to the brother's horses, and understanding the brother's lame horse was repeatedly run

into a barbed wire fence to the point where the horse took about a year for it to heal completely, (7) hearing the threats reported to her by patients even to the threat of denial of emergency care if they continued to see her as a health care professional, (8) labeled her a bitch and a fat cow behind her back, let alone to her face, (9) and always wondering if anyone was going to sue her at Dr. Redd's behest. Mrs. Lyman was working steadily, 12 and 15 and more hour days to build her practice, keep up on charting, and deal with all the business issues associated with an independent clinic. Mrs. Lyman claims per se and reasonably demonstrable damages.

Mrs. Lymans' years of stress have played a role in her now having some health problems. Her relationships with her family have been severely strained at times. She has provided some health care for free when people had no money or insurance. Mrs. Lyman has not been sued by a patient, has not been reported nationally, and is the victim of bullies that are incapable of giving patients the level of sincere compassion, uniformity, and live in fear of the District, County and Dr. Redd who has not been held accountable by the Board or Commission for patient complaints or the community's hundreds of names who support Michele Lyman and her supervising doctors. Mrs. Lyman is praying for damages in excess of Six (6) Million Dollars, some of which is treble damages, due to unfair practices, use of the government to restrain trade in the community, and the use of the mail system to send fraudulent cards, use of extortionate threats against patients telling them even in an emergency they will not be seen if they continue to go to Mrs. Lyman, the actual turning away of patients in labor without so much as a statutorily required examination, and the terrorism of her children, and herself, and the spreading of rumors that equate to nothing less than criminal defamation for both Michele Lyman and Dr. MacArthur.

Mrs. Lyman is praying for damages in excess of 6 million dollars.

Helen Valdez and her husband are fearful of returning to the District and have a private ambulance carrier to take them to Cortez in an emergency. Helen is ill and elderly and weakened. Mrs. Valdez believes she suffered a sense of inferiority and negativity at a time when she was most vulnerable. No one took any actions to make the staff accountable. EMPTALA violations occured about June of 1999, after Cleal had been warned about them. Mrs. Valdez is asking damages of $350,000.

  b.  **Defendants' Statement of Contested Issues of Fact:**

    1.  Defendant San Juan Health Services District (the "Health District"), which was created by San Juan County as a special improvement district pursuant to Utah Code Ann. § 17A-2-1304, owns and operates the San Juan County Hospital in Monticello, Utah.

    2.  Defendants Bill Redd and Ty Lewis were San Juan County Commissioners at all relevant times. Redd was a member of the Health District Board of Trustees for a brief period in late 1998 and early 1999, and Lewis was a member from late 1998 to mid-1999.

    3.  Defendants Roger Atcitty, John Lewis, John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday are or were members of the Board of Trustees of the Health District. Defendant Cleal Bradford was also a member of the Board of Trustees from approximately February 1999 until June 1999. From approximately June 22, 1999 until April 2001, Bradford was executive director of the Health District.

    4.  On or about April 14, 1999, at approximately 8:15 a.m., Plaintiff Valdez went to San Juan Hospital suffering from vomiting and diarrhea.

5.      Valdez had called earlier that morning, at approximately 6:30 a.m., to see if Dr. Penn would be in the hospital that morning.  Valdez claims she was told that Dr. Penn would be making rounds at approximately 8:00 that morning.

6.      After Valdez filled out some paperwork, including insurance information, Laurie Wallace, a hospital employee, told the desk clerk that Valdez and another man who was waiting could be set up in the Emergency Room to see a doctor.

7.      During Valdez's visit to the San Juan Hospital on April 14, 1999, Valdez left the hospital waiting room to use the restroom.  When Valdez returned, Charlene Gonzales, Valdez's sister-in-law who accompanied her to the hospital, told Valdez that Laurie Wallace said that Dr. Penn was at his clinic and Valdez could see him there.

8.      Thereafter, Valdez and Gonzales left the hospital.  Valdez did not ask anyone about Laurie Wallace's statement that Valdez could go see Dr. Penn at his office, and she neither went to Dr. Penn's office nor telephoned him after leaving the hospital.

9.      Three days after her April 14, 1999 visit to the San Juan Hospital, Valdez went to a Health District facility, then known as the Urgent Care Center, located in Blanding, Utah, and was treated by Dr. Redd, an employee of the Health District.

10.      Dr. Redd diagnosed Valdez with diverticulitis, prescribed two antibiotics, restricted her diet, and scheduled a colonoscopy for approximately ten days later for purposes of conducting further analysis.

11.      Dr. Redd also instructed Valdez to contact him if she was not feeling better within 72 hours.

12.     About two days after seeing Dr. Redd, Valdez became ill again. Rather than returning to Dr. Redd or attempting to see Dr. Penn, she went to a hospital in Cortez, Colorado.

13.     Valdez never went to the colonoscopy scheduled by Dr. Redd.

14.     Valdez is Caucasian.  Her husband is Mexican American.

15.     Valdez is over age 60.

16.     As part of her physician's assistant education program, from approximately August 1995 until mid-1996, Lyman fulfilled a preceptorship at the Montezuma Creek Clinic, then owned by the Health District.  Lyman worked with and was supervised by Dr. Jones in her preceptorship.

17.     From approximately mid-1996 until early October 1998, Lyman worked for defendant Dr. James Redd in his private practice in Blanding, Utah.  During this period, Dr. Redd served as Lyman's supervising physician.

18.     During the period that Lyman worked for Dr. Redd in his private practice, Lyman also worked in the Health District's urgent care facility in Blanding, Utah.

19.     While working for Dr. Redd, Lyman applied for and received mid-level provider privileges with the Health District, subject to Dr. Redd's supervision.

20.     Prior to March 1999, while Dr. Redd had privileges at Health District facilities, Dr. Redd owned his own practice and was not an employee of the Health District.

21.     In approximately November 1998, Lyman began working in Dr. Nathaniel Penn's office, which was located in Monticello, Utah.  At this time, Dr. Penn had

privileges at Health District facilities but was not a Health District employee.  At this time, Dr.

Penn became Lyman's supervising physician.

22.     In approximately January 1999, Lyman opened a clinic in

Blanding, Utah.  While Dr. Penn remained Lyman's supervising physician, he maintained his

practice in Monticello, but Lyman maintained an office and saw patients in Blanding.  Dr. Penn

did not see patients at Lyman's office on a regular basis.

23.     In July 1999, Dr. Penn closed his Monticello practice and moved to

Moab, Utah.  When he moved to Moab, Dr. Penn relinquished his privileges at the Health

District.

24.     Beginning in approximately July 1999, in addition to Dr. Penn,

Lyman was supervised by Dr. Robert Mena.  Dr. Mena had provisional privileges with the Health

District which expired in November, 1999, and he has not had privileges with the Health District

since that date.

25.     In approximately December 1999, Lyman submitted an application

seeking renewal of her privileges with the Health District.  At that time, Lyman indicated she

would be supervised by Dr. MacArthur, who had also submitted an application for medical

privileges with the Health District.  Because Lyman had no other supervising physician with

privileges, her application for renewal was moot or premature unless and until Dr. MacArthur

obtained hospital privileges.

26.     Therefore, after November 1999 and until sometime in 2001,

Lyman did not have a supervising physician who had privileges with the Health District, other

than for the brief period Dr. MacArthur had temporary privileges, assuming he had in fact been approved as her supervising physician.

27.     Pursuant to the medical staff bylaws, a mid-level provider such as a physician's assistant may not have privileges with the Health District unless he or she is being supervised by a physician who maintains current Health District privileges.

28.     Lyman's mid-level privileges expired of their own accord as of January 1, 2000.

29.     Dr. MacArthur submitted an application for privileges with the Health District on approximately December 9, 1999.

30.     In approximately December 1999, Dr. MacArthur began seeing patients in Michele Lyman's office.

31.     On December 23, 1999, Dr. MacArthur was informed by Cleal Bradford that he had been granted temporary privileges, which would last from December 23 through January 5, 2000, while his application was being fully considered.

32.     When Dr. MacArthur first discussed obtaining temporary privileges with Mr. Bradford, Bradford asked Dr. MacArthur to specify the number of patients that Dr. MacArthur thought he would treat during the temporary privilege period.  When Dr. MacArthur indicated that it would be difficult to estimate exactly, Bradford told MacArthur to increase his estimate to cover any potential but unplanned patients.  Ultimately, however, the authorization of temporary privileges did not contain any limitation on the number of patients that Dr. MacArthur could see during the period of temporary privileges.

33.     On January 10, 2000, Dr. MacArthur's temporary privileges were extended from January 5, 2000, through January 25, 2000.

34.     On January 26, 2000, Dr. MacArthur was again granted an extension of temporary privileges for January 25 through February 2, 2000.

35.     The Bylaws of San Juan County Hospital permit the granting of temporary privileges.

36.     In late January 2000, the Health District had not acted on Dr. MacArthur's application for privileges because it was continuing its due diligence work on the application and awaiting certain documentation from Dr. MacArthur.  Due to the Health District's belief that Lyman's application packet was not complete and that certain documentation contained in the packet was incorrect, and because the Health District could not act on Dr. MacArthur's application, the Health District had not acted on Lyman's application by late January or early February 2000.

37.     On February 2, 2000, the privileges granted to Dr. MacArthur by the San Juan County Hospital lapsed.

38.     Lyman and Dr. MacArthur were invited to a February 2, 2000 medical staff meeting at the Health District to discuss their applications for privileges.

39.     Lyman and Dr. MacArthur did not attend the meeting.

40.     No one informed anyone at the Health District why Lyman and MacArthur did not attend the meeting.

41.     After failing to attend the February 2, 2000 medical staff meeting, and after his temporary privileges lapsed, Dr. MacArthur took no further steps in pursuit of

privileges with the Health District and took a better paying job that he had been pursuing since before he applied for privileges with the Health District.  The Health District understood that Dr. MacArthur had abandoned his application for privileges and no further action was taken on it. Because Lyman did not have a supervisory physician with privileges, no further action was taken on her application.

42.     Drs. Redd, Jones and Nelson are over age 40, and Dr. Nelson is older than Dr. MacArthur.

43.     Cleal Bradford is older than Dr. MacArthur.

44.     Dr. MacArthur was in jail for twenty-four days on a charge of contempt of court in connection with his exercise of his Fifth Amendment rights in a tax protestor case.

45.     Since May 1, 2000, Dr. MacArthur has been working in Ely, Nevada, where he is an employee of the William Bee Ririe Hospital and conducts a private practice.  Dr. MacArthur was also the medical director at the Ely State Prison for several years. Dr. MacArthur began investigating employment possibilities in Ely, Nevada in approximately October 1999, before he visited San Juan County.

46.     Dr. MacArthur currently earns more than $240,000 annually from his work in Ely, Nevada, an amount greater than he has earned at any other time in his career.

6.     **CONTESTED ISSUES OF LAW.**

a.     **Plaintiffs' Statement of Contested Issues of Law:**

LEGAL PRESUMPTIONS

The Plaintiffs assert that the facts as plead are entitled to a presumption of truthfulness unless they are rebutted.   Under the Utah Fair Practices Act once a prima facie case has been made in regards to inequality of providing goods and services, the burden of proof shifts to the defendants to show why any discrepancy in goods and service provisions was justified. Utah Code Ann. 13-5-3.

The District has illegally operated the district by having County Commissioners as board members, by not holding doctors accountable for violations of the law, by not following their own medical by-laws, by not applying policies equally across the board to all persons, by not overriding letters or memos of doctors that set policy, without board approval, while stifling economic competition in the area.

*State involvement with San Juan County and Health District defendants*

Utah State Department of Hospital Licensing has no statutory authority over San Juan Health Services District, "District",  or San Juan County, "County",  decisions regarding specifically what qualified individuals the District or County approves or disapproves for privileges to perform medical procedures within  District facilities, or to determine  the scope, time limits, or patient limits for privileges.

Utah State Department of Hospital Licensing has no regulatory authority over San Juan Health Services District, "District",  or San Juan County, "County",  decisions regarding specifically what qualified individuals the District or County approves or disapproves for privileges to perform medical procedures within  District facilities, or to determine  the scope, time limits, or patient limits for privileges.

Utah State provides no state agency administrative appeal processes for persons turned down for privileges in the District to appeal the decision.

*Legal Nature of the Defendants*

*San Juan County*

San Juan County is a governmental  political subdivision of Utah. Utah Constitution Article XI, Sec. 1

San Juan County has no contractual obligations with any Utah State Agency  to provide health care to San Juan County residents in behalf of the State.

San Juan County is not statutorily obligated to provide health care by way of a hospital or medical clinics to the people of San Juan County.

San Juan County has enumerated powers, derived from the 'rights' of the people, limited with specificity in statutes.   Utah Constitution  Article I, Sec. 2; Article  XI, Section 8;

These limits on government are prohibitory and mandatory. Utah Constitution Article I, Sec. 26;

All Utah Statutes are to be read and applied uniformly.  Utah Constitution Article I, Sec. 24.

San Juan County Commission is the 'governing authority' for the District. Utah Code Ann. 17A-2-1302   (3).

San Juan County Commissioners are the legislative body of San Juan County and have authority to exercise the legislative powers of investigations, hearings, supervision, audits, require witnesses to appear, take evidence, make rulings, appoint committees to carry out County business. Utah Code Ann. 17-53-106.

San Juan County is the proprietor of the Hospital and clinics.

*San Juan Health Services District*

San Juan Health Services District has enumerated powers, derived from the 'rights' of the people, limited with specificity in statutes.   Article XI, Section 8.

San Juan Health Services District is a  incorporated political subdivision of Utah.  Utah Constitution Article XI, Section 8.

San Juan Health Services District is a government operated, public tax supported, Utah special services district formed under Utah Code Ann. 17A-2-1304.

San Juan Health Services District providers, obtain  higher rates from Medicaid based on seeing higher numbers of medicaid patients.   42 C.F.R. 440.20 (D)(8), Attachment 4.19B pg. 4c, T.N. #99.04, effective 4-1-99.

San Juan Health Services District and Blanding Family Clinic at the times pertinent were located in a Heath Professional Shortage Area as designated by Medicaid and the U. S. Department of Health Care Financing.

San Juan Health Services District, its governance board members, and employees were bound to obey Medicaid and Medicare regulations, policies, and administrative decisions for those who receive federal funds for their programs.

San Juan Health Services District, the governance board members, and employees are obligated to provide medical care equally to all people whether new or old patients, indistinguishable based upon race, age, sex, religion, or national origin.

San Juan District governance board of directors is by statute a policy making, rather than advisory, board.

San Juan Health Services District is not an 'arm of the state' .

San Juan Health Services District has a legal obligation to keep and preserve all medical and personnel and medical staff files.

San Juan Health Services District has a legal obligation to prevent loss, destruction, fraud in the keeping of its personnel, medical and medical staff files.

San Juan Health Services District at the times pertinent provided services to Medicare patients.

San Juan Health Services District during the times pertinent was classified as a Rural Primary Care Hospital.

Medicare/Medicaid patients have an entitlement to have access to any provider qualified to provide medicaid and medicare services.  42 USC 1395a.

San Juan Hospital has a rural hospital classification as defined in the rural health clinic services act.  42 USC 1395x(e).

San Juan District has a legal obligation to preserve the privacy of patients and their records.

San Juan District has a legal obligation to preserve the privacy of medical staff records.

San Juan District has a legal obligation to preserve the privacy of anyone making application to the District.

San Juan District has a legal obligation not to discriminate based upon race, age, color, sex, creed, religion, or disability.

San Juan District has a duty to verify the medical license and DEA license necessary for a doctor to practice medicine prior to giving the medical professional privileges.

San Juan District qualified as a 'person' under the Utah Code Ann. 13-5-2.

San Juan County qualifies as a 'person' under the Utah Code Ann. 13-5-2.

*Legal Entitlements of the Plaintiffs to Records of all open meetings*

San Juan County is obligated to obey Utah's open meetings law.  Utah Code Ann.  17-53-206.

Any 'open meeting' is defined as " the convening of a public body, with a quorum present, whether in person or by means of electronic equipment, for the purpose of discussing or acting upon a matter over which the public body has jurisdiction or advisory power." Utah Code Ann. 52-4-2.

Utah's Open Meetings Act is Utah's legislative mandate that San Juan County and District conduct their business  openly with public involvement. Utah Code Ann. 52-4-1.

San Juan County and District are  obligated to make and keep,  accurate records of its open meetings that reflect the substance of all matters proposed, discussed, or decided, and a record, by individual member, of votes taken; the names of all citizens who appeared and the substance in brief of their testimony; and any other information that any member requests be entered in the minutes.  Utah Code Ann. 52-4-7.

*Legal Nature of the Plaintiffs*

*Michele Lyman, Physician's Assistant*

A Physician's Assistant is considered a 'primary provider' under P.L. 95-210, Rural Health Clinic Services Act,  for purposes of meeting the rural health clinic's act's mandates for providing medical care in rural areas.  42 USC 1395x(aa)(5).

Michele Lyman, P. A. provided services to Medicaid and Medicare patients while working at Blanding Family Practice.

Blanding Family Practice was a private corporation organized under Utah law.

Blanding Family Practice  was classified as a Rural Health Clinic by Medicaid and the Department of  Health Care Financing.

Blanding Family Practice was located in a Health Professional Shortage Area.

Michele Lyman was approved by the State Department of Professional Licensing to provide rural off-site services to the public.

Mrs. Lyman is a Physician's Assistant and was authorized by the Utah State Department of Professional Licensing to operate an rural off-site clinic.  Mrs. Lyman had two supervising physician's accessible by phone.  Utah has since done away with the off-site classification and now allows the supervising doctors the authority to determine how close they will supervise the physician's assistant working for them and how far away they can be.

Blanding Family Practice was classified as a rural off-site clinic by Utah DOPL.

Dr. MacArthur was a secondary supervising physician within the meaning of the Utah code.

*Dr. Steven MacArthur*

Dr. Steven MacArthur operated his business at the time in question as a sole proprietership.

Dr. Steven MacArthur was the supervising physician within the meaning of the Utah Code.

Dr. Steven MacArthur was legally qualified to practice medicine anywhere in the State of Utah.

Dr. Steven MacArthur's DEA license and Medical License had to be kept in the offices of the Utah State Department of Professional Licensing, within the Department of Commerce.

The Plaintiffs challenge the constitutionality of the San Juan District's medical staff by-laws as given to Dr. MacArthur and prior to Dr. MacArthur when Mrs. Lyman began working for the District.

The Plaintiffs challenge the constitutionality of the Utah statutory scheme Utah Code Ann. 1301 -1332 wherein the County can own and operate and control the District by way of setting tax rates, collecting taxes, withdrawing administrative powers from persons on the District's governance board selected by the County Commission, and in this case for a short time, the Commissioners were District board members,  but still be considered a separate body politic under Utah Code Ann.  17A-2-1313.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63-30-3.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63-30-38.

The Plaintiffs challenge the federal and state  constitutionality of Utah Code Ann. 63-30-10.

The Plaintiffs challenge the federal and state constitutionality of Utah Code Ann. 63-30-20.

The Plaintiffs challenge the federal and state  constitutionality of Utah Code Ann. 63-30-22

No statute, federal or state, authorizes a public health facility or hospital to deny privileges to a Physician's Assistant who has access to her supervising physicians by phone in a Health Professional Shortage Area, or create working conditions so hostile as to interfere in the quality of care of the patients in the area.

*Helen Valdez*

Helen Valdez was a patient entitled to the benefit of the Patients' Bill of Rights.

*The Plaintiffs' Legal Entitlements*

Michele Lyman and Dr. Steven MacArthur were :

1.      Entitled to be free from local prohibitions and limitations upon their practice of medicine.

2.      Entitled to be free from interference between themselves and their patients;

3.      Entitled to privacy of their clients' records and procedures;

4.      Entitled to be free from injury, destruction or limitation of competition in the area.

5.      Entitled to be free from discrimination in the use of the public facilities of the District and County.

6.      Entitled to their business' good will not being harmed by their patients being treated in a manner lacking uniformity, consideration and care that is sensitive to each patients unique needs.

7.      Entitled to be free of feeling physically threatened.

8.      Entitled to be free of feeling like Mrs. Lyman's child may be in danger.

9.      Entitled to be free of having credential files tampered with, having forged documents placed in the file, and having the forged document placed in the U. S. mail to discredit Mrs. Lyman with the American Heart Association and other medical providers in a meeting that she did not attend, while threatening patients seeing Mrs. Lyman with unavailability of services in a highly remote and isolated area.

10.     Dr. MacArthur should be entitled to not have to inform any potential clinic area he may wish to relocate to that he was limited in privileges and denied privileges in San Juan District.

11.     Dr. MacArthur is entitled to equipment that is working, that facilitates the care of the patients, and is prepared, sterile, and ready to use in emergencies.

b.      **Defendants' Statement of Contested Issues of Law:**

1.      Did defendants discriminate against Valdez on the basis of her age or gender or her association with her husband, Lyman or Dr. Penn in connection with her April 14, 1999 visit to the San Juan County Hospital?

2.      Did defendants deprive Valdez of due process in connection with her  April 14, 1999 visit to the San Juan County Hospital?

3.      Did defendants discriminate against Dr. MacArthur on the basis of his age or his association with Lyman in connection with his application for privileges?

4.      Did defendants deprive Dr. MacArthur of due process in connection with his application for privileges?

5.      Did defendants defame Dr. MacArthur?

6.      Did defendants subject Lyman to discrimination or harassing treatment on the basis of her gender in connection with her practice as a physician's assistant in Blanding, Utah, or in connection with her late-1999 application for renewal of her mid-level provider privileges?

7.      Did defendants deprive Lyman of due process in connection with her late-1999 application for renewal of her mid-level provider privileges?

8.      Did defendants enter into a contract, combination in the form of trust or otherwise, or conspiracy in restraint of interstate trade or commerce and with an unlawful motive in connection with Lyman's or Dr. MacArthur's applications for privileges or Valdez' medical treatment?

9.      Do plaintiffs have standing to maintain an antitrust claim and, if so, are defendants immune from the claim under the state action defense or the Health Care Quality Improvement Act?

10.     Did defendants receive any income from, acquire any interest in, or conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in interstate commerce?

7.      **EXHIBITS.**  The following were received in evidence or were identified and offered:

a.      Plaintiffs' exhibits:  The Exhibit List will be filed separately.

b.      Defendants' exhibits:  The Exhibit List will be filed separately.

c.      Exhibits received in evidence and placed in the custody of the clerk may be withdrawn from the clerk's office upon signing of receipts therefor by the respective parties offering them.  The exhibits shall be returned to the clerk's office within a reasonable time and in the meantime shall be available for inspection at the request of other parties.

d.      Exhibits identified and offered that remain in the custody of the party offering them shall be made available for review by the offering party to any other party to the action that requests access to them in writing.

e.      If other exhibits are to be offered, the necessity for which reasonably cannot now be anticipated, they will be submitted to opposing counsel at least _____ [2] days before trial.

8.      **WITNESSES.**

a.      In the absence of reasonable notice to opposing counsel to the contrary:

i.      Plaintiffs <u>will</u> call as witnesses:[3]

1.      Candace Davis

2.      Jennifer Senecker

3.      Tanya Holladay

4.      Sharon Kent

5.      Andrea Bianchini

6.      Maureen LaGigla

7.      Christine Singer

8.      Ora Lee Black

9.      Gloria Yanito

---

[2]      Plaintiffs and Defendants do not agree on the number of days prior to trial by which additional exhibits must be provided to the opposing party.  Defendants suggest fourteen days and Plaintiffs suggest five days.

[3]      Defendants reserve the right to call any of Plaintiffs' witnesses not called at trial by Plaintiffs.

10.      Donna Arthur

11.      LeAnn Jacobs

12.      Letha St. Clair

13.      Camille Yonkers

14.      Gena Grover

15.      Emy Paterson

16.      Leatha Burtenshaw

17.      Cindy Tumeh

18.      Budd Hadley

19.      Keele Johnson

20.      Candace Laws

21.      Christina Brendt

22.      Linda Cacapardo

23.      Nichole Roberts

24.      Lisa Wright

25.      Patsy Shumway

26.      Ty Lewis

27.      Craig Halls

28.      Amy Byrd

29.      Tracy Bradford

30.      KD Perkins

31.     Trudy Latham

32.     Kim Glover

33.     LeAnn Bowring

34.     Robert Bowring

35.     Mary Nielsen

36.     Charlene Gonzalez

37.     Michele Lyman

38.     Dr. Steven MacArthur

39.     Helen Valdez

40.     Dr. Redd

41.     Rick Bailey

42.     John Lewis

43.     Karen Adams

44.     Gary Holladay

45.     Cleal Bradford

46.     Reid Wood

47.     Laurie Shafer

48.     Dr. Nelson

49.     Venice Lyman

50.     John Housekeeper

51.     Dr. Val Jones

52.     Gloria Yanito

53.     Ora Lee Black

54.     Marilee Bailey

55.     Mary Maryboy

56.     Roger Atcitty

57.     Rick Bailey

58.     Linda Swenson

59.     Belina Ashbury

60.     Louisa Lyman

61.     Etta Shumway

62.     Blen Freestone

63.     Bryan Bolander

64.     Juliane Robinson

65.     Doug Springmeyer

66.     Bart Lyman

67.     Makenzie Lyman

68.     John Lyman

69.     Kirk Redd

70.     Kathleen Redd

71.     Judy Kesckeviciak

            ii.     Plaintiffs may call as witnesses:

1. Calvin Balch

2. Dale Slade

3. Norman Johnson

4. Leatha Burtenshaw

5. Dr. Stephen Morris at the University of Utah

6. Rayburn Jack

7. Dr. Terry Cook

8. Pat Hartsock

9. Marci Meiers

10. Craig Ambrosiani

11. Dr. Steve Bigler - Department Chair OB/gyn former med staff pres

12. Director of Utah Valley Regional Women's center

13. Dr. Joseph Glenn- Former Department Chairman ob/gyn at Utah Valley Regional Medical center

14. Dr. Steve Minton- Chairman of neonatology of Utah Valley Regional Medical Center

15. DR. Kent Gammett- Former Department chair of ob/gyn at Utah Valley Regional Medical Center.

16. Dr. George Gourley- ob/gyn staff member at Utah Valley Hospital-cross covered with Dr. MacArthur

17. Mrs. Molitor - Lutheran Health Services Director of Nursing

18. Dana Barnett

19.     Dr. Hoffmeister

20.     Venice Lyman

21.     Bart Lyman

22.     McKensie Lyman

iii.     Plaintiffs may use the following depositions:[4]

1. Laurie Shafer- May 13, 2002

2. Patsy Shumway- May 14, 2002

3. Gloria Yanito- Aug. 12, 2002

4. Gary Holliday- May 15, 2002

5. Dr. James Redd- May 15, 2002

6. Helen Valdez - 12-8-2001

7. Charlene Gonzalez- Jan. 2002

8. Cleal Bradford- August 12, 2002

9. Carla Grimshaw- May 13, 2002

10. John Housekeeper- May 14, 2002

11. Dr. Jones- May 15, 2002

12. Reid Wood- August 12, 2002

13. Nicole Roberts- January 7, 2002

14. Julian Robinson

b.     In the absence of reasonable notice to opposing counsel to the contrary:

i.     Defendants <u>will</u> call as witnesses:

1.     Roger Atcitty

---

[4]     Defendants object to the use of depositions at trial except as permitted under the applicable rules.

2.       John Lewis

3.       John Housekeeper

4.       Karen Adams

5.       Patsy Shumway

6.       Gary Holliday

7.       Cleal Bradford

8.       Dr. James Redd

9.       Dr. L. Val Jones

10.      Dr. Manfred Nelson

11.      Richard Bailey

12.      Craig Halls

13.      Bill Redd

14.      Marilee Bailey

15.      Ora Lee Black

16.      Lori Wallace

17.      Carla Grimshaw

18.      Gloria Yanito

19.      Julie Bronson

20.      Laurie Schafer

21.      Reid Wood

ii.      Defendants <u>may</u> call as witnesses:

1.       Terry Cook

2.       Etta Shumway

3.       Judy Ksaizkiewicz

c.      In the event that witnesses other than those listed are to be called to testify at the trial, a statement of their names, addresses, and the general subject matter of their

testimony will be served upon opposing counsel and filed with the court at least 14 days prior to trial.  This restriction shall not apply to rebuttal witnesses whose testimony, where required, cannot reasonably be anticipated before the time of trial.

9. **REQUESTS FOR INSTRUCTIONS.**  If the case is to be tried before a jury, requests for instructions to the jury and special requests for voir dire examination of the jury shall be submitted to the court pursuant to D. U. Civ. R. 51-1.  Counsel may supplement requested instructions during trial on matters that could not reasonably be anticipated prior to trial.

10. **AMENDMENTS TO PLEADINGS.**  Plaintiffs request permission to amend pleadings.

11. **DISCOVERY.**  Discovery has been completed.

12. **TRIAL SETTING.**  This case was set for trial by jury on _____, 2002, at _____ o'clock ____.m at Salt Lake City.

13. **POSSIBILITY OF SETTLEMENT.**  Defendants deem the possibility of settlement to be poor.  Plaintiffs deem the possibility of settlement to be good,  with the newly elected County Commissioners that take office after January 1, 2003.  Two out of the three were elected.

DATED this ____ day of November, 2002.

BY THE COURT

_____
Judge Bruce S. Jenkins
UNITED STATES DISTRICT COURT JUDGE

_____

The foregoing proposed pretrial order is hereby adopted this *12th* day of *November*,
2002.


_Carolyn Cox /s/_
_____
Blaine J. Benard
Carolyn Cox
HOLME ROBERTS & OWEN LLP
299 South Main Street, Suite 1800
Salt Lake City, Utah 84111
*Attorneys for Defendants San Juan Health Services District, Roger Atcitty, John Lewis,*
*John Housekeeper, Karen Adams, Patsy Shumway and Gary Holliday*


_Susan Rose_
_____
Susan Rose
9553 South Indian Ridge Drive
Sandy, Utah 84092
*Attorney for Plaintiffs*


_Robert R Harrison /s/_
_____
Robert R. Harrison
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, 11th Floor
Salt Lake City, Utah 84145
*Attorneys for Defendants San Juan Health District, Cleal Bradford, Dr. James Redd, Dr.*
*L. Val Jones, Dr. Manfred Nelson, Marilee Bailey, Ora Lee Black, Lori Wallace, Carla*
*Grimshaw, Gloria Yanito, Julie Bronson, Laurie Schafer and Reid Wood*