IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| DR. STEVEN MACARTHUR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil No.  2:00-CV-584J |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| SAN JUAN COUNTY, et al., | ) | **ORDER** |
| | ) | |
| Defendants; | ) | |
| | ) | |
| | ) | |
| DONNA SINGER, FRED RIGGS, and | ) | |
| ALLISON DICKSON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| SAN JUAN COUNTY, SAN JUAN | ) | |
| HEALTH SERVICES DISTRICT, | ) | |
| COMMISSIONER TYRON LEWIS, | ) | |
| COMMISSIONER BILL REDD, | ) | |
| CRAIG HALLS, RICHARD BAILEY, | ) | |
| REID WOOD, ROGER ATCITTY, | ) | |
| JOHN LEWIS, KAREN ADAMS, | ) | |
| PATSY SHUMWAY, and LAUREN | ) | |
| SCHAFER, | ) | |
| | ) | |
| Defendants. | ) | |

```
┌─────────────────────────────────┐
│            FILED                │
│   CLERK, U.S. DISTRICT COURT    │
│   October 12, 2005 (4:08pm)     │
└─────────────────────────────────┘
```

\* \* \* \* \* \* \* \* \*

I.  THE ISSUES ON REMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PRÉCIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.  THE CLAIMS OF THE PART II PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . 11
    A.  Ms. Donna Singer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    B.  Mr. Fred Riggs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    C.  Mr. Allison Dickson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    D.  The Nature of Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    E.  Plaintiffs' Supplemental Pleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

V.  THE NAVAJO COURT ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    A.  The December 28, 1999 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        1.  Findings re: Mr. Riggs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
        2.  Findings re: Ms. Singer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        3.  Findings re: Mr. Dickson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        4.  Preliminary Relief Under the December 28, 1999 Order . . . . . . . . . . . 37
    B.  The March 1, 2000 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    C.  The March 6, 2000 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VI.  THE NATURE AND EXTENT OF NAVAJO SOVEREIGNTY . . . . . . . . . . . . . . . 49
    A.  Inherent Navajo Tribal Sovereignty . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        1.  "Domestic Dependent Nations" . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        2.  Inherent Tribal Powers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        3.  Tribal Sovereignty & Federal Indian Policy . . . . . . . . . . . . . . . . . . 64
    B.  *Oliphant*, *Montana* & Implied Divestiture of Tribal Sovereignty . . . . . . . . . . . 73
        1.  *Oliphant v. Suquamish Indian Tribe* . . . . . . . . . . . . . . . . . . . . . . . 75
        2.  *Montana v. United States* & its Exceptions . . . . . . . . . . . . . . . . . . . 80
        3.  Civil Jurisdiction Over Non-Indians Reaffirmed . . . . . . . . . . . . . . . . 84
    C.  Navajo Sovereignty & Self-Government . . . . . . . . . . . . . . . . . . . . . . . . . 87
        1.  The Navajo Treaty of 1868 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
        2.  Subsequent Legislation Enlarging the Navajo Reservation . . . . . . . . . . . 92
        3.  A Tale of Two Treaties: *Montana* & the 1933 Act . . . . . . . . . . . . . . . . 95
        4.  The Navajo Nation Government . . . . . . . . . . . . . . . . . . . . . . . . . . 99
    D.  Navajo Sovereignty & the Navajo Courts . . . . . . . . . . . . . . . . . . . . . . . 104
        1.  Creation of the Navajo Court System . . . . . . . . . . . . . . . . . . . . . . 104
        2.  Jurisdiction of the Navajo Courts . . . . . . . . . . . . . . . . . . . . . . . . . 107

3. Navajo Court Jurisdiction Over Non-Indian Defendants . . . . . . . . . . . . 108
4. *Montana* & the NPEA in the Navajo Courts:
the *Manygoats* Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113
E. The Navajo Preference in Employment Act (NPEA) . . . . . . . . . . . . . . . . . . . . 119
1. "At-Will" Employment vs. "Just Cause" Tenure . . . . . . . . . . . . . . . . . . . 121
2. NPEA Protection for Non-Navajo Spouses . . . . . . . . . . . . . . . . . . . . . . . 125
3. Administrative Enforcement of the NPEA . . . . . . . . . . . . . . . . . . . . . . . 125
4. *Singer, et al. v. San Juan County, et al.* and
the NPEA's Exhaustion Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
F. Navajo Tort Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

VII. ENFORCEMENT OF THE NAVAJO COURT ORDERS IN THIS FORUM . . . . . 137
A. Theories re: the Navajo Court's Subject-Matter Jurisdiction in
*Singer, et al. v. San Juan County, et al.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137
1. Navajo Court Jurisdiction as a Federal Question . . . . . . . . . . . . . . . . . . . 137
2. Subject-Matter Jurisdiction Over the County and
Health District Defendants Under the *Montana* Exceptions . . . . . . . . . . . . 141
(*i*) Plaintiffs' Theory re: Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . 141
(*ii*) San Juan County's Theory re: Jurisdiction . . . . . . . . . . . . . . . . . 145
(*iii*) The Health District's Theory re: Jurisdiction . . . . . . . . . . . . . . 148
B. Analysis & Conclusions re: the Navajo Court's Subject-Matter
Jurisdiction in *Singer, et al. v. San Juan County, et al.* . . . . . . . . . . . . . . . . . . . . 150
1. *Montana* & the Plaintiffs' "Congressional Presumption" . . . . . . . . . . . 150
2. The Defendants' Reading of *Montana* . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
3. The Navajo Court's Findings of Jurisdictional Facts . . . . . . . . . . . . . . . 158
(*i*) Fred Riggs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
(*ii*) Allison Dickson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
(*iii*) Donna Singer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
(*iv*) San Juan County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169
(*v*) San Juan County Commissioners . . . . . . . . . . . . . . . . . . . . . . . . 170
(*vi*) San Juan County Attorney Craig Halls . . . . . . . . . . . . . . . . . . . 171
(*vii*) County Administrator Richard "Rick" Bailey . . . . . . . . . . . . . 172
(*viii*) Summary re: the County Defendants . . . . . . . . . . . . . . . . . . . 173
(*ix*) San Juan Health Services District . . . . . . . . . . . . . . . . . . . . . . . . 175
(*x*) Health District Board Members . . . . . . . . . . . . . . . . . . . . . . . . . . 183
(*xi*) Roger Atcitty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184
(*xii*) Lauren "Laurie" Schafer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185
(*xiii*) Reid Wood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
(*xiv*) Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188
C. Navajo Court Judgments in the Federal Courts . . . . . . . . . . . . . . . . . . . . . . . 189
1. Comity vs. Full Faith and Credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

2.  Full Faith and Credit, Comity &
the Problem of Non-Final Judgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202
3.  Final Judgments Under Navajo Law . . . . . . . . . . . . . . . . . . . . . . . . . . 205
4.  Preliminary Injunctive & other Equitable Relief in
the *Singer, et al. v. San Juan County, et al.* Navajo Court Orders . . . . . . . . 208
D.  Attorney's Fees Awards Under Navajo Law . . . . . . . . . . . . . . . . . . . . . . . . . . . 213
E.  Plaintiffs' Standing re: Navajo Patients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215
F.  Governmental Immunity & The Health District Defendants . . . . . . . . . . . . . . . 219
1.  The October 30, 2000 Decision & Law of the Case . . . . . . . . . . . . . . . 220
2.  State Sovereign Immunity & Tribal Courts . . . . . . . . . . . . . . . . . . . . . . . 222
3.  The Utah Governmental Immunity Act . . . . . . . . . . . . . . . . . . . . . . . . . . 226
4.  Counterclaims & the Waiver of State Immunity . . . . . . . . . . . . . . . . . . . 230
5.  The Health District's Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 232
6.  Sovereign Immunity & Reciprocity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 233
7.  Plaintiffs' Claims & the Utah Governmental Immunity Act . . . . . . . . . 239
(*i*) Contractual Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240
(*ii*) Intentional Tort Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
(*iii*) Civil Rights Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 244
8.  Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

SUMMARY & CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251

The original complaint filed in this action asserted claims by fifteen plaintiffs, including Donna Singer, Fred Riggs, and Allison Dickson.[1]  (*See* Complaint (Verified), filed July 25, 2000 (dkt. no 1).)  These three plaintiffs' claims were addressed early in this litigation by Judge Kimball, the district judge then assigned to this case, who entered orders dismissing their claims against San Juan County, the San Juan Health Services District and various individual defendants on the grounds that neither the County nor the Health District had waived their sovereign immunity from suit in tribal court, and that individual employee defendants likewise remained immune from suit under Utah law absent allegations of fraud or malice.  The court dismissed their claims against Truck Insurance and R. Dennis Ickes on the ground that the tribal court lacked subject matter jurisdiction.  (*See* Memorandum Decision and Order, filed October 30, 2000 (dkt. no. 81); Memorandum Decision and Order, filed December 13, 2000 (dkt. no. 115).)  Those rulings became the subject of a Rule 54(b) certification and an appeal.  (*See* Notice of Appeal, filed January 4, 2001 (dkt. no. 126); Order, filed March 6, 2001 (dkt. no. 168).)  On October 7, 2002, The court of appeals affirmed the dismissal of Truck Insurance and Ickes on jurisdictional grounds, but vacated the dismissal of the County and Health District defendants and remanded the matter for further proceedings.  *See MacArthur v. San Juan County*, 309 F.3d 1216 (10th Cir. 2002).  By that time, the case had already been reassigned to this court.

One month later, in November of 2002, the plaintiffs sought leave to file an amended

---

[1]In a number of instances, Mr. Dickson's name was spelled "Alison" rather than "Allison" in plaintiffs' pleadings, affidavits, and other papers. Except when it would alter a quotation, this court uses the "Allison" spelling, as it appears on this record to be the one Mr. Dickson uses in writing his own name.

complaint that, among other things, would clarify the claims of Singer, Riggs and Dickson in light of the appellate court opinion.  Leave to amend having since been granted, the claims of these three plaintiffs are now set forth in Part II of the Amended Complaint.  (*See* Amended Complaint, filed June 14, 2005 *nunc pro tunc* to November 14, 2002 (dkt. no. 744) ("Amended Complaint"), at 98-120.)

## I.  THE ISSUES ON REMAND

The Tenth Circuit vacated the court's dismissal of Singer, Riggs and Dickson's claims against County and Health District defendants, and remanded the matter for further proceedings consistent with its opinion that "the district court should have performed a *Montana* analysis before reaching the sovereign immunity question," referring to *Montana v. United States*, 450 U.S. 544 (1981).  *MacArthur v. San Juan County*, 309 F.3d at 1227, 1228.

> The threshold question in our review of the Navajo court judgment is whether the Navajo Nation's decision to exercise adjudicative power over County and Health District defendants passes muster under *Montana.*  If, and only if, appellants overcome the heavy presumption *Montana* establishes against the existence of tribal jurisdiction will a federal court have occasion to address the sovereign immunity issue at all.

*Id.* at 1226.

On remand, then, this court must first determine whether the Navajo Nation District Court had subject-matter jurisdiction over the parties and claims in *Donna Singer, et al. vs. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation Dist. Ct., filed April 12, 1999), the proceeding in which the orders now at issue were originally entered.  To make that determination, this court has examined (1) the nature and scope of Navajo sovereignty; (2) the tribal forum's relationship to the parties and the subject matter of the claims, including

2

the nature of the interests and injuries asserted by these plaintiffs, and whether the scope of the protection of Navajo law extends to embrace those interests and injuries; and (3) the extent of the jurisdiction of the Navajo courts to adjudicate plaintiffs' pleaded claims against the County and Health District defendants and grant the relief reflected in the three orders now at issue.

Should plaintiffs' claims fall within the subject matter jurisdiction of the Navajo court, this court must decide whether the Navajo court's adjudication of those claims was barred by sovereign immunity—as asserted by the County and Health District defendants and previously held by this court—or whether the plaintiffs are entitled to enforcement of the Navajo court orders through further proceedings in this court, applying either principles of comity or full faith and credit.

## II. PRÉCIS

For reasons explained in some detail below, this court holds that the Navajo Nation District Court had subject-matter jurisdiction of plaintiffs Riggs and Dickson's claims against the San Juan Health Services District, and Riggs' defamation claim against one individual defendant, Reid Wood, arising from Riggs and Dickson's employment at the Montezuma Creek Clinic, a facility located on state-owned land within the boundaries of the Navajo Reservation: both Riggs and Dickson are Navajo tribal members living on the Navajo Reservation, and (1) their employment by the District was a "consensual relationship with the tribe or its members" entered into "through . . . contracts, . . . or other arrangements," and (2) employer conduct in such employment relationships "has some direct effect on . . . the

3

economic security, or the health or welfare of the tribe," all within the meaning of *Montana v. United States*, 450 U.S. 544, 565-566 (1981), the controlling Supreme Court precedent vindicating the exercise of Navajo civil jurisdiction over non-Indians under either of those circumstances.  The Navajo court also had exclusive subject-matter jurisdiction of the claims of Riggs, Dickson and Singer against defendant Roger Atcitty, a Navajo tribal member residing on the reservation who had served as a member of the Health District's governing board, under *Navajo Nation Code*, tit. 7, § 253(B).

This court holds that the Navajo court did not have subject-matter jurisdiction of Riggs and Dickson's claims against San Juan County and the named non-Indian individual defendants (other than defendants Wood and Atcitty) under *Montana* or the *Navajo Nation Code*.  Under controlling Supreme Court precedent, the Navajo court also did not have subject-matter jurisdiction of the claims of plaintiff Singer, a non-Indian living outside of the Navajo Reservation who is married to a Navajo tribal member, as against San Juan County, the Health District, or the non-Indian individual defendants arising from her employment as manager of the same clinic.

Excepting Riggs' defamation claim pleaded against Wood individually, adjudication in the Navajo court of Riggs and Dickson's cognizable claims against the San Juan Health Services District, Atcitty and Wood (and Singer's claim against Atcitty) is barred by the District's sovereign immunity under the limited-waiver, exclusive-remedy and exclusive-forum provisions of the Utah Governmental Immunity Act.  The Act's limited waiver of immunity does not give the State of Utah's consent to suit against its political subdivisions in

4

Indian tribal courts.

Sovereign immunity aside, the plaintiffs have asked this court to enforce three interlocutory orders "as issued" by the Navajo court granting preliminary injunctive and other equitable relief against the Health District and defendant Wood as a matter of full faith and credit, or under principles of comity. Yet much of that injunctive relief was rendered moot even before this action was filed in July of 2000; the portion of the equitable relief prescribed by those orders that is not moot still remains interlocutory and unliquidated as to sums ordered to be paid. For these reasons, the three Navajo court orders at issue need not be recognized or enforced in this forum at this time.

## III. PROCEDURAL HISTORY

Following receipt of the Tenth Circuit's mandate in this case on November 20, 2002 (dkt. no. 460), this court set a schedule for consideration of the issues on remand. (*See* Minute Entry, dated January 7, 2003 (dkt. no. 480).) Those issues were briefed by counsel for the parties. (*See* "Plaintiffs' Briefing on *Montana*," filed February 13, 2003 (dkt. no. 492);[2] San Juan Health District Defendants' Memorandum Regarding Subject Matter Jurisdiction and in Support of Motion to Dismiss or for Summary Judgment, filed February

---

[2]Plaintiffs "incorporate[d] the briefing done in their Supreme Court petition and Writ of Mandamus petitions into this briefing," apparently referring to their "Petition for a Writ of Certiorari," *Riggs v. San Juan County*, No. 02-1253 (U.S.S.Ct., filed February 6, 2003), and "Petition for a Writ of Mandamus and Prohibition," *In re: Riggs, et al. v. San Juan County, et al.*, Case No. 03-4036 (10th Cir., filed February 13, 2003), copies of which are lodged in this court's file. Those briefs are hereinafter cited as "**Pltfs' Cert. Pet.**" and "**Pltfs' Mandamus Pet.**," respectively.

The plaintiffs' Tenth Circuit mandamus petition was denied on February 20, 2003, and certiorari was denied on June 2, 2003, *see* 539 U.S. 902 (2003). Plaintiffs also filed in the Supreme Court a Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct. filed May 28, 2003), which was denied on October 6, 2003, *see* 540 U.S. 810 (2003). The Supreme Court denied rehearing on plaintiffs' petition on December 1, 2003, *see* 540 U.S. 1069 (2003).

20, 2003 (dkt. no. 497); San Juan County Defendants' Memorandum Regarding Tribal Court

Jurisdiction, filed February 20, 2003 (dkt. no. 499); Adoption of San Juan Health District

Defendants and San Juan County Defendants' Memoranda Regarding Subject Matter

Jurisdiction, filed February 21, 2003 (dkt. no. 501); "Federalism and Article III Court

Limitations in Defining Navajo Tribal Court Jurisdiction" [unsigned original document

submitted by plaintiffs' counsel], filed February 24, 2003 (dkt. no. 502).[3])

The issues on remand were set for hearing on February 24, 2003.  At that time, the

court heard and considered the arguments of counsel and the matter was taken under

advisement.  (*See* Minute Entry, dated February 24, 2003 (dkt. no. 503); Transcript of

Hearing, dated February 24, 2003 ("Tr. 2/24/03"), *passim*.)

Following the hearing, counsel submitted additional written materials, including

plaintiffs' motion for summary judgment. (*See* Plaintiffs' Motion for Summary Judgment for

Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and

Response of the District and County's Briefs and Motions for Summary Judgment [&

Memorandum in Support], filed February 28, 2003 (dkt. no. 504) ("Pltfs' Summ. Judg. Mem.

(504)").[4]

---

[3]As it turns out, this submission consisted of exhibits that were supposed to be appended to "Plaintiffs'
Motion to Allow Plaintiffs Corrections of Factual Assertions in the February 24, 2003 Hearing,"(dkt. no. 571), which
was served on opposing counsel on or about February 24, 2003, but was not filed with the court until November 18,
2003.  *Cf.* Fed. R. Civ. P. 5(d).

[4](*See also* "Plaintiffs' Motion to Compel," filed March 6, 2003 (dkt. no. 507); Memorandum in Support of
the Plaintiffs' Motion to Compel, filed March 6, 2003 (dkt. no. 508).)  This "motion to compel" did not concern
discovery or disclosure.  *Cf.* Fed. R. Civ. P. 37(a).  Instead, the Part II Plaintiffs sought an order requiring the
defendants to brief the jurisdictional question in the manner consistent with language found in *National Farmers
Union Ins. Co. v. Crow Tribe*, 471 U.S. 845, 856 (1985), to "express their waiver of any claims of immunity for this

(continued...)

The court revisited the issues on remand at a December 19, 2003 hearing on pending

---

[4](...continued)

Court's jurisdiction," and to "brief this Article III court's subject matter jurisdiction to define . . . the Navajo Court's subject matter jurisdiction in any way other than as Congress defines tribal court jurisdiction."  (Plaintiffs' Motion to Compel, filed March 6, 2003 (dkt. no. 507), at 2.)  The motion was briefed, (*see* Health District Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel, etc., filed March 20, 2003 (dkt. no. 524); San Juan County Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel, filed March 24, 2003 (dkt. no. 526); Plaintiffs' Reply to the County Defendant's Opposition to the Plaintiffs' Motion to Compel a Nat'l Farmers Analysis, filed March 28, 2003 (dkt. no. 537)); was argued at the December 19, 2003 hearing; was taken under advisement; and was ultimately denied.  (*See* Order re: Pending Motions, filed March 30, 2005 (dkt. no. 718), at 1-2.)

Plaintiffs' "Motion to Allow Plaintiffs 'Pertinent Parts of the Navajo Court Record' as Originally Served on Navajo Court Defendants and in Possession of the Court and Defendants be Accepted as Evidence for the Enforcing [of] Navajo Court Orders," was filed on November 17, 2003 (dkt. no. 568), with a memorandum in support (dkt. no. 569).)  It appears that this motion was served on opposing counsel on or about February 24, 2003, but was not filed with the court until November 17, 2003.  *Cf.* Fed. R. Civ. P. 5(d).  The defendants had filed memoranda responding to this motion on March 11, 2003.  (*See* San Juan County Defendants' Memorandum in Opposition to Plaintiffs' Motion to Allow Parts of the Navajo Court Record Be Accepted as Evidence for Enforcing Navajo Orders, filed March 11, 2003 (dkt. no. 512); Health District Defendants' "Memorandum in Opposition to Motion to Allow Plaintiffs' Pertinent Parts of the Navajo Court Record as Originally Served on Navajo Court Defendants and in Possession of the Court and Defendants [to] Be Accepted as Evidence for the Enforcing [sic] Navajo Orders," filed March 11, 2003 (dkt. no. 515).)  Plaintiffs replied.  (Plaintiffs' Reply to Defendant's Memorandum in Opposition to the Plaintiffs' Submitting Parts of the Navajo Court Record, filed March 18, 2003 (dkt. no. 520);"Plaintiffs' Reply to the District/County Memorandum Opposition to Allow Plnt's' Pertinent Parts of the Navajo Record, [etc.]," filed March 31, 2003 (dkt. no. 539).)  The court granted this motion in part.  (*See infra* note 12; Order re: Pending Motions, filed March 30, 2005 (dkt. no. 718), at 2.)

It also appears that plaintiffs' "Motion to Allow Plaintiffs Corrections of Factual Assertions in the February 24, 2003 Hearing" was not filed until November 18, 2003 (dkt. no. 571), with a memorandum in support (dkt. no. 570); ironically preceded by opposition memoranda, and a reply.  (Plaintiffs' Reply to Defendant's Memorandum in Opposition to the Plaintiffs' Correction of Record for February 24, 2003, filed March 18, 2003 (dkt. no. 519).)

 On March 13, 2003, plaintiffs filed a motion attacking the defendants' sovereign immunity defense.  (*See* Plaintiffs' Motion to Strike All Defendants' Cases re: "State" Immunity, filed March 13, 2003 (dkt. no. 516); Memorandum in Support of Motion to Strike All Defendants' Cases re: "State" Immunity, filed March 13, 2003 (dkt. no. 517).) This motion was discussed briefly at the December 19, 2003 hearing, *see* Transcript of Hearing, dated December 19, 2003 ("Tr. 12/19/03"), at 6:21-7:1 (the Court), and was stricken by order of the court as premature. (*See* Order on Motions Decided at December 19, 2003 Hearing, filed on January 29, 2004 (dkt. no. 603), at 3.) Further, Plaintiffs' Motion for Declaratory Judgment with Regard to Government Immunity, filed August 16, 2002 (dkt. no. 407), was likewise stricken as premature.  (*Id.*)

Plaintiffs filed additional motions and memoranda in March of 2003.  (*See* Plaintiffs' Motion for Immediate Enforcement of Navajo Orders against the County and County Commissioners Stevens and Morgan, filed March 18, 2003 (dkt. no. 521); Memorandum in Support of Plaintiffs' Motion for the Immediate Enforcement of Navajo Orders against the County and the County Commissioners Stevens and Morgan, filed March 18, 2003 (dkt. no. 522); Plaintiffs' Motion to Correct Their Submission of the BIA Contract with the Navajo Nation Judicial Program, filed March 28, 2003 (dkt. no. 535); "Plaintiffs' Reply to the District/County (1) Memorandum in Opposition to the Plaintiffs' Motion to Compel; (2) Summary Judgment Motion; (3) Motion to Strike State Cases and (4) Response to the Def's **Gag Order** Motion; (5) Response to Def's Opposition to the Plnt's Motion for Reconsideration," filed March 31, 2003 (dkt. no. 540).) The defendants, in turn, filed responsive memoranda. (*See, e.g.,* Health District Defendants' Memorandum in Opposition to Plaintiffs' Motion to Correct Their Submission of the BIA Contract with the Navajo Nation Judicial Program, filed April 17, 2003 (dkt. no. 554).)

motions:

> THE COURT: . . . Now people have filed a great deal of material couched under some fairly interesting labels, but they relate really to the question of the subject matter of the mandate, namely the jurisdictional powers of the Navajo Court.  And the defendants have filed a memorandum which I think is their effort to deal with the jurisdiction issue on remand and plaintiffs have filed a motion but it relates to the jurisdictional question on remand and it seems to me we have got three questions.  We have got the jurisdiction of the Navajo Court, which is the subject matter of the mandate.  We have got the question then of the jurisdiction of this court and then we have got the question as to whether immunity is available.

> But the first thing we have to decide, it seems to me, is the power of the Navajo Court to do what it did and the effort on the part of the plaintiffs here to enforce the order that was received from the Navajo Court.

(Tr. 12/19/03, at 7:2-18 (the Court).)[5]  The court inquired "if anybody wants to add anything in writing, in dealing with the jurisdictional question?"  (*Id.* at 7:19-20.)  Plaintiffs' counsel indicated that she wished to submit further written materials.  (*Id.* at 8:3-13 (Ms. Rose).)[6]

---

[5]Shortly before the December 19th hearing, plaintiffs' counsel filed motions seeking to "remand" this action in favor of requiring the defendants to exhaust tribal appellate remedies as to the jurisdictional question and other issues.  (*See* Plaintiffs' Motion for an Order to Reschedule the Hearing of Dec. 19th and Schedule a Hearing for the Motion to Remand or Allow Plaintiffs' to Dismiss their Action," filed December 12, 2003 (dkt. no. 575); Plaintiffs' Motion for an Order of Remand to Navajo Court or in the Alternative an Order Allowing Plaintiffs' to Withdraw their Complaint for Enforcement of Navajo Court Orders, filed December 12, 2003 (dkt. no. 579).)  There was some preliminary discussion of plaintiffs' "remand" concept at the December 19th hearing, (*see* Tr. 12/19/03, at 25:11-27:6, 51:4-52:6, 53:5-12), but the defendants had not yet filed written responses.  Thereafter, the San Juan County defendants filed a memorandum opposing the "remand" motion, joined by the Health District defendants, to which the plaintiffs then filed a reply. (*See* San Juan County Defendants Memorandum in Opposition to Plaintiffs' Motion for an Order of Remand to Navajo Court or in the Alternative an Order Allowing Plaintiffs' to Withdraw their Complaint for Enforcement of Navajo Court Orders, filed December 31, 2003 (dkt. no. 586); Joinder in San Juan County Defendants' Memorandum, etc., filed January 2, 2004 (dkt. no. 587); The Health District Defendants' Joinder in San Juan County Defendants' Memorandum, etc., filed January 6, 2004 (dkt. no. 588); Plaintiffs' Reply to and Motion to Strike or Dismiss Defendants' Opposition to Plaintiffs' Motion to Remand or in the Alternative to Withdraw the Complaint Without Prejudice, filed January 9, 2004 (dkt. no. 591).)  Subsequently, however, counsel indicated that the "remand" motion was to be withdrawn, and later, deferred "until the Court and the parties have disposed of the prior motions," (Letter from Ms. Rose to the Court (via fax), dated September 28, 2004, at [2]); the remand motion was not listed by counsel as among the matters still needing to be addressed as of the time of the September 28, 2004 status conference.  (*See* Transcript of Hearing, dated September 28, 2004, *passim*.)

[6]*See* "Compendium of Exhibits in Support of Enforcing Navajo Court Orders Under Full Faith and Credit

(continued...)

The court then asked if anyone wanted to add anything "in the way of oral argument at this point" as to the issues on remand, and plaintiffs' counsel indicated that she did.  (*Id.* at 8:14-9:10 (Ms. Rose).)  Counsel presented argument at some length concerning the jurisdictional question, (*see id.* at 9:18-65:13), and the court once again took the matter under advisement. (*Id.* at 66:20-22; *see* Minute Entry, dated December 19, 2003 (dkt. no. 582).)

The filing of motions and memoranda continued.[7]  Counsel also submitted several

_____

[6](...continued)
or Remanding the Case for Exhaustion," duplicate copies of which were submitted as Plaintiffs' Exhibits "A" and "B" (hereinafter cited as "**Pltfs' 12/19/03 Compendium A/B**").)

[7](*See* "Motion to Correct Facts Asserted in the 12-19-03 Hearing and Supplement the Hearing Record," filed on December 19, 2003 (dkt. no. 583), and memorandum in support (dkt. no. 584); "Plaintiffs' Notice to the Court of a Pending Indian Law Decision in U.S. v. Lara," filed February 3, 2004 (dkt. no. 607); "Plaintiffs' Motion for an Order Granting Parties Permission to Brief the U.S. v. Lara Supreme Court Decision," filed April 20, 2004 (dkt. no. 641), and supporting memorandum (dkt. no. 642); Health District Defendants' Memorandum in Opposition to Plaintiffs' Motion for an Order Granting Parties Permission to Brief the U.S. v. Lara Supreme Court Decision, filed May 5, 2004 (dkt. no. 643); "Plaintiffs' Motion for this Court to Address the Defendants' Immunity Issue and Full Faith and Credit Issue in any Order on Jurisdiction," filed September 24, 2004 (dkt. no. 661), with supporting memorandum (dkt. no. 662).)

Plaintiffs' counsel also submitted proposed forms of order finding that the Navajo court had subject matter jurisdiction (currently lodged in the court's file), precipitating a flurry of written objections filed by the defendants, to which plaintiffs filed a reply.  (*See* San Juan County Defendants' "Objection to Plaintiffs' Order Finding the Navajo Court Had Subject Matter Jurisdiction Over Navajo Nation Law and Indian Civil Rights Act Violations," filed January 14, 2004 (dkt. no. 593); Health District Defendants' "Objection to Plaintiffs' Proposed 'Order' Finding the Navajo Court Subject Matter Jurisdiction Over Navajo Nation Law and Indian Civil Rights Act Violations," filed January 14, 2004 (dkt. no. 594); Health District Defendants' "Objection to the Plaintiffs' Proposed Orders Finding the Navajo Court Subject Matter Jurisdiction Over Navajo Nation Law and Indian Civil Rights Act Violations and Memorandum in Opposition to Plaintiffs' Motion to Strike or Dismiss," filed January 20, 2004 (dkt. no. 596); San Juan County Defendants' Joinder in the Health District Defendants' Objection, etc. [dkt. no. 596], filed January 22, 2004 (dkt. no. 598); Plaintiffs' Reply to Defendants' Objections to the Plaintiffs' Proposed Orders Supporting Navajo Nation Court Jurisdiction, filed January 26, 2004 (dkt. no. 600); Objection of the San Juan Health Service Defendants to Plaintiffs' Proposed Order Finding the Navajo Court Had Subject Matter Jurisdiction and Proposed Order Allowing Withdrawal of the Complaint Without Prejudice for Further Fact Finding in Light of Supreme . . . Court Rulings, filed January 27, 2004 (dkt. no. 601); Plaintiffs' Reply to Attorney Harrison's Objection to the Plaintiffs' Proposed Orders and Motion to Strike the Objection, filed January 29, 2004 (dkt. no. 605); Plaintiffs' Motion to Strike Mr. Harrison's Objection to the Proposed Orders Finding the Navajo Court Had Subject Matter Jurisdiction, filed January 30, 2004 (dkt. no. 606); Health District Defendants' Response to Plaintiffs' Motion to Strike Mr. Harrison's Objection to the Proposed Orders Finding the Navajo Court Had Subject Matter Jurisdiction, filed February 11, 2004 (dkt. no. 608); Plaintiffs' "Reply to Mr. Harrison's February 11, Response," filed February 20, 2004 (dkt. no. 613).)

9

citations to supplemental authority as allowed by DUCivR 7-1(b)(4).[8]

In May of 2004, plaintiffs' counsel requested that this case be referred to mediation or a settlement conference.[9]  Though the defendants initially opposed a referral to mediation, by the time of the July 6, 2004 hearing on the subject, they had joined in the request, and this court referred the matter for a judicial settlement conference pursuant to the court's Local Rule, DUCivR 16-3(b), deferring further consideration of the matter pending the outcome of the settlement conference.  (*See* Minute Entry, dated July 6, 2004 (dkt. no. 657).)

The court set the matter for a status conference on September 28, 2004.  (*See* Notice of Hearing, filed September 7, 2004 (dkt. no. 660).)  At that time, counsel reported that the

_____

[8]Those authorities include *Inyo County v. Paiute-Shoshone Indians*, 538 U.S. 701 (2003); *Jinks v. Richland County*, 538 U.S. 456 (2003); *Cook County v. United States ex rel. Chandler*, 538 U.S. 119 (2003); *Prairie Band of Potawatomi Nation v. Wagnon*, 402 F.3d 1015 (10th Cir. 2005); *Prairie Band of Potawatomi Nation v. Richards*, 379 F.3d 979 (10th Cir. 2004); *Kaw Nation ex rel. McCauley v. Lujan*, 378 F.3d 1139 (10th Cir. 2004); *Skull Valley Band Of Goshute Indians v. Nielson*, 376 F.3d 1223, 198 A.L.R. Fed. 741, 34 Envtl. L. Rep. 20,064 (10th Cir. 2004), *petition for writ of certiorari filed*, 73 U.S.L.W. 3287 (Oct 28, 2004) (No. 04-575); *Soskin v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004); *Seneca-Cayuga Tribe of Oklahoma v. National Indian Gaming Comm'n*, 327 F.3d 1019 (10th Cir. 2003); *cert. denied sub nom. Ashcroft v. Seneca-Cayuga Tribe of Oklahoma*, 540 U.S. 1218 (2004); *Cabazon Band of Mission Indians v. Smith*, 388 F.3d 691 (9th Cir. 2004); *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674 (9th Cir. 2004), *cert. denied*, 125 S.Ct. 1397 (2005); *Boozer v. Wilder*, 381 F.3d 931 (9th Cir.  2004); *Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055 (9th Cir. 2004);   *United  States v. Archambault*, 97 Fed. Appx. 59, 2004 WL 1058069, 2004 U.S.App. LEXIS  9288 (8th Cir. 2004); *Grand Traverse Band of Ottawa and Chippewa Indians v. Office of U.S. Atty. for Western Div. of Michigan*, 369 F.3d 960 (6th Cir. 2004); *Marathon Oil Co. v. Johnston*, Case No. 03-CV-1031J (D. Wyo., decided June 1, 2004); *Azure-Lone Fight v. Cain*, 317 F. Supp.2d 1148 (D.N.D.  2004); *Johnston v. Marathon Oil Co.*, Case No. CV-02-010 (Shoshone & Arapahoe Trib. Ct., decided January 7, 2005); *Judy v. White*, No. SC-CV-35-02 (Navajo S. Ct. 08/02/2004); *Ackerman v. Edwards*, 121 Cal. App. 4th 946, 17 Cal. Rptr. 3d 517 (Ct. App. 3d Dist. 2004); *State of South Dakota v. Cummings*, 2004 SD 56, 679 N.W.2d 484; *Rodriguez v. Wong*, 119 Wash. App. 636, 82 P.3d 263 (2004).

On April 4, 2005, plaintiffs' counsel also filed a document entitled "Plaintiffs' Motion for an Order Enforcing Navajo Court Orders," (dkt. no. 719), which consisted of a citation to supplemental authority buttressed by further written argument as to the issues on remand.  The court struck the filing because of counsel's failure to comply with the court's Local Rules concerning supplemental memoranda and citations to supplemental authority, *see* DUCivR 7-1(b)(4), DUCivR 7-2.  (*See* Order re: Plaintiffs' April 4, 2005 Motion, filed April 5, 2005 (dkt. no. 720).)

[9](*See* Plaintiffs' Motion to Refer Case to Mediation, Filed May 10, 2004 (dkt. no. 644), and supporting memorandum (dkt. no. 645); Plaintiffs' Motion for Settlement Conference with the County and County Defendants, filed June 7, 2004 (dkt. no. 652), and supporting memorandum (dkt. no. 653).)

10

settlement conference had failed, and court and counsel discussed the issues then remaining for decision.  (*See* Minute Entry, dated September 28, 2004 (dkt. no. 663);  Transcript of Hearing, dated September 28, 2004, *passim*.)[10]

More recently, the court granted the plaintiffs' "Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & The 10th Cir. Court 10-7-02 Opinion," filed November 6, 2002 (dkt. no. 438), which *inter alia*, cast the pleadings of the Part II Plaintiffs (Singer, Riggs and Dickson) in their current form, purportedly  clarifying the Part II Plaintiffs' claims in light of the court of appeals' October 7, 2002 opinion.  (*See* Amended Complaint, filed June 14, 2005 (*nunc pro tunc* to November 14, 2002) (dkt. no. 744), at 98-120.)   That amendment to the pleadings, however, did not significantly alter the analytical framework for consideration of the issues on remand—a framework that was examined in detail at both the February 24 and December 19, 2003 hearings, was reviewed briefly at the September 28, 2004 status conference, and now guides this court's consideration and resolutions of the issues on remand.

## IV.  THE CLAIMS OF THE PART II PLAINTIFFS

At the outset, the subject-matter jurisdiction of the Navajo court must be examined in the context of the pleadings that originally invoked that jurisdiction, the parties over whom the Navajo court sought to exercise its adjudicative authority, and the remedies that it

---

[10]Thereafter, plaintiffs' counsel filed a series of motions involving the Part I Plaintiffs (MacArthur, Lyman and Valdez), as well as two motions to amend the complaint, primarily involving revisions to the Part I Plaintiffs' claims.  On June 13, 2005, this court entered a Memorandum Decision & Order detailing the reasons for the dismissal of the Part I Plaintiffs' claims—claims which had previously been disposed of pursuant to Fed. R. Civ. P. 16(c)(1) in the context of the Final Pretrial Conference on November 14 and 15, 2002.  (*See* Memorandum Decision & Order, filed June 13, 2005 (dkt. no 742), *passim*.)

prescribed in an effort to resolve the disputes brought before it.

According to Part II of the Amended Complaint, plaintiffs Singer, Riggs and Dickson (the "Part II Plaintiffs") seek an order of this court enforcing four orders previously entered by the Navajo District Court against several of the named defendants, including San Juan County, the San Juan Health Services District, Rick Bailey (County administrator and CEO of the District); Reid Wood (District CEO); Laurie Schafer (District Patient Care Director); San Juan County Attorney Craig Halls; County Commissioners Bill Redd and J. Tyron Lewis (both as commissioners and Health District Board members); and Health District Board members Roger Atcitty, John Lewis, Karen Adams, and Patsy Shumway.[11]   (Amended Complaint at 105-106.)

### A.  Ms. Donna Singer

Donna Singer is the "non-Indian spouse of a Navajo Tribal Member who lives outside but near the reservation, and who worked at Montezuma Creek Clinic," a facility operated by

---

[11]Former County Commissioner Mark Maryboy was also named as a defendant in the Navajo court, but has since been dismissed as a defendant in this action and is not now before this court.  (*See* Order re: Dismissal of Defendant Mark Maryboy, filed November 29, 2001 (dkt. no. 234).)  In this action, Commissioner Maryboy had been sued solely in his official capacity, which as a practical matter "is the same as a suit 'against [the] entity of which [the] officer is an agent," in this case, San Juan County, which remains a named defendant in this action. *McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997) (quoting *Kentucky v. Graham*, 473 U.S. 159,165 (1985) (quoting *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 n.55 (1975))).  Recalling that an adverse judgment in an "official capacity" suit "'imposes liability on the entity that [the officer] represents,'" *id.* at 785 n.2 (quoting *Brandon v. Holt*, 469 U.S. 464, 471 (1985)), and noting that the plaintiffs sought no specific remedy as against former Commissioner Maryboy—in contrast to other named individual defendants—this court saw no need to prolong former Commissioner Maryboy's presence as a defendant in this case.

And essentially the same may be said for defendant Shumway, also sued only in her official capacity. Plaintiffs' counsel indicated to the United States Supreme Court in 2003 that Ms. Shumway is no longer a defendant in this action.  (*See* Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct. filed May 28, 2003), at iv ("Previously Commissioner Mark Maryboy and Patsy Shumway were named in their official capacities only, and have since left office and are no longer parties.").)

Mary Nielson (a/k/a Mary Nielsen), the Health District financial officer, was listed as a defendant in plaintiffs' original Complaint (Navajo Ct. Cmplt. at 1, 3 ¶ 10),  (District CFO); but is not listed in the caption of the three Navajo court orders.  Nor was she named as a defendant in this case.

the San Juan Health Services District at the time of the events of which she complains. (Amended Complaint at 104.)  She was employed as the manager of the Montezuma Creek Clinic from 1995 until the termination of her employment by the SJHSD in December 1998. She is currently employed at the clinic by Utah Navajo Health Systems, Inc., a Native American non-profit organization that has operated the Montezuma Creek Clinic under a Pub. L. 93-638 (Indian Self-Determination and Education Assistance Act) contract with the Navajo Nation since January 1, 2000.

According to her Navajo court pleadings, Ms. Singer "over the years had made numerous minor time card mistakes," as had "[m]any people throughout the San Juan Health Services District system."  (Complaint for Damages, filed April 12, 1999, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District ("Navajo Ct. Cmplt."), at 7 ¶¶ 43-44; *available in* "Pertinent Parts of the Navajo Court Record As Attachment to the Amended Complaint," received November 8, 2002 (dkt. no. 438 note).[12])  Yet she "received no official letter or notice with warning

---

[12]Though filed on November 8, 2002—two days *after* the plaintiffs' "Rule 15 Motion to Amend and Supplement Complaint to Conform to the Evidence & The 10th Cir. Court 10-7-02 Opinion," filed November 6, 2002 (dkt. no. 438)—this three-inch-thick compendium of documents purported to be "attached to the amended Complaint" and "incorporated into the complaint."  ("Pertinent Parts of the Navajo Court Record As Attachment to the Amended Complaint," received November 8, 2002 (dkt. no. 438 note), at [1].)  The plaintiffs' Rule 15 motion was granted on June 13, 2005, *nunc pro tunc* to November 14, 2002, (*see* Memorandum Decision & Order, filed June 13, 2005 (dkt. no. 742), at 187), and the Amended Complaint was filed on June 14, 2005 (dkt. no. 744), together with four attached documents originally submitted with the proposed Amended Complaint on November 6, 2002.  However, the plaintiffs' "Pertinent Parts" compendium was not embraced in that filing.

The plaintiffs had previously filed a "Motion to Allow Plaintiffs 'Pertinent Parts of the Navajo Court Record' as Originally Served on Navajo Court Defendants and in Possession of the Court and Defendants be Accepted as Evidence for the Enforcing [of] Navajo Court Orders," filed November 17, 2003 (dkt. no. 568).  This court had already granted that motion in part, *viz.*, "to the extent that the submitted documents shall be received as evidentiary exhibits."  (Order re: Pending Motions, filed March 30, 2005 (dkt. no. 718), at 2.)  The plaintiffs' "Pertinent Parts" compendium thus remains a part of the record in this action as a compilation of *evidentiary*

(continued...)

13

language concerning time card mistakes or errors in nearly 18 years" of working for the County and the SJHSD.  (*Id.* at 7 ¶ 47 & Exhs. 25, 27, 28.)[13]  As an "exempt" managerial employee under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (2000), Ms. Singer asserted that she "was not allowed to have overtime" compensation, (*id.* at 8 ¶¶ 51-52[14]), yet was required to keep time cards, allegedly "in violation of SJHSD board policies." (*Id.* at 8 ¶ 53 & Exh. 38.)

Ms. Singer alleged that she "was asking questions about ambiguous budget expense items put onto Montezuma Creek Health Clinic's budget at a public meeting of the Administrative Control Board of the San Juan Health Services District regular monthly scheduled meeting as a participating member of the audience," apparently in June of 1998, (*id.* at 8-9 ¶ 60 & Exh. 64, at [1]-[2]), and that she had been both "privately" and "publicly" supportive "of a private hospital coming into Blanding."  (*Id.* at 9 ¶¶ 61-62.)[15]

_____

[12](...continued)
*exhibits*, rather than as a part of the Amended Complaint itself, and is hereinafter cited as "**Pertinent Parts Navajo Ct. R.**"

[13]It appears that the plaintiffs' original Navajo court complaint was accompanied by a series of documentary "attachments," including the plaintiffs' ONLR complaints, a legal memorandum discussing jurisdictional issues, and 65 evidentiary exhibits.  (*See* Pertinent Parts Navajo Ct. R. ("Memorandum SMJ" and "Table of Exhibits 1-65" Tabs).)  For purposes of this discussion, the plaintiffs' original Navajo court complaint and all of its attachments are treated as a single pleading.

[14]Memoranda attached to the original tribal court complaint refer to Ms. Singer receiving overtime compensation based upon her time cards.  (Navajo Ct. Cmplt. at Exhs. 25, 32.)

[15]Her public comments apparently provoked some reaction within the SJHSD.  Ms. Singer recounts that on November 25, 1998, SJHSD financial officer Mary Nielson told her "All I can say is that you made some people very angry with your questions and comments at [the] board meeting."  (Navajo Ct. Cmplt. at Exh.64, at [4].)  When Ms. Singer met privately with Reid Wood for the first time on November 19th, she recalls him beginning by saying "You need to remember who you work for," without further explanation of the import of that comment.  (*Id.* at Exh. 64, at [3].)  Wood terminated Ms. Singer's employment two weeks later.  (*Id.* at Exh. 64, at [4]-[5].)

14

She further alleged that on or about November 13, 1998, a mistake was made on her time card: "Mrs. Singer was in Blanding when an unknown person at the Montezuma Creek Health Clinic clocked in on her card." (*Id.* at 7 ¶¶ 45-46 & Exh. 30.)  The resulting error came to the attention of District administrators, and on or about November 25, Ms. Singer provided a written explanation of the error.  (*Id.* at Exh.32.)  Ms. Singer was then given a December 1 memorandum from Reid Wood, Chief Executive Officer of the Health District, referring to allegations of "time card fraud," and she was placed on paid administrative leave. (*Id.* at Exh. 34.)  A second memorandum from Wood, dated December 2, advised Ms. Singer that "it has been alleged that you have engaged in employment related misconduct," specifically that she had "[s]ubmitted false information regarding your hours worked on your time card for the period ending November 22, 1998 by reporting that you worked 80 regular hours when you only worked 68 regular hours," and scheduled a "pre-disciplinary hearing" for December 4, 1998.  (*Id.* at Exh. 35.)

Following his meeting with Ms. Singer on December 4, Wood prepared a "Notice of Decision" memorandum, dated December 7, advising Ms. Singer that the allegations that her "[t]ime card for the period ending November 22, 1998 was improperly reported," and that she "also approved another employee's time card that was incorrect" was "supported by the substantial evidence," and that "it is my decision to terminate your employment as of 5:00 p.m. December 4, 1998."  (*Id.* at Exh. 36.)

> As we discussed, as a supervisor you are held to a higher standard of conduct.
> Your personnel file also indicates that this is not the first time this problem has
> occurred. . . .

15

Please be advised that you have a right to appeal this decision by submitting a written notice to appeal with San Juan Health Care Services within ten days of receipt of this notice.  If an appeal is filed, your appeal will be submitted to the appeals board.  If you fail to file an appeal you waive any right to contest this decision at a later date.

(*Id.*)

Her pleadings did not detail the sequence of events following December 7, 1998 (*e.g.*, her pursuit of an appeal, *see id.* at Exh. 44), but Ms. Singer did allege that at a subsequent grievance hearing on February 12, 1999, "Mr. Wood admitted that 'time cards' were not the problem or cause of Mrs. Singer's discharge from her employment," (*id.* at 7 ¶ 39 & Exh. 39), that Wood and Mary Nielson, the Health District financial officer, had made derogatory verbal remarks about her, casting doubt on her honesty and integrity, and that these remarks were published to others.  (*Id.* at 7 ¶¶ 40-41, 12 ¶¶ 100-103.)

From the materials submitted by the plaintiffs, it appears that in or about April of 1999, Ms. Singer filed complaints with both the Office of Navajo Labor Relations (ONLR) and the Navajo Nation District Court in Shiprock, New Mexico, together with applications for temporary restraining orders and preliminary injunctive relief.  (*See id.*; Pertinent Parts Navajo Ct. R. ("Docket," & "ONLR App for TRO & P.I." Tabs).)  In both forums, Ms. Singer sought "[r]einstatement . . . to her merit position of employment as manager of the Montezuma Creek Health Clinic," with back pay, benefits and seniority status, as well as compensatory and punitive damages, attorney's fees, the retraction and expungement of all derogatory remarks and records, and a public apology.  (Navajo Ct. Cmplt. at 39-41.)  Ms. Singer also sought affirmative relief requiring the County and the District to implement a

16

merit system for employees, an employee bill of rights, and  the Navajo Preference in

Employment Act, as well as "[p]roportionate representation on the SJHSD for Aneth and Red

Mesa chapters commensurate with the population of Navajos living in the San Juan County

boundaries," presumably referring to representation on the Health District board.  (*Id.* at 40-

41.)  She requested appointment of a special master "to protect the employment rights of the

Montezuma Creek Clinic employees and possibly the Monument Valley Clinic (also serving

the Navajo Nation)" and the imposition of an unspecified "fine or sanction"against the

defendants "for SJHSD's callous disregard for the poverty stricken, down trodden, condition

of health care within the Navajo Nation, an independent sovereign and federally recognized

reservation, due primarily to the historical subjugation of the United States that has

precipitated such long standing problems as recognized in federal law."  (*Id.* at 42, 43.)  She

also asked the Navajo court "for exclusion of the defendants Mr. Wood, Mrs. Nielsen and

Mrs. Shafer, for all time from coming within the Navajo Nation's territorial boundaries . . .

for endangerment of the public safety and callous disregard for the health and welfare of the

Navajo Nation," and for "such further sanctions, fines, penalties as the Court feels is

necessary and just to protect the health, safety and welfare of the tribal members in the areas

of the Navajo Nation."  (*Id.* at 43.)[16]

---

[16]Before the Office of Navajo Labor Relations, Ms. Singer sought similar relief, including an award of
"$250,000 for recompense for nearly losing my life from the stress this caused me," the "immediate obliteration of
the CIB policy implemented by Mary Nielsen and Reid Wood," to "be taken off time cards as an legally exempt
manager," and that "[t]he same discipline I received," *viz.*, termination of employment, "be given to Reid Wood, for
any fraudulent misrepresentations Reid Wood made to the board and/or Rick Bailey," and "be given to Mary Nielsen
for not obeying the SJHSD directive to give Montezuma Creek the software it needs for billing, and for retaliation
and threats against my witnesses."  (Pertinent Parts Navajo Ct. R. at  ("ONLR Complaint" Tab).)

### B.  Mr. Fred Riggs

Fred Riggs is an enrolled member of the Navajo Nation who resides within the boundaries of the Navajo Reservation in New Mexico, and has worked for many years as a Physician's Assistant at the Montezuma Creek Clinic.  Like Ms. Singer, Mr. Riggs is currently employed by Utah Navajo Health Systems, Inc., the tribal contractor that has operated the Montezuma Creek Clinic since January 1, 2000.

Like Ms. Singer, Mr. Riggs also had problems with his SJHSD "time card" in November of 1998.

According to his Navajo court pleadings, by a letter dated November 2, 1998, SJHSD patient care director Laurie Shafer offered Riggs "the position of a Mid-Level Provider for San Juan Health Care Services," with full-time work at the Montezuma Creek Clinic at a rate of pay of $ 60,000 per year "with full benefits and $ 1000 allowance for CME's."  (Navajo Ct. Cmplt. at 9 ¶ 66 & Exh. 46.)  The letter advised that "[y]ou will be required to use a time clock while you are working," and that "[t]his position may require additional duties as necessary."  The District abruptly terminated his employment at the Montezuma Creek Clinic on or about November 4, 1998 as a "reduction in force," then rehired him almost immediately, upon Riggs' signature  accepting Shafer's offer.  (*See id.* at Exh. 46.)

Riggs thus continued to work at the Montezuma Creek Clinic, but in a lesser position at a significantly reduced rate of pay—purportedly $10,000 less per year than he had been receiving up to that time.  (Navajo Ct. Cmplt. at 9 ¶ 66 & Exh.45, at ¶¶ 8-11 (Fred Riggs Affidavit).)  And for the first time in his career, Riggs was required to keep "time cards."  (*Id.*

at Exh. 45, at ¶ 18.)

Riggs recounted an incident on or about November 11, 1998, in which he had agreed to take an emergency call in Blanding later that day, outside his existing job description.  He averred that he "asked administration personnel how, and how much he was to be paid, Reid Wood threatened his job acting as if [Riggs] was lazy, uncooperative, and insubordinate and greedy." (*Id.* at 9 ¶ 70 & Exh. 45, at ¶¶ 4-7.)

According to Riggs, his very first time card in November of 1998 reported "a day and a half of leave as 8.4 hours instead of 12 hours," an error of which he insists he was unaware. (*Id.* at Exh. 45, at ¶ 25.)  Like Singer, Wood advised Riggs in writing on December 1, 1998 that he faced allegations of "time card fraud" and placed him on administrative leave with pay   (*Id.* at 10 ¶¶ 72-73 & Exh. 45, at ¶¶ 12, 25, Exh. 48.)   Remarkably, the "specific conduct" alleged against Riggs was identical to the allegation made against Singer that same day, namely that Riggs had "[s]ubmitted false information regarding your hours worked on your time card for the period ending November 22, 1998 by reporting that you worked 80 regular hours when you only worked 68 regular hours." (*Id.* at Exh. 49.)[17]  Wood advised Riggs that he had scheduled a "pre-disciplinary hearing" for December 4, 1998.

Following the December 4th "hearing," Wood advised Riggs in writing that he had determined that the allegation that Riggs' time card "for the period ending November 22,

---

[17]Moreover, Wood's allegation that Ms. Singer had "also approved another employee's time card that was incorrect"—part of the justification for her termination—appears to refer to Mr. Riggs' November 22 time card. (Navajo Ct. Cmplt. at Exh. 36.)  Yet, according to the plaintiffs, Ms. Singer was not Mr. Riggs' supervisor and was not responsible for approving his time cards; they allege that Reid Wood was Mr. Riggs' supervisor and bore that responsibility.  (*Id.* at 8 ¶¶ 55-58.)

19

1998 was improperly reported" was "supported by the substantial evidence," and that "it is

my decision to place you on 30 days probation," meaning that Riggs' "time card will be

audited for sufficiency for that period of time."  (*Id.* at Exh. 50.)  As he had done with Singer,

Woods advised Riggs that he could appeal Wood's determination within ten days of receipt

of his memorandum.  (*Id.* at Exh. 50.)

Riggs subsequently returned to work on thirty days' probation.  (*Id.* at 10 ¶

74 & Exh. 50.)  According to Riggs, he was kept on probation for longer than thirty days,

(*id.* at 10 ¶ 75), and was given a verbal warning for placing "the time for President's [D]ay in

the wrong place on the time card."  (*Id.* at Exh. 45, at ¶ 33.)

Mr. Riggs gave written notice of his grievance concerning Wood's disciplinary action

on or about December 15, 1998, (*see id.* at Exh. 60), and a "grievance hearing" was held on

February 12, 1999.  (*Id.* at Exh. 45, at ¶¶ 27, 28.)  Riggs asserts that the February 12th

hearing panel was "tainted"by Wood's influence (Wood had recently been appointed CEO of

the Health District), and was "constituted in such a way that impartiality can not be

achieved."  (*Id.* at Exh. 45, at ¶¶ 35-40.)  Following that hearing, Riggs averred that the

"SJHSD is refusing to take charge of the time card fraud out of [his] records though it is

wholly fallacious and without foundation, and instead wish[ed] to place a letter in the file

saying it was not proven and that [Riggs] had requested the charge be removed."  (*Id.* at Exh.

45, at ¶ 29.)

Riggs complained that his "reduction in force" and resulting reduction in pay did not

comply with the Navajo Preference in Employment Act, "did not comply with a merit

20

system," and was discriminatory.[18]   (*Id.* at 9 ¶¶ 67, 68.)  He alleged that the SJHSD

failed to implement a merit system as required by Utah law,[19] and that Mr. Wood had treated

him and other Montezuma Creek Clinic employees "differently than managers and other

employees in the SJHSD system who had numerous similar time card errors on their cards,

including the payroll department."  (*Id.* at Exh. 45, at ¶ 30 (Fred Riggs Affidavit).)  He

complains that he requested training and orientation on time cards "and was met with Reid

Wood's anger and impatience . . . ."  (*Id.* at Exh. 45, at ¶ 34.)  "SJHSD has not disciplined

Mr. Riggs with common sense or respect for him as a person."  (*Id.* at 32 ¶ 286.)

---

[18]Mr. Riggs also alleges that Reid Wood offered Mr. Riggs the position of manager of the Montezuma Creek Clinic that had recently been vacated by Ms. Singer's termination.  (Navajo Ct. Cmplt. at 10 ¶ 77 & Exh. 45, at ¶ 14.)  He recounted that Wood withdrew the offer when Riggs told Wood that the action taken against Riggs had been discriminatory.  (*Id.* at 10 ¶ 80 & Exh. 45, at ¶¶ 16-17.)

[19]The Part II Plaintiffs point to the Utah Special District Personnel Management Act, Utah Code Ann. § 17A-1-601 through 17A-1-604 (2004), enacted in 1992.  (*See, e.g.*, Navajo Ct. Cmplt. at 16 ¶ 149 ("SJHSD does not adhere to merit system principals [sic] of the Utah Code 17A-1-[601] through 603.").)  That statute provides that "[a] merit system of personnel administration for the special districts of the state of Utah, their departments, offices, and agencies, except as otherwise specifically provided, is established," Utah Code Ann. § 17A-1-601(2) (2004), and states that "[i]t is the policy of this state that each special district *may establish* a personnel system administered in a manner that will provide for the effective implementation of the following merit principles:"

> (1) Recruiting, selecting, and advancing employees on the basis of their relative ability, knowledge, and skills, including open consideration of qualified applicants for initial appointment.
> (2) Provision of equitable and adequate compensation.
> (3) Training of employees as needed to assure high-quality performance.
> (4) Retention of employees on the basis of the adequacy of their performance, and separation of employees whose inadequate performance cannot be corrected.
> (5) Fair treatment of applicants and employees in all aspects of personnel administration without regard to race, color, religion, sex, national origin, political affiliation, age, or disability, and with proper regard for their privacy and constitutional rights as citizens.
> (6) Provision of information to employees regarding their political rights and prohibited practices under the Hatch Political Activities Act, 5 U.S.C. Sec. 1501 through 1508 et seq.
> (7) Provision of a formal procedure for processing the appeals and grievances of employees without discrimination, coercion, restraint, or reprisal.

Utah Code Ann. § 17A-1-603 (2004) (emphasis added).  As plaintiffs' counsel now insists that Singer, Riggs and Dickson were pursuing claims before the Navajo court solely under Navajo law, this court need not address the effect of this statute upon the Health District, or its applicability to District conduct relating to the plaintiffs.

In both the Navajo court and ONLR proceedings, Riggs sought reinstatement to his position and rate of pay prior to the November 1998 "reduction in force," with back pay, benefits and seniority status.  Like Ms. Singer, Riggs requested a public apology, expungement of disciplinary action from his file, a "published retraction of all derogatory allegations and comments made" against him, and an award of both compensatory and punitive damages ($ 3,000,000 each).  (*Id.* at 39-40.)  Like Ms. Singer, Riggs also sought sweeping affirmative relief requiring the Health District to implement a merit system, an employee bill of rights, the Navajo Preference in Employment Act, as well as proportionate representation of the Aneth and Red Mesa chapters; he requested the exclusion of Wood, Nielson and Shafer from the reservation "for all time," and the appointment of a special master to protect his employment rights and those of his fellow Montezuma Creek Clinic employees.  (*Id.* at 40-43.)[20]

### C.  Mr. Allison Dickson

Allison Dickson is an enrolled member of the Navajo Nation, living in Utah within the boundaries of the Navajo Reservation.  Like plaintiffs Singer and Riggs, he is currently employed at the Montezuma Creek Clinic by Utah Navajo Health Systems, Inc., the tribal

---

[20]Before the ONLR, Mr. Riggs further requested that "[t]he same discipline Donna Singer received for 'fraud',"—termination of employment—"be given to Reid Wood, for any fraudulent misrepresentations Reid Wood made to the [District] Board and/or Rick Bailey,"and "[t]he immediate obliteration of the CIB policy implemented by Mary Nielsen and Reid Wood." (Pertinent Parts Navajo Ct. R. ("ONLR Complaint" Tab).)  He also asked "[t]o be taken off of time cards and put back on salary.  (*Id.*)

The "CIB policy" refers to an alleged requirement by the Health District that patients seeking non-emergency medical treatment at District facilities in 1999 furnish proof of their Medicare, Medicaid or Indian Health Service eligibility, the latter by presentation of a patient's "certificate of Indian blood" or "CIB."  (Navajo Ct. Cmplt. at 27-30 ¶¶ 249-267.)  Plaintiffs allege that under this District policy  "no Indians without their 'CIB' on file or on their person would receive treatment," in violation of federal regulations.  (*Id.* at 27 ¶ 249, 28 ¶ 256.)

contractor that has operated the clinic since January of 2000.

Mr. Dickson was initially hired by the Health District in March of 1998 for six months as a full-time temporary office clerk, handling medical records and billing at the Montezuma Creek Clinic and filling in for another employee who was away on maternity leave.  Dickson continued working at the Clinic after the absent employee returned to work.  He applied for full-time *permanent* employment in November or December of 1998, but his request was rejected by the District.

Dickson complained that this denial of permanent full-time employment  violated an established Health District policy that "mandates that a person 'will' become a 'regular' employee after 520 hours" of employment by the District.  (*Id.* at 11 ¶ 88 & Exh. 55.)  The excerpt from the District personnel policies and procedures relied upon by Dickson reads as follows:

> Introductory Period.  Each new, transferred, or promoted full-time and part-time employee will be subject to an initial introductory period.  The length of the introductory period is generally 520 working hours (the equivalent of three months of full-time work), those who are in a supervisor or exempt profession position will have a 6 month introductory period.  During this time period the new employee must demonstrate the ability and willingness to perform the job.  During this period, the employee's work will be continuously evaluated by the supervisor.  At the end of the period, performance will ususally [sic] be reviewed by the supervisor to determine if employment should be continued.  Successful completion of the introductory period will ususally [sic] be documented in writing as designated in the Employee Evaluation section.  An employee may either resign or be terminated during the introductory period, with neither the employee nor San Juan Health Care Services required to give the other prior written notification or explanation.  *Upon successful completion of the introductory period, the new employee will become a regular employee, unless hired specifically for a short-term job.*  Employment as a regular employee is still "at will", and regular employees may be terminated at any time, with or without notice, and with or without

23

cause.

(*Id.* at Exh. 55 (emphasis added).)  Dickson alleges that he "has worked over 520 hours, *in addition to* the six month temporary position," but had still been refused "regular" permanent full-time employment.  (*Id.* at 11 ¶¶ 87, 90-91, 96 (emphasis added).)  Dickson also alleges that at Wood's instance, he was denied a hearing on his grievance at about the same time that Singer and Riggs' appeals were to be considered in February 1999.  (*Id.* at 11 ¶¶ 93-94; *see id.* at Exhs. 51, 56.)

Mr. Dickson's principal claim before the Navajo court thus depended on the construction and application of the Health District's own personnel policies and procedures—in particular the language quoted and italicized above.  That claim thus becomes a question of the terms of his contractual employment relationship with the District; if District policy is construed to create a "property" interest in his continuing or prospective employment, it becomes a question of due process as well.[21]

Dickson also complained about "racially insensitive and derogatory remarks and policies by Mr. Wood and Mrs. Nielsen," (*id.* at 11 ¶ 95), remarks allegedly made at a January 5, 1999 staff meeting with Montezuma Creek Clinic "P.A.R." (patient accounts

---

[21]In addition to the District's written policy, Dickson joined Singer and Riggs in invoking an array of legal bases for his claims,

> including but not limited to, the *Navajo Nation Bill of Rights*; the *Navajo Nation Code*; . . . *Navajo Custom and Traditions*; the *Navajo Preference in Employment Act*; including the *United Nations Declaration of Human Rights*; *United States Bill of Rights*; the *Constitution of the State of Utah*, and the *Utah Code* under *17A*, 9-9-208, 9-9-209.

(Navajo Ct. Cmplt. at 5 ¶ 27 & Exhs. 2-5, 12, and 21.)  At least in the referenced documents, the court finds nothing that expressly guaranties that a person hired as a "temporary" employee would be legally entitled to the tenure and benefits of a "regular" or "permanent" employee, based upon the duration of his or her "temporary" employment, or otherwise.

receivable?) personnel at which they discussed "the Certificate of Indian Blood in which patients need to have on file before receiving their medical care." (*Id.* 11 ¶ 95 & Exh. 57.) Apparently, Wood asked if Certificates of Indian Blood "were like dog tags," (*id.* at 27 ¶ 249 & Exh. 57),[22] while at some point, District financial officer Mary Nielson publicly labeled the Montezuma Creek Clinic billing clerks" as "rebellious" and "insubordinate." (*Id.* at 28 ¶¶ 257, 259 & Exh. 45, at ¶ 26 (Affidavit of Allison Dickson).) Plaintiffs alleged that when Dickson pressed his claim for full-time permanent employment, "Mrs. Nielsen told Mr. Dickson to cut his hours back to 32 and reminded him his position probably 'wasn't that necessary.'" (*Id.* at 12 ¶ 104.)

The relief originally sought by Dickson largely parallels that requested by Singer and Riggs: he would be made "a full time employee with all benefits"; all "non hiring action" would be expunged from his file; he would receive a public apology, a formal retraction of any derogatory remarks made about him by SJHSD administrators, and an award of $ 3,000,000 in compensatory damages and $ 3,000,000 in punitive damages. (*Id.* at 39-41 (Prayer for Relief).)[23] Dickson also joined Singer and Riggs in seeking affirmative relief as to Health District personnel practices, including the implementation of a merit system and an

---

[22]A "dog tag" may refer either to "[a] metal identification disk attached to a dog's collar," or "[a] metal identification tag worn on a chain around the neck by members of the armed forces." *The American Heritage Dictionary of the English Language* 548 (3d ed. 1992); *accord Webster's New World College Dictionary* 423 (4th ed. 1999) ("an identification tag or license tag for a dog" or "a military identification tag worn about the neck"). Which connotation Mr. Wood had in mind on January 5, 1999 is unknown.

[23]Before the Office of Navajo Labor Relations, Mr. Dickson requested "$25,000 for recompense for the trouble I have been put through to obtain my rights; the discrimination against me in violation of policy, and laws; and the insults to my heritage that I witnesses, and to demonstrate that discrimination is illegal and expensive." (Pertinent Parts Navajo Ct. R. at ("ONLR Complaint" Tab).)

employee bill of rights, compliance with the Navajo Preference in Employment Act, as well as the appointment of a special master, proportionate representation of two Navajo chapters in SJHSD governance, and the other equitable relief summarized above.[24]

### D.  The Nature of Plaintiffs' Claims

The plaintiffs' original Navajo court complaint alleged that "all the captioned plaintiffs have standing to sue herein due to the intentional injurious acts the have been perpetrated upon them by the defendants," and that "all of the events herein complained of giving rise to these proceedings occurred at or near the Montezuma Creek Health Clinic and/or *in the course of the plaintiffs['] employment* with the Montezuma Creek Health Clinic which is physically located within the exterior boundaries of the Navajo Nation."  (*Id.* at 4 ¶ 21 (emphasis added).)  They alleged that the Navajo court

> has jurisdiction over the parties and subject matter pursuant to 7 NNC 253 and 7 NNC 254, and the Navajo Nation's independent and inherent sovereignty that is encouraged by federal Statute at 25 U.S.C. 450a., and is undiminished by the Treaty of 1868, and Utah Code sections 9-9-208 and 9-9-209 among others, and the United States Supreme Court " exception" in **Montana v. United States**, 450 US 544 at 565 to 566 (1981).  See likewise the attached MEMORANDUM OF LAW, attached hereto as Attachment C.

(*Id.* at 5-6 ¶ 29 (font variations in original).)

Plaintiffs' pleaded causes of action included civil rights claims alleging the denial of freedom of speech, (*id.* at 17-18 ¶¶ 170-183); freedom to assemble, (*id.* at 19 ¶¶ 184-190);

---

[24]Before the Office of Navajo Labor Relations, Mr. Dickson joined Ms. Singer and Mr. Riggs in seeking "[t]he immediate obliteration of the CIB policy implemented by Mary Nielsen and Reid Wood."  (Pertinent Parts Navajo Ct. R. ("ONLR Complaint" Tab).)

due process, (*id.* at 19-22 ¶¶ 191-214); and equal protection, (*id.* at 26-31 ¶¶ 243-280)[25]— "as protected by the Navajo Nation, the United Nations and the United States," as well as tort claims of "wrongful hiring," (*id.* at 22-23 ¶¶ 215-220);[26] defamation, (*id.* at 23-24 ¶¶ 221-229); "tortious interference with future contractual relations," (*id.*);[27] intentional and negligent infliction of emotional distress, (*id.* at 32-33 ¶¶ 281-296); "theft," (*id.* at 24-26 ¶¶ 230-242);[28] "violation of fiduciary duties," (*id.* at 33 ¶¶ 297-300);[29] "misfeasance," (*id.* at 33-34 ¶¶ 301-309); and "malfeasance in office," (*id.* at 35-39 ¶¶ 310-348).[30]  Most of these

---

[25]Plaintiffs' "equal protection" claim presents a laundry list of grievances, beginning with the failure of the County and the Health District to implement "a cross cultural training program for non-Indian administrators, supervisors, or managers as required by the {Navajo Preference in Employment Act," (*id.* at 26 ¶ 246), and the imposition of the alleged "CIB policy," (*id.* at 27-30 ¶¶ 249-267, 269), to the promotion of Mr. Wood to CEO of the District "two months earlier than his six months initial probation period," (*id.* at 30 ¶ 268), alleged expense shifting among District facilities (*id.* at 30-31 ¶¶ 272-276), and $ 40,000 of Utah Navajo Trust Fund money that "has not been accounted for in SJHSD public board meeting records," (*id.* at 30 ¶ 271).

[26](*See, e.g.,* Navajo Ct. Cmplt. at 22 ¶ 217 ("But for the hiring of Mr. Wood, the employee plaintiffs may never have been harmed.").)

[27]Plaintiffs plead no factual allegations in ¶¶ 221-229 pertaining to their "tortious interference" theory apart from those pertaining as to their defamation claim, though the essential elements of the two theories differ.  *Compare Restatement (Second) of Torts* § 766B (1979) (intentional interference with prospective contractual relation) *with id.* § 558 (1977) (elements of defamation).  Plaintiffs' "theft" claim likewise deals with alleged injury to the same legal interest as their defamation claim.  (*See* Navajo Ct. Cmplt. at 24 ¶ 232 ("Mrs. Singer and Mr. Riggs had their reputations taken . . .")); W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 113, at 797 (5th ed. 1984) (under the law of defamation, "the interest protected is that of reputation").
  This court will treat all three "theories" as pleading one cause of action: defamation.

[28]According to the plaintiffs, "Mrs. Singer and Mr. Riggs had their reputations taken and all the Plaintiffs had their speech taken in violation of Article 12 of the United Nations Declaration of Human Rights."  (*Id.* at 24 ¶ 232.)

[29]"In Utah, a claim for breach of fiduciary duty is an independent tort that, on occasion, arises from a contractual duty . . . ."  *Norman v. Arnold,* 2002 UT 81, ¶ 35, 57 P.3d 997, 1006.

[30]Plaintiffs' "malfeasance" claim presented another laundry list of more generalized allegations, (*e.g., id.* at 37 ¶ 329 ("Courts have found schools and juries in San Juan County to be discriminatory"); ¶ 330 ("Government entities in San Juan County have prolonged litigation for decades in various suits")), and legal conclusions, (*e.g., id.* at 38 ¶ 338 ("SJHSD is not an at will employer")), interspersed with more fact-specific allegations (*e.g., id.* at 38 ¶ 342 ("Mrs. Shafer knew Mrs. Singer was not a dishonest person and did nothing to help her"))—a few of which may even have been germane to the plaintiffs' other legal theories (*e.g., id.* at 39 ¶ 347 ("Mr. Woods [sic] refused to give

(continued...)

causes of action were footed upon factual allegations arising from the events involving

plaintiffs' employment at the Montezuma Creek Clinic by the Health District, as summarized

above.  The rest, it turns out, were surplusage.[31]  Absent from the Complaint was any claim of

breach of contract.

As originally pleaded, then, the plaintiffs' claims before the Navajo Nation District

Court were employment-related claims.[32]  They arose out of each plaintiff's individual

employment relationship with the Health District, and the plaintiffs sought compensatory

legal and affirmative equitable relief that would resolve their existing employment disputes.

Indeed, the plaintiffs asserted that "all Labor Commission and Office of Navajo Labor

Relations claims of the Plaintiffs will not be prohibited from being heard in this Court, after

such time as the plaintiff's employment claims have gone through their respective

administrative process," (*id.* at 5 ¶ 28), clearly indicating that Singer, Riggs and Dickson also

_____

[30](...continued)

Mr. Allison Dickson his full time permanent employment status")).

[31]In May of 2003, plaintiffs' counsel advised the United States Supreme Court that

[i]n the Complaint, to the degree the state nonfeasance, malfeasance, and misfeasance claims are found, *Petitioners acknowledge the Navajo Court will have no authority to rule upon them as state claims*, but they do serve as a backdrop to understand the level of deliberateness of harm by these quasimunicipal organizations and officers. Otherwise, all tort claims are Navajo tort claims.  See, 7 N.N.C. 701, *infra.*

(Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct., filed May 28, 2003), at 5 n.12.)  Viewing these claims solely as a "backdrop," then, this Court need not address them further.  *But cf.* Navajo R. Civ. P. 11.

[32](*Cf.* "Findings, Opinion and Judgment at Preliminary Injunction," dated December 28, 1999, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District  (a copy of which is annexed to the Amended Complaint (dkt. no. 744)), at [11] ("At first glance, and without the benefit of testimony, these proceedings appeared to have been framed solely as a labor-employment issue.").)

had employment claims then pending before the Navajo labor agencies—claims as to which they had not yet exhausted their administrative remedies at the time they commenced the Navajo court action in April of 1999.  (*See infra*, at 125-130.)

### E.  Plaintiffs' Supplemental Pleading

A month after entry of the Navajo court's December 28, 1999 Order, (*see infra* at 32-40), plaintiffs Singer, Riggs and Dickson filed "Plaintiffs' Supplemental Pleadings to the Original Pleadings," dated January 28, 2000, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District) (a copy of which is annexed to the Amended Complaint (dkt. no. 744)) ("Navajo Ct. Supp. Pldg."), with the Navajo Nation District Court.  The Supplemental Pleadings purported to add claims of "Obstruction of Justice," "Misuse of Judicial Process," "Defamation, per se," and "[t]he endangerment of Navajo patients at Montezuma Creek Clinic."  (Navajo Ct. Supp. Pldg. At 2 ¶ 3.)  The plaintiffs' new claims were said to be "based upon the Court's Findings of Fact in the Court's Preliminary Injunction Order issued on the 28th day of December, 1999," including "factual findings therein pertaining to the defendant's counsel" and the conduct of the Navajo court litigation, and the "intentional and malicious disruption of operations and services of the Montezuma Creek Health Clinic."  (*Id.* at 2 ¶¶ 4, 5.)  The Supplemental Pleading made no additional factual allegations in support of the plaintiffs' new claims, but augmented their prayer for relief to demand that "each of the defendants, both jointly and severely [sic], be ordered to pay damages to the plaintiffs in the amount of $18,000,000 USD (Eighteen Million Dollars);" and that

29

each of the defendants, both jointly and severely [sic], be ordered to pay additional damages to the plaintiffs pursuant to __7__ NCC __701__ in the amount of $6,000,000 USD (Six Million Dollars) *to be paid directly to Montezuma Creek Clinic* to be used as the management of Montezuma Creek Clinic sees fit in the best interest of the Native American People, and not to be used for employment compensation or to take the place of the insurance payments made in behalf of the Native American patients, without express authority of this Court; . . .

(Navajo Ct. Supp. Pldg. at 3 ¶ 7(b) (emphasis added).)[33]  It appears that the Navajo court granted plaintiffs leave to file their Supplemental Pleading on February 22, 2000. (*See* Order for Leave to Supplement the Pleadings, signed February 23, 2000 (a copy of which is annexed to the Amended Complaint (dkt. no. 744)).)[34]

## V.  THE NAVAJO COURT ORDERS

The Part II Plaintiffs sought enforcement of four written orders entered by the Navajo Nation District Court for the Shiprock, New Mexico Judicial District: (1) the "Findings, Opinion and Judgment at Preliminary Injunction," dated December 28, 1999, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation

---

[33]The Supplemental Pleading also demanded that the defendants "and each of them, jointly and severely [sic], publicly retract all defamatory and other libelous statements made of any of the plaintiffs or other litigants or counsels herein," to be accomplished "by publication in the local newspapers, and radio stations of local circulation . . . and the general coverage of the Navajo Nation, . . . and issuing statements of apology which are deemed appropriate by this Court and the plaintiffs by prior review; . . ."  (*Id.* at 3-4 ¶ 7(c).  *Compare* Navajo Ct. Cmplt. at 40 ¶¶ 8-9 (demanding a "public apology" and a "published retraction").)

[34]It appears that these plaintiffs also filed an amended complaint with the Navajo court in mid-March of 2000, subsequent to the Navajo court's entry of the three orders now at issue in this lawsuit.  (*See* Complaint for Damages (Modified), filed March 14, 2000, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District) ("Navajo Ct. Cmplt. (Modified)"), available in Pertinent Parts Navajo Ct. R. ("Complaint Modified" Tab), and as Exhibit "B" to San Juan Health District Defendants' Memorandum Regarding Subject Matter Jurisdiction and in Support of Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no. 497).)  The amended pleading sought to incorporate their "supplemental claims" augmenting the plaintiffs' original causes of action, and to join Truck Insurance and Mr. Ickes as defendants.  (*Id.* at 3-4 ¶ 16a, 40-41 ¶¶ 341-345, 44-45 (prayer for relief).)

District Court, Shiprock District) (the "December 28, 1999 Order"); (2) the "Order Denying Defendants' Motion to Dissolve or Modify the Preliminary Injunction Order," entered March 1, 2000 (the "March 1, 2000 Order"); (3) the "Special Order in Aid to Satisfaction of Preliminary Injunction," signed March 6, 2000 (the "March 6, 2000 Order"); and (4) the "Order Mandating that All Defendants' to be Bound by the Preliminary Injunction Order," entered March 15, 2000 (the "March 15, 2000 Order").  (*See* Amended Complaint at 99, and the copies of three of the orders annexed thereto.)

As noted above, the court of appeals affirmed the dismissal of the Part II Plaintiffs' claims as against defendants Truck Insurance and R. Dennis Ickes because of the Navajo court's lack of subject-matter jurisdiction over those defendants under *Montana v. United States*, 450 U.S. 544 (1981).  *MacArthur v. San Juan County*, 309 F.3d at 1222-1225. Therefore, the question of enforcement of the Navajo court's March 15, 2000 Order—which purported to bind Truck Insurance and Ickes to that court's prior orders—is no longer before this court.[35]

---

[35]The Amended Complaint, drafted and submitted one month *after* the court of appeals issued its October 7, 2002 opinion, nevertheless included Truck Insurance and Mr. Ickes in the caption and makes several references to them in the body of the pleading, and still seeks enforcement of all four orders.  (*See* Amended Complaint at 98, 114, 116-119, 120.)  Apparently these references persist on the theory that "[w]hile Truck Insurance and Mr. Ickes were dismissed, they were not dismissed with prejudice and then only upon the facts as found of the District Court."  (*Id.* at 98.)

By affirmance, the dismissal of Truck Insurance and Ickes became the judgment of the court of appeals, and the "law of the case" as far as this court is concerned.  *See* 1B James Wm. Moore, et al., *Moore's Federal Practice* ¶ 0.404[1] at II-2 - II-3 (2d ed. rev. 1996) ("When a case is appealed and remanded, the decision of the appellate court establishes the law of the case, which *must* be followed by the trial court on remand." (emphasis in original; footnote omitted)).  Therefore, that judgment is not subject to further adjudication in this court, and further consideration of the dismissal of Truck Insurance and Ickes falls beyond the scope of the remand to this court under the Tenth Circuit's mandate.  (*See* Judgment, dated October 7, 2002 (certified copy of mandate received from the court of appeals November 20, 2002) (dkt. no. 460).)  *See also Carpenter v. Rohm & Haas Co.*, 9 F.R.D. 535, 536-537 (D. Del. 1950) ("The Court of Appeals having affirmed this court without qualification, it becomes the duty of this court

(continued...)

### A.  The December 28, 1999 Order

The Navajo Nation District Court's December 28, 1999 "Findings, Opinion and

Judgment at Preliminary Injunction" serves as the centerpiece of the Part II Plaintiffs' claims

in this proceeding.  Styled and written as a preliminary injunction, the December 28, 1999

Order made preliminary fact findings, (*see* December 28, 1999 Order at [3]-[11]), discussed

the factors bearing upon the issuance of a preliminary injunction, (*id.* at [11]-[20]), and

prescribed sweeping equitable relief in favor of Singer, Riggs and Dickson as to their specific

employment disputes with the Health District, and in favor of Navajo health care recipients

generally as to a litany of concerns involving the District's administration of health care

services at the Montezuma Creek Clinic.[36]  (*Id.* at [20]-[22].)  The Order also anticipated that

"[t]he proceedings in chief herein be and are hereby scheduled for initial pretrial conference

---

[35](...continued)

upon receipt of the mandate to proceed with the execution of the judgment and no more. No power exists, under Rule 60(b) or otherwise, to alter or amend a decision of the reviewing court. *Home Indemnity Co. of New York v. O'Brien*, 6 Cir., 112 F.2d 387."), *affirmed*, 180 F.2d 749 (3d Cir.), *cert. denied*, 340 U.S. 841 (1950).

According to the Tenth Circuit, an "important corollary" to the law of the case doctrine "known as the 'mandate rule,' provides that a district court 'must comply strictly with the mandate rendered by the reviewing court.'" *Ute Indian Tribe v. State of Utah*, 114 F.3d 1513, 1520-21 (10th Cir. 1997) (quoting *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1534 (10th Cir. 1992)), *cert. denied*, 522 U.S. 1107 (1998).  Strict compliance with the mandate rule in this case requires this court to give effect to the dismissal of Truck Insurance and Ickes.  *See Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414-415 (4th Cir. 2005) ("once a case has been decided on appeal and a mandate issued, the lower court may not deviate from that mandate but is required to give full effect to its execution. . . . Because our order stated that the district court lacked jurisdiction, the court was not free to do anything else but to dismiss the case."). *Kerman v. City of New York*, 374 F.3d 93, 109-110 (2d Cir. 2004) ("Where the appellate court has decided a question of law, the lower court on remand lacks discretion to decide that question to the contrary."); 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4478.3 (2d. ed. 2002).

[36]In addition to preliminary injunctive relief, the Order required the defendants "to issue full payment of attorney's fees, costs and expenses associated with these proceedings to date to be paid by cashier's check within five working days of the issuance of the injunction and to be paid not later than the 31st day of December, 1999, by and through the Registry of this Court[,]" but did not make any determination as to the amount of that award. (December 28, 1999 Order at [21].)

by this court, unless these proceedings are not earlier settled and compromised by the parties

by stipulation on the limited factual; legal; and damage issues remaining."  (*Id.* at [22].)

On a preliminary basis, at least, the Navajo court made findings as to many of the

transactional facts alleged by Singer, Riggs and Dickson, as summarized above.  (*See supra*,

at 12-26.)

### 1.  Findings re: Mr. Riggs

As to Mr. Riggs, the Navajo court found, *inter alia*, that on or about November 11,

1998, Riggs had been terminated as a "RIF and rehired with a $10,000 pay cut; was made to

start using a time card; and lost three years of raises," (December 28, 1999 Order at [3]);  that

"Mr. Riggs accidentally represented 8.4 hours as a day and a half, or 12 hours," and that "as a

result of this time card mistake Mr. Riggs was disciplined," even though he "never received

any warning letters; any time card instruction; nor any time to correct any alleged

deficiencies, either prior to this November RIF, or the aforestated discipline," and even

though "as a bona fide professional, [he] is exempt from time card keeping requirements,"

(*id.* at [4]); that Riggs was offered "a promotion to fill the position made vacant by Ms.

Singer[']s termination, as manager of the Montezuma Creek Clinic," but that Wood

"immediately withdrew the offered promotion because Mr. Riggs had accused him of

discrimination" in pursuing a formal grievance as to the disciplinary action, (*id.*); that after

Riggs' grievance hearing, "he was placed on an additional 30 days['] probation without

justification," (*id.*); and that evidence showed "similar and multiple errors on time cards

throughout the" District, and in November 1998, "just one week prior to Mr. Riggs being

disciplined, Reid Wood[']s time card had ink; cross-outs; and write ins, errors for which others, notably the plaintiffs were disciplined," but Wood "was not similarly disciplined for his time cards errors."  (*Id.* at [5].)  The Navajo court also found similar errors on time cards kept by Mary Nielson, District financial officer, (*id.*); that another "caucasian physician assistant" had "time cards showing he was not required to punch in or out, either for or after the November, 1998, RIF;" (*id.*); that the November 1998 "RIF was not done in compliance with the Navajo Preference in Employment Act (NPEA) in as much as there was no written justification as to just cause for the RIF; nor was a warning of the RIF made to Mr. Rigg; nor was Mr. Riggs RIF last, as a Navajo Physician Assistant;" (*id.* at [3]); and that

> The defendants offered absolutely no credible evidence of the San Juan Health Services District affording any evidence of Mr. Riggs receiving any due process; evidence of any degree of equal protection of the policies and procedures, as well as the law applicable to his employment; no evidence of any consideration of the Navajo Preference in Employment Act in its actions toward Mr. Riggs; and no evidence that the San Juan Health Services District had not intentionally used the reputation of Mr. Riggs without his permission essentially to stop the time card problems throughout the San Juan Health Services District; . . . .

(*Id.* at [5].)  The court found that the defendants had not refuted the allegation that they had used Riggs' case to make "an example of what happens to people who take greivance of decisions of" the Health District and "who make allegations of racial or other discrimination[.]"  (*Id.*)

### 2.  Findings re: Ms. Singer

Concerning Ms. Singer, the Navajo court found, *inter alia*, that "on the 13th day of November, 1998, Ms. Singer was unaware of another person[']s clocking in on her

Montezuma Creek Clinic time card when she was in Blanding, Utah;"  "[t]hat Ms. Singer told

the Chief Financial Officer of her whereabouts on the date in question;" and "[t]hat the

purported time card error involved only four hours of work for which Ms. Singer was never

paid, and Ms. Singer admitted to having made the time card error[.]" (*Id.* at [6].)

Nonetheless, the court found that Singer had been "charged with fraud; placed on

administrative leave; told not to communicate with anyone at the clinic; and then

terminated;" (*id.*)  that District administrator Rick Bailey had "participated in the decision to

terminate Ms. Singer," and that he "proceed[ed] as her grievance hearing officer anyway" on

the advice of the County Attorney. (*Id.*)  Reviewing the testimony adduced at the hearing, the

Navajo court noted that plaintiffs' accounting expert "found no pattern of fraud in Ms.

Singer[']s time cards;" that "he attributed Ms. Singer[']s time card errors to the fact that she

was required to be clocking in and out at three different work places and had so many

responsibilities," and that in his experience, "managers are not usually required to use time

cards because of their FLSA exemption; . . ." (*Id.* at [7].)  The court also noted that the

"caucasian manager of the Monument Valley Clinic, also within the San Juan Health

Services District, was not obliged to punch in and out on time cards," and that other District

employees whose "time cards are worse than Singer[']s" were "never disciplined; charged

with fraud; or terminated."  (*Id.* at [7]-[8].)

Like Mr. Riggs, the Navajo court found that the defendants "offered absolutely no

credible . . . evidence of the San Juan Health Services District affording . . . Ms. Singer . . .

any due process; evidence of any degree of equal protection of the policies and procedures, as

well as the law, applicable to her employment;" that the defendants offered "no evidence of

any consideration of the Navajo Preference in Employment Act in its actions toward Ms.

Singer;" and that, as with Riggs, the defendants did not "offer any evidence that the

defendants had not administratively conspired to" use Singer's case to "mak[e] an example . .

. of what happens to people who stand up for their rights" and pursue grievances against the

Health District, "who make allegations of racial or other discrimination," or who "take any

position in opposition to San Juan Health Services District or the defendants themselves[.]"

(*Id.* at [8].)

### 3.  Findings re: Mr. Dickson

The Navajo court preliminarily found that "Mr. Dickson started working for the San

Juan Health Services District as a full time temporary fill-in in March of 1998 and in

November of 1998 applied for full time employment status;" that 'Mr. Dickson['s] time cards

and W-2 show that Mr. Dickson worked some 700 hours after his temporary fill-in position

had expired;" that the District policies and procedures state "that after an employee has

worked for the total of 520 hours they will be made to be regular employees of the San Juan

Health Services;" and that "the defendants acknowledge that Mr. Dickson formally requested

in writing to Mary Nielson on the 11th day of December, 1998, that he be given regular

employment status[.]" (*Id.* at [8]-[9].)  The court further found that "the time cards entered

into evidence demonstrate[] the current Montezuma Creek Clinic manager's nephew is

working full time as a regular status employee and working for more hours than Mr. Dickson

with less time in seniority;" and that District records "show that there is no other employee of

the San Juan Health Services District with Mr. Dickson's time in service measure[d] by

regular work hours that is not a regular permanent employee with benefits of regular status

employment."  (*Id.* at [9].)[37]

### 4.  Preliminary Relief Under the December 28, 1999 Order

Based upon the findings set forth in the December 28, 1999 Order, and "[w]ith minor

adaptation from the arguments delivered to the Court," the Navajo court "largely adopted the

position of the plaintiffs to the legal reasoning of these proceedings."  (*Id.* at [11].)  "[T]he

Navajo court concluded that Riggs, Singer, and Dickson demonstrated a substantial

likelihood of success on the merits of their NPEA claims and entered a preliminary injunction

in their favor,"  *MacArthur*, 309 F.3d at 1219, and sought to fashion affirmative remedies for

the plaintiffs' employment grievances, treating them as involving more than purely economic

harm:

> The case law of the Navajo Nation provides that an injunction is
> extraordinary relief that is granted when an injury is unquantifiable and when
> there is no adequate remedy at law.  Gudac v. Marianto, 1 Nav. R. 385, Nav.
> App. Feb. 28, 1978.  The United States Supreme Court has likewise found that
> while economic loss alone generally does not constitute irreparable injury,
> "cases may arise in which the circumstances surrounding an employee's
> discharge, together with the resultant effect on the employee, may be so far
> departed from the normal situation that irreparable injury might be found."
> Sampson v. Murray, 415 U.S. 61, 92 n. 68 (1974).

(December 28, 1999 Order at [11].)  In the Navajo court's view, "all these claims raise[d]

issues clearly extending well beyond the mere loss of income or loss of a job," and went

---

[37]The December 28, 1999 Order also noted that Mr. Dickson had attested to "the highly racially
inflammatory and insensitive comment of Reid Wood concerning Certificates of Degree of Indian Blood being
equated with "dog tags[.]" (*Id.* at [9].)

37

"directly into the wellbeing of the plaintiffs and Navajo Nation citizens" and "as argued by the plaintiffs, go to the soul of a person and their inalienable rights"—fundamental interests, the importance of which "exceeds monetary value."  (*Id.* at [2].)

> Damages such as deprivation of rights; discrimination; denial of due process; infringements on freedom of speech; denial of dignity; and impunity of a person's reputation are all deprivations that far exceed mere deprivation of money, or employment of embarrassment. . . .  No amount of money . . . can fully compensate the plaintiffs and Native American population in the Montezuma Creek for these past and ongoing substantial and inestimable damages.

(*Id.* at [18].)

Besides the individual claims of Singer, Riggs and Dickson, the Navajo court made reference to evidence already received concerning "patient welfare" and "clinic operations" at the Montezuma Creek Clinic, *e.g.,* the District's "billing of IHS eligible patients," which discouraged those patients from seeking further treatment at the clinic, as well as "stoppage of ambulance services;" "interference with pharmaceutical services;" and "stoppage of lab services" at the clinic.  (*Id.* at [13], [15]). "[T]hese plaintiffs produced testimonial evidence and documentary evidence to support their claims of violation of civil and personal rights . . . and as well the San Juan Health Services District's *endangerment of the Native American and Navajo public*," persuading the court that

> [i]n this case, a preliminary injunction will *insure the protection of overwhelming public interest by way of the restoration and preservation of patients' welfare in the northeastern sector of the Navajo Nation*; restoration of the clinic operations of the Montezuma Creek Clinic that are sensitive to Navajo needs; customs; and economic levels; . . . thereby improving adherence to the provisions, terms, and conditions of the Navajo Preference in Employment Act; . . . .

38

(*Id.* at [12], [13] (emphasis added).)  The court thus fashioned injunctive relief in the December 28, 1999 Order to vindicate not only the personal interests of the named plaintiffs, but also the interests of many Navajo patients served by the Montezuma Creek Clinic, as well as the Navajo Nation's broader governmental interest in safeguarding "the health or welfare of the tribe."  *Montana*, 450 U.S. at 566.  (*See* December 28, 1999 Order at [20].)

Though it acknowledged "that the Montezuma Creek Clinic will be removed from the control and supervision of the San Juan Health Services District beginning the 1st day of January 2000"—*four days* after the entry of the December 28, 1999 Order—the Navajo court proceeded to grant preliminary injunctive relief against the County and Health District defendants, ordering that the defendants "immediately reinstate Singer and Riggs to their previous positions of employment,"[38] and "immediately tender to Mr. Dickson full time status as an employee of the Montezuma Creek Clinic and that he be paid all commensurate back pay and benefits as may be due him from the occasion of being eligible for such status." (*Id.* at [14], [20]).  The December 28, 1999 Order further required the defendants to "delete and expunge all the charges and writings pertaining to the December 2nd through December 8th charges of fraud, discipline, and termination, from Mr. Riggs and Ms. Singer's personnel file"; the defendants were ordered to "immediately pay all due income from whichever source derived within the District, including but not limited to full back pay and compensation as well as back benefits to the plaintiffs, including but not limited to retirement

---

[38]While Ms. Singer had been working as the manager of the Montezuma Creek Clinic at the time of her termination, the December 28, 1999 Order directed that "Ms. Singer be returned to her role and position as a technician" for the Health District.  (*Id.* at [21].)

benefits . . . with all such compensations to be credited and/or paid immediately," and further

ordered "to issue full payment of attorney's fees, costs and expenses associated with these

proceedings to date to be paid by cashier's check within five working days of the issuance of

the injunction" and "not later than the 31st day of December, 1999,"—three days later—"by

and through the Registry of this Court," (*id.* at [21]); as to the "time card" issue, the

defendants were ordered "to not put Ms. Singer, and other like managers, and Mr. Riggs, and

other like Physicians Assistants, on hourly time card keeping requirements for the purposes

of salary and compensations or otherwise[.]"  (*Id.*)

     In addition to mandating immediate relief in favor of Singer, Riggs and Dickson on

their employment claims, the December 28, 1999 Order imposed a series of express

prohibitions affecting the defendants' operation of the Montezuma Creek Clinic: the court

ordered the defendants "to not interfere with clinic operations or move any clinic personnel,"

(*id.* at [21]); the defendants were prohibited from "[e]liminating Emergency Medical

Technician services and coverage within the territorial jurisdiction of the Navajo Nation";

"[i]nterfering with the laboratory services" or "pharmaceutical services" to "the Montezuma

Creek Clinic," or "interfering with any form of patient care by, among any other matter or

things, billing IHS patients," (*id.* at [22]); the defendants were also ordered "to assist the

Montezuma Creek Clinic and the local Navajo Chapters . . . by any means necessary . . . to

help diabetic IHS patients to return to the Montezuma Creek Clinic for treatment," including

informing them "that as an IHS patient they do not have to pay for their health care

treatment" at the clinic.  (*Id.* at [22].)[39]

As the court of appeals observed:

The Navajo court was troubled by what it perceived as a sharp drop in visits to the clinic by diabetic patients.  In the court's view, "The reason these patients have not been coming in for life critical medical care is due to San Juan Health Service District's billing of IHS eligible patients, making them believe they must pay for medical services before receiving medical attention."

309 F.3d at 1219 (quoting December 28, 1999 Order at [13].).

## B.  The March 1, 2000 Order

The Navajo court's "Order Denying Defendants' Motion to Dissolve or Modify the

Preliminary Injunction Order," dated March 1, 2000, made additional findings of fact and

conclusions of law in light of the defendants' objections to the December 28, 1999 Order,

explaining in some detail its rejection of the defendants' assertions that (1) they had been

denied the services of a certified court reporter during the preliminary injunction hearings;

and (2) they had been denied due process because of omissions in the existing transcripts of

the taped proceedings caused by inaudible or garbled sections of the court's tape.  (March 1,

2000 Order at 1-5.)  The March 1, 1999 Order also discussed the use of evidence received

during the preliminary injunction hearings as evidence for purposes of a jury trial on the

merits, to which use the defendants had objected as well:

the Court is obliged by Rule of Court and in the exercise of judicial economy to receive during the proceedings on the preliminary injunction evidence which is likewise admissible in the case in chief <u>as though occurring during the trial on the merits</u>, and that evidence becomes a part of the record at trial and need not be repeated at trial.  See Rule 65(d)."

---

[39]For their part, the plaintiffs were ordered to "report any such interference, harassment, or intimidation of Montezuma Creek Clinic operations, patients, and employees immediately to this Court[.]" (*Id.* at [22].)

(*Id.* at 7 (emphasis in original); *see id.* at 5-9.)[40]  The court indicated that as for the plaintiffs,

the receipt of such evidence "does substantially reduce their burden of proof which has

already well been met even as to the case in chief."  (*Id.*)[41]  In contrast, "the defendants," in

the court's view, "failed to put on any credible evidence to rebut the volume of testimony and

evidence o[f] the plaintiffs, after having ample opportunity to do so."  (*Id.* at 8.)

The March 1, 2000 Order also reaffirmed in conclusory terms the Navajo court's

initial finding that it had jurisdiction over the plaintiffs' claims, and over "the defendants" as

parties:

> The Court has jurisdiction over the defendants partly because they are
> the named parties who have committed acts within the Navajo Nation['s]
> territorial boundaries, and as well because the defendants became plaintiffs by
> filing their counterclaims.  In accord with <u>Dodge v. Nakai</u>, 298 F. Supp. 17
> (Ariz. dist. 1968) and <u>Clark v. Barnard</u>, 108 U.S. [436] (1883). This court has
> jurisdiction.

(*Id.* at 10.)  The "legal foundations for jurisdiction in this case" included

the Navajo Nation's inherent sovereignty, the Navajo Nation Code, 25 U.S.C. §1301 and
1302, the <u>Montana</u> and <u>Strate</u> decisions, and the United States Supreme Court rulings in
<u>Clark v. Barnard</u>, 108 U.S. [436] (1883), as cited approvingly in <u>College Savings Bank v.
Florida [Prepaid] Post Secondary Education Expense Board, et al.</u>, [527] U.S. [627] decided
June 23, 1999[.]"

 (*Id.* (citing *Montana v. United States*, 450 U.S. 544 (1981), and *Strate* v. *A–1 Contractors,*

---

[40]Rule 65(d) of the Navajo Rules of Civil Procedure provides that "any evidence received upon a petition
for preliminary injunction, which would be admissible upon the trial on the merits, becomes part of the record at trial
and need not be repeated at trial."

[41]The court recounted several "examples" of "the evidence and testimony before the Court" offered during
the preliminary injunction hearings, which "was overwhelmingly in favor of the plaintiffs."  (*Id.* at 6, 7-8; *see, e.g.,
id.* at 8 ("For example, human beings being somehow seriously referred to in such a way as to make people believe
because they are Native Americans they are being called dogs — is only something this Court would prefer to hear
the evidence on only one time — in its life time.").)

520 U. S. 438 (1997)).[42]

The March 1, 2000 Order not only denied the defendants' motion to dissolve the preliminary injunction, it recast *the preliminary injunction itself*, doing so in even more stringent terms: "The Preliminary Injunction as issued shall be carried out immediately, and *no later than the 3rd day of March, 2000*, in all respects, with written confirmation delivered to this Court on or by that date, or be subject to the contempt powers of this Court," (*id.* at 12 (emphasis added)); the "defendants be and are hereby ordered to immediately reinstate Mrs. Singer as a x-ray and ultrasound technician making her whole to the 1st day of November 1998, not later than the 3rd day of March, 2000," to "immediately reinstate the plaintiff Mr. Riggs to his previous position of employment and compensation" prior to the November 1998 "reduction in force," with "written confirmation delivered to this Court on or by the 3rd day of March, 2000," and to "immediately tender to Mr. Dickson full time status as an employee of the Montezuma Creek Clinic" with payment of "all commensurate back pay and benefits as may be due to him from the occasion of his being eligible for such status," also with confirmation "on or by the 3rd day of March, 2000 . . . ." (*Id.* at 12.)  The defendants were again ordered to "pay immediately all due income . . . including but not limited to full back pay and compensation as well as back benefits," to be confirmed "by the 3rd day of March, 2000," and they were again ordered to pay the plaintiffs' attorney's fees, costs and expenses—this time by March 31, 2000, "or each and every one of the defendants shall be subject to execution on their personnel [sic] properties, and otherwise individually subject to

---

[42](*See also id.* at 10 ("And accordingly the Court cites to [the] tribal code and <u>Montana</u> and <u>Strate</u>, to further its finding of jurisdiction.").)

43

the contempt powers of this Court[.]" (*Id.* at 13.)  The prescribed elimination of time cards

for managers and physician's assistants was also amplified by a requirement that the

defendants "provide a copy of the written policy to this effect on or by the 3rd day of March,

2000, or be subject to the contempt powers of this Court;" (*id.*); the same March 3, 2000

deadline was imposed upon the required expungement of Ms. Singer's and Mr. Riggs'

personnel files.  (*Id.*)

The March 1, 2000 Order also reiterated the December 28, 1999 Order's prohibitions

affecting the operation of the Montezuma Creek Clinic, *e.g.*, the defendants were

"immediately ordered to cease billing eligible IHS patients for medical services," with the

added requirement that "the defendant shall make payment of any and all current and past

due billings of the Montezuma Creek Clinic occurring before the 1st day of January, 2000," to

be confirmed "on or before the 3rd day of March, 2000[.]" (*Id.* at 14.)

"The Preliminary Injunction, and findings of the Court, accordingly shall remain

undisturbed[;]" in the Navajo court's view, disturbing the preliminary injunction "would

continue to place Navajo *employees* and *patients* . . . in harm's way.  Navajo common law,

i[t]s customs and traditions, mandate that the Court protect the people, and this Court shall

not hesitate to exercise all its powers to do so."  (*Id.* at 11 (emphasis added).)

The text of the March 1, 2000 Order concluded by setting the case for a pretrial

conference on April 18, 2000.  (*Id.* at 15.)

Attached to the end of the March 1, 2000 Order was an additional page, unsigned and

undated, that provided: "[t]hat in the event that the defendants fail to obey the Order of this

Court, commencing the 4th day of March, 2000, the defendants shall be fined at the rate of $10,000 (Ten Thousand Dollars) per day, for each and every day the Order of this Court is not carried out in its entirety"; and further, that "each and every personal defendant and defendants['] counsel will pay $1000 per day of the $10,000 daily fine beginning on March 2, 2000, from their own personal assets."  (*Id.* at 16.)

By the December 28, 1999 Order, as amplified by the March 1, 2000 Order, the Navajo Nation District Court for the District of Shiprock, New Mexico had thus assumed direct supervisory authority over the day-to-day operations of San Juan Health Services District facilities located within or serving Navajo patients within the boundaries of the Navajo Reservation.  The Navajo court's obvious dismay and annoyance with the defendants' conduct—at least as portrayed by the plaintiffs—became ever more apparent with each order it entered:

> All of the above enumerated actions of the defendants and defendants' counsel, have here constituted a pattern of behavior that only magnifies and exemplifies past and continued deprivations of the plaintiffs' inalienable rights, be they tribal or federal in nature, and harm to Native American patients and community in the Montezuma Creek area . . . . [S]uch actions demonstrate the arrogance of the defendants, their cultural insensitivity, and contempt and disdain in which they hold this Court; the Navajo Nation judicial system; and Native Americans in general.

(December 28, 1999 Order at [18]; *see also id.* at [15] (harm to Singer "done simply at the folly of her oppressors").[43])

_____

[43]As the court of appeals explained:

In its order granting a preliminary injunction, the Navajo court found that the defendants had engaged in a pattern of bad faith conduct toward the court, had wasted judicial resources, had

(continued...)

The defendants' motion to dissolve the preliminary injunction lacked even so much as an apology for the harm they have done over the last nine months of billing indigent Native American patients discouraging their attendance to both emergency and routine health care.  The motion of the defendants lacks even the smallest appreciation for their blatant violations of civil rights of the plaintiffs that has torn a family apart, and grossly harmed the plaintiffs, and innocent patients and families relying on the clinic for health care.

Likewise such cold, insensitive and recalcitrant attitudes on the part of the defendants further goes to illustrate the defendants['] bad faith to these proceedings and presents a foundation from which so much prejudice can grow from like a scavenging parasite of people ignorant of harm of their malignant acts, and who lack any remorse for their harm to plaintiffs, the patients and this Court.

(March 1, 2000 Order at 11.)

The March 1, 2000 Order made it plainly apparent that the preliminary injunctive relief mandated by the Navajo court had already ranged far beyond the original pleadings asserting the employment claims of the named plaintiffs Singer, Riggs and Dickson,[44] and deliberately so.

### C.  The March 6, 2000 Order

Ostensibly granting a further motion by the plaintiffs, the Navajo court's March 6, 2000 "Special Order in Aid to Satisfaction of Preliminary Injunction" decreed that the

---

[43](...continued)
engaged in "repeated misrepresentations of fact and law," had engaged in evidence spoliation, had intimidated and tampered with witnesses, had obstructed testimony, and had engaged in the sandbagging of evidence. . . . In the Navajo court's view, the defendants had made frivolous claims against Navajo plaintiffs and subjected them "to a trial by tabloid." . . .

309 F.3d at 1219 (record citations omitted).

[44]The plaintiffs' "Supplemental Pleadings" listed "[t]he endangerment of Navajo patients at Montezuma Creek Clinic as an addition to their claims," (Navajo Ct. Supp. Pldg. at 2), but without pleading any additional factual allegations.  Instead, plaintiffs submit, "The assertions are based upon the Court's Findings of Fact in the Court's Preliminary Injunction Order issued on the 28th Day of December, 1999," (*id.*), in effect conforming their own pleadings to the court's already more expansive view of the case as reflected in its December 28, 1999 Order.

"defendants are hereby restrained from alienating any and all money, property and assets of any type until the plaintiffs are paid their relief as granted" in that court's prior orders; the order required that "a list of all assets be immediately given to the plaintiffs," together with "complete income tax return[s] for 1998 and 1999," and further, that the "defendants "immediately list the plaintiffs *first in order of priority as secured creditors* on the files of the County Recorder of San Juan County and any other county wherein their property is located[.]" (*Id.* at 1 (emphasis added).)[45]  "[A]ny disobedience to this Order will be viewed as contempt of the Court" and, the order continued, "warrants for the arrest of the defendants disobeying this Order will issue[.]"  (*Id.* at 1-2.)

Curiously absent from the Navajo court's December 28, March 1 and March 6 Orders were any fact findings as to the specific *amount* of "all commensurate back pay and benefits as may be due to" each named plaintiff, or the "full payment of attorney's fees, costs, and expenses associated with these proceedings to date,"[46] to be "paid by cashier's check" to the plaintiffs within only a few days of the entry of the March 1, 2000 Order.  (March 1, 2000

---

[45]The legal basis for summarily granting the plaintiffs what amounted to a "superpriority" judgment lien at the expense of the defendants' existing secured creditors remains a mystery.

[46]This "how much" question would seem to be one requiring findings based upon context-specific evidence. As the Navajo Supreme Court had ruled a few weeks prior to the entry of the March 1st and March 6th orders,

> The Navajo Nation Bar Association is separate and distinct from the other bars in this region. We have our own admission standards to practice law, our own standards to regulate the practice of law, and our legal economy is separate and distinct. The proper frame of reference to calculate attorney's fees is the hourly rates in the given area where the dispute arose, which here is the Tuba City judicial district. The proper standard is the fee rates of lawyers who practice there.

*Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo 01/14/2000), at ¶ [62], *available at* http://www.tribal-institute.org/opinions/2000.NANN.0000003.htm.  *Manygoats* reversed the Navajo Labor Commission's award of attorney's fees using "regional attorney fee hourly rates rather than Navajo Nation rates." (*Id.*)

Order at 13.)  Nor did those orders prescribe any procedure or mechanism by which those sums were to be quantified or liquidated.

Without actual numbers, compliance with—or  enforcement of—the pecuniary terms of the Navajo court's orders would prove problematic at best.  Read literally, the March 6, 2000 Order commanded that the fiscal operations of a Utah county government and a Utah special services district come to an abrupt halt unless and until those unspecified sums were disbursed to the plaintiffs.  How the County and Health District defendants were to proceed, as a practical matter, in order to avoid the issuance of "warrants for the arrest of the defendants" for non-payment of those amounts was not explained.[47]

Finally, the March 6, 2000 Order further provided that "the plaintiffs are granted leave to seek enforcement of this Order as appropriate in any Utah or federal Court where it will be enforce[d] pursuant to principles of comity and applicable law."  (*Id.* at [2].)  To that end, the plaintiffs commenced the above-captioned action in this court by filing a complaint on July 25, 2000.  (*See* Complaint (Verified), filed July 25, 2000 (dkt. no. 1).)

---

[47]According to the plaintiffs, "In January, 2000, Mr. Dickson's and Mrs. Singers' amount of back pay was given to SJHSD, Truck/Farmer's Insurance and others to pay," (Complaint (Verified), filed July 25, 2000 (dkt. no. 1), at 100 ¶326), but plaintiffs did not plead what that amount was, or whether such an amount was furnished as to Mr. Riggs, to anyone.  (*See* Amended Complaint  at 98-120.)  One or more affidavits or "bills" containing at least estimated figures may have been presented to the Navajo court, but if so, that court made no reference to them in its orders.  (*See* Tr. 2/24/2003, at 7:23-8:5 (Ms. Rose); *id.* at 17:20-19:4 (Ms. Cox); *id.* at 20:23-21:1 (Mr. Trentadue).)

48

## VI.  THE NATURE AND EXTENT OF NAVAJO SOVEREIGNTY

In remanding this action because "the district court should have performed a *Montana* analysis" of Navajo tribal court jurisdiction, the court of appeals noted that "'the existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.'"  *MacArthur*, 309 F.3d at 1227, 1228 (quoting *Nat'l Farmers,* 471 U.S. at 855-56).

Defining the current scope and extent of the Navajo Nation's civil authority over non-Indians begins with Navajo inherent sovereignty, brought into sharper focus through examination of pertinent treaties and congressional legislation, which may confirm, augment or limit the Navajo Nation's inherent sovereignty; through analysis of the extent to which that sovereignty may have been diminished as a consequence of the "dependent" status of Indian tribes; and through practical consideration of how the Navajo Nation has actually exercised its powers, given the legal framework that exists.[48]

### A.  Inherent Navajo Tribal Sovereignty

Analysis of the jurisdictional question on remand thus begins with the nature and extent of inherent Navajo tribal sovereignty.

### 1. "Domestic Dependent Nations"

The *MacArthur* panel delineated the original source and inherent nature of Navajo

---

[48]*See* Sarah Krakoff, *A Narrative of Sovereignty: Illuminating the Paradox of the Domestic Dependent Nation*, 83 Or. L. Rev. 1109 (2004).

tribal sovereignty:

> Long before the arrival of Europeans on this continent, tribes were self-governing political communities. *Nat'l Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 851, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). As such, the tribes possessed the full attributes of sovereignty, which included "the inherent power to prescribe laws for their members and to punish infractions of those laws." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Although "[t]heir incorporation within the territory of the United States, and their acceptance of its protection necessarily divested them of some aspects of the sovereignty which they had previously exercised," *id.,* this divestiture was not absolute. Today, tribes retain sovereignty of a

>> unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

> *Id.*

> As Felix Cohen observed in his seminal work on the subject of federal Indian law, "[T]hose powers which are lawfully vested in an Indian tribe are not, in general, delegated powers granted by express acts of Congress, but rather inherent powers of a limited sovereignty which has never been extinguished." Felix S. Cohen, *Handbook of Federal Indian Law* 122 (1941); *see Wheeler,* 435 U.S. at 322, 98 S.Ct. 1079.

*MacArthur*, 309 F.3d at 1221-1222. The Supreme Court has likewise observed:

> As we have often noted, Indian tribes occupy a unique status under our law. At one time they exercised virtually unlimited power over their own members as well as those who were permitted to join their communities. Today, however, the power of the Federal Government over the Indian tribes is plenary. Federal law, implemented by statute, by treaty, by administrative regulations, and by judicial decisions, provides significant protection for the individual, territorial, and political rights of the Indian tribes. The tribes also retain some of the inherent powers of the self-governing political communities that were formed long before Europeans first settled in North America.

*National Farmers Union Ins. Cos. v. Crow Tribe,* 471 U.S. 845, 851 (1985) (footnotes

omitted).[49]

The unique status of Indian tribes under American law has been characterized in a variety of ways: "'Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory . . . . [They] are a good deal more than "private

---

[49]The Court recently elaborated upon the plenary power of Congress in Indian affairs:

First, the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as "plenary and exclusive." *E.g.*, *Washington v. Confederated Bands and Tribes of Yakima Nation*, 439 U. S. 463, 470–471 (1979); *Negonsott v. Samuels*, 507 U. S. 99, 103 (1993); see *Wheeler*, 435 U. S., at 323; see also W. Canby, American Indian Law [in a Nutshell] 2 (3d ed. 1998) (hereinafter Canby) ("[T]he independence of the tribes is subject to exceptionally great powers of Congress to regulate and modify the status of the tribes").

This Court has traditionally identified the Indian Commerce Clause, U. S. Const., Art. I, §8, cl. 3, and the Treaty Clause, Art. II, §2, cl. 2, as sources of that power. *E.g.*, *Morton v. Mancari*, 417 U. S. 535, 552 (1974); *McClanahan v. Arizona Tax Comm'n*, 411 U. S. 164, 172, n. 7 (1973); see also Canby 11–12; F. Cohen, Handbook of Federal Indian Law 209–210 (1982 ed.) (hereinafter Cohen) (also mentioning, *inter alia*, the Property Clause). The "central function of the Indian Commerce Clause," we have said, "is to provide Congress with plenary power to legislate in the field of Indian affairs." *Cotton Petroleum Corp. v. New Mexico*, 490 U. S. 163, 192 (1989); see also, *e.g.*, *Ramah Navajo School Bd., Inc. v. Bureau of Revenue of N. M.*, 458 U. S. 832, 837 (1982) ("broad power" under the Indian Commerce Clause); *White Mountain Apache Tribe v. Bracker*, 448 U. S. 136, 142 (1980) (same, and citing *Wheeler*, *supra*, at 322–323).

The treaty power does not literally authorize Congress to act legislatively, for it is an Article II power authorizing the President, not Congress, "to make Treaties." U. S. Const., Art. II, §2, cl. 2. But, as Justice Holmes pointed out, treaties made pursuant to that power can authorize Congress to deal with "matters" with which otherwise "Congress could not deal." *Missouri v. Holland*, 252 U. S. 416, 433 (1920); see also L. Henkin, Foreign Affairs and the U. S. Constitution 72 (2d ed. 1996). And for much of the Nation's history, treaties, and legislation made pursuant to those treaties, governed relations between the Federal Government and the Indian tribes. See, *e.g.*, Cohen 109–111; F. Prucha, American Indian Policy in the Formative Years 44–49 (1962).

*United States v. Lara*, 541 U.S. 193, 200-201 (2004). Further, to the extent that "'Indian affairs were more an aspect of military and foreign policy than a subject of domestic or municipal law,' Cohen 208," *Lara* would ground Congress' authority "not upon 'affirmative grants of the Constitution,' but upon the Constitution's adoption of preconstitutional powers necessarily inherent in any Federal Government, namely powers that this Court has described as 'necessary concomitants of nationality.' *United States v. Curtiss-Wright Export Corp.*, 299 U. S. 304, 315–322 (1936); . . . ." *Id.* at 201 (additional citations omitted).

Moreover, "Congress, with this Court's approval, has interpreted the Constitution's 'plenary' grants of power as authorizing it to enact legislation that both restricts and, in turn, relaxes those restrictions on tribal sovereign authority." *Id.* at 202.

voluntary organizations."'";[50]  "Indian tribes are 'distinct, independent political communities retaining their original natural rights' in matters of local self-government";[51]  "[T]hey are 'a separate people' possessing 'the power of regulating their internal and social relations . . . .'";  Indian tribes endure as distinct "entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life."[52]

However they may have been characterized in a particular case, in each instance the Supreme Court has acknowledged that Indian tribes still possess inherent powers of self-government rooted in their own historic sovereignty.  So has our own court of appeals: "Indian tribes are neither states, nor part of the federal government, nor subdivisions of either.  Rather, they are sovereign political entities possessed of sovereign authority not derived from the United States, which they predate."  *NLRB v. Pueblo of San Juan,* 276 F.3d 1186, 1192 (10th Cir. 2002) (en banc) (footnote omitted).[53]

Felix S. Cohen's *Handbook of Federal Indian Law* articulated the classic synthesis of

---

[50]*United States v. Wheeler*, 435 U.S. 313, 323 (1978) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (internal quotation omitted) (citing *Worcester v. State of Georgia*, 31 U.S. (6 Pet.) 515, 557 (1832));  *accord Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001); *United States v. Lara*, 541 U.S. 193, 204 (2004).

[51]*Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978) (quoting *Worcester v. State of Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832)).

[52]*United States v. Mazurie*, 419 U.S. at 557 (quoting *United States v. Kagama*, 118 U.S. 375, 381-82 (1886), and *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 173 (1973)); *see also Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 16 (1831) (describing Cherokee Nation as "a distinct political society, separated from others, capable of managing its own affairs and governing itself").

[53]Indeed, some years ago, the court of appeals explained it this way: "Indian tribes are not states. *They have a status higher than that of states*.  They are subordinate and dependent nations possessed of all powers as such," and are limited as to those powers "only to the extent that they have expressly been required to surrender them by the superior sovereign, the United States."  *Native American Church v. Navajo Tribal Council*, 272 F.2d 131, 134 (10th Cir. 1959) (emphasis added).  As the *MacArthur* panel explained, "tribes are not subordinate to the states, *see Washington v. Confederated Tribes*, 447 U.S. 134, 154, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), and certainly not to counties."  309 F.3d at 1222 (footnote omitted).

the scope and extent of Indian tribal sovereignty:

> The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles: (1) An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative power of the United States, and, in substance, terminates the external powers of sovereignty of the tribe, *e.g.*, its power to enter into treaties with foreign nations, but does not by itself affect the internal sovereignty of the tribe, *i.e.*, its powers of local self-government.  (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government.

Felix S. Cohen, *Handbook of Federal Indian Law* 123 (1942) (footnotes omitted); *accord*

*Powers of Indian Tribes*, 55 I.D. 14, 22 (1934), 1 *Opinions of the Solicitor of the Department*

*of the Interior Relating to Indian Affairs 1917-1974* 445, 449.

> Given these fundamental principles, an Indian tribe serves as "its own source of

power."

> Thus a tribe's right to establish a court or levy a tax is not subject to attack on the ground that Congress has not authorized the tribe to take these actions; the tribe is sovereign and needs no authority from the federal government. . . . The relevant inquiry is whether any limitation exists to *prevent* the tribe from acting within the sphere of its sovereignty, not whether any authority exists to *permit* the tribe to act. . . .

William C. Canby, Jr., *American Indian Law in a Nutshell* 75 (4th ed. 2004) (emphasis in

original; citations omitted).[54]

---

[54]*Cf.* Skibine, *Deference Owed Tribal Courts' Jurisdictional Determination: Towards Co-Existence, Understanding, and Respect Between Different Judicial Norms*, 24 N.M.L. Rev. 191, 191-192 (1994):

> If the Court asks whether Indian tribes have sovereign rights because these rights, which have always existed, have never been relinquished in a treaty or taken away by an act of Congress, the Court is asking a legal question, the answer to which depends on statutory construction and historical interpretation.  If, however, the Court asks whether a tribe's sovereign rights still exist

(continued...)

Since 1978, the Supreme Court has elaborated upon a theory concerning the extent to which the Indian tribes' authority over their "external relations" has been withdrawn "by implication as a necessary result of their dependent status." *United States v. Wheeler*, 435 U.S. 313, 323 (1978); *see, e.g., Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), and *Montana v. United States*, 450 U.S. 545 (1981), discussed *infra*. This "implicit divestiture" theory bears most heavily upon the scope of Indian tribal authority over non-Indians. Indeed, "The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe." *Wheeler*, 435 U.S. at 326. The full extent of implicit divestiture has yet to be determined, resulting in no small amount of uncertainty and confusion as to the scope of tribes' inherent civil authority over non-Indians, *e.g.*, *Nevada v. Hicks*, 533 U.S. 353 (2001); *Brendale v. Confederated Tribes and Bands of the Yakima Nation*, 492 U.S. 408 (1989), and leading to frequent litigation of that question in cases such as this one.

Nonetheless, it still remains true that "[d]efined by Chief Justice Marshall as 'domestic dependent nations,'"

> Indian tribes have long been recognized under principles of federal Indian law as possessing the right to self-government, free of most state law strictures over their own territory and members. Tribal sovereignty thus protects and affirms the right of tribes to exercise criminal and civil jurisdictional authority over their own members. By virtue of their inherent sovereignty, tribes, as recognized and affirmed by Congress, exercise criminal jurisdiction over non-member Indians on their reservation as well. In addition, the tribes have also

---

[54](...continued)

because they are vital to tribal self-government, it is asking a question of a more political and subjective nature. In effect, the answer to this second question will largely depend on who decides the issue.

been recognized as possessing a limited degree of civil jurisdictional authority over all non-members, Indian or non-Indian, who enter the reservation . . . .

David H. Getches, Charles F. Wilkinson & Robert A. Williams, Jr., *Cases and Materials on Federal Indian Law* 377-378 (5th ed. 2005).  "Notwithstanding various congressional restrictions and judicial limitations 'on the right of reservation Indians to make their own laws and be ruled by them,'" Indian "tribal governments and law-making institutions are flourishing throughout Indian country, mainly because of the commitment of Indians to one of the fundamental principles of federal Indian law, tribal sovereignty."  *Id.* at 378 (citation omitted).

## 2.  Inherent Tribal Powers

In practical terms, inherent sovereignty enables Indian tribes to exercise a wide range of specific powers of self-government, among them: the power to levy and collect taxes from members, and from nonmembers engaging in transactions involving the tribe or taking place on tribal lands,[55]  the power to manage the use of their territory and resources by both members and nonmembers,[56] and to the power to regulate economic activity and land use

---

[55] *See, e.g.*, *Washington v. Confederated Tribes of the Colville Reservation*, 447 U.S. 134, 152 (1980) ("The widely held understanding within the Federal Government has always been that federal law to date has not worked a divestiture of Indian taxing power."); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137, 142 (1982) ("The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management."); *Kerr-McGee Corp. v. Navajo Tribe of Indians*, 471 U.S. 195 (1985) (affirming Navajo Nation's power to impose possessory interest and business activity taxes without prior approval of Interior Department); *Mustang Production Co. v. Harrison*, 94 F.3d 1382 (10th Cir. 1996) (tribal taxing power extends to trust allotment lands).

[56] *See, e.g., White Mountain Apache Tribe v. Bracker*, 448 U. S. 136, 151 (1980); *Montana v. United States*, 450 U.S. at 557;  *Merrion*, 455 U.S. at 137; *New Mexico v. Mescalero Apache Tribe*, 462 U.S.324, 335 (1983) (tribe's authority to regulate hunting and fishing by non-members on tribal lands preempted state jurisdiction); *cf. Brendale v. Confederated Tribes and Bands of the Yakima Nation*, 492 U.S. 408, 438-444 (Stevens & O'Connor, JJ.); *id.* at 448-468 (Blackmun, Brennan & Marshall, JJ.) (1989).

within the reservation.[57]  *See Duro v. Reina*, 495 U.S. 676, 687-688 (1990).

In a footnote to its 1978 opinion in *United States v. Wheeler*, the Court listed three examples of powers encompassed within Indian tribes' "right of internal self-government," in addition to the tribes' acknowledged authority to prosecute tribal members for criminal offenses:

> Thus, unless limited by treaty or statute, a tribe has the power to determine tribe membership, *Cherokee Intermarriage Cases*, 203 U.S. 76 ; *Roff v. Burney*, 168 U.S. 218, 222-223; to regulate domestic relations among tribe members, *Fisher v. District Court*, 424 U.S. 382 ; cf. *United States v. Quiver*, 241 U.S. 602 ; and to prescribe rules for the inheritance of property. *Jones v. Meehan*, 175 U.S. 1, 29; *United States ex rel. Mackey v. Coxe*, 18 How. 100.

435 U.S. at 322 n.18.  *Wheeler* involved a federal criminal prosecution, and nothing in Justice Stewart's opinion for the Court in *Wheeler* even hints that these examples were thought to delineate the full extent of Indian tribes' civil "'power of regulating their internal and social relations.'" *Id.*

Justice Stewart, quoting at some length from his *Wheeler* opinion, reiterated this same list of examples three years later in *Montana v. United States*:

> Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.  *Id.*, at 322, n. 18.  But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is

---

[57]*See Merrion*, 455 U.S. at 137 (referring to "the tribe's general authority as sovereign, to control economic activity within its jurisdiction"); *Duro v. Reina*, 495 U.S. at 688 (noting that zoning is "vital to the maintenance of tribal integrity and self-determination"); *see also Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. at 152-153 ("Executive Branch officials have consistently recognized that Indian tribes possess a broad measure of civil jurisdiction over the activities of non-Indians on Indian reservation lands in which the tribes have a significant interest") (citing 23 Op. Atty. Gen. 214 (1900); 17 Op. Atty. Gen. 134 (1881); 7 Op. Atty. Gen. 174 (1855); Powers of Indian Tribes, 55 I. D. 14, 46 (1934))).

inconsistent with the dependent status of the tribes, and so cannot survive
without express congressional delegation. . . .

*Montana*, 450 U.S. at 564 (citations omitted).

*Montana*'s restatement of *Wheeler*'s examples of tribal powers has been reiterated by

the Court in more recent opinions as descriptive of the nature of inherent tribal sovereignty.

*Strate v. A-1  Contractors*, 520 U.S. 438, 459 (1997), referred to the *Wheeler* examples as

"the Court's preface" to "the *Montana* rule's second exception," which is "[k]ey to its proper

application[.]" *Nevada v. Hicks*, 533 U.S. 353 (2001), in turn, elaborated upon *Strate*'s

reference:

> In *Strate*, we explained that what is necessary to protect tribal
> self-government and control internal relations can be understood by looking at
> the examples of tribal power to which *Montana* referred: tribes have authority
> '[to punish tribal offenders,] to determine tribal membership, to regulate
> domestic relations among members, and to prescribe rules of inheritance for
> members,' 520 U. S., at 459 (brackets in original), quoting *Montana*, *supra*, at
> 564." These examples show, we said, that Indians have "'the right . . . to make
> their own laws and be ruled by them,'" 520 U. S., at 459, quoting *Williams v.
> Lee*, 358 U. S. 217, 220 (1959). See also *Fisher v. District Court of Sixteenth
> Judicial Dist. of Mont.*, 424 U. S. 382, 386 (1976) (per curiam) ("In litigation
> between Indians and non-Indians arising out of conduct on an Indian
> reservation, resolution of conflicts between the jurisdiction of state and tribal
> courts has depended, absent a governing Act of Congress, on whether the state
> action infringed on the right of reservation Indians to make their own laws and
> be ruled by them" (internal quotation marks and citation omitted)). . . .

533 U.S. at 360-361.  *Hicks* treats the *Wheeler* examples as *examples* of the Indian tribes'

broader "'right . . . to make their own laws and be ruled by them,'" giving no indication that

the examples themselves should be considered all-inclusive.[58]

---

[58]In their memorandum, the Health District defendants quotes *Strate*'s reiteration of the *Montana* examples,
highlighting all four examples in boldface type as the preface for their argument that "[p]laintiffs' claims have

(continued...)

In recent opinions defining the extent of inherent tribal sovereignty, the Court has sought guidance from "the published opinions of the Solicitor of the Department of the Interior," among other sources.  *United States v. Lara*, 541 U.S.193, 206 (2004) (discussing *Duro v. Reina*, 495 U.S. at 689-692).   Nathan Margold's oft-cited Solicitor's opinion, *Powers of Indian Tribes*, 55 I.D. 14 (1934), enumerates a number of specific tribal powers as being among those "powers vested in any Indian tribe or tribal council by existing law," 25 U.S.C.A. § 476 (2001).  In addition to the powers over criminal offenses, domestic relations, inheritance and tribal membership highlighted in *Wheeler*, Margold's opinion detailed the legal authorities recognizing the inherent powers of Indian tribes to determine their own form of government; to lay and collect taxes; to control, manage and protect tribal property; "to adopt police regulations governing the property and contracts" of tribal members; to regulate entry into tribal territory; and to exercise "plenary civil and criminal jurisdiction" through "the judicial powers of the tribe [that] are co-extensive with its legislative or executive powers."  55 I.D. at 30-67, 1 *Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-1974*, at 455-476.

The earlier and more recent editions of Cohen's *Handbook* make similar enumerations of tribal powers, but even these authoritative texts do not exhaust the subject.  *See* Felix S.

---

[58](...continued)

absolutely nothing to do with internal tribal self-government, but rather address their own treatment as individuals and the alleged treatment of certain patients . . . ."  (San Juan Health District Defendants' Memorandum Regarding Subject Matter Jurisdiction and in Support of Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no. 497), at 13.)

Cohen, *Handbook of Federal Indian Law* 126-149 (1942) (*"Handbook* (1942 ed.)");[59] *Felix S. Cohen's Handbook of Federal Indian Law* 246-257 (Rennard Strickland, et al., eds. 1982) (*"Handbook* (1982 ed.)").

In its *Final Report* to Congress nearly thirty years ago, the American Indian Policy Review Commission observed:

> The question of jurisdiction of tribal governments has grown increasingly complex in recent years. Tribal governments are emerging from an essentially dormant period forcibly imposed upon them by Federal policies directed toward their ultimate destruction. The tribes are beginning to assert those governmental powers necessary to take their proper place in the role of governments within the United States. *The powers they are seeking to assert are no more and no less than those of any local sovereign of these United States.* The objectives they seek to attain are peace and tranquility within the reservation boundaries and economic independence which will permit them to operate free of the Federal purse strings without fear of termination.

1 American Indian Policy Review Comm'n, *Final Report* 153 (1977) (emphasis added). The Commission recommended that "[t]he long term objective of Federal-Indian policy be the development of tribal governments into fully operational governments exercising the same

---

[59]Cohen's *Handbook* observed that at least as of 1942, "The legal powers of an Indian tribe, measured by the decisions of the highest courts, are far more extensive than the powers which most Indian tribes have been actually permitted by energetic officials to exercise in their own right"; but the *Handbook* also anticipated that "affording statutory recognition of these powers of tribal self-government and administrative assistance in developing adequate mechanisms for such government" through the Wheeler-Howard Act (Indian Reorganization Act) of 1934 "may reasonably be expected to end the conditions that have in the past led the Interior Department and various state agencies to deal with matters that are properly within the legal competence of the Indian tribes themselves." *Handbook* (1942 ed.) at 125, 126 (footnote omitted).

It follows that the true scope and extent of inherent tribal sovereignty cannot fairly be measured by "historic practices" or "the experience of forerunners of modern tribal courts" during the era of enforced tribal dormancy to which the *Handbook* referred. *Lara,* 541 U.S. at 206 (discussing *Duro v. Reina*, 495 U.S. at 689-692.) If, as the *Lara* Court postulates, "major policy changes inevitably involve major changes in the metes and bounds of tribal sovereignty," *id.* at 202, then Indian tribes reasonably should anticipate a more expansive reading of those same "metes and bounds" by the Court, given the fact that the "political branches" of "the Federal Government are firmly committed to the goal of promoting tribal self-government," *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 334-335 (1983), and have been consistently pursuing that goal for more than 35 years. *See id.* at 335-336.

powers and shouldering the same responsibilities as other local governments." *Id.* at 154.

Today, nearly three decades later, modern tribal governments routinely exercise civil governmental authority over a range of day-to-day activities, much like comparable state and local government entities. Tribal codes and ordinances govern subject matter ranging from agriculture to zoning, and tribal departments and agencies administer and deliver an expanding array of community services—from police, fire, and other emergency services to education, health, housing, justice, employment assistance, environmental protection, cultural preservation, land use planning, natural resource conservation and management, road maintenance, water and public utilities. Indian tribes fit squarely within the ranks of modern American civic bodies, sharing the common duty and responsibility to provide essential services to the people of the communities they serve. *See, e.g.*, *Meyers v. Board of Education of San Juan Sch. Dist.*, 905 F. Supp. 1544 (D. Utah 1995) (federal, state, local and tribal governments are each obligated to provide education for Navajo students).

Moreover, Congress has afforded tribal governments a significant role in federal environmental protection under legislation such as the Clean Air Act,[60] the Clean Water Act,[61] and the Safe Drinking Water Act,[62] which were amended to authorize the Environmental Protection Agency to treat Indian tribes as states for the purposes of developing and enforcing their own tribal air and water quality standards, and to grant Indian

---

[60]Pub. L. No. 101-549, § 107(d), 104 Stat. 2464 (1990), *codified at* 42 U.S.C.A. § 7601(d)(1)(A) (2003).

[61]Pub. L. No. 100-581, § 207, 102 Stat. 2940 (1988), *codified as amended at* 33 U.S.C.A. § 1377(e) (2001).

[62]Pub. L. No. 99-339, § 302(c), 100 Stat. 666 (1986), *codified at* 42 U.S.C.A. § 300h-1(e) (2003).

tribes primary enforcement authority over aspects of safe drinking water enforcement.  Tribal authority in these matters has consistently been confirmed by the federal courts.  *See, e.g., City of Albuquerque v. Browner*, 97 F.3d 415, 419 (10th Cir. 1996), *cert. denied*, 522 U.S. 965 (1997); *Montana v. United States Environmental Protection Agency*, 137 F.3d 1135 (9th Cir. 1998); *Arizona Public Service Co. v. EPA*, 211 F.3d 1280 (D.C. Cir. 2000); *Wisconsin v. EPA*, 266 F.3d 741 (7th Cir. 2001).

As noted above, Interior Solicitor Margold's Opinion on *Powers of Indian Tribes* acknowledged that "[t]he powers of an Indian tribe in the administration of justice derive from the substantive powers of self-government which are legally recognized to fall within the domain of tribal sovereignty.  If an Indian tribe has the power to regulate . . . it necessarily has the power to adjudicated, through tribunals established by itself, controversies involving" the "fields of local government in which our analysis has shown that tribal authority endures.  *In all these fields the judicial powers of the tribe are coextensive with its legislative or executive powers*." *Id.*, 1 *Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1917-1974*, at 471 (emphasis added).  "Unless this power is removed by explicit legislation or is given up by the tribe . . . exclusive tribal judicial jurisdiction over reservation affairs is retained." *Handbook* (1982 ed.) at 250 (footnote omitted); *see also Handbook* (1942 ed.) at 146.[63]

The Supreme Court has reaffirmed that "tribal courts are important mechanisms for

---

[63]"So long as the complete and independent sovereignty of an Indian tribe was recognized, its criminal jurisdiction, no less than its civil jurisdiction, was that of any sovereign power. . . . Such jurisdiction continues to this day, save as it has been expressly limited by the acts of a superior government." *Id.*

protecting significant tribal interests." *United States v. Wheeler*, 435 U.S. at 332 (footnote omitted).  "Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 (1978).

Such recognition has been accorded tribal courts even as they continue to develop and evolve as institutions.[64]  As one respected commentator has observed:

> The tribal courts, while relatively young, are developing in leaps and bounds.  For example, many tribes are working to revise their tribal constitutions and to codify their civil, regulatory, and criminal law to provide greater guidance and predictability in tribal justice.  At the same time, tribes have expanded the use of traditional law.  Many tribal codes now combine unique tribal law with adapted State and Federal law principles.  The number of law-trained Native Americans has increased.  Both State and Federal courts continue to recognize the tribal courts as important fora for resolution of reservation-based claims involving both Indians and non-Indians.

---

[64]In 1970, "there were only 85 operating tribal courts." Charles Wilkinson, *Blood Struggle: The Rise of Modern Indian Nations* 289 (2005).  By 1976, "there were 117 operative tribal courts in Indian country," and "tribal justice systems" were seen as "evolving institutions that are capable of fair and efficient justice." 1 American Indian Policy Review Comm'n, *Final Report* 163, 167-168 (1977).  "Today, approximately 275 tribal courts and 23 CFR courts exist in the United States," but "[t]he numbers . . . tell only part of the story of the growth and diversity of these unique and evolving institutions that are in the forefront of modern tribal efforts to define the meanings and scope of tribal sovereignty . . . ."  David H. Getches, Charles F. Wilkinson & Robert A. Williams, Jr., *Cases and Materials on Federal Indian Law* 420 (5th ed. 2005).

> Much has changed in thirty-five years.  Most of the 562 federally recognized tribes have created courts under their own constitutions or laws.  This requires considerable infrastructure.  Tribal justice systems need courtrooms and office spaces, judges for both trials and appeals, prosecutors, court clerks, tribal defenders in criminal cases, counselors, child welfare workers, and jail facilities.  In addition to personnel, tribal justice systems must have civil and criminal laws, rules of court procedure, law libraries, and, typically, intergovernmental agreements with federal and state agencies for child welfare, environmental regulation, and criminal law. . . .

Wilkinson, *Blood Struggle*, at 289.  "Tribal court systems vary from the highly structured, multiple court system of the Navajo Nation, served by tribal prosecutors and defense advocates, to very informal single-judge courts operated on a part-time basis without supplementary services."  Canby, *American Indian Law*, at 67.

Justice Sandra Day O'Connor, *Lessons from the Third Sovereign: Indian Tribal Courts,* 33

Tulsa L.J. 1, 1 (1997).

> Tribal courts have demonstrated an exceptional capacity for growth in
> competence and sophistication in the last quarter century. They are currently
> hearing more cases of greater complexity and impact than ever before. As part
> of this process of significant change, tribal courts are crafting a unique
> jurisprudence of vision and cultural integrity. In other words, tribal courts are
> responding competently and creatively to federal oversight pressures and
> cultural values in order to synthesize the best of both traditions.

Frank Pommersheim, *Tribal Courts: Providers of Justice and Protectors of Sovereignty*, 79

Judicature 110 (Nov.-Dec. 1995).   *See generally* Nell Jessup Newton, *Tribal Court Praxis:*

*One Year in the Life of Twenty Indian Tribal Courts*, 22 Am. Indian L. Rev. 285 (1998);

Frank Pommersheim, *Braid of Feathers: American Indian Law and Contemporary Tribal*

*Life* (1995); Frank Pommersheim, *Tribal Court Jurisprudence: A Snapshot From the Field*,

21 Vt. L. Rev. 7 (1996); Vine Deloria, Jr. & Clifford M. Lytle, *American Indians, American*

*Justice* 110-138 (1983).

  "'Indian sovereignty' can be defined as the exercise of the powers of self-

government."[65]  No enumeration by examples of specific powers can paint a complete

portrait of the inherent sovereignty of Indian tribes.  This summary of fundamental principles

and inherent tribal powers offers an introductory overview, giving at least some sense of the

true breadth of the subject.  *See* American Indian Policy Review Commission, *Final Report*

at 103 ("The point . . . is not to enumerate all sovereign powers of Indian tribes, but simply to

give examples for the purpose of showing that Indian tribes are in fact governments.").

---

[65]Alex Tallchief Skibine, *Deference Owed Tribal Courts' Jurisdictional Determination: Towards
Co-Existence, Understanding, and Respect Between Different Judicial Norms*, 24 N.M. L. Rev. 191, 191 (1994).

Tribal sovereignty today finds at least as much meaningful definition in the growth, development and day-to-day functioning of effective tribal governments as it finds in the volumes of the law library.  Far from being relics of a bygone era, Indian tribal powers bear the fine burnish of everyday use.

### 3.  Tribal Sovereignty & Federal Indian Policy

Tribal self-government cannot thrive in a jurisdictional vacuum, and for many years it has been the expressed policy of both the President and the Congress that tribal self-government should thrive.  Indeed, "[o]ur cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination."  *National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. at 856 (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S.324, 334-335 (1983) (Federal Government "firmly committed to the goal of promoting tribal self-government"); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130,138 n. 5 (1982) ("Through various Acts governing Indian tribes, Congress has expressed the purpose of 'fostering tribal self-government.'"); *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-144 & n. 10 (1980) (the "tradition of Indian sovereignty over the reservation and tribal members . . . [a]s we have repeatedly recognized, . . . is reflected and encouraged in an number of congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development"); *Morton v. Mancari*, 417 U.S. 535, 551-555 (1974) (upholding 25 U.S.C. § 472 Indian employment preference as "reasonable and rationally designed to further Indian self-government"); *cf. Williams v. Lee*, 358 U.S. at 223 ("The cases in this Court have consistently guarded the authority of Indian

64

governments over their reservations.").

In *New Mexico v. Mescalero Apache Tribe*, decided one year after *Montana*, the Court observed that "both the tribes and the Federal Government are firmly committed to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes," citing to a series of congressional acts, from the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461 *et seq.*,[66] through the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. §§ 450 *et seq.*  462 U.S. at 334-335 & n.17.[67]

> We have stressed that Congress' objective of furthering tribal self-government encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging "tribal self-sufficiency and economic development." . . .  In part as a necessary implication of this broad federal commitment, we have held that tribes have the power to manage the use of their territory and resources *by both members and nonmembers*, . . . to undertake and *regulate economic activity within the reservation*, . . . and to defray the cost of governmental services by levying taxes. . . .

462 U.S. at 335-336 (emphasis added & citations omitted) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. at 143 (footnote omitted)).  With the "successful accomplishment of the federal purpose" to further tribal autonomy clearly in mind, the Court concluded that the Mescalero Apache Tribe's regulation of non-Indian hunting and fishing on its reservation left no room for concurrent regulation by the State of New Mexico:

> It is beyond doubt that the Mescalero Apache Tribe lawfully exercises

---

[66] *See also* Comment, *Tribal Self-Government and the Indian Reorganization Act of 1934*, 70 Mich. L. Rev. 955 (1972); R. Ericson & D. Snow, Comment, *The Indian Battle for Self-Determination*, 58 Cal. L. Rev. 445 (1970).

[67] Congress continues to encourage greater tribal participation in and responsibility for the administration of federal services to Indians.  *See, e.g.*, Tribal Self-Governance Act of 1994, Pub. L. 103-413, title II, 108 Stat. 4270 (1994) (*codified at* 25 U.S.C. §§ 458aa-458hh (2000)).

substantial control over the lands and resources of its reservation, including its wildlife.  As . . . conceded by New Mexico, the sovereignty retained by the Tribe under the Treaty of 1852 includes its right to regulate the use of its resources by members *as well as nonmembers*.  In *Montana v. United States*, we specifically recognized that tribes in general *retain this authority*.

Moreover, this aspect of tribal sovereignty has been expressly confirmed by numerous federal statutes. . . .

*Id.* (emphasis added & footnotes omitted).[68]

Congress remains firmly committed to supporting tribal autonomy through the effective operation of tribal courts, no less than other aspects of tribal self-government.  Congress is aware that "[t]ribal courts play a vital role in tribal self-government . . . and [it] has consistently encouraged their development."  *Iowa Mutual*, 480 U.S. at 14-15.  In addition to legislation supporting tribal self-government generally, such as the Indian Reorganization Act of 1934, the Indian Self-Determination Act of 1975, the Tribal Self-Governance Act of 1994,[69] or the Indian Tribal Regulatory Reform and Business Development Act of 2000,[70] Congress has enacted measures specifically aimed at supporting and encouraging the development and effective functioning of Indian tribal courts and justice systems.

The Indian Civil Rights Act of 1968, Pub. L. No. 90-284, 82 Stat. 77 (1968), *codified*

---

[68]The *New Mexico* case was before the Court in the October 1982 Term on certiorari after remand to the Tenth Circuit for remand "in light of *Montana v. United States*, 450 U.S. 544 (1981)," decided during the prior Term.  462 U.S. at 330.  On remand, the Tenth Circuit had "adhered to its earlier decision" affirming injunctive relief against the enforcement of state hunting and fishing laws "against any person for hunting and fishing activities conducted on the reservation," a decision which in turn was affirmed by a unanimous Court.  *Id.*

[69]Pub. L. No. 103-413, Title II, 108 Stat. 4270 (1994), *codified at* 25 U.S.C.A. §§ 450 note, 458aa-458hh (2001).

[70]Pub. L. No. 106-447, 114 Stat. 1934 (2000), *codified at* 25 U.S.C. § 4301 note (2001).

*at* 25 U.S.C.A. §§ 1301-1303 (2001), reflected Congress' intent "to promote the well-established federal `policy of furthering Indian self-government.'" *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62  (1978) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)).

The Indian Child Welfare Act of 1978, Pub. L. No. 95-608, 92 Stat. 3069 (1978), *codified at* 25 U.S.C.A. §§ 1901 *et. seq.* (2001), emphatically reaffirmed Indian tribal jurisdiction over child custody, adoption and child welfare issues, including the primary role of tribal courts in the exercise of tribal jurisdiction over the children of tribal members.  *See* 25 U.S.C.A. § 1911.  Congress further afforded tribal judicial proceedings involving Indian child custody "full faith and credit" to the same extent that federal and state entities "give full faith and credit to the public acts, records, and judicial proceedings of any other entity."  25 U.S.C.A. § 1911(d) (2001).[71]

Following the Supreme Court's decision in *Duro v. Reina*, 495 U.S. 676 (1990), which held Indian tribes to be divested of inherent criminal jurisdiction over non-member Indians, Congress immediately amended the Indian Civil Rights Act to reaffirm each Indian tribe's inherent power to prosecute non-member Indians for crimes committed within its jurisdiction.  *See* Pub. L. No. 101-511, Title VIII, § 8077(b), (c), 104 Stat. 1892 (1990),

---

[71]25 U.S.C.A. § 1911(d) reads:

**(d)  Full faith and credit to public acts, records, and judicial proceedings of Indian tribes.**
 The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

*codified at* 25 U.S.C.A. § 1301(2) (2001).[72]  In doing so, Congress did not delegate federal

criminal authority to the tribes; by exercising its power to "relax restrictions that the political

branches have, over time, placed on the exercise of a tribe's inherent legal authority,"

Congress simply "adjust[ed] the tribes' status," reviving inherent tribal sovereignty and

thereby overruling the *Duro* Court's reading of the "'judicially made' federal Indian law" of

inherent tribal jurisdiction.  *United States v. Lara*, 541 U.S. 193, 196, 200, 205-207 (2004).[73]

Attributing the *Duro* ruling to the vicissitudes of federal Indian policy over the past two

centuries ("Such major policy changes inevitably involve major changes in the metes and

---

[72]25 U.S.C.A. § 1301(2) now reads:

> (2) "powers of self-government" means and includes all governmental powers possessed by an
> Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and
> through which they are executed, including courts of Indian offenses; and means the inherent
> power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all
> Indians; . . . .

Pub. L. No. 102-137, 105 Stat. 646 (1991) repealed a time limitation on the 1990 amendments to § 1301.  *See
generally*, Alex Tallchief Skibine, Duro v. Reina *and the Legislation That Overturned It: A Power Play of
Constitutional Dimensions*, 66 S. Cal. L. Rev. 767 (1993).

[73]

> And the statute's legislative history confirms that such was Congress' intent.  See, *e.g.*, H. R. Conf.
> Rep. No. 102–261, pp. 3–4 (1991) ("The Committee of the Conference notes that . . . this
> legislation is not a delegation of this jurisdiction but a clarification of the status of tribes as
> domestic dependent nations"); accord, H. R. Rep. No. 102–61, p. 7 (1991); see also S. Rep. No.
> 102–168, p. 4 (1991) ("recogniz[ing] and reaffirm[ing] the inherent authority of tribal governments
> to exercise criminal jurisdiction over all Indians"); 137 Cong. Rec. 9446 (1991) (statement of Sen.
> Inouye) (the "premise [of the legislation] is that the Congress affirms the inherent jurisdiction of
> tribal governments over nonmember Indians" (emphasis added)); *id.*, at 10712–10714 (statement
> of Rep. Miller, House manager of the bill) (the statute "is not a delegation of authority but an
> affirmation that tribes retain all rights not expressly taken away" and the bill "recognizes an
> inherent tribal right which always existed"); *id.*, at 10713 (statement of Rep. Richardson, a sponsor
> of the amendment) (the legislation "reaffirms" tribes' power).

*Lara*, 541 U.S. at 199.

bounds of tribal sovereignty"),[74] the *Lara* Court observed that "Congressional policy . . . now seeks greater tribal autonomy within the framework of a 'government-to-government relationship' with federal agencies."  *Id.* at 202 (citing *Government-to-Government Relations with Native American Tribal Governments: Memorandum for the Heads of Executive Departments and Agencies*, 59 Fed. Reg. 22951 (1994); 19 Weekly Comp. of Pres. Doc. 98 (1983) (President Reagan reaffirming the rejection of termination as a policy and announcing the goal of decreasing tribal dependence on the Federal Government);[75] 25 U.S.C. §450a(b)

----

[74]*Lara* explained that "in *Duro*, the Court drew upon a host of different sources in order to reach its conclusion that a tribe does not possess the inherent power to prosecute a non-member.  The Court referred to historic practices, the views of experts, the experience of forerunners of modern tribal courts, and the published opinions of the Solicitor of the Department of the Interior. 495 U.S., at 689-692," 541 U.S. at 206, which largely reflected the impact of earlier federal Indian policies.  *Cf. National Farmers Union Ins. Cos.* v. *Crow Tribe*, 471 U.S. 845, 855-856 (1985) ("[T]he existence and extent of a tribal court 's jurisdiction will require a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.").

[75]Of course, in his Message from the President of the United States Transmitting Recommendations for Indian Policy, dated July 8, 1970,  H.R. Doc. No. 91-363, 91st Cong., 2d Sess. (1970), President Richard M. Nixon had soundly repudiated the destructive forced "termination" policy that briefly held sway in the Congress during the 1950s, proclaiming the Indians' right to self-determination and urging Congress to make tribal self-determination a matter of national policy.  "In many respects it was a logical culmination of all that had occurred and all that had been recommended in Indian affairs during the preceding decade.  But in the full context of Indian-white relations in the United States," wrote historian Alvin M. Josephy, "it was historic in tone and intent. . . . [I]t showed that a national administration had at last listened to the Indians and accepted *their* ideas of what they needed and wanted," and "it pointed federal policy in a new direction and demanded new thinking and attitudes from those in the federal agencies who dealt in Indian affairs."  Alvin M. Josephy, *Red Power: The American Indians' Fight for Freedom* 223 (1971) (emphasis in original).

> The ideas in Nixon's text were not new, but the widely cited message, with its remarkable force and specificity, served as a catalyst.  Several of the proposals were adopted by Congress, in a form surprisingly close to Nixon's guidelines. . . .

> The principal legislative initiative to emerge from the Nixon proposals, the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C.A. §§ 450a-450nm gives express authority to the Secretaries of the Interior and Health and Human Services to contract with, and make grants to, Indian tribes and other Indian organizations for the delivery of federal services.  The Act reflects a fundamental philosophical change concerning the administration of Indian affairs: tribal programs are funded by the federal government, but the programs should be planned and administered by the tribes themselves; federal "domination" should end. . . .

(continued...)

(congressional commitment to "the development of strong and stable tribal governments");

*Felix S. Cohen's Handbook of Federal Indian Law* 78–202 (Rennard Strickland, ed. 1982);

William Canby, *American Indian Law in a Nutshell* 13–32 (3d ed. 1998)).

Three years later, Congress enacted the Indian Tribal Justice Act of 1993, Pub. L. No. 103-176, 107 Stat. 200, *codified at* 25 U.S.C.A. §§ 3601 *et. seq.* (2001), creating an Office of Tribal Justice Support within the Bureau of Indian Affairs to provide technical assistance and training to Indian tribes for the development of tribal codes, court rules, court administration and case management systems, standards of conduct, and long-range planning, 25 U.S.C.A. § 3611; and providing funding "for the development, enhancement, and continuing operation of tribal justice systems and traditional tribal judicial practices by Indian tribal governments," 25 U.S.C.A. § 3613, with authorization for appropriations exceeding $58,000,000 for each of the fiscal years 2000 through 2007. 25 U.S.C.A. § 3621.[76]

---

[75](...continued)

David H. Getches, Charles F. Wilkinson & Robert A. Williams, Jr., *Cases and Materials on Federal Indian Law* 220 (5th ed. 2005). *See also* Michael P. Gross, *Indian Self-Determination and Tribal Sovereignty: An Analysis of Recent Federal Indian Policy*, 56 Tex. L. Rev. 1195 (1978).

The Indian Self-Determination and Education Assistance Act of 1975, Pub. L. No. 93-638, 88 Stat. 2203 (1975), in turn, has particular relevance to this case: as noted above, plaintiffs Singer, Riggs and Dickson are currently employed by Utah Navajo Health Systems, Inc., a Native American non-profit organization that has operated the Montezuma Creek Clinic under a "Pub. L. 93-638 contract" with the Navajo Nation since January 1, 2000—when it replaced the SJHSD, which had managed the clinic for several years under a prior contract with the Indian Health Service.

[76]Congress enacted the Indian Tribal Justice Act based upon its findings that

(1) there is a government-to-government relationship between the United States and each Indian tribe;

(2) the United States has a trust responsibility to each tribal government that includes the protection of the sovereignty of each tribal government;

(3) Congress, through statutes, treaties, and the exercise of administrative authorities, has

(continued...)

Similarly, the Indian Tribal Justice Technical and Legal Assistance Act of 2000, Pub. L. No. 106-559, 114 Stat. 2778, *codified at* 25 U.S.C.A. §§ 3651 *et seq.* (2001), provides for the awarding of grants by the Attorney General to tribal justice organizations and non-profit entities for tribal justice training, technical assistance, criminal assistance and civil legal assistance to tribal courts and tribal justice systems, 25 U.S.C.A. §§ 3661-3663 (2001); it also authorizes grants and technical assistance to Indian tribes "to enable such tribes to carry out programs to support—"

> (1) the development, enhancement, and continuing operation of tribal justice systems; and
>
> (2) the development and implementation of—
>
>> (A) tribal codes and sentencing guidelines;
>> (B) inter-tribal courts and appellate systems;
>> (C) tribal probation services, diversion programs, and alternative

---

[76](...continued)
recognized the self-determination, self-reliance, and inherent sovereignty of Indian tribes;

(4) Indian tribes possess the inherent authority to establish their own form of government, including tribal justice systems;

(5) tribal justice systems are an essential part of tribal governments and serve as important forums for ensuring public health and safety and the political integrity of tribal governments;

(6) Congress and the Federal courts have repeatedly recognized tribal justice systems as the appropriate forums for the adjudication of disputes affecting personal and property rights;

(7) traditional tribal justice practices are essential to the maintenance of the culture and identity of Indian tribes and to the goals of this chapter;

(8) tribal justice systems are inadequately funded, and the lack of adequate funding impairs their operation; and

(9) tribal government involvement in and commitment to improving tribal justice systems is essential to the accomplishment of the goals of this chapter.

25 U.S.C.A. § 2601(1)-(9) (2001).

> sentencing provisions;
> (D) tribal juvenile services and multi-disciplinary protocols for
> child physical and sexual abuse; and
> (E) traditional tribal judicial practices, traditional tribal justice
> systems, and traditional methods of dispute resolution.

25 U.S.C.A. § 3681(a) (2001).

Each of these measures reflects Congress' firm commitment "to a policy of supporting tribal self-government and self-determination," *National Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. at 856, particularly through the continued development and operation of effective tribal courts.

The Executive Branch has consistently shared that same commitment to furthering tribal self-government. *See, e.g.*, Department of Justice Policy on Indian Sovereignty and Government-to-Government Relations, 61 Fed. Reg. 29424 (June 10, 1996), *current version available at* http://www.usdoj.gov/otj/sovtrb.htm ; Memorandum for the Heads of Executive Departments and Agencies: Government-to-Government Relationship with Tribal Governments, dated September 23, 2004, *available at* http://www.whitehouse.gov/news/releases/2004/09/20040923-4.html   (The Bush Administration "is committed to continuing to work with federally recognized tribal governments on a government-to-government basis and strongly supports and respects tribal sovereignty and self-determination for tribal governments in the United States.").

As one recent commentary suggests, "There is reason to believe that the policy of Indian self-determination is more deeply entrenched than past congressional policies.  In over fifty years, Congress's power over Indian affairs has been exercised almost exclusively to

72

further tribal sovereignty and economic self-sufficiency."  David H. Getches, Charles F. Wilkinson & Robert A. Williams, Jr., *Cases and Materials on Federal Indian Law* 225 (5th ed. 2005).  The direct participation and input of Native Americans in shaping and implementing the policy supporting Indian self-determination through tribal self-government may have a great deal to do with the self-determination policy's stability and endurance.  *See generally* Charles Wilkinson, *Blood Struggle: The Rise of Modern Indian Nations* (2005); Vine Deloria, Jr. & Clifford Lytle, *The Nations Within: The Past and Future of American Indian Sovereignty* (1984); *Indian Self Rule* (Kenneth R. Philp, ed. 1986); 1 American Indian Policy Review Comm'n, *Final Report* at 69-82.

Since the Indian Civil Rights Act in 1968, Congress has enacted no legislation limiting, restricting or diminishing Indian tribal jurisdiction, tribal sovereignty or autonomy. To the contrary, it has expressly disclaimed any such purpose.[77]  So in fashioning the federal common law of tribal civil jurisdiction over non-Indians, any judicial reading of the policies of the "political branches" of the federal government must take into account these consistent congressional and Executive policies favoring tribal self-government and the effective operation of tribal courts.  "Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination."  *National Farmers*, 471 U.S. at 856.

## B. *Oliphant, Montana* & Implied Divestiture of Tribal Sovereignty

In May of 1977, following a detailed examination of federal Indian policy, Indian

---

[77]*See, e.g.*, 25 U.S.C.A. § 3631 (2001); 25 U.S.C.A. § 3665 (2001).

tribal sovereignty and the jurisdictional interplay among federal, state, local and Indian tribal governments, the American Indian Policy Review Commission reported to Congress:

> There is an established legal basis for tribes to exercise jurisdiction over non-Indians.
>
> There has been a demonstrated need for the exercise of some tribal jurisdiction over non-Indians within Indian reservations.
>
> The multiplicity of circumstances and variance in resources and capabilities of the tribes makes it undesirable that Congress attempt to impose a uniform solution to the jurisdictional authority of Indian tribes.
>
> The administrative decisions, the judicial opinions and the authorities of tribes thus far asserted reflect a conservative approach to defining the parameters of jurisdiction and authority of tribal governments and that such case by case determination is preferable to attempting any legislative solution.
>
> The provisions of the 1968 Civil Rights Act supply safeguards and remedies to persons aggrieved by actions of tribal governments which are adequate to the concerns expressed by non-Indians at this time.
>
> In the event any substantial problem arises in the future, the Congress has ample authority to impose whatever legislative solution may be required.

1 American Indian Policy Review Comm'n, *Final Report* at 154.  The Commission recommended that "[n]o legislative action be undertaken by Congress in relation to tribal jurisdiction over non-Indians at this time."  *Id.*

With the exception of the Indian Child Welfare Act of 1978, dealing with Indian child custody issues,[78] Congress did not enact general legislation addressing tribal civil or criminal jurisdiction over non-Indians, leaving the law to develop on a case-by-case basis, consistent with the Commission's recommendation.  It thus should not seem surprising that as Indian

---

[78]Pub. L. No. 95-608, 92 Stat. 3069 (1978), *codified at* 25 U.S.C.A. §§ 1901 *et. seq.* (2001).

tribal self-government has flourished, and even more so in recent years, the Supreme Court "has frequently been required to decide questions concerning the extent to which Indian tribes have retained the power to regulate the affairs of non-Indians." *National Farmers*, 471 U.S. at 851 (footnote omitted).[79]

### 1. *Oliphant v. Suquamish Indian Tribe*

Following on the heels of the Commission's *Final Report*—and with no small amount of irony—the Supreme Court issued an opinion in March of 1978 that propounded a sweeping general rule drastically restricting the exercise of inherent tribal authority over non-Indians. In *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), the Court held that all "Indian tribes do not have inherent jurisdiction to try and punish non-Indians" for criminal offenses. *Id.* at 212. Rewriting the legal principles defining inherent tribal sovereignty, the *Oliphant* Court asserted that Indian tribes had been completely divested of inherent criminal authority over non-Indians as an implied consequence of their "dependent" status:

> Indian tribes do retain elements of "quasi-sovereign" authority after ceding their lands to the United States and announcing their dependence on the Federal Government. See *Cherokee Nation v. Georgia*, 5 Pet. 1, 15 (1831). But the tribes' retained powers are not such that they are limited only by specific restrictions in treaties or congressional enactments. As the Court of Appeals recognized, Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers "*inconsistent with their status*."

*Id.* at 208 (quoting *Oliphant v. Schlie*, 544 F.2d 1007, 1009 (9th Cir. 1976) (emphasis

---

[79]Of course, the analytical approach the Court has prescribed to define the limits of tribal civil jurisdiction over nonmembers requires case-by-case determination of the reach of tribes' inherent sovereignty, which in turn requires frequent recourse to the courts.

supplied by the Court)).[80]  Looking to historical materials largely pre-dating the modern federal policies favoring tribal self-determination, the *Oliphant* Court found support for its conclusion in "the commonly shared presumption of Congress, the Executive Branch, and lower federal courts that tribal courts do not have the power to try non-Indians," which albeit unwritten, "carries considerable weight."  *Id.* at 206 (citations omitted).[81]

> "Indian law" draws principally upon the treaties drawn and executed by the Executive Branch and legislation passed by Congress. These instruments, which beyond their actual text *form the backdrop for the intricate web of judicially made Indian law,* cannot be interpreted in isolation but *must be read in light of the common notions of the day and the assumptions of those who drafted them.* . . .
>
> . . . .
>
> By submitting to the overriding sovereignty of the United States, Indian tribes

---

[80]*Oliphant* deemed tribal jurisdiction over non-Indian offenders to be a function of Indian tribes' "external sovereignty" that had been diminished through their submission to the "overriding sovereignty" of the United States:

> Indian reservations are "a part of the territory of the United States."  *United States v. Rogers,* 4 How. 567, 571 (1846).  Indian tribes "hold and occupy [the reservations] with the assent of the United States, and under their authority."  *Id.*, at 572.  Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty. "[T]heir rights to complete sovereignty, as independent nations, [are] necessarily diminished." *Johnson v. M'Intosh,* 8 Wheat. 543, 574 (1823).

*Id.* at 208-209.

[81]The *Oliphant* Court "rested its conclusion about inherent tribal authority . . . in large part upon [this] 'commonly shared presumption,'" and based "its descriptions of inherent tribal authority" in *Oliphant* and other cases "upon the sources as they existed at the time the Court issued its decisions." *Lara*, 541 U.S. at 205, 206. *Oliphant*'s reliance on that presumption and treatment of those sources—indeed, its whole approach to the issue—has been the subject of vigorous on-going scholarly criticism.  *See, e.g.,* Russel L. Barsh & James Y. Henderson, *The Betrayal:* Oliphant v. Suquamish Indian Tribe *and the Hunting of the Snark*, 63 Minn. L. Rev. 609 (1979); Peter C. Maxfield, Oliphant v. Suquamish Indian Tribe: *The Whole is Greater than the Sum of the Parts*, 19 J. Contemp. L. 391, 399-439 (1993) (a source-by-source critique); Philip P. Frickey, *Congressional Intent, Practical Reasoning, and the Dynamic Nature of Federal Indian Law*, 78 Cal. L. Rev. 1137, 1161-1163 (1990); Philip P. Frickey, *A Common Law for Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers*, 109 Yale L.J. 1 (1999); Robert N. Clinton, *There Is No Federal Supremacy Clause for Indian Tribes*, 34 Ariz. St. L.J. 113 (2002);  Symposium, 13 Kan. J. L. & Pub. Pol'y 59 (2003); *see also* Catherine Baker Stetson, *Decriminalizing Tribal Codes: A Response to* Oliphant, 9 Am. Indian L. Rev. 51 (1981); N. Bruce Duthu, *Implicit Divestiture of Tribal Powers: Locating Legitimate Sources of Authority in Indian Country*, 19 Am. Indian L. Rev. 353 (1994).

therefore necessarily give up their power to try non-Indian citizens of the
United States except in a manner acceptable to Congress. This principle would
have been obvious a century ago when most Indian tribes were characterized
by a "want of fixed laws [and] of competent tribunals of justice." H. R. Rep.
No. 474, 23d Cong., 1st Sess., 18 (1834). It should be no less obvious today,
even though present-day Indian tribal courts embody dramatic advances over
their historical antecedents.

*Id.* at 210.[82]

Two weeks later, in an oft-quoted passage from its opinion in *United States v.*

*Wheeler*, the Court gave succinct expression to *Oliphant*'s reformulation of the law: "In sum,

Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or

*by implication as a necessary result of their dependent status.  Oliphant v. Suquamish Indian*

*Tribe*, *ante*, p. 191."  *Wheeler*, 435 U.S. at 323 (emphasis added).  Language this broad

necessarily raised the question whether inherent tribal *civil* jurisdiction over non-Indians had

been similarly withdrawn "by implication."

---

[82]In what could almost be read as a rebuttal to the American Indian Policy Review Commission's
jurisdictional analysis, the Court continued:

> We recognize that some Indian tribal court systems have become increasingly
> sophisticated and resemble in many respects their state counterparts. We also acknowledge that
> with the passage of the Indian Civil Rights Act of 1968, which extends certain basic procedural
> rights to anyone tried in Indian tribal court, many of the dangers that might have accompanied the
> exercise by tribal courts of criminal jurisdiction over non-Indians only a few decades ago have
> disappeared. Finally, we are not unaware of the prevalence of non-Indian crime on today's
> reservations which the tribes forcefully argue requires the ability to try non-Indians.  But these are
> considerations for Congress to weigh in deciding whether Indian tribes should finally be authorized
> to try non-Indians. They have little relevance to the principles which lead us to conclude that
> Indian tribes do not have inherent jurisdiction to try and to punish non-Indians.

435 U.S. at 212-213 (footnote omitted).
     The *Oliphant* Court's suggestion that the exercise of tribal criminal jurisdiction over non-Indians poses a
fundamental conflict with the individual rights of Americans guaranteed by national citizenship echoed the dissenting
views of Judge—now Justice—Anthony M. Kennedy in *Oliphant* at the court of appeals level.  *Compare Oliphant v.
Schlie*, 544 F.2d at 1014-1019 (Kennedy, J., dissenting) *with United States v. Lara*, 541 U.S. at 211-214 (Kennedy,
J., concurring in judgment).

In *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*—cited by the court of appeals in this case—the Court expressly rejected the assertion that Indian tribes had likewise been completely divested of inherent *civil* jurisdiction over non-Indians within reservation boundaries: "For several reasons," the Court explained, "the reasoning of *Oliphant* does not apply to this case."  471 U.S. 845, 854 (1985).[83]

First, although Congress' decision to extend the criminal jurisdiction of the federal courts to offenses committed by non-Indians against Indians within

---

[83]*National Farmers Union* seemed to signal a retreat from the Court's assertion four years earlier in *Montana v. United States* that "[t]hough *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Montana*, 450 U.S. at 565.  "Rather than further extending the rule in *Oliphant* to tribal jurisdiction over civil matters, the Supreme Court concluded:

> [T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

*Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1501 (10th Cir. 1997), *cert. denied,* 522 U.S. 1090 (1998) (quoting *National Farmers*, 471 U.S. at 855-56).

The *National Farmers* opinion was authored by Justice Stevens, writing for a unanimous Court.  Three years before, in *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), Justice Stevens had quoted the above passage from *Montana*, this time in his dissenting opinion, joined by Chief Justice Burger and Justice Rehnquist, objecting to the imposition of a tribal severance tax on existing non-Indian lessees of tribal mineral resources.  By the time of *National Farmers*, Justice Stevens had acceded to the view that "the reasoning of *Oliphant* does not apply" to the question whether a tribal court had civil jurisdiction over a lawsuit involving both tribal members and non-Indians that arose within reservation boundaries.

Subsequently, the Court declared that *National Farmers* and *Iowa Mutual* "do not expand or stand apart from *Montana*'s instruction on 'the inherent sovereign powers of an Indian tribe.' 450 U.S., at 565."

> While *Montana* immediately involved regulatory authority, the Court broadly addressed the concept of "inherent sovereignty." *Id.*, at 563. Regarding activity on non-Indian fee land within a reservation, *Montana* delineated—in a main rule and exceptions—the bounds of the power tribes retain to exercise "forms of civil jurisdiction over non Indians." *Id.*, at 565.  As to nonmembers, we hold, a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction.  Absent congressional direction enlarging tribal court jurisdiction, we adhere to that understanding.  Subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the civil authority of Indian tribes and their courts with respect to non Indian fee lands generally "do[es] not extend to the activities of nonmembers of the tribe." *Ibid.*

*Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997).

Indian Country supported the holding in *Oliphant*, there is no comparable legislation granting the federal courts jurisdiction over civil disputes between Indians and non-Indians that arise on an Indian reservation.

*Id.* (footnote omitted).  "Moreover," the Court continued, "the opinion of one Attorney General on which we relied in *Oliphant*, specifically noted the difference between civil and criminal jurisdiction. Speaking of civil jurisdiction, Attorney General Cushing wrote:"

> "But there is no provision of treaty, and no statute, which takes away from the Choctaws jurisdiction of a case like this, a question of property strictly internal to the Chocktaw nation; nor is there any written law which confers jurisdiction of such a case in any court of the United States.
>
> .        .        .        .        .
>
> "The conclusion seems to me irresistible, not that such questions are justiciable nowhere, but that they remain subject to the local jurisdiction of the Chocktaws.
>
> .        .        .        .        .
>
> "Now, it is admitted on all hands . . . that Congress has 'paramount right to legislate in regard to this question, in all its relations. *It has legislated, in so far as it saw fit, by taking jurisdiction in criminal matters, and omitting to take jurisdiction in civil matters. . . . By all possible rules of construction the inference is clear that jurisdiction is left to the Choctaws themselves of civil controversies arising strictly within the Chocktaw Nation*."  7 Op. Atty. Gen. 175, 179-181(1855) (emphasis added).

*Id.* at 854-855 (emphasis in original & footnote omitted).  "Thus," the Court concluded, "the answer to the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians in a case of this kind is not automatically foreclosed, as an extension of *Oliphant* would require. . . ."  *Id.* at 855 (footnote omitted) (citing *Kennerly v. District Court of Montana*, 400 U.S. 423 (1971), and *Williams v. Lee*, 358 U.S. 217

(1959));[84] *accord Handbook* (1982 ed.) at 253 ("The development of principles governing civil jurisdiction in Indian Country has been markedly different from the development of rules dealing with criminal jurisdiction").[85]

Here, too, as explained below, "'there is no provision of treaty, and no statute, which takes away from the [Navajos] jurisdiction of a case like this,'" involving the exercise of Navajo civil jurisdiction over non-Indian litigants.

### 2. *Montana v. United States* **& its Exceptions**

Navajo civil jurisdiction over non-Indians likewise cannot be "automatically foreclosed" by *Oliphant* where the Court has expressly endorsed the exercise of tribal civil jurisdiction over non-Indians in at least two distinct sets of circumstances—the so-called "*Montana* exceptions"—even where the controversy arises on non-Indian fee land within Indian reservation boundaries:

To be sure, Indian tribes retain inherent sovereign power to exercise some

---

[84]Both *Kennerly* and *Williams* involved state court lawsuits by non-Indian creditors against tribal members residing on the reservation arising out of purchases transacted within reservation boundaries. In both cases, the Court held that the state courts lacked jurisdiction over those claims. "There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that the respondent is not an Indian. . . ." *Williams*, 358 U.S. at 223.

[85]The Court quoted from the 1982 edition of Cohen's *Handbook* on this point:

A leading treatise on Indian law suggests strongly that Congress has had a similar understanding:
"In the civil field, however, Congress has never enacted general legislation to supply a federal or state forum for disputes between Indians and non-Indians in Indian country. Furthermore, although treaties between the federal government and Indian tribes sometimes required tribes to surrender non-Indian criminal offenders to state or federal authorities, Indian treaties did not contain provision for tribal relinquishment of civil jurisdiction over non-Indians.". . .

471 U.S. at 855 n.17 (quoting *Handbook* (1982 ed.) at 253-254).

> forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.  A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.  *Williams v. Lee*, *supra*, at 223; *Morris v. Hitchcock*, 194 U.S. 384; *Buster v. Wright*, 135 F. 947, 950 (CA8); see *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 152 -154. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. See *Fisher v. District Court*, 424 U.S. 382, 386 ; *Williams v. Lee*, *supra*, at 220; *Montana Catholic Missions v. Missoula County*, 200 U.S. 118, 128 -129; *Thomas v. Gay*, 169 U.S. 264, 273.

*Montana v. United States*, 450 U.S. at 565-566 (footnote omitted).

According to the late Chief Justice William H. Rehnquist, author of the *Oliphant* opinion, the *Montana* opinion—not *Oliphant*—represents "the most exhaustively reasoned of our modern cases addressing" Indian tribes' "retained or inherent sovereignty."  *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 650 (2001).  In praising *Montana*'s reasoning twenty years after Justice Stewart had penned that opinion for a six-member majority, the Chief Justice was speaking for a unanimous Court.  *Accord Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997) (Ginsburg, J., for a unanimous Court) ("*Montana v. United States*, decided three years [after *Oliphant*] is the pathmarking case concerning tribal civil authority over nonmembers."); *Nevada v. Hicks*, 533 U.S. 353, 358 (2001) ("Indian tribes' regulatory authority over nonmembers is governed by the principles set forth in *Montana v. United States*, 450 U.S. 544 (1981), which we have called the 'pathmarking case' on the subject, *Strate*, . . . .").[86]

---

[86]*Nevada v. Hicks* extended the *Montana* analysis to determine tribal regulatory and adjudicatory

(continued...)

*Atkinson Trading Co.* resoundingly reaffirmed "the framework set forth in *Montana*,"

which "broadly addressed the concept of 'inherent sovereignty.'" 532 U.S. at 651 (quoting

*Strate v. A-1 Contractors*, 520 U.S. 438, 453 (1997)).[87]

> Although we extracted from our precedents "the general proposition
> that the inherent sovereign powers of an Indian tribe do not extend to the
> activities of nonmembers of the tribe," 450 U. S., at 565, we nonetheless noted
> in *Montana* two possible bases for tribal jurisdiction over non-Indian fee land.
> First, "[a] tribe may regulate, through taxation, licensing, or other means, the
> activities of nonmembers who enter consensual relationships with the tribe or
> its members, through commercial dealings, contracts, leases, or other
> arrangements." *Ibid.* Second, "[a] tribe may . . . exercise civil authority over
> the conduct of non-Indians on fee lands within its reservation when that
> conduct threatens or has some direct effect on the political integrity, the
> economic security, or the health or welfare of the tribe." *Id.*, at 566.

532 U.S. at 651. Referring to the Court's opinion in *Strate v. A-1 Contractors*, 520 U.S. 438

(1997), the *Atkinson* Court continued:

> Recognizing that *Montana* "immediately involved regulatory authority," we
> nonetheless concluded that its reasoning had "delineated—in a main rule and
> exceptions—the bounds of the power tribes retain to exercise 'forms of civil

---

[86](...continued)

jurisdiction over the conduct of state game wardens in executing state-court and tribal-court search warrants at a
tribal member's residence located on *tribally owned land* within the boundaries of the Fallon Paiute-Shoshone
Tribes' reservation in Nevada, in the course of the investigation of an off-reservation criminal offense. The *Hicks*
majority opined that "the general rule of *Montana* applies to both Indian and non-Indian land," and that "[t]he
ownership status of land, in other words, is only one factor to consider in determining whether regulation of the
activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.' It may
sometimes be a dispositive factor." 533 U.S. at 360.

   In this case, the Navajo court found jurisdiction over the conduct of the nonmember County and Health
District defendants involving the Montezuma Creek Clinic. "The clinic and land upon which it is located was
purchased by the State of Utah as part of the Utah Navajo Trust Fund,"and the property remains in State ownership.
*MacArthur*, 309 F.3d at 1218. Thus, this court need not decide how *Hicks*' application of the *Montana* analysis to
what it called "Indian-fee lands," 533 U.S. at 363, 366, 370, may affect the Navajo Nation's inherent civil authority
over its own tribal lands.

[87]In his concurring opinion, Justice Souter, joined by Justice Kennedy and Thomas, wrote that "[i]f we are
to see coherence in the various manifestations of the general law of tribal jurisdiction over non-Indians, the source of
doctrine must be *Montana v. United States*, 450 U.S. 544 (1981), and it is in light of that case that I join the Court's
opinion." 532 U.S. at 659 (Souter, Kennedy & Thomas, JJ., concurring).

jurisdiction over non-Indians.'"  520 U. S., at 453 (quoting *Montana*, *supra*, at 565). We accordingly held that *Montana* governed tribal assertions of adjudicatory authority over non-Indian fee land within a reservation. See 520 U. S., at 453 ("Subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana*, the *civil authority* of Indian tribes and their courts with respect to non-Indian fee lands generally 'do[es] not extend to the activities of nonmembers of the tribe'" (emphasis added) (quoting *Montana*, *supra*, at 565)).

*Id.* at 652.  *Atkinson Trading Co.* applied *Montana* "straight up" in concluding that "[b]ecause Congress has not authorized the Navajo Nation's hotel occupancy tax through treaty or statute, and because the incidence of the tax falls upon nonmembers on non-Indian fee land, it is incumbent upon the Navajo Nation to establish the existence of one of *Montana*'s exceptions."  *Id.* at 654.[88]

In this case, if we give presumptive effect to *Montana*'s "general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe" on non-Indian fee land within the reservation, 450 U. S. at 565, as the *Atkinson* Court did, 532 U.S. at 659, we must accord no less authoritative force to *Montana*'s two express exceptions to that "general proposition."  *Atkinson* warned that the exceptions cannot be read to "swallow the rule."  532 U.S. at 655.  Conversely, "*Montana*'s general rule that Indian tribes lack civil authority over nonmembers on non-Indian fee land," *id.* at 654, cannot

---

[88]In *Atkinson*, the Court held that the Navajo Nation had "failed to establish that the hotel occupancy tax is commensurately related to any consensual relationship with petitioner" under *Montana*'s first exception, or that the tax "is necessary to vindicate the Navajo Nation's political integrity" under *Montana*'s second exception, which "grants nothing '"beyond what is necessary to protect tribal self-government or to control internal relations."'" 532 U.S. at 658-659 (quoting *Strate*, 520 U.S. at 459 (quoting *Montana*, 450 U.S. at 564)).  *Atkinson* also cited Justice White's opinion in *Brendale v. Confederated Tribes and Bands of the Yakima Nation*, 492 U.S. 408, 431 (1989), for the proposition that under *Montana*'s second exception, "the impact of the nonmember's conduct 'must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe.'" 532 U.S. at 659.

fairly be read to swallow its "two prime exceptions."  *Strate*, 520 U.S. at 452.[89]

Following the recent guidance of *Atkinson Trading Co. v. Shirley* and taking the *Montana* Court at its word—and, of course, there should be no reason to infer that the United States Supreme Court does not mean what it says—the two *Montana* "exceptions" allowing for the exercise of inherent tribal sovereignty over non-Indians on non-Indian fee lands must be read to have some genuine substantive meaning and day-to-day practical significance in the lives of Native Americans and their tribes, bands and communities.[90]

### 3.  Civil Jurisdiction Over Non-Indians Reaffirmed

The Supreme Court, both before *Montana* and since, has repeatedly reaffirmed Indian tribes' civil authority over non-Indians doing business on the reservation, at least to the extent necessary to safeguard the interests of the tribe and its members.

It is true that our decisions recognize broader retained tribal powers outside the criminal context. Tribal courts, for example, resolve civil disputes involving nonmembers, including non-Indians.  See, *e. g.*, *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65-66 (1978); *Williams v. Lee*, 358 U.S. 217, 223 (1959); F. Cohen, Handbook of Federal Indian Law 253 (1982 ed.) (hereafter Cohen) ("The development of principles governing civil jurisdiction in Indian country has been markedly different from the development of rules dealing with criminal jurisdiction").  Civil authority may also be present in areas such as zoning where the exercise of tribal authority is vital to the maintenance of

---

[89]"*Montana* delineated—in *a main rule and exceptions*—the bounds of the power tribes retain to exercise 'forms of civil jurisdiction over non-Indians.'  *Id.* at 565."  *Strate*, 520 U.S. at 453 (emphasis added).

[90]This court has not yet grown so cynical as to infer that the *Montana* analysis was concocted merely as a device to be used to diminish Indian tribal sovereignty "one case at a time," though some argue quite convincingly that such has been its actual effect, intended or not. *See, e.g.*, Sarah Krakoff, *Undoing Indian Law One Case at a Time: Judicial Minimalism and Tribal Sovereignty*, 50 Am. U. L. Rev. 1177 (2001); Philip P. Frickey, *A Common Law for Our Age of Colonialism: The Judicial Divestiture of Indian Tribal Authority over Nonmembers*, 109 Yale L.J. 1, 37 (1999);  *cf. Nevada v. Hicks*, 533 U.S. at 360 (opinion by Scalia, J.) ("with one minor exception, we have never upheld under *Montana* the extension of tribal civil authority over nonmembers on non-Indian land"); *Wilson v. Marchington*, 127 F.3d 805 (9th Cir.1997); *Ford v. Todecheene*,  394 F.3d 1170 (9th Cir. 2005) (tribal courts lack jurisdiction to apply tribal tort law to non-Indians causing injury or death to tribal members).

> tribal integrity and self-determination. See, *e. g.*, *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation*, 492 U.S. 408 (1989).  As distinct from criminal prosecution, this civil authority typically involves situations arising from property ownership within the reservation or "consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  *Montana v. United States*, *supra*, at 565.

*Duro v. Reina*, 495 U.S. at 687-688.

> Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty.  See *Montana v. United States*, 450 U.S. 544, 565-566, 67 L. Ed. 2d 493, 101 S. Ct. 1245 (1981); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152-153, 65 L. Ed. 2d 10, 100 S. Ct. 2069 (1980); *Fisher v. District Court*, 424 U.S. [382,] 387-389 [(1976)].  Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute . . . .

*Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 18 (1987); *see Pela v. Peabody Coal Co.*, No. A-CV-18-89 (Navajo S. Ct. 09/28/1990), at ¶ [29]("Consistent with congressional policy, tribal courts presumptively have civil jurisdiction over reservation activities unless affirmatively limited by treaty or a federal statute. *[Iowa Mutual*] at 18; *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978).").[91]

*Montana* itself acknowledged that "[t]o be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands."  *Montana*, 450 U.S. at 565.  Currently, "Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make

---

[91]*Available at* http://www.tribal-institute.org/opinions/1990.NANN.0000009.htm.  *Cf. Strate*, 520 U.S. at 453 ("the *Iowa Mutual* statement . . . stands for nothing more than the unremarkable proposition that, where tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.'  480 U.S., at 18.").

their own laws and be governed by them," *Nevada v. Hicks*, 533 U.S. at 361 (citing *Merrion*,

455 U.S. at 137, 142), as is also true of the assertion of the tribes' corresponding

"adjudicative jurisdiction" over nonmembers.  *Id.* at 357-358 (citing *Strate*, 520 U.S. at

453).[92]  Yet as recently reaffirmed in *Atkinson* and *Hicks*, *Montana* continues to stand for the

proposition that Indian tribes' civil authority extends to regulate and adjudicate the interests

of non-Indians who enter into a variety of "consensual relationships with the tribe or its

members, through commercial dealing, contracts, leases, or other arrangements," or whose

conduct or activities threaten, imperil or have "some direct effect on the political integrity,

the economic security, or the health and welfare of the tribe."  *Montana*, 450 U.S. at 565, 566

(citations omitted).  Nor can these "*Montana* exceptions" fairly be read to apply only to some

singularly  "exceptional" case that somehow never seems to arise.[93]  As Justice O'Connor

explains:

> *Montana* and our other cases concerning tribal civil jurisdiction over
> nonmembers occupy a middle ground between our cases that provide for
> nearly absolute tribal sovereignty over tribe members, see generally *Williams
> v. Lee*, 358 U.S., at 218-223, and our rule that tribes have no inherent criminal
> jurisdiction over nonmembers, see *Oliphant v. Suquamish Tribe*, 435 U.S. 191
> (1978).  *Montana* recognizes that tribes retain sovereign interests in activities
> that occur on land owned and controlled by the tribe, and provides principles
> that guide our determination of whether particular activities by nonmembers
> implicate these sovereign interests to a degree that tribal civil jurisdiction is
> appropriate.

---

[92]"As to nonmembers . . . a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction . . . ."
*Strate*, 520 U.S. at 453.

[93]"If this power is to be taken away from them, it is for Congress to do it."  *Williams v. Lee*, 358 U.S. at 223
(citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 564-566 (1903)).

*Hicks*, 533 U.S. at 391-392 (O'Connor, Stevens & Breyer, JJ., concurring).[94]

## C.  Navajo Sovereignty & Self-Government

### 1.  The Navajo Treaty of 1868

Concerning the authority of the Navajo Nation over its reservation—including civil jurisdiction over disputes between tribal members and non-Indians—the United States Supreme Court had long since acknowledged that "Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since."  *Williams v. Lee*, 358 U.S. 217, 223 (1959).

> In return for their promises to keep peace, this treaty "set apart" for "their permanent home" a portion of what had been their native country, and provided that no one, except United States Government personnel, was to enter the reserved area.  Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in *Worcester v. State of Georgia*, was the understanding that the internal affairs of the Indians remained exclusively

---

[94]Plaintiffs read the current congressional and Executive policies as creating a presumption favoring tribal jurisdiction over non-Indians, and argue that "[t]his Court can enforce the Orders based upon *Montana* that presumes against the Tribal Court jurisdiction, or it can enforce the Orders based upon Congress' presumption for Tribal Court jurisdiction, but it can't do both." ("Plaintiffs' Briefing on *Montana*," filed February 13, 2003 (dkt. no. 492), at 5; *see also* "Federalism and Article III Court Limitations in Defining Navajo Tribal Court Jurisdiction" [unsigned original document submitted by plaintiffs' counsel], filed February 24, 2003 (dkt. no. 502), at 10-17.)

For now, at least, this court declines to view the post-*Montana* law of Indian tribal civil jurisdiction over non-Indians in purely Manichaean terms, *viz.,* as the mixed result of an attack by the realm of darkness on the realm of light—a theme that resonates throughout plaintiffs' briefing of the issues on remand.  (*See* "Plaintiffs' Briefing on *Montana*" at 6-10; "Federalism and Article III Court Limitations" at 10-17; Memorandum in Support of Plaintiffs' Motion for Summary Judgment for Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and Response of the District and County's Briefs and Motions for Summary Judgment, filed February 28, 2003 (dkt. no. 504), at 9-14 ("PRO TRIBAL PRESUMPTIONS").)

*United States v. Lara* establishes that Congress may exercise its plenary power over Indian affairs to redefine the federal law delimiting tribal jurisdiction, "adjusting" or "relaxing" the implied divestiture of tribal powers over nonmembers essentially as it sees fit—as it did after *Duro v. Reina* in 1990—should it again choose to do so.  *Lara* teaches that Indian tribes' external sovereignty that has been "withdrawn . . . by implication as a necessary result of their dependent status" simply lies dormant until it is reawakened at Congress's behest.  *Lara* discarded the notion that *delegation* of power would be required to restore tribal powers impliedly divested in favor of legislative "adjustment" of the extent of the divestiture.  541 U.S. at 207.  Thus, if Congress finds that the *Montana* analysis frustrates its firm policy supporting tribal sovereignty and tribal courts, it can simply overrule *Montana* through legislation redefining the limits of tribal civil jurisdiction over nonmembers.

If the jurisdictional "presumptions" are broken, as plaintiffs insist, Congress can fix them.

within the jurisdiction of whatever tribal government existed.  Since then, Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts. . . .

*Id.* at 221-222 (citations omitted) (quoting Treaty with the Navajo, dated June 1, 1868, articles 2, 13, 15 Stat. 667, 2 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 1015, 1016, 1019 (1904)).[95]

The Court reaffirmed this reading of the 1868 Treaty in *McClanahan v. Arizona State Tax Comm'n*, 411 U.S 164 (1973):

> The beginning of our analysis must be with the treaty which the United States Government entered with the Navajo Nation in 1868. The agreement provided, in relevant part, that a prescribed reservation would be set aside "for the use and occupation of the Navajo tribe of Indians" and that "no persons except those herein so authorized to do, and except such officers, soldiers, agents and employees of the government, or of the Indians, as may be authorized to enter upon Indian reservations in discharge of duties imposed by law, or the orders of the President, shall ever be permitted to pass over, settle upon, or reside in, the territory described in this article." 15 Stat. 668.

411 U.S. at 173-174.  "The treaty nowhere explicitly states that the Navajos were to be free from state law or exempt from state taxes.  But the document is not to be read as an ordinary contract agreed upon by parties dealing at arm's length with equal bargaining positions."  *Id.*

---

[95]The earlier Treaty with the Navajo, dated September 9, 1849, 9 Stat. 974, 2 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 583-584 (1904), acknowledged that the "tribe was lawfully placed under the exclusive jurisdiction and protection of the Government of the said United States, and that they are now, and will forever remain under the aforesaid protection and jurisdiction," consistent with the 1848 Treaty of Guadalupe Hidalgo, but did not address Navajo territory or jurisdiction, other than to annex their territory to New Mexico, guarantee Americans "free and safe passage" through Navajo country, and promise federal punishment of citizens committing crimes against Navajos and that "the Government of the United States shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries . . . ."  *Id.*, arts. I, II, III, VI, VII, IX, 1 Kappler at 583-584.

Copies of the Navajo Treaties of 1849 and 1868, as well as the Treaty of Guadalupe Hidalgo are included as Exhibits D, E & C, respectively, in Pltfs' 12/19/03 Compendium A/B.

at 174.  Recalling the discussion of the history of the 1868 Treaty in *Williams v. Lee*,[96] the

*McClanahan* Court continued:   "It is circumstances such as these which have led this Court

in interpreting Indian treaties, to adopt the general rule that "[d]oubtful expressions are to be

resolved in favor of the weak and defenseless people who are the wards of the nation,

dependent upon its protection and good faith."  *Carpenter v. Shaw*, 280 U.S. 363, 367

(1930)."  *Id.*

> When this canon of construction is taken together with the tradition of Indian
> independence described above, it cannot be doubted that the reservation of
> certain lands for the exclusive use and occupancy of the Navajos and the
> exclusion of non-Navajos from the prescribed area was meant *to establish the
> lands as within the exclusive sovereignty of the Navajos under general federal
> supervision*. It is thus unsurprising that this Court has interpreted the Navajo
> treaty to preclude extension of state law—including state tax law—to Indians
> on the Navajo Reservation.  See *Warren Trading Post Co. v. Arizona Tax
> Comm'n*, 380 U.S., at 687 , 690; *Williams v. Lee*, *supra*, at 221-222.

*Id.* at 174-175 (emphasis added).

In examining the question of subject-matter jurisdiction over non-Navajos, the Navajo

Supreme Court also begins with the Navajo Treaty of 1868:

> [P]rior to proceeding to the contemporary Indian affairs law rules on civil
> jurisdiction over non-Indians, we will first apply the Treaty of 1868 between
> the United States of America and the Navajo Nation. 15 Stats. 667.  We do so
> because there are three foundations for jurisdiction in Indian law cases.  Our
> jurisdiction comes from (1) the inherent authority of the Navajo Nation as an

---

[96]

We have had occasion in the past to describe the circumstances under which the agreement was
reached. "At the time this document was signed the Navajos were an exiled people, forced by the
United States to live crowded together on a small piece of land on the Pecos River in eastern New
Mexico, some 300 miles east of the area they had occupied before the coming of the white man. In
return for their promises to keep peace, this treaty 'set apart' for 'their permanent home' a portion
of what had been their native country." *Williams v. Lee*, 358 U.S. at 221."

*Id.* at 174.

Indian nation, (2) the Navajo Nation's treaties with the United States of
America, and (3) federal statutes which vest jurisdiction in the Navajo Nation.
We address the treaty issue first, because a treaty constitutes the United States'
recognition of our jurisdiction.  We will then address contemporary Indian
affairs law principles of jurisdiction over non-Indians.

*Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. 01/14/2000), at ¶

[40], *available at* http://www.tribal-institute.org/opinions/2000.NANN.0000003.htm.

> Article II of the Treaty, 15 Stats. at 668, begins with a boundary
> description and then says that "this reservation" is "set apart for the use and
> occupation of the Navajo tribe of Indians, and for such other friendly tribes or
> individual Indians as from time to time they may be willing, with the consent
> of the United States, to admit among them . . . ."  Federal courts use this
> language as the basis for Navajo Nation civil jurisdiction.  *Williams v. Lee*, 358
> U.S. 217, 221-223 (1959); *Littell v. Nakai*, 344 F.2d 486, 488 (9th Cir. 1965);
> *UNC Resources, Inc. v. Benally*, 518 F.Supp. 1046, 1050 (D. Ariz. 1981).

*Means v. District Court of the Chinle Judicial District*, No. SC-CV-61-98 (Navajo S. Ct.

05/11/1999), at ¶ [62].[97]  "While the entry of non-Indians is not specifically mentioned in the

'set apart for the use' article, federal courts have consistently held that this treaty language is

the basis for Navajo Nation civil jurisdiction, including jurisdiction over non-Indians."

*Manygoats*, at ¶ [41].

Looking to the negotiations leading to the formation of the 1868 Treaty, the Navajo

Supreme Court discerns additional support for Navajo autonomy and authority over its

permanent homeland:

> These preliminary discussions are important to an understanding of the
> Treaty of 1868. They show that the Navajo negotiators, . . . raised many
> questions about the power and authority of the Navajos on their return to their
> homeland. [General William T.] Sherman's responses show that the Navajo
> negotiators raised many such questions, and while the questions may not have

---

[97]*Available at* http://www.tribal-institute.org/opinions/1999.NANN.0000013.htm .

> been written down, the replies show the Navajo concerns. Sherman guaranteed the right of political integrity for the Navajo Nation, along with full powers to maintain territorial integrity. He expected a democratic council with a chief executive. Both that council and the chief executive would have broad powers.

*Arizona Public Service Co. v. Office of Navajo Labor Relations*, No. A-CV-08-87 (Navajo S. Ct. 10/08/1990), at ¶ 53.[98]  In the language of the 1868 Treaty itself, the Navajo Supreme Court finds confirmation that "these are distinctly and solely Navajo lands," and "that the benefits of the treaty lands, including employment or the fruits of industry solely belong to the Navajo People," *id.* at ¶ [55]; that the Navajo Nation holds "the general exclusion power which is said to be the source of a great deal of tribal authority," *id.* at ¶ [57]; that "Article XIII provides that the Navajo Reservation is the 'permanent home' of the Navajos, implying all that goes with a home — the right to keep it in good order," *id.* at ¶ [58]; "[t]herefore, using the Treaty of 1868, the Navajo Nation has the power to regulate non-Indian businesses," including those with whom it has entered into leasing or other commercial arrangements, such as Arizona Public Service Company.  *Id.* at ¶ [72].

"The Treaty of 1868 did not fully define Navajo governmental power because of many reserved rights which are not enumerated in it."  *Id.* at ¶ [65].  Indeed, "no provision in the relevant treaties or statutes confers the right of self-government in general . . . upon the Tribe."  *Wheeler*, 435 U.S. at 327.  "But none of these laws *created* the Indians' power to govern themselves . . . ."  *Id.* at 328 (emphasis in original).  "It must always be remembered that various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government."  *McClanahan*, 411 U.S. at 173.

---

[98]*Available at* http://www.tribal-institute.org/opinions/1990.NANN.0000003.htm .

> It is an elementary foundation block of United States-Indian nation relationships that Indian nations are sovereign and derive their sovereignty from their preexistence to the United States and their dealings with the United States as independent sovereigns. When sovereign Indian nations dealt with the United States by treaty, they did so in an international law sense. Further, they did not receive their lands and powers from the United States but only ceded lands and privileges to it. That is true of the Navajo Nation and must be remembered in connection with the Treaty of 1868.

*Benally v. John*, 4 Nav. R. 39, No. A-CV-27-81 (Navajo Ct. App. 05/05/1983), at ¶ [34].[99]

"Implicit in the Treaty of 1868," then, "is the understanding that the internal affairs of the Navajo people are within the exclusive jurisdiction of the Navajo Nation government. *Williams v Lee*, 358 U.S. 217, 221-222 (1959). And, 'since the signing of the Navajo treaty, Congress has consistently acted upon the assumption that the States lacked jurisdiction over Navajos living on the reservation.' *McClanahan v. Arizona State Tax Comm'n*, 411 U.S.164, 175 (1973)." *Billie v. Abbott*, No. A-CV-34-87 (Navajo S. Ct. 11/10/1988), at ¶ [26].[100]

Far from limiting the inherent sovereignty of the Navajo Nation, the 1868 Treaty has consistently been read to recognize and reaffirm Navajo autonomy and to reinforce inherent Navajo authority over their permanent homeland on the Navajo Reservation, including the exercise in specific cases of tribal civil authority over non-Navajos living or conducting activities in Navajo country.

## 2.  Subsequent Legislation Enlarging the Navajo Reservation

Subsequent Executive Orders and congressional legislation enlarging the Navajo

---

[99]*Available at* http://www.tribal-institute.org/opinions/1983.NANN.0000042.htm .

[100]*Available at* http://www.tribal-institute.org/opinions/1988.NANN.0000012.htm .

reservation redefined and enlarged the boundaries of the Navajo Nation's territory,[101] but did so without diminishing "the exclusive sovereignty of the Navajos under general federal supervision" over their "permanent home" in any way.   This is no less true of "An Act to Permanently Set Aside Certain Lands in Utah as an Addition to the Navajo Indian Reservation, and for Other Purposes," Act of March 1, 1933, ch. 160, 47 Stat. 1418 (1933), 5 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 326-327 (1941), *as amended by* Pub.L. No. 90-306, 82 Stat. 121 (1968) (the "1933 Act"), which added the Aneth Extension to the Navajo Reservation, including the lands located at Montezuma Creek where the plaintiffs' place of employment is located.[102]   That statute enlarged the Reservation by re-drawing its

---

[101]According to *Tiller's Guide*:

The Navajo Nation, comprised of 26,606 square miles, is the largest Indian reservation in the United States, both in terms of land base and tribal enrollment.  The land base, comparable in size to the state of West Virginia, is located in northeast Arizona, northwest New Mexico, and southeast Utah. . . .

The original Navajo Reservation, established pursuant to a treaty concluded on June 1, 1868, and ratified by Congress on July 25, 1868, contained 3,414,528 acres, only about 10 percent of the land the Navajos earlier owned and used.  The original reservation was expanded by Executive Orders in 1878, 1880, 1882, 1884, 1900, 1901, 1905, 1907, and 1908.  In 1911, lands in New Mexico were restored to the public domain.  Minor revisions to the Navajo Reservation's size were made in 1912, 1913, 1914, 1915, and 1917.  Executive Orders in 1917 and 1918 again expanded the reservation, In 1930 and 1931, the reservation was expanded by Congressional Acts.  In 1933, Congress added 552,000 acres in Utah to the reservation, and in 1934 provided for some smaller additions.  Minor changes to the size of the reservation in 1948, 1949 and 1958.  Court decisions in 1962, 1963, and 1977 reallocated some areas of the Navajo Reservation to the Hopis.

In addition to the main Navajo Reservation, there are three satellite areas of Navajo land located in New Mexico.  The Cañoncito Reservation, the present boundaries of which were established in 1960, contains 57,863 acres of trust land.  The Alamo Reservation, established in 1964, contains 62,000 acres.  The Ramah Reservation, established in 1931, contains 91,456 acres.  Today, the total acreage of the Navajo Reservation, including the main reservation, trust lands of the Eastern Navajo, and the satellite lands of Cañoncito, Alamo and Ramah, is 16,224,896 acres.

Veronica E. Velarde Tiller, ed., *Tiller's Guide to Indian Country* 326 (2d ed. 2005).

[102]This case arises from that portion of the Navajo reservation that was added by Congress in 1933, within

(continued...)

boundaries, encompassing public lands as well as lands held by others.  The "vacant,

unreserved and undisposed of public lands within the areas" thus bounded were "permanently

withdrawn from all forms of entry or disposal for the benefit of the Navajo and such other

Indians as the Secretary of the Interior may see fit to settle thereon."  *Id.* at § [1], 47 Stat. at

1418, 5 Kappler at 326.  The State of Utah was afforded the opportunity to exchange "such

tracts of school land within the areas added to the Navajo Reservation" for equivalent "in

lieu" lands to be selected from among "unreserved and nonmineral public lands . . . within

the State of Utah."  *Id.* at § 2, 47 Stat. at 1419, 5 Kappler at 327.  Further,

> Though no oil or gas was believed to be located on these lands, it was provided
> that should such mineral resources be produced in commercial quantities, "37
> 1/2 per centum of the net royalties accruing therefrom derived from tribal
> leases shall be paid to the State of Utah: *Provided*, That said 37 1/2 per centum
> of said royalties shall be expended by the State of Utah *in the tuition of Indian*
> *children in white schools and/or in the building or maintenance of roads*
> *across the lands described in section 1 hereof, or for the benefit of the Indians*
> *residing therein*." 47 Stat. 1418. The remaining 62 1/2% of the royalties
> generated by any such tribal mineral leases were, by implication, to go to the
> Navajo tribe.

*United States v. Jim*, 409 U.S. 80, 80-81 (1972) (emphasis added).  "To make the

administration of these funds more flexible and to spread the benefits of the royalties more

broadly among the Navajo community, the Congress enacted a statute in 1968 that directed

the State to expend the 37 1/2% of royalties 'for the health, education, and general welfare of

---

[102](...continued)
which the Montezuma Creek Clinic is located.  *See* Act of March 1, 1933, ch. 160, 47 Stat. 1418, as amended by the
Act of June 14, 1934, ch. 521, 48 Stat. 960, and Pub. L 90-306, 82 Stat. 121 (1968); *Pelt v. State of Utah*, 104 F.3d
1534, 1540 (10th Cir. 1996).  (Memorandum in Support of Plaintiffs' Motion for Summary Judgment for
Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and Response of the District and
County's Briefs and Motions for Summary Judgment, filed February 28, 2003 (dkt. no. 504), at 4 n. 1).

the Navajo Indians residing in San Juan County.' 82 Stat. 121." *Id.* at 81.  These provisions

bear directly upon this case because "The [Montezuma Creek C]linic and land upon which it

is located was purchased by the State of Utah as part of the Utah Navajo Trust Fund."

*MacArthur*, 309 F.3d at 1218.[103]

### 3.  A Tale of Two Treaties: *Montana* & the 1933 Act

While the parcels in question are not, strictly speaking, Navajo *tribal* lands, (*see infra*,

at n. 114), they likewise are not, strictly speaking, "non-Indian fee lands" in the same sense

as the lands at issue in *Montana*.  The 1933 Act did not create a jurisdictional "checkerboard"

of Reservation land and non-tribal land holdings; it delineated a continuous Reservation

boundary, bringing the lands thus encompassed "within the exclusive sovereignty of the

Navajos under general federal supervision," *McClanahan*, 411 U.S. at 175, and within

"Indian country" under 18 U.S.C.A. § 1151(a).

In *Montana*, the Court considered the 1868 Treaty with the Crow Tribe, which like

the 1868 Navajo Treaty, set apart a defined reservation for "the absolute and undisturbed use

and occupation" of the Crow Tribe.  *Montana*, 450 U.S. at 548, 553-554, 558-559 (quoting

the Treaty with the Crows, dated May 7, 1868, art. 2, 15 Stat. 649, 2 Charles J. Kappler,

*Indian Affairs: Laws and Treaties* 1008 (1904)).  The *Montana* Court emphasized that the

non-Indian lands at issue within the Crow Reservation existed as a consequence of the

---

[103]It appears that the land in question is located at Montezuma Creek Subdivision #1, parcels 23 and 24, section 32, T. 40 S., R. 24E, Salt Lake Meridian, Utah. (*See* "Answer to Complaint for Damages and Counterclaim, filed June 23, 1999, in *Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District), at 31 ¶ 18, *available in* Pertinent Parts Navajo Ct. R. ("Complaint for Damages" Tab).)

subsequent allotment of lands on that reservation by Congress.  *Id.* at 559.  Inherent tribal

authority under the 1868 Treaty with the Crow Tribe, the Court reasoned,  "could only extend

to the land on which the Tribe exercises 'absolute and undisturbed use and occupation,'"

> And it is clear that the quantity of such land was substantially reduced by the allotment and alienation of tribal lands as a result of the passage of the General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U.S.C. 331 et seq., and the Crow Allotment Act of 1920, 41 Stat. 751.  If the 1868 treaty created tribal power to restrict or prohibit non-Indian hunting and fishing on the reservation, that power cannot apply to lands held in fee by non-Indians.

*Montana*, 450 U.S. at 559 (footnote omitted).  Looking to the policy of the Allotment

Acts—"the eventual assimilation of the Indian population . . . and the 'gradual extinction of

Indian reservations and Indian titles,'" the *Montana* Court asserted that "that treaty rights

with respect to reservation lands must be read in light of the subsequent alienation of those

lands."  *Id.* at 559 n.9, 561 (citations omitted).

> The Secretary of the Interior and the Commissioner of Indian Affairs repeatedly emphasized that the allotment policy was designed to eventually eliminate tribal relations. . . . And throughout the congressional debates on the subject of allotment, it was assumed that the "civilization" of the Indian population was to be accomplished, in part, by the dissolution of tribal relations. . . .

> There is simply no suggestion in the legislative history that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority.  Indeed, throughout the congressional debates, allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction. . . . *It defies common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction when an avowed purpose of the allotment policy was the ultimate destruction of tribal government.*  And it is hardly likely that Congress could have imagined that the purpose of peaceful assimilation could be advanced if feeholders could be excluded from fishing or hunting on their acquired property.

96

*Id.* at 559-560 n.9 (emphasis added & citations omitted).

The *Montana* Court acknowledged that "[t]he policy of allotment and sale of surplus reservation land was, of course, repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984, 25 U.S.C. 461 *et seq.*  But what is relevant in this case," the Court explained, "is the effect of the land alienation *occasioned by that policy* on Indian treaty rights tied to Indian use and occupation of reservation land."  *Id.* at 560 n.9 (emphasis added).

In contrast, the state-owned lands at the Montezuma Creek Clinic are *not* the product of "land alienation occasioned by" the allotment policy; they are lands incorporated within Reservation boundaries extended by Congress, and purchased using funds derived from tribal oil and gas leasing in the 1933 Aneth Extension, funds held in trust for the Navajo people of the area.  *See Pelt v. State of Utah*, 104 F.3d 1534  (10th Cir. 1996); *State of Utah v. Babbitt*, 53 F.3d 1145, 1149 (10th Cir.1995) (noting Congress' clear intent that oil and gas development on the Aneth Extension benefit San Juan Navajos).  The presumptions underlying the Allotment policy find no application here because the Montezuma Creek area was *added* to the Navajo Reservation as part of the major shift in federal Indian policy reflected in legislation such as the Indian Reorganization Act of 1934.

At that point, in the wake of the influential "Meriam Report," (*see* Lewis Meriam, *The Problem of Indian Administration* (1928)), the Executive and Legislative Branches were seeking to restore, consolidate and enlarge the Indian tribal land base to encourage the reorganization and revival of effective tribal self-government.  *See Handbook* (1942 ed.) at 27, 83-87; *see generally* S. Lyman Tyler, *A History of Indian Policy* 125-150 (1973).

97

The 1933 Act cannot be read in terms of the prior Allotment policy where the contrary view of the destiny of Indian tribes already held sway at the time the 1933 Act was adopted.[104]  Likewise the rationale of *Montana* concerning the limitations on the Crow Tribe's authority under Article 2 of the 1868 Crow Treaty because of the alienation of lands occasioned by allotment finds no application to the scope of the Navajo Nation's authority under Article 2 of the 1868 Navajo Treaty as to lands within its reservation boundaries as enlarged by Congress.[105]

Consistent with the court of appeals' mandate, this court has applied the *Montana* analysis in deciding the jurisdictional issues on remand.  Yet the drastic differences in historical context and current consequence between the 1933 Act and the Crow Allotment

---

[104] "The New Deal for the American Indians began before the passage of the Indian Reorganization Act. . . . Soon after his appointment, Secretary Ickes issued an order that ended the sale of allotments and the issuance of fee patents." Floyd A. O'Neil, "The Indian New Deal: An Overview," in *Indian Self-Rule* 30, 39 (Kenneth R. Philp., ed. 1986); *see* 54 I.D. 559 (1934).  In his first annual Report in 1933, Commissioner of Indian Affairs John Collier observed:

> The allotment system has enormously cut down the Indian landholdings and has rendered many areas, still owned by Indians, practically unavailable for Indian use.  The system must be revised both as a matter of law and of practical effect.  Allotted lands must be consolidated into tribal or corporate ownership with individual tenure, and new lands must be acquired for the 90,000 Indians who are landless at the present time. . . .

Report of Comm. of Ind. Aff., *in* Ann. Rept. of Sec'y of Interior, 1933, at 68, *quoted in Handbook* (1942 ed.) at 27.

[105] Speaking of a similar 1934 enlargement of the Navajo Reservation in Arizona that encompassed the non-Indian fee land of the Cameron Trading Post, the *Atkinson* Court remarked that the enlargement "did not alter the status of the property: It is, like millions of acres throughout the United States, non-Indian fee land within a tribal reservation."  532 U.S. at 648 (citing Act of June 14, 1934, ch. 521, 48 Stat. 960-962).  But remembering that most of those "millions of acres" were alienated through various Allotment acts rather than being added through enlargement of reservation boundaries in aid of tribal self-government—or by being purchased using Indian trust funds— the lands in question at Montezuma Creek are not "like" those "millions of acres" at all.

Viewed through the lens of the relevant Indian policy of the political branches in 1934, the *Atkinson* Court may have erred by importing *Montana*'s "general principle" into the context of the Navajo Nation without examining the historical relevance of *Montana*'s rationale.  *See* Robert N. Clinton, Carole E. Goldberg & Rebecca Tsosie, *American Indian Law: Native Nations and the Federal System* 719 (4th ed. 2003) (text note re: "*Atkinson*'s Use of *Montana*").

Act necessarily raise the question whether *Montana*'s limited reading of the Crow Tribe's

authority under its 1868 Treaty has any logical bearing upon the Navajo Nation's authority

*under the 1868 Navajo Treaty* over the lands within its boundaries, particularly over parcels

that were purchased with Navajo trust funds and are still held in trust for the Navajo people

of San Juan County.  *Pelt*, 104 F.3d at 1541-1542; *see also* Robert N. Clinton, *Reservation*

*Specificity and Indian Adjudication: An Essay on the Importance of Limited Contextualism in*

*Indian Law*, 8 Hamline L. Rev. 543 (1985).[106]

### 4.  The Navajo Nation Government

Modern Navajo self-government began with the creation of the Navajo Council:

> The Navajo Tribal Council was first formally recognized by the federal
> government in 1923.  The Navajo Tribe rejected the Indian Reorganization Act
> of 1934 (IRA) and is, therefore, not recognized under that Act.  Between 1936
> and 1938, the Navajos attempted a constitutional government; it was refused
> by the Secretary of the Interior who cited factionalism among the tribal
> members as a reason for denial.  The BIA issued federal regulations, "Rules for
> the Governance of the Navajo Tribal Council," in 1938, and democratic
> elections to the Navajo Nation Council have been held every four years since
> then.  The rules, as amended in December 1989, are the basis for all tribal
> operations. . . .

> The nation is headed by a council consisting of 88 members which represents
> the 110 local government subdivisions (chapters) that make up the Navajo
> Nation.  Twelve standing committees conduct business between quarterly full
> council sessions. . . . All programs and projects are processed through the
> appropriate standing committee before submission to the Navajo Nation
> Council.

---

[106]*Montana* and its progeny address *inherent* tribal authority over nonmembers, *see Atkinson*, 532 U.S. at 649-650, while the Navajo courts look to treaty and statutory sources of jurisdiction as well: "Our jurisdiction comes from (1) the inherent authority of the Navajo Nation as an Indian nation, (2) the Navajo Nation's treaties with the United States of America, and (3) federal statutes which vest jurisdiction in the Navajo Nation."  *Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. 01/14/2000), at ¶ [40].

Veronica E. Velarde Tiller, ed., *Tiller's Guide to Indian Country* 327 (2d ed. 2005).[107]  *See also* David E. Wilkins, *The Navajo Political Experience* 67-112 (2003) (overview of the historical development and current framework of the Navajo government).

The Navajo Nation exercises its inherent sovereignty through independent and co-equal branches of a tripartite Navajo government, including an independent Navajo judiciary:

> The Navajo Nation has a three-branch government, similar to that of the United States.  The Navajo Nation Bill of Rights is similar in structure, as well, to that of the federal government.  The executive branch is headed by a tribal president, chosen by popular election every four years.  During the same election year, the 88 council delegates are elected. . . . The judicial branch, created April 1, 1959, is headed by a chief justice who is nominated by the president and confirmed by the council.  The judicial branch consists of a supreme court, seven district courts, seven family courts, and traditional peacemaker courts.  Peacemaker courts are alternatives to typical courtroom settings, in that these courts use traditional Navajo laws and procedures in mediation to resolve disputes. . . .

*Tiller's Guide* at 327.

---

[107]According to the Part II Plaintiffs, "The Navajo Nation District Court Division of Shiprock, lies within the exterior borders of New Mexico, is organized by Navajo legislative authority *as found in federal statutes 25 U.S.C. §§ 461-479 pursuant to federal authority found in Article I of the United States Constitution* for communicating and working with Indian tribes."  (Amended Complaint at 110 (emphasis added).)

This is not accurate.

As *Tiller's Guide* correctly recounts, the government of the Navajo Nation was *not* organized under the Wheeler-Howard Act, or Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, *codified at* 25 U.S.C.A. §§ 461-479 (2001), and does not exercise its powers of self-government under an "IRA" constitution, *see* 25 U.S.C. § 476, in contrast to many other Indian tribes, bands and communities that have adopted IRA constitutions.

Indeed, this appears to a point of some pride:

> Poorly-worded and restrictive tribal codes forced upon various tribes by the Bureau of Indian Affairs we thankfully do not have, since the Navajo Nation is not organized under the Indian Reorganization Act. See, American Indian Lawyer Training Program, Manual of Indian Law, E-4 (1976 Ed.). Since the Navajo rely upon their inherent sovereignty and not the restrictions placed upon other Indian Nations, we are able to solve problems on our own as they arise.

*Deal v. Blatchford,* 3 Navajo Rptr. 159, at ¶ [29] (Navajo Ct. App. 1982), *available at* http://www.tribalresourcecenter.org/opinions/opfolder/1982.NANN.0000026.htm.

The Navajo Nation has not adopted a tribal constitution as such, relying instead upon

several fundamental laws as its organic documents, in addition to the 1938 Rules for the

Navajo Tribal Council: in 1967, the Navajo Nation adopted its own Bill of Rights;[108]  the

Navajo Nation Judicial Reform Act of 1985 reestablished as the Navajo judiciary as a

separate and independent branch.[109]  Four years later, the 1989 "Title II Amendments"[110]

---

[108]Res. of the Navajo Tribal Council, CO-63-67 (Oct. 9, 1967), *codified at* Navajo Nation Code, tit. 1, §§ 1-9 (1995).

[109]Navajo Nation Council Resolution No. CD-94-85 (December 4, 1985), *codified at* Navajo Nation Code, tit. 7, §§ 101 *et seq.* (1995).  In a recent opinion, the Navajo Supreme Court explained:

> The Navajo Nation government is comprised of three co-equal branches, each with its own area of responsibility and limitations of power. The Judicial Branch was originally created as a separate branch in 1959. Navajo Tribal Council Resolution Nos. CO-69-58, Sec. 1 (October 16, 1958) and CJA-5-59, Sec. 1 (January 9, 1959) (effective April 1, 1959 and codified at Title 7 of the Navajo Nation Code).  It was later reestablished as a separate branch by the Navajo Nation Judicial Reform Act of 1985. Navajo Nation Council Resolution No. CD-94-85 (December 4, 1985) (codified as Title 7 of the Navajo Nation Code). . . .

*Tuba City Judicial Dist. of the Navajo Nation v. Sloan*, No. SC-CV-57-97, at ¶ [16] (Navajo 09/07/2001), *available at* http://www.tribal-institute.org/opinions/2001.NANN.0000012.htm.

[110]*See* Navajo Nation Code, tit. 2, §§ 101-878, 931-978, 1001-1021(1995).  For many years,

> the Navajo Nation government operated as a two-branch government: the Legislative and Judicial Branches. Under that scheme, the Navajo Tribal Council controlled both the legislative and executive functions of government. The Chairman of the Navajo Tribal Council was the chief legislative officer as well as the chief executive officer. This unilateral control left no room for the exercise of checks and balances. This resulted in unchecked abuses of power and eventually to what is now known as the "1989 Crisis."

> From the experiences of the 1989 Crisis and in recognition of the fundamental flaw in this two-branch design, the Navajo Nation Council undertook the Title II Amendments which separated governmental powers into three separate and equal branches. "The lack of definition of power and separation of legislative and executive functions . . . also allowed the legislative body to overly involve itself in the administration of programs thereby demonstrating the need to limit the legislative function to legislation and policy decision making and further limit the executive function to implementation of laws and representation of the Navajo Nation."  Preamble of Resolution No. CD-68-89, Par. 3.  The Title II Amendments redistributed governmental powers among the Legislative, Executive and Judicial Branches. 2 N.N.C. 1.  The Title II Amendments, along with the Navajo Nation Bill of Rights and the Judicial Reform Act of 1985, are fundamental, organic laws, which are superior to any conflicting law.  See *Bennett v. Navajo Board of Election Supervisors*, 6 Nav. R. 319 (1990) .

(continued...)

reorganized the Navajo government, re-emphasized the principles of separation of powers

and checks and balances between the three branches, and "redistributed governmental powers

among the Legislative, Executive and Judicial Branches":

> The government of the Navajo Nation belongs to the Navajo people.  A
> government cannot operate effectively unless the citizenry has confidence in
> its government. Public confidence comes when citizens believe that their
> government can protect them from tyranny and from violations of their rights.
> Even the least aware among us know that those who hold powerful
> government positions are not always trustworthy and honorable. Even the most
> honorable politician or administrator can experience lapses of sound judgment.
> Our legislators recognized these shortcomings in 1989.  The separation of
> powers and checks and balances contained in our government provide
> mechanisms for addressing corruption, abuses of discretion, and lapses of
> judgment.  They prevent each branch from exercising unfettered discretion.

*Tuba City Judicial Dist. of the Navajo Nation v. Sloan*, at ¶ [19].  "The Title II Amendments,

along with the Navajo Nation Bill of Rights and the Judicial Reform Act of 1985, are

fundamental, organic laws, which are superior to any conflicting law."  *Id.* at ¶ [17].

The Navajo Nation's inherent sovereignty includes the "Power to Legislate,"

*Handbook* (1982 ed.) at 248, and like other legislative bodies, the Navajo Nation Council has

enacted laws on a range of subjects over the years, reflected in the various titles and chapters

of the current *Navajo Nation Code*.  Besides incorporating the fundamental legislation

organizing the three branches of Navajo government and defining election procedures—and

in addition to the laws governing tribal membership, "law and order" (criminal offenses),

domestic relations, and decedents' estates anticipated by the oft-quoted *Wheeler* footnote—

---

[110](...continued)
*Tuba City Judicial Dist. of the Navajo Nation v. Sloan*, No. SC-CV-57-97, at ¶¶ [16]-[17].

the *Navajo Nation Code* includes titles and chapters addressing agriculture and livestock;

environmental protection, conservation and wildlife; land and natural resources (water, mines

and minerals); trade and commerce (including the Navajo version of the Uniform

Commercial Code); motor vehicles; taxation and fiscal matters; public services such as

education, health and welfare, public utilities, communications, and community development;

and tribal parks and monuments.  Of particular significance to this case, Title 15 of the

*Navajo Nation Code* sets forth the current Navajo legislation governing labor and

employment, and Title 7 governs Navajo courts and judicial procedure.

Of course, Navajo self-government consists of far more than words on a page or

sections in a code.  What emerges from an examination of the on-going evolution of Navajo

self- government "is a picture of a nation hard at work, enacting its sovereignty in creative

ways.  The Navajo Nation's adaptation and resistance to federal law allows a distinctly

Navajo political and cultural life to continue."  Sarah Krakoff, *A Narrative of Sovereignty:*

*Illuminating the Paradox of the Domestic Dependent Nation*, 83 Or. L. Rev. 1109, 1113-

1114 (2004).  The law of tribal sovereignty exemplified by cases such as *Williams v. Lee* has

afforded the Navajo Nation "the breathing room to develop consumer protection,

employment, and other statutory laws that relate to core aspects of practical sovereignty, such

as provision of jobs and protection from unfair economic practices."  *Id.* at 1139; *see also id.*

at 1201 (App. A) (cross-table comparison of Navajo and Arizona state governmental

functions).

### D.  Navajo Sovereignty & the Navajo Courts

#### 1.  Creation of the Navajo Court System

The Navajo Nation has long recognized the importance of the Navajo court system to effective self-government.

For generations, Navajos relied on their own traditional conciliatory methods of dispute resolution that emphasized the restoration of harmony, often achieved by hearing all interested parties' viewpoints and reaching a consensus among the parties.  It was "'a system of justice based on clan relations, harmony, mediation, leadership by reputation and respect, a focus on making victims whole, equality and freedom with responsibility.'"  Wilkins, *The Navajo Political Experience* at 138 (quoting Jayne Wallingford, *The Role of Tradition in the Navajo Judiciary: Reemergence and Revival*, 19 Okla. City U. L. Rev. 141, 142 (1994)); *see also* Robert Yazzie, *"Life Comes From It": Navajo Justice Concepts*, 24 N.M. L. Rev. 175 (1994).

But beginning in 1892,

> the federal government created an alternative to traditional means of dispute resolution on the Navajo Reservation: Courts of Indian Offenses.  These courts had little real power.  The judges were Navajos appointed by federal officials, few if any of the judges had formal legal education, the operated under rules promulgated by the Commissioner of Indian Affairs, and government agents reviewed their decisions.  The courts primarily resolved petty criminal matters, and seldom resolved civil disputes.  Underfunding made even their law and order role largely symbolic.

Michael D. Leider, *Navajo Dispute Resolution and Promissory Obligations: Continuity and Change in the Largest Indian Nation*, 18 Am. Ind. L. Rev. 1, 36 (1993) (footnotes omitted); *see also* Tom Tso, *The Tribal Court Survives in America*, Judges' J., Spring 1986, 22, 25.

Not too many years passed before the Navajos replaced the "bare-bones" Court of

Indian Offenses system "with a more developed tribal system": in 1958, the Navajo Council

"assumed all costs of law enforcement on the reservation and created a new court system,"

with "seven trial judges and a chief justice.  The court of appeals consisted of the chief justice

and two trial court judges . . . ."  *Id.* at 37.  The Council did so "for several reasons," among

them, "[a] successful tribal court system would strengthen the developing tribal government

vis-a-vis the communities by making it the provider of law-and-order and the dispenser of

justice."  *Id.* at 37 (footnote omitted).

> External relations, however, were probably even a more important spur
> to action.  Navajo leaders feared that, if they did not have a legal system
> modeled on Anglo-American law, the states would assume jurisdiction on the
> reservation.  The case of *Williams v. Lee* highlighted the threat.  A reservation
> trader sued a Navajo couple residing on the reservation in Arizona state court
> to enforce a debt.  The Arizona Supreme Court upheld the state court's
> jurisdiction, and the Navajos appealed to the United States Supreme Court.

*Id.* (footnotes omitted).[111]  In *Williams v. Lee*, 358 U.S. 217 (1959), the Supreme Court

reversed the judgment of the Arizona Supreme Court, holding that the Navajo tribal courts

had exclusive jurisdiction over disputes arising out of consumer credit transactions between

Navajos and non-Indians on the Navajo reservation.  Noting that the Navajo tribe "has in

recent years greatly improved its legal system," the Court concluded:

> There can be no doubt that to allow the exercise of state jurisdiction
> here would undermine the authority of the tribal courts over Reservation
> affairs and hence would infringe on the right of the Indians to govern
> themselves.  It is immaterial that respondent is not an Indian.  He was on the

---

[111]*Accord* Stephen Conn, *Mid-Passage—The Navajo Tribe and Its First Legal Revolution*, 6 Am. Ind. L.
Rev. 329, 338-339 (1978) ("The Navajos were concerned with the establishment of a legal forum which would be
accepted by those who would challenge the tribe's ability to govern.").

> Reservation and the transaction with an Indian took place there. . . . The cases
> in this Court have consistently guarded the authority of Indian governments
> over their reservations.  Congress recognized this authority in the Navajos in
> the Treaty of 1868, and has done so ever since. . . .

358 U.S. at 223 (citations omitted).

The fledgling Navajo courts survived the *Williams* crisis in 1959 and have matured

into the leading tribal court system in the country.  "Today, in the vast Navajo landscape,

home to more than 220,000 people, the nation has seven district courts with 14 trial judges.

Appeals can be taken to a three-judge supreme court."  Charles Wilkinson, *Blood Struggle:*

*The Rise of Modern Indian Nations* 290-291 (2005).  Currently, "The Navajo judicial system

hears about 100,000 cases a year, of which 28,000 involve criminal charges."  *Id.*  It is "the

most complex and sophisticated of Indian court systems," Wilkins, *The Navajo Political*

*Experience* at 139, and provides both "a fair and familiar forum for non-Navajo persons and a

culturally coherent body of laws and procedures for tribal members."  Krakoff, *A Narrative*

*of Sovereignty*, at 1138 (footnote omitted).

"The Navajo courts have a distinguished history," and "have stood firm for the

principle of separation of powers in the face of various assaults on judicial

independence[:]"[112]

> One of the basic tenets which derives from the doctrine of separation of
> powers is judicial independence. The judiciary's function is to render
> judgments and to enforce its judgments and orders.  No other branch or office
> of the government may legally interfere with the judiciary's duty to render
> judgments and enforce judgments in any way. Likewise, no other branch,
> office, or entity of the government may influence a court with the intent of
> altering its decision. Outcomes of cases that are before the courts must be free

---

[112]Wilkinson, *Blood Struggle , supra*, at 289.

of any form of political influence. . . . . Justice for the Navajo people means the courts' decisions must be free of influence or pressure from the Executive and Legislative Branches.

*Tuba City Judicial Dist. of the Navajo Nation v. Sloan*, No. SC-CV-57-97, at ¶ [23] (citations omitted).

The Navajo courts have also succeeded in incorporating more traditional methods of dispute resolution, resulting in a "unique melding of Anglo-American-style judicial systems and traditional Navajo customary law."  Krakoff, *A Narrative of Sovereignty* at 1138 (footnote omitted).  *See also* Tom Tso, *1992 Navajo Nation Code of Judicial Conduct: Moral Principles, Traditions, and Fairness in the Navajo*, 76 Judicature 15, 16 (1992) (overview of Navajo courts and the re-integration of Navajo customary law); Raymond D. Austin, *ADR and the Navajo Peacemaker Court*, 32:2 Judges' J. 8 (1993); Tom Tso, *The Process of Decision Making in Tribal Courts*, 31 Ariz. L. Rev. 225 (1989).

## 2.  Jurisdiction of the Navajo Courts

As to civil causes of action, the *Navajo Nation Code* provides that "[t]he District Courts of the Navajo Nation shall have original jurisdiction over . . . All civil actions in which the defendant is a resident of Navajo Indian Country, or has caused an action to occur within the territorial jurisdiction of the Navajo Nation."  Navajo Nation Code, tit. 7, § 253(B) (1995).  The *Code* in turn defines the "territorial jurisdiction of the Navajo Nation" as:

Navajo Indian Country, defined as all land within the exterior boundaries of the Navajo Indian Reservation or of the Eastern Navajo Agency, all land within the limits of dependent Navajo Indian communities, all Navajo Indian allotments, and all other land held in trust for, owned in fee by, or leased by the United States to the Navajo Nation or any Band of Navajo Indians.

107

Navajo Nation Code tit. 7, § 254 (1995).

These current provisions reflect the Navajo Nation Council's 1980 amendment expanding the jurisdiction of the tribal courts.  The Council Resolution adopting the amendment noted that while the United States Supreme Court had limited tribal criminal jurisdiction over non-Indians, no such limitations had been imposed on tribal *civil* jurisdiction over non-Indians "'within Navajo Indian country.'" Krakoff, *A Narrative of Sovereignty*, at 1138 (footnote omitted) (citing Res. of the Navajo Tribal Council, CF-19-80 (1980)) .  The resolution also made reference to the need for expanded access to the Navajo legal system: "Many non-Indians reside or do business or conduct other activities within the Navajo Nation (Navajo Indian country) and it is appropriate that these persons be called upon to account for their activities and the effect thereof in the courts of the Navajo Nation." *Id.* at 1139 (footnote omitted).  The 1980 resolution amended Navajo Nation Code, tit. 7, § 253(B) to read as it does today.  *Id.*   Under § 253(B),

> The Navajo courts have civil jurisdiction over all persons who cause an action to occur in Navajo Indian Country.  *Window Rock Mall v Day IV*, 3 Nav. R. 58, 59 (1981); *Deal v. Blatchford*, 3 Nav. R. 159 (1982); *Billie v. Abbott*, 6 Nav. R. 66 (1988).  Navajo Indian Country is "defined as all land within the exterior boundaries of the Navajo Reservation . . . ." 7 N.T.C. § 254 (1985). Navajo Indian Country makes up the Navajo courts' territorial jurisdiction.

*Taylor v. Bradley*, No. A-CV-14-88 (Navajo S. Ct. 08/31/1989), at ¶ [24].

### 3.  Navajo Court Jurisdiction Over Non-Indian Defendants

"Navajo courts assert jurisdiction over disputes as broadly as permitted by federal law."  Leider, *Navajo Dispute Resolution*, at 38.

> Our jurisdiction statute, 7 NTC Sec. 253 . . . provides for civil jurisdiction over all areas where the prior Navajo Tribal Courts of Indian Offenses had jurisdiction and those provided for by a resolution of the Tribal Council. Today we hold that there is *full civil jurisdiction over any person doing injury within the Navajo Nation* because of the inherent sovereignty of the Navajo Nation and because of the residual jurisdiction of the prior courts.

*Deal v. Blatchford*, 3 Navajo Rptr. 159, 160 ¶ [20] (Navajo Ct. App. 1982) (emphasis added).[113]  Remembering that "the source of authority for tribal courts is the inherent sovereignty of their respective tribes and not the United States,"[114] and that "tribal court authority is coextensive with sovereignty of the Indian nation itself,"[115] *Deal v. Blatchford* reasserted tribal court jurisdiction in the wake of *Oliphant* and *Montana*:

> By now there should be utterly no question regarding the right of the Navajo Nation to exercise civil jurisdiction over non-Indians. *Williams v . Lee*, 358 U.S. 217 (1959); *United States v . Mazurie*, 419 U.S. 544, 557-558 (1975); *Montana v . United States*, 450 U.S. 554 (1981); *Babbitt Ford Inc. v. The Navajo Indian Tribe*, No. CIV 80-686 PCT CAM (D. Ariz., July 14, 1981) ; *Merrion v. Jicarilla Apache Tribe*, 71 L.Ed.2d 71 (1982).

> [O]ur tribal courts are courts of general jurisdiction, unlike the District Courts

---

[113]*Available at* http://www.tribalresourcecenter.org/opinions/opfolder/1982.NANN.0000026.htm.

[114]According to the Navajo Supreme Court, "The jurisdiction of the Navajo courts is not derived from a federal grant of power, but rather comes from the Navajo Nation's inherent sovereignty. *Navajo Tribe v Orlando Helicopter Airways, Inc.*, 1 Nav. R. 40 (1972)." *Pela v. Peabody Coal Co.*, No. A-CV-18-89 (Navajo S. Ct. 09/28/1990), at ¶ [20], *available at* http://www.tribal-institute.org/opinions/1990.NANN.0000009.htm .

[115]On this point, the Navajo Court of Appeals quoted Cohen's *Handbook*:

"The powers of an Indian tribe in the administration of justice derive from the substantive powers of self-government which are legally recognized to fall within the domain of tribal sovereignty. If an Indian tribe has power to regulate the marriage relationships of its members, it necessarily has power to adjudicate, through tribunals established by itself, controversies involving such relationships. So, too, with other field of local government in which our analysis has shown that tribal authority endures. In all these fields the judicial powers of the tribe are coextensive with its legislative or executive powers."

*Id*. at ¶ [26] (quoting *Handbook* (1942 ed.) at 145 (footnotes omitted), and citing Margold, *Powers of Indian Tribes* 55 I.D. 14, 56 (Oct. 25, 1934)).

of the United States, which are creatures of Congress. As courts of general
jurisdiction, the Navajo Courts exercise all jurisdiction which is not forbidden
them. Therefore we will exercise general civil jurisdiction over all matters
arising within the Navajo Nation. . . .

*Id.* at ¶¶ [27], [28].

And as the Navajo Supreme Court recently explained:

[A] tribal court has subject matter jurisdiction over non-Indians from several
sources. A tribe may exercise its broad inherent sovereignty over non-Indian
conduct anywhere within its territory. *United States v. Wheeler*, 435 U.S. 313,
323 (1978).  Federal and state statutes, regulations, and intergovernmental
agreements may acknowledge or delegate tribal authority over non-Indians.
*E.g.* Indian Child Welfare Act, 25 U.S.C. § 1901. Treaties recognize some
authority over non-Indians not otherwise within a tribe's inherent sovereignty.
*Means v. Chinle District Court*, 7 Nav. R. 383 (1999). A tribe's authority as
landowner provides additional authority over non-Indians who enter tribal
lands. Cohen's Handbook of Federal Indian Law 252 (1982 Ed.).

*Nelson v. Pfizer, Inc.*, No. SC-CV-01-02 (Navajo S. Ct. 11/17/2003), at ¶ [20], *available at*

http://www.tribal-institute.org/opinions/2003.NANN.0000002.htm.  *Nelson* involved product

liability claims against non-Navajo pharmaceutical manufacturers involving a prescription

drug product that had been dispensed to and ingested by Navajos living on the reservation.

The Navajo Supreme Court held that the district court erred when it applied *Montana* and its

exceptions to determine its jurisdiction over claims arising out of injuries suffered on tribal

land.[116]  Acknowledging that "[w]e have applied these exceptions to cases involving

non-Indian fee land," *id.* at ¶ [24] (citing *Manygoats v. Atkinson Trading Company, Inc.*, No.

SC-CV-62-200 slip op. at 5-8 (August 12, 2003), and *In re Atkinson Trading Company, Inc.*,

---

[116]*Nelson* defined "tribal land to include "both land held in trust by the United States, whether for the
Navajo Nation or individual members, and land held in fee by the Navajo Nation or individual members."  *Id.* at n.1
¶ [44].

7 Nav. R. 275, 282-287 (1997)), *Nelson* declined to extend *Montana* to delimit tribal

jurisdiction over non-Indian conduct occurring or causing injury on Navajo tribal lands:

> The implications of *Montana* for the Navajo Nation's power over its
> territory are clear. A rule requiring the application of *Montana* to all land
> restricts judicial authority over non-Indian conduct. We take judicial notice of
> the fact that trust land and tribally-owned fee land comprise virtually all land
> within the Navajo Nation. There are many non-Indian actors who impact the
> Navajo Nation in various and significant ways that may escape the authority of
> the Navajo Nation if our courts are required to apply the *Montana* exceptions
> to every civil case involving non-Indians. Judicial resources would be
> stretched if every case brought against a non-Indian required a detailed
> analysis of the various consensual relationships or direct effects on the Navajo
> Nation merely to establish jurisdiction. Further, application of *Montana* to
> every civil case with a non-Indian defendant undermines the federal policy
> encouraging the development of tribal courts. See *Iowa Mutual Ins. Co. v. La
> Plante*, 480 U.S. 9, 15 (1987) ("Tribal courts play a vital role in tribal
> self-government . . . and the federal government has consistently encouraged
> their development.") (internal citations omitted).  Finally, our responsibility to
> protect the sovereignty of the Navajo Nation counsels that we not surrender
> authority unnecessarily.

> Based on these considerations, and the explicit restrictions in *Montana*
> and later cases, including *Hicks*, we decline to extend *Montana* to activity on
> tribal land . . . .  *Hicks* applies *Montana* in the unique situation where the
> sovereign interests of a state government enforcing state criminal law are at
> issue, and no further. We decline to extend *Hicks* beyond the United States
> Supreme Court's own limitation. . . .

*Id.* at ¶¶ [35]-[36].[117]  "Until *Hicks*, it was clear that the *Montana* test only applied when the

non-Indian activity occurred on non-Indian owned fee land or on certain types of

---

[117]"While *Hicks* applied *Montana* to a certain type of non-Indian activity on trust land, the U.S. Supreme Court explicitly restricted its holding and left open the issue of general civil authority. It stated that '[o]ur holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law.'  *Id.* at 358 n. 2. Therefore, according to the court, the holding 'leave[s] open the question of tribal-court jurisdiction over nonmember defendants in general.'  *Id.*"  *Id.* at ¶ [33] (footnote omitted).

rights-of-way considered the equivalent of fee land. . . ." *Id.* at ¶ [29] (citations omitted).[118]

*Nelson* reaffirms that, with the exception of *Hicks*' "unique situation," *Montana* applies only to "non-Indian fee lands," not tribal lands.[119]

---

[118]"See *Montana*; *Strate v. A-1 Contractors*, 520 U.S. 438 (1997) (right-of-way owned by State of North Dakota subject to *Montana*); *Atkinson* (fee parcel within Navajo Reservation); see also *El Paso Nat'l Gas v. Neztsosie*, 526 U.S. 473, 483 n. 4 (1999) (stating that Montana test not necessary because activity occurred on trust land within Navajo Reservation); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 330-31 (1983) (same on Mescalero Apache Reservation)." *Id.*

[119]*Dale Nicholson Trust v. Chavez*, No. SC-CV-69-00 (Navajo 01/06/2004), *available at* http://www.tribal-institute.org/opinions/2004.NANN.0000004.htm, carved out an exception to *Nelson*'s limitation of the application of *Montana* to non-Indian owned fee lands:

> State officials are a special category of non-Indians for jurisdictional purposes. State officials are not, however, outside Navajo courts' subject matter jurisdiction merely because they are acting as agents of a state government.  *Office of Navajo Labor Relations ex rel. Jones v. Central Consolidated*, No. SC-CV-13-98 (Nav.Sup.Ct June 5, 2002) (rejecting Eleventh Amendment state sovereign immunity and other jurisdictional defenses based on status as state officials). In *Jones* we stated that the legal doctrine of "intergovernmental immunity" barring authority over officials of other governments no longer exists. Id., slip op. at 5-6. The district court's legal conclusion in this case was incorrect, as our courts do not lack subject matter jurisdiction over state officials merely because they are agents of a state.
> . . . .
> Though we rejected an automatic bar to jurisdiction over state officials in *Jones*, supra, we suggested such jurisdiction depends on fulfilling *Montana*, even where, as in *Jones*, the state activity is on tribal land. We authorized a remand in *Jones* to consider jurisdiction in light of *Nevada v. Hicks*, 533 U.S. 353 (2001), to allow the Office of Navajo Labor Relations to establish more evidence on the two *Montana* exceptions. No. SC-CV-13-98, slip op. at 8. If *Jones* applies to this case, the Trust must affirmatively establish one of the two *Montana* exceptions against the state defendants, even if the actions of the state officials to seize the Trust's property were to have occurred on tribal land.

*Id.* at ¶¶ [35], [39] (footnote omitted).  "The anomaly in treatment of state official defendants," the court explains, "arises from the U.S. Supreme Court's decision in *Hicks*. In that case the court applied *Montana* to state official activity on tribal land, there a trust allotment.  *Hicks*, 533 U.S. at 358."  *Id.* at ¶ [40].

Whether defendant Wood, as an officer of a local special services district, would be deemed a "state official" under *Dale Nicholson Trust* is not clear.  Consistent with  the court of appeals' mandate, this court's reading of *Montana* and subsequent cases, and a reading of *Dale Nicholson Trust* that embraces District officials among the "state officials" in "a special category of non-Indians for jurisdictional purposes" to whom *Montana* would always apply, this court has determined the Navajo court's subject-matter jurisdiction over Wood by applying *Montana*.

### 4. *Montana* & the NPEA in the Navajo Courts: the *Manygoats* Case

With the Navajo Nation's inherent sovereignty and provisions of the 1868 Treaty clearly in mind, the Navajo Supreme Court "proceed[s] to the contemporary test for civil jurisdiction over non-Indians, taken from *Montana v. United States*, 450 U.S. 544 at 565-566 (1981), and applied in *Strate v. A-1 Contractors*, 520 U.S. 438, 565-566 (1997)," in deciding questions of civil jurisdiction over non-Indian conduct on non-tribal lands.  *Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. 01/14/2000) ("*Manygoats I*"), at ¶ [43], *available at* http://www.tribal-institute.org/opinions/2000.NANN.0000003.htm.

For example, the *Manygoats* case applied the *Montana* analysis in deciding "whether the Navajo Nation has civil regulatory and adjudicatory jurisdiction over the employment practices of a New Mexico corporation conducting business on fee land within the territory of the Navajo Nation," (*id.* at ¶ [40]), specifically whether the civil jurisdiction of the Navajo courts encompassed a wrongful discharge claim pleaded under the Navajo Preference in Employment Act by a Navajo plaintiff who had been fired from her job at the Cameron Trading Post:[120]

Did the Trading Post enter into consensual relationships with the Navajo

---

[120]The non-Indian defendant in *Manygoats* is actually the Atkinson Trading Co., the same litigant as was before the United States Supreme Court in *Atkinson Trading Co. v. Shirley*, discussed *supra*, doing business as the "Cameron Trading Post."  *Id.* at ¶ [13].  According to *Manygoats*,

> The Trading Post is the area's major employer, and during the period from April through September, it employs approximately 130 people, 85% of whom are Navajo. The Trading Post employs approximately 80 people during the winter, and 70 to 75% of those employees are Navajos.

*Id.* at ¶ [15].

Nation or its members, through commercial dealing, contracts, leases, or other arrangements, or does the Trading Post's activities affect the Navajo Nation's political integrity, economic security, health, or welfare?

In the case of *FMC v. Shoshone -Bannock Tribes*, 905 F.2d 1311 (9th Cir. 1990), *cert. denied,* 499 U.S. 943 (1991), the court upheld Indian nation jurisdiction over a business because of a variety of consensual commercial relationships, including mining leases and contracts, recognition of the Tribe's taxing power, royalty agreements, employment of members, and the location of a business facility within reservation boundaries. The same principles apply here.

*Manygoats I*, at ¶ [40].

As to *Montana*'s first exception, *Manygoats I* found that "[t]he 'consensual relationship' with Navajos is an employer-employee one, and employment is a contract. The Trading Post does business with Navajos, another form of consensual relationship, and despite disclaimers at the Commission hearing about the volume of business, it is clear that the Trading Post does have such consensual relationships." (*Id.* at ¶ [45].)[121]

*Manygoats I* also found that *Montana*'s second exception applied to extend the Navajo Nation's civil authority over employment relationships involving Navajos at the Cameron Trading Post:

[T]he Navajo Nation retains the right and the duty to protect its members, the public at large, and its territory. The Navajo Nation Council recognized that the regulation of employment relations and the protection of workers are essential when it adopted the Navajo Preference in Employment Act. See, 15 N.N.C. § 602(A)(6). Those are among the most important government powers generally, and it would be nonsense to assert that such authority is not an essential part of the Navajo Nation's powers.  See, LITTLEFIELD &

---

[121]Apparently the Atkinson company tried to evade *Montana*'s "consensual relationship" exception by arguing that Cameron Trading Post hires Navajo employees against its will. The Navajo court rejected this: "We do not buy Atkinson's assertion that the practice of hiring Navajos is involuntary, given their obvious importance to the very business of the establishment (as reflected in its website pages)."  *Manygoats*, at ¶ [45].

KNACK, NATIVE AMERICANS AND WAGE LABOR (1996).

*Id.* at ¶ [47].[122]   Exercise of jurisdiction over the Cameron Trading Post likewise comported

with the uniform application of Navajo labor laws within the Navajo reservation, and

specifically, within the Cameron community:

> Aside from the treaty and "*Montana* test" considerations, it would be
> senseless to conclude that the Navajo Nation cannot regulate labor relations at
> the Trading Post, when it clearly can regulate the employment practices of
> businesses just a few yards away near the Cameron Chapter House, all of
> which employ Navajos and are within Navajo Nation territory.

*Id.* at ¶ [48].  *Manygoats I* concluded that the "Navajo Nation does have civil regulatory and

quasi-judicial adjudicatory jurisdiction over the employment practices of Cameron Trading

Post when it conducts business on fee land within the Navajo Reservation," *id.* at ¶ [49], at

least to the extent that the Trading Post employs Navajos.

> On a second appeal after remand in the *Manygoats* case, the Navajo Supreme Court

held that

> [t]he Navajo Nation's regulation of Cameron's employment practices easily
> falls within the first exception, for Cameron has clearly entered consensual
> relationships with members of the Navajo Nation through employment
> contracts, by employing tribal members to provide services in exchange for
> mutually agreed upon wages.  Its employment practices are, therefore, subject
> to the Navajo Nation's employment regulations.

*Manygoats v. Atkinson Trading Co., Inc.*,  No. SC-CV-62-2000 (Navajo S. Ct. 08/12/2003)

---

[122]*See also Arizona Public Service Co.*, No. A-CV-08-87, at ¶¶ [102], [104], [108] (Navajo Nation retains
the "police" power to protect the health, welfare and safety of its citizens," and "[a]mong the purposes of NPEA is
the protection of the health, safety and welfare of Navajo workers.  15 N.T.C. § 602(a)(6).").

("*Manygoats II*"), at ¶ [35].[123]   The court rejected the trading post's assertion that its

employment of Navajos was not "consensual" because it was not free to discriminate against

Navajos under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e-1 *et seq.*, and

because "there are simply not enough non-Navajos in the area to permit Cameron not to

employ Navajo workers," *id.* at ¶ [36]:

> These rules and conditions may limit the range of choices available to
> contracting parties, but they do not negate the voluntary or consensual nature
> of otherwise legal contractual relationships. Since Cameron's employment
> relationships with its Navajo workers *are* consensual, the Navajo Nation's
> regulation of Cameron's employment practices falls within the first *Montana*
> exception.

*Id.* at ¶ [40] (emphasis in original; footnote omitted).

In *Atkinson Trading Co. v. Shirley*, the United States Supreme Court pointed out that

"*Montana's* consensual relationship exception requires that the tax or regulation imposed by

the Indian tribe have a nexus to the consensual relationship itself."  532 U.S. at 656.  The

*Manygoats II* court addressed this requirement:

> Moreover, the Navajo Nation's exercise of regulatory and adjudicatory
> jurisdiction over Cameron's employment practices satisfies the nexus
> requirement recently articulated by the U.S. Supreme Court in *Atkinson v.
> Shirley*. 532 U.S. 645 (2001). According to *Atkinson*, "*Montana*'s consensual
> relationship exception requires that the . . . regulation imposed by the Indian
> tribe have a nexus to the consensual relationship itself."  *Id.* at 656.  Such a
> nexus clearly exists here.  The regulation at issue is the NPEA, which governs
> the terms and conditions of *employment* of Navajo workers on the Nation's
> territory. The relevant consensual relationship is an *employment contract*
> between Cameron and its Navajo workers; therefore, the nexus requirement is
> met.

*Manygoats II*,  at ¶ [41] (emphasis in original).  The *Manygoats II* court again held the

---

[123]*Available at* http://www.tribal-institute.org/opinions/2003.NANN.0000016.htm.

second *Montana* exception to apply as well:

> We take judicial notice of the fact that Navajo Nation unemployment rates are very high. The Navajo Nation Council enacted the NPEA to ensure the economic growth of the Nation and the economic well being of the Navajo workforce. 15 N.N.C. § 602(A). Cameron is the major employer in the area surrounding the trading post, with 7% to 13% of the area's Navajo population working for Cameron at any given time. Most families living in the area rely either directly or indirectly on Cameron for their livelihood. Thus, Cameron's employment practices have a great, and potentially devastating, impact upon the welfare of the local community and economy. Therefore, they properly come within the scope of the Navajo Nation's civil authority.

*Id.* at ¶ [44] (footnote omitted).[124]

---

[124]Atkinson challenged the Navajo Supreme Court's *Manygoats II* ruling in federal district court on jurisdictional grounds, and that court granted summary judgment *in Atkinson's favor. Atkinson Trading Co. v. Manygoats*, Civil No. CIV 02-1556-PCT-SMM (D. Ariz., decided March 17, 2004). That court acknowledged that the Navajo Nation Labor Commission was "correct that the regulation they have attempted to impose on Atkinson (the NPEA) is directly related to Atkinson's employment of Navajo Nation members, the precise relationship at issue here." *Id.*, slip op. at 13. Yet in order to avoid upholding Navajo enforcement of the NPEA's "just cause" and prior notice requirements, the district court (1) engrafted a new element onto *Montana*'s first exception requiring the "consensual relationship" to include the nonmember's explicit or implicit consent *to tribal jurisdiction*—admittedly forsaking the plain meaning of the English language in doing so; and (2) found that "[w]hile employment matters concerning tribal members are certainly *related* to the economic security and welfare of the tribe, they do not have a *substantial* impact on the tribe as a whole" and thus fall outside of *Montana*'s second exception. *Id.*, slip op. at 13-18 (emphasis in original). Ignoring the NPEA's express language limiting its application to "[a]ll employers doing business within the territorial jurisdiction [or near the boundaries] of the Navajo Nation, or engaged in any contract with the Navajo Nation," Navajo Nation Code tit. 15, § 604(A) (1995), the federal district court asserted that if "a consensual relationship was formed when the Plaintiff hired a member of the Navajo Nation as an employee," then "[u]nder this analysis, every employer in the nation would consent to tribal jurisdiction by hiring a tribal member," and this "would yield a result exactly opposite of the general proposition articulated by the Supreme Court; that generally Indian tribes lack civil authority over the conduct of nonmembers. . . ." *Atkinson*, slip op. at 14-15; *see also id.* at 17 ("if the termination of a Navajo employee were to trigger the second *Montana* exception, every employer nationwide that terminated such an employee would be subject to tribal jurisdiction").

To sustain these conclusions, *Montana* must be read to implicitly overrule *Williams v. Lee*—a precedent cited by *Montana* in support of *both* of its exceptions. *See Montana*, 450 U.S. at 565-566 (citing *Williams v. Lee*, 358 U.S. at 220, 223). It seems likely that Hugh Lee's Ganado Trading Post did not explicitly or implicitly consent to Navajo jurisdiction when it sold goods on credit to the Williams family and then used state court process to attach and unlawfully sell their sheep for non-payment. *See generally Williams v. Lee*, 83 Ariz. 241, 319 P.2d 998, 1002-1003 (1958), *reversed on other grounds*, 358 U.S. 217 (1959). *See also Strate*, 520 U.S. at 457 ("*Montana*'s list of cases fitting within the first exception . . . indicates the type of activities the Court had in mind: *Williams v. Lee*, 358 U.S. 217, 223 (1959) (declaring tribal jurisdiction exclusive over lawsuit arising out of on-reservation sales transaction between non-member plaintiff and member defendants); . . .") If "*Montana* requires consent to jurisdiction" to be bargained for in "consensual relationships," where *Williams v. Lee* clearly did not, then *Montana* could easily have said that. It did not, and this court declines to read *Montana* as though it does.

The federal district court ruling in *Manygoats* is currently on appeal to the Ninth Circuit, though it appears

(continued...)

The trading post's consensual employer-employee relationship with Navajo members in *Manygoats* plainly satisfies the *Atkinson* "nexus" requirement, in contrast to the relationship between the non-Indian hotel enterprise and its "nonmember hotel guests" that was subject to the Navajo hotel occupancy tax at issue in the *Atkinson* case. *See* Krakoff, *A Narrative of Sovereignty*, at 1158 ("The tribal member's employment claim against Atkinson appears to fall squarely within the first *Montana* exception, which allows for tribal jurisdiction over contracts with tribal members, even in the post-*Strate* world of extremely narrow readings of this exception." (footnote omitted)).

The *Manygoats* opinions also grounded the assertion Navajo civil jurisdiction in the tribe's essential interest in the growth and regulation of employment on the reservation as activity having "some direct effect on . . . the economic security, or the health and welfare of the tribe." The development of the Navajo court system itself occurred in part as a response to the fundamental shift in emphasis in Navajo economics from livestock agriculture to a wage-earning economy since the 1950s. With "a total of 800 employers in Navajoland, including various BIA and governmental sectors," *Tiller's Guide* at 328, the need for some degree of local regulation of employment practices and protection of Navajo employees becomes readily apparent.

The *Manygoats* opinions bear directly upon the issues on remand in this case because they reflect the Navajo courts' view of the extent of Navajo regulatory and adjudicative

---

[124](...continued)

that a settlement of the action may be pending. *See Atkinson Trading Co. v. Manygoats*, Case No. 04-15854 (9th Cir., appeal docketed May 4, 2004).

jurisdiction to apply Navajo employment law to non-Indian employers who employ Navajos within the boundaries of the reservation,[125] both at the time when the three preliminary orders at issue in this case were entered (*Manygoats I* was decided January 14, 2000), and at the present time.

**E.  The Navajo Preference in Employment Act (NPEA)**

As the *Manygoats* court recognized, "Certainly, the Nation has an interest in fair employment practices, and it is one which we find to be essential to Navajo Nation government." *Id.* at ¶ [59].  Safeguarding employment relationships becomes even more critical when jobs are scarce:

> Indian reservations usually have the highest rates of unemployment in the nation.  Economic development on Indian reservations is therefore a high priority for Indian tribal governments and the federal government.  In 1974, Congress passed the Indian Financing Act, 25 U.S.C.A. § 1451 et seq., "to provide capital on a reimbursable basis to help develop and utilize Indian resources, *both physical and human*, to a point where the Indians will fully exercise responsibility for the utilization and management of their own resources" and improve their standard of living.  Pub. L. No. 93-262, § 2.

---

[125]*Manygoats II* noted a possible exception to the application of the NPEA to non-Indian employers:

> Significantly, this case is distinguishable from *Montana Department of Transportation v. King*, a recent 9th Circuit Court case in which the court held that absent a state or federal statute or treaty, a tribe does not have jurisdiction to regulate the employment practices of state employees working to maintain a right-of-way through their territory. 191 F.3d 1108 (1999).  The issue in *King* was narrowly limited to whether a tribe has jurisdiction over the employment practices of a state - *another sovereign* - when the state is engaged in performing one of its sovereign duties, namely the maintenance of the highway. Id. at 1114. *King* did not deal with whether a tribe may impose employment regulations on *private* employers doing work on fee land within a Nation's territory and therefore has no bearing on the case before us.

*Id.* at ¶ [42] (emphasis in original).  *King* involved the State's non-compliance with a tribal hiring preference ordinance in performing state highway maintenance, rather than any adverse employment action taken against an employee who is a tribal member, and may be distinguishable from *Manygoats* for that reason as well.  *See id.* at ¶ [41] ("The regulation at issue is the NPEA, which governs the terms and conditions of employment of Navajo workers on the Nation's territory.")

David H. Getches, Charles F. Wilkinson & Robert A. Williams, Jr., *Cases and Materials on Federal Indian Law* 223 (5th ed. 2005) (emphasis added).

As *Manygoats I* explains, the Navajo Preference in Employment Act ("NPEA") was adopted because "the Navajo Nation Council found that the NPEA was needed to protect 'the health, safety, and welfare of Navajo workers,' 15 N.N.C. § 602(A)(6)," *Manygoats I*, at ¶ [57]; the Council expressly "recognized that the regulation of employment relations and the protection of workers are essential when it adopted the Navajo Preference in Employment Act. See, 15 N.N.C. § 602(A)(6). Those are among the most important government powers generally . . . ." *Id.* at ¶ [47]. The stated purposes of the NPEA are "to provide employment opportunities and training, promote economic development; lessen the Navajo Nation's dependence upon off-reservation sources of employment and income; foster economic self-sufficiency; protect the health, safety, and welfare of Navajo workers; and to foster cooperative efforts with employers to expand employment opportunities. 15 N.T.C. § 2.A. 1-7 (1990)." *Charles v. Furniture Warehouse*, No. A-CV-18-93 (Navajo 07/12/1994), at ¶ [18], *available at* http://www.tribal-institute.org/opinions/1994.NANN.0000004.htm.

In *Arizona Public Service Co.*, the Navajo Supreme Court upheld the validity of the NPEA as an exercise of tribal powers:

> We hold that the cited provisions of the 1985 Navajo Preference in Employment Act are valid exercises of the treaty powers, inherent powers, and police power of the Navajo Nation. The Navajo Nation has the power to enact legislation to regulate labor and employment, including provisions to protect the civil rights of workers.

*Arizona Public Service Co. v. Office of Navajo Labor Relations*, No. A-CV-08-87 (Navajo S.

Ct. 10/08/1990), at ¶ [31], *available at*

http://www.tribal-institute.org/opinions/1990.NANN.0000003.htm.

### 1.  "At-Will" Employment vs. "Just Cause" Tenure

Under Navajo labor policy as it existed prior to the enactment of the NPEA in 1985, it

appears that the Navajo courts applied "the American rule, as harsh as it may be, . . . that an

employee at will has no remedy for firing unless:"

> (1) The employee is tenured by contract;
> (2) The employee is tenured by practice of employment (i.e. the custom of the
> workplace);
> (3) The employee is protected by civil rights legislation or a constitutional
> guarantee;
> (4) The employee's firing violates protected speech policies;
> (5) Public policy has been violated (e.g. firing for refusing sexual advances by
> a supervisor or firing for filing a worker's compensation claim); or,
> (6) There is some other identifiable legal protection which has been breached.

*Davis v. Navajo Tribe*, 4 Nav. R. 50, at ¶¶ [15]-[21] (Navajo Ct. App. 05/12/1983), *available*

*at* http://www.tribal-institute.org/opinions/1983.NANN.0000062.htm ; *see id.* at ¶ [23]

(plaintiff "is an employee at will, who could be fired for any reason.").

The NPEA was adopted on August 1, 1985, by Navajo Tribal Council Resolution

CAU-63-85, and is currently codified at Navajo Nation Code tit. 15, §§ 601-619 (1995).  The

scope of the NPEA is considerably broader than its name might suggest:

> NPEA is *a general labor code*, and it supplanted the Navajo Nation labor
> policy adopted in 1958 (15 N.T.C. §§ 601-612 (repealed 1985)).  The NPEA
> contains requirements that employers exercise preferential hiring practices in
> favor of Navajos, employment procedures, *just cause employment tenure*,
> health and safety guarantees, and training requirements. 15 N.T.C. § 604(b).

*Arizona Public Service Co.*, No. A-CV-08-87, at ¶ [20] (emphasis added).  NPEA's "just

cause" provision requires that "[a]ll employers shall not penalize, discipline, discharge, nor take any adverse action against any Navajo employee without just cause.  A written notification to the employee citing such cause for any of the above actions is required in all cases."  Navajo Nation Code tit. 15, § 604(B)(8) (1995).

In supplanting prior Navajo labor policy, the NPEA deliberately abandoned the "American rule" presuming at-will employment in favor of a rule establishing employment tenure based upon a "just cause" standard.  As the Navajo Supreme Court recently explained:

> The purpose of the NPEA is clearly stated in the statute: "to protect the health, safety, and welfare of Navajo families." 15 N.N.C. § 602(A)(6). *The requirement of just cause for firing springs from this purpose, as it seeks to prevent wrongful terminations and maintain the welfare of Navajo families by keeping wage earners employed.*  The Council reinforced and gave further weight to their intent with the following statement: "It is the intention of the Navajo Nation Council that the provisions of this Act be construed and applied to accomplish the purposes set forth above." 15 N.N.C. § 602(B). The broad principles of family welfare written into NPEA by the Council, and the stated desire for the NPEA to accomplish these goals, means that Council intended to provide broad coverage to employees on the Navajo Nation, including necessary power for the Commission to set wrongful firings right through enforcement of back pay awards against employers not specifically excluded.

*Tso v. Navajo Housing Authority*, No. SC-CV-10-02, at ¶ [32] (Navajo S. Ct. 08/26/2004), *available at* http://www.tribal-institute.org/opinions/2004.NANN.0000013.htm (emphasis added).

Like its other mandatory terms, the NPEA "just cause" requirement applies to "all persons, firms, associations, corporations, and the Navajo Nation and all of its agencies and instrumentalities, who engage the services of any person for compensation, whether as employee, agent, or servant."  Navajo Nation Code tit. 15, § 603(C) (1995).  All contractual

"transaction documents" involving work "to be performed within the territorial jurisdiction of

the Navajo Nation" are required to include a provision that the employer or contractor

"affirmatively agree to strictly abide by all requirements of this Act[;]" as to contracts in

which such express language is absent, "the terms and provisions of this Act are incorporated

therein as a matter of law."  Navajo Nation Code tit. 15, § 609(A) (1995).  In the event of

inconsistency or conflict between a contractual provision and the NPEA's requirements, the

contractual provision "shall be legally invalid and unenforceable and the Act shall prevail

and govern the subject of the inconsistency or conflict."  Navajo Nation Code tit. 15, §

609(A) (1995).

The Navajo Supreme Court has held the NPEA to apply to a wide spectrum of

employers, both Navajo and non-Navajo, including an Arizona public utility,[126] a local school

district,[127] a historic Indian trading post,[128] an Indian Health Service contractor,[129] as well as

the Navajo Nation itself, including the Navajo courts.[130]

From and after its adoption of the NPEA on August 1, 1985, the Navajo Nation struck

a new bargain with employers—itself included—for the benefit of Navajos working within

the Nation's boundaries, guarantying each covered employee a greater degree of employment

---

[126]*Arizona Public Service Co.*, No. A-CV-08-87.

[127]*Office of Navajo Labor Relations ex rel Bailon v. Central Consolidated School District No. 22*, No. SC-CV-37-00 (Navajo 06/23/2004), *available at* http://www.tribal-institute.org/opinions/2004.NANN.0000008.htm.

[128]*Manygoats v. Cameron Trading Post*, No. SC-CV-50-98; *Manygoats v. Atkinson Trading Co.*, No. SC-CV-62-2000.

[129]*Staff Relief, Inc. v. Polacca*, No. SC-CV-86-98 (Navajo 08/18/2000), *available at* http://www.tribal-institute.org/opinions/2000.NANN.0000006.htm .

[130]*Tuba City Judicial Dist. of the Navajo Nation v. Sloan*, No. SC-CV-57-97.

security than mere employment "at will."

As interpreted by the Navajo Supreme Court,

At the very least, "'just cause' implies that the employer must have fair reasons for taking adverse actions against an employee and that those reasons are supported by the facts of the case." *Dilcon* at 9. Indeed,

> [n]ot all employee misconduct will meet the standard for just cause. . . . The misconduct must be *substantial*. Thus, a minor neglect of duty, an excusable absence, a minor misrepresentation, rudeness, and even filing a defamation action against the employer have been held not to establish just cause.

Rothstein, et al., 2 Employment Law § 8.8 (2d ed., 2003) (emphasis in original; internal citations omitted).

*Manygoats II*, at ¶¶ [66]-[68] (quoting *Dilcon Navajo Westerner/True Value Store v. Jensen*, No. SC-CV-52-98, slip op. at 9 (Navajo S. Ct. 2000)).  The NPEA also requires "written notification to the employee citing such cause for any" adverse employment action involving a covered employee "in all cases."  Navajo Nation Code tit. 15, § 604(B)(8) (1995).

The just cause and notice requirements of NPEA reflect the obvious exercise of the Navajo Nation's acknowledged power to "make their own laws and be ruled by them," *Williams v. Lee*, even with respect to relationships with non-Navajo employers. There can be *no* meaningful conceptual difference between Navajo jurisdiction over the rights of individual Navajos as consumers of goods sold by non-Navajos—jurisdiction expressly vindicated by the Supreme Court in *Williams v. Lee*—and Navajo jurisdiction over the rights of individual Navajos as employees of non-Indian employers working within the Navajo reservation boundaries.  358 U.S. at 220-223.

124

## 2.  NPEA Protection for Non-Navajo Spouses

Besides the tribal members covered by the Act, the NPEA also extends its protections

to cover "non-Navajo spouses" of Navajo members:

> When a non-Navajo is legally married to a Navajo, he or she shall be
> entitled to preference in employment under the Act.  Proof of marriage by a
> valid marriage certificate shall be required.  In addition, *such non-Navajo
> spouse shall be required to have resided within the territorial jurisdiction of
> the Navajo Nation for a continuous one-year period* immediately preceding the
> application for Navajo preference consideration.

Navajo Nation Code, tit. 15 § 614(A) (1995) (emphasis added).  In addition to preference

coverage, eligible non-Navajo spouses "shall also have and enjoy *all other employment rights*

*granted to Navajos under the Act*, it being understood that Navajos retain a priority right with

respect to provisions of the Act concerning preferential treatment in employment

opportunities."  Navajo Nation Code, tit. 15 § 614(C) (1995) (emphasis added).  "All other

employment rights" would encompass, *inter alia*, the "just cause" and notice requirements.

*See* Navajo Nation Code, tit. 15 § 604(B)(8) (1995).

## 3.  Administrative Enforcement of the NPEA

Direct enforcement of the NPEA begins with the Office of Navajo Labor Relations

(ONLR): "When a violation of the NPEA occurs, a claimant can file a charge with ONLR. 15

N.T.C. § 10.B.1, 3 (1990)," or the ONLR may initiate an enforcement action on its own.

*Charles v. Furniture Warehouse*, No. A-CV-18-93 (Navajo S. Ct. 07/12/1994), at ¶ [19],

*available at* http://www.tribal-institute.org/opinions/1994.NANN.0000004.htm .  "In this

process, an investigation is then conducted by ONLR to determine whether there is probable

cause to believe a violation of the NPEA has occurred. 15 N.T.C. § 10.C.1 (1990).  A hearing

will then be held by the Navajo Nation Labor Commission (NNLC). 15 N.T.C. § 11.C.

(1990)."" *Id.* at ¶ [20].

The Navajo Nation Labor Commission "has primary jurisdiction to determine

compliance with the Act in a wrongful termination matter." *Office of Navajo Labor Relations*

*v. West World*, No. A-CV-22-92, at ¶ [33] (Navajo S. Ct. 4/18/1994), *available at*

http://www.tribal-institute.org/opinions/1994.NANN.0000005.htm .  Generally, then, NPEA

claims must first be brought before the Navajo Nation Labor Commission (NNLC) before

being filed in the Navajo district courts.  Section 612(C) of the NPEA provides that "[t]he

person or party *in whose favor a Commission's decision providing for remedial action is*

*entered* shall have the right to seek legal and/or equitable relief in the District Courts of the

Navajo Nation *to enforce the remedial action*; . . . ."  Navajo Nation Code tit. 15, § 612(C)

(1995) (emphasis added).

The "NNLC and ONLR have the authority to remedy NPEA violations.  But these

administrative agencies do not have the authority to redress violations of statutory law

beyond the NPEA." *West World* at ¶ [21].  "The question of whether a complainant is

required to bring a claim before the NNLC implicates the doctrine of exhaustion of

administrative remedies." *Id.* at ¶ [22].

"[E]xhaustion of administrative remedies is the concept that administrative agencies

should complete [their] procedures before the courts interfere." *Id.*   NPEA enforcement is "a

process which has been committed to the agency by the legislature and it should be allowed

to run its course"; the exhaustion doctrine "prevents confusion that may arise if a party seeks

relief in two forums; and requires parties to address their grievances without going to court."

*Id.* at ¶ [22] (citing *Navajo Skill Center v. Benally*, 5 Nav. R. 93, 96 (1986)).

> Exhaustion of administrative remedies "is, however, not always required."
>
> It is not required if the administrative remedy is inadequate, which includes an unreasonable delay, inability to come to a decision, or lack of authority to grant the relief the party is entitled to. . . . Also, exhaustion of administrative remedies is not required if irreparable injury is imminent or the agency is acting in excess of its authority. . . . Thus, if the complainant alleges one of these exceptions, the complainant is not required to exhaust the agency's remedies.
>
> When the complainant is not required to exhaust the agency's remedies, he or she may file with a district court because those courts have general civil jurisdiction, which includes jurisdiction to hear claims raised under applicable federal laws. 7 N.T.C. §§ 204, 253 (1985).

*Id.* at ¶¶ [23]-[24] (citations omitted).  The Navajo district courts "can hear NPEA claims if the parties have exhausted their administrative remedies or fall under one of the exceptions to the rule."  *Id.* at ¶ [26].

As to which forum, the district court or the NNLC, should determine whether the complainant's allegations fall under one of the exceptions to the exhaustion of remedies rule, the Navajo Supreme Court held in *Charles* that "'[t]he NNLC must make that determination."  *Id.* at ¶ [27].

> Under the NPEA, the ONLR is given the specific responsibility of monitoring and enforcing the Act, 15 N.T.C. § 10.A. (1990), and to perform that duty, it must work closely with the NNLC--the administrative hearing body under the NPEA.  The ONLR is also required to investigate and attempt to conciliate charges in which it finds that there is probable cause to believe the NPEA has been violated.  15 N.T.C. §§ 10.C., 10.F. (1990).  To permit persons with employment claims to bypass this investigation and conciliation process and proceed directly to the courts would defeat one of the principle goals of the NPEA: "To foster cooperative efforts with employers to assure

127

expanded employment opportunities for the Navajo work force." 15 N.T.C. §
2.A.7 (1990).

There are considerations of judicial efficiency and economy as well. To
allow complainants to immediately bring their claims to the district courts
would overload an already overburdened Navajo Nation Court System.  See,
*PC&M Construction Co. v. Navajo Nation et al.*, No. A-CV05-93 (decided
August 26, 1993).  Furthermore, it would open the flood gates and encourage
complainants to concoct claims outside the NPEA, in an attempt to circumvent
the administrative process. Thus, the NNLC, the agency with expertise on
NPEA matters, must initially determine whether the complainant is alleging
valid claims of statutory violations outside of the NPEA.

*Id.* at ¶¶ [27]-[28].

Where complainants have initiated NPEA enforcement proceedings through the

Office of Navajo Labor Relations, it is for the Navajo Nation Labor Commission to decide in

the first instance whether the complainants are somehow excused from the exhaustion

requirement, before an action seeking to enforce the NPEA may be brought in the Navajo

district courts.

### 4.  *Singer, et al. v. San Juan County, et al.* and the NPEA's Exhaustion Requirement

As the Navajo Supreme Court explained in *Charles v. Furniture Warehouse*,

There needs to be a starting point in this process of determining the
different aspects of employer-employee relationships. It is only reasonable to
begin with the appropriate agency charged with the responsibility to oversee
these matters. The Navajo Nation has a comprehensive and detailed plan that
has regulations analogous to the National Labor Relations Board and covers
the areas of concern to the working Navajo public similar to any federal and
state employment statute, if not better.  The Navajo Nation Council has
charged the ONLR and NNLC with the responsibility to assure  compliance
with those laws. Thus, the process must be initiated with the ONLR and
NNLC.

*Charles*, No. A-CV-18-93 (Navajo 07/12/1994), at ¶ [30], *available at*

http://www.tribal-institute.org/opinions/1994.NANN.0000004.htm .  The Navajo Supreme

Court reiterated the same point a year later in *Raymond v. Navajo Agricultural Products*

*Industry* in affirming the dismissal of a Navajo employee's wrongful discharge lawsuit:

> Raymond should have sought an administrative remedy under the
> Navajo Preference in Employment Act (NPEA).  According to the NPEA,
> "[a]ll employers shall not penalize, discipline, discharge nor take any adverse
> action against any Navajo employee without just cause." 15 N.T.C. § 604B(8)
> (1990).  A potential claimant can file a charge with the Office of Navajo Labor
> Relations, the agency responsible for the monitoring and enforcement of the
> NPEA. 15 N.T.C. §§ 610A and B (1990).  NPEA provides for full enforcement
> and remedy in sections 10 through 12 (codified at 15 N.T.C. §§ 610-612
> (1990)).  Remedies available to plaintiffs are both prospective and
> retrospective.  Appeal to the Navajo Nation Supreme Court is available to any
> party under the NPEA. 15 N.T.C. § 613A (1990).  Raymond should have
> exhausted her administrative remedies before seeking relief in the courts.
> *Begay v. Board of Election Supervisors*, 2 Nav. R. 120, 125 (1979).

No. SC-CV-26-94 (Navajo S. Ct. 07/20/1995), at ¶ [39]*, available at*

http://www.tribal-institute.org/opinions/1995.NANN.0000013.htm .  It thus appears that by

the time Riggs and Dickson's disputes with the Health District arose in 1999, the NPEA

exhaustion requirement had become settled law in the Navajo courts.

    In this case, while it appears that Singer, Riggs and Dickson each filed a complaint

with the ONLR in early 1999, (*see* Pertinent Parts Navajo Ct. R. ("ONLR Complaint" &

"ONLR App. For TRO" Tabs)), there does not appear to have been any disposition of those

complaints by the Navajo Nation Labor Commission prior to the commencement of *Singer,*

*et al. v. San Juan County, et al.*, in April of 1999, or prior to the entry of the three orders now

at issue in December of 1999 and March of 2000.  The three orders make no reference to

either the dismissal of the plaintiffs' ONLR proceedings or the entry of any Commission

"decision providing for remedial action" based upon their complaints.  And like the original

Navajo court Complaint, the plaintiffs' "Complaint for Damages (Modified)," filed March

14, 2000, in *Donna Singer, et. al. v. San Juan County, et al.*, pleads that  "all Labor

Commission and Office of Navajo Labor Relations claims of the Plaintiffs will not be

prohibited from being heard in this Court, *after such time as the plaintiff's employment

claims have gone through their respective administrative process*," (*id.* at 4 ¶ 18 (emphasis

added)), suggesting that even after all three of the Navajo court orders had been entered, the

plaintiffs' NPEA claims were still pending before the ONLR and the Labor Commission.

Keeping in mind that the NPEA vests "primary jurisdiction to determine compliance

with the Act in a wrongful termination matter" in the Navajo Nation Labor Commission,

*Office of Navajo Labor Relations v. West World*, No. A-CV-22-92 (Navajo S. Ct. 4/18/1994),

at ¶ [33], including the question whether the exhaustion of the NPEA's ONLR/NLCC

administrative remedies will be required, *Charles v. Furniture Warehouse*, No. A-CV-18-93

(Navajo S. Ct. 07/12/1994), at ¶ [27], the silence of the December 28, 1999 Order and the

March 1, 2000 Order leaves unresolved the question whether that court had jurisdiction under

Navajo law to hear and determine the plaintiffs' NPEA claims.

The record now before this court suggests that it did not.

**F.  Navajo Tort Law**

As summarized above, in the Navajo court proceeding, the Part II Plaintiffs pleaded

tort claims of "wrongful hiring," defamation, "tortious interference with future contractual

relations," intentional and negligent infliction of emotional distress, "theft,"  "violation of

130

fiduciary duties," "misfeasance," and "malfeasance in office," at least three of which have been recognized as a basis for relief in the Navajo courts.  As courts of general jurisdiction,[131] the Navajo district courts have subject matter jurisdiction over civil claims arising out of employment grievances, including causes of action for defamation,[132] infliction of emotional distress, interference with contractual relations, and denial of civil rights.  *See, e.g.*, *Manuelito v. Kellogg*, No. WR-CV-217-87 (Navajo S. Ct. 08/22/1989), at ¶¶ [13], [14], [17]-[20], [53] (citing Navajo Nation Code, tit. 7, § 253(2)), *available at* http://www.tribal-institute.org/opinions/1989.NANN.0000024.htm.  And "the Navajo courts have jurisdiction 'over any person doing injury within the Navajo Nation . . . .' *Deal v. Blatchford*, 3 Nav. R. 159, 160 (1982); Accord, *Keith v. Allred*, 3 Nav. R. 191 (Chinle Dist. Ct. 1981)."  *Billie v. Abbott*, No. A-CV-34-87 (Navajo S. Ct. 11/10/1988), at ¶ [48], *available at* http://www.tribal-institute.org/opinions/1988.NANN.0000012.htm.  Indeed, "The Navajo Nation inherently has the authority to protect its members from fraud, deceit, undue influence, overreaching, unconscionable conduct, torts and the other kinds of personal conduct the civil law is designed to regulate."  *Benally v. John*, 4 Nav. R. 39, No.

---

[131]"Our district courts are courts of general jurisdiction under the Navajo Nation Code, 7 N.N.C. § 253, but their jurisdiction is limited by federal statutes and by United States Supreme Court case law."  *Nelson v. Pfizer, Inc.*, No. SC-CV-01-02 (Navajo 11/17/2003), at ¶ [20], *available at* http://www.tribal-institute.org/opinions/2003.NANN.0000002.htm.

[132]*See Davis v. Navajo Tribe*, 4 Nav. R. 50, at ¶ [22] (Navajo Ct. App. 05/12/1983), *available at* http://www.tribal-institute.org/opinions/1983.NANN.0000062.htm ("Defamation actions are fashionable in the employment law field these days, and they may or may not relate to employment, depending upon the circumstances.").

A-CV-27-81 (Navajo Ct. App. 05/05/1983), at ¶ [45].[133]  "Our courts have the authority to declare that a wrong has been committed and, in equity cases, to give an individual an order to correct the wrong. . . ."  *Id.*

The question now before this court is whether on the facts in this case, Navajo adjudicative jurisdiction properly extended to reach the non-Navajo County and Health District defendants for purposes of these tort claims in light of *Montana* and more recently, *Strate v. A-1 Contractors*.  As noted above, where "tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.'"  *Strate*, 520 U.S. at 453 (quoting *Iowa Mutual*, 480 U.S. at 18).

The Navajo Nation's inherent civil authority over employment relationships involving Navajo members includes the power to prescribe both statutory and common-law standards of conduct for employers and employees.  Thus, as *Strate* indicates, we presume that the Navajo courts have civil jurisdiction over disputes arising out of those employment relationships.  *See Manuelito v. Kellogg*, No. WR-CV-217-87 (Navajo S. Ct. 08/22/1989), at ¶ [53].

As part of the acknowledged inherent power of Navajos "to make their own laws and be ruled by them," *Williams v. Lee*, 358 U.S. at 220; *Nevada v. Hicks*, 533 U.S. at 361, the Navajo Nation may also adopt legal standards of conduct that apply within its territorial jurisdiction to protect the interests of Navajo members in their persons, property and

---

[133] *Available at* http://www.tribal-institute.org/opinions/1983.NANN.0000042.htm .

relationships generally. The recent cases acknowledge this. *Nevada v. Hicks* noted that

"there was little doubt that the tribal court had jurisdiction over such tort claims," 533 U.S. at

368, referring to *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473 (1999), a case involving

Navajo plaintiffs' claims of injuries suffered as a result of the Uranium mining operations of

non-Navajo companies. And the Navajo Nation's "right of self-government includes the

right to decide what conduct on the reservation will subject the Indians living there to civil

liability in the Tribal court," in relation to non-Indian as well as tribal member plaintiffs.

*Enriquez v. Superior Court*, 115 Ariz. 342, 343, 565 P.2d 522, 523 (Ct. App.1977) (holding

that a tribal court had exclusive jurisdiction in tort cases involving actions brought by a

non-member against a tribal member resulting from an accident occurring on the Papago

Reservation) (citing *Williams v. Lee*, 358 U.S. at 220, and *Fisher v. District Court of

Sixteenth Judicial District*, 424 U.S. 382 (1976)).

     The Navajo courts have been developing their own body of Navajo common-law tort

law, drawing upon both mainstream and traditional Navajo remedial concepts. *See, e.g.*, J. R.

Mueller, *Restoring Harmony through Nalyeeh: Can the Navajo Common Law of Torts be

Applied in State and Federal Forums?* 2 Tribal L.J. 3 (2001/2002), *available at*

http://tlj.unm.edu/articles/volume_2/mueller/index.php; Robert Yazzie, *"Life Comes From

It": Navajo Justice Concepts*, 24 N.M. L. Rev. 175 (1994); Daniel L. Lowery, *Developing a

Tribal Common Law Jurisprudence: the Navajo Experience, 1969-1992*, 18 Am. Indian L.

Rev. 379 (1993). The Navajo Nation Council has also undertaken to incorporate traditional

Navajo legal principles in its statutory codification. *See* Kenneth Bobroff, *Diné Bi*

*Beenahaz'áanii: Codifying Indigenous Consuetudinary Law in the 21st Century*, 5 Tribal L.J. (2004/2005), *at* http://tlj.unm.edu/articles/volume_5/_dine_bi_beenahazaanii__codifying_indigenous_consuetudinary_law_in_the_21st_century/index.php.

Though the reported cases are few, it appears that where non-Indian defendants are involved, the Navajo courts assert the full extent of Navajo civil jurisdiction over conduct that "cause[s] an action to occur" or that results in an injury to Navajo members on tribal land, (*see supra,* note 116 & accompanying text),[134] and they apply *Montana* to determine their jurisdiction over non-Indian defendants involving conduct or injuries occurring on non-tribal, non-Indian fee lands within Navajo boundaries.

This approach comports with the Tenth Circuit case law applying the *National Farmers* exhaustion requirement to tort claims against non-Indians for conduct and injuries on tribal lands.  In *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1508 (10th Cir 1997), *cert. denied*, 522 U.S. 1090 (1998),  the court of appeals affirmed the district court's ruling requiring non-Indian defendants to exhaust tribal judicial remedies as to wrongful death and injury claims brought by tribal members in tribal court:

> We agree that strong tribal interests are implicated by these claims. The mill that allegedly produced the toxic and radioactive waste was located on the reservation pursuant to a lease with the tribe, and the alleged victims of the tort are tribal members residing on the reservation. *The tribal nexus is strong, as is*

---

[134]Of course, as *Nelson* reminds us, the exercise of Navajo court jurisdiction remains subject to due process considerations.  *Nelson v. Pfizer, Inc.*, at ¶ [40] ("Our courts, like other courts, must have both subject matter jurisdiction and personal jurisdiction to properly hear a case. *Yazzie  v. Yazzie*, 5 Nav. R. 66, 68 (1985). Though, as we hold today, our subject matter jurisdiction over matters occurring on tribal land is broad, that does not mean our courts may hear any case with some impact on tribal members.  Personal jurisdiction over the defendant is still required.  *Sells v. Espil*, 6 Nav. R. 195, 197 (1990).") (also citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980)).

134

> *the interest of the tribe as a sovereign in protecting and vindicating the rights of its residents*, as well as its interest as lessor of the land for the mill.

*Id.* at 1508.  *See also Navajo Nation v. Intermountain Steel Bldgs., Inc.*, 42 F. Supp. 2d 1222 (D.N.M. 1999) (reading *Kerr-McGee* as recognizing "that tribes retain a core sovereign interest in regulating the health and welfare of tribal members" through adjudication of tort claims in tribal court); *McDonald v. Means*, 309 F.3d 530  (9th Cir. 2002) (amended opinion);  *Allstate Indemnity Co. v. Stump,* 191 F.3d 1071, 1072 (9th Cir.1999).[135]

---

[135]A recent Ninth Circuit case has taken a different approach.  In *Ford Motor Co. v. Todecheene*, 394 F.3d 1170 (9th Cir. 2005), "Esther Todecheene, an on-duty law enforcement officer employed by the Navajo Department of Public Safety, died when her Ford Expedition patrol vehicle rolled over while she was driving on a dirt road within the Navajo Nation. . . .  The road is a reservation road, maintained by the Tribe.  There is no federal or state right-of-way, and the road is not located on non-Indian fee land."  394 F.3d at 1172 (citation omitted).  Officer Todecheene's parents sued the manufacturer in Navajo tribal court, alleging that Officer Todecheene's death resulted from a defective seat belt mechanism in her Ford vehicle—one of a fleet of Ford vehicles purchased by the Navajo Nation for use by its officers.  Ford rushed the litigation into the federal courts, challenging the Navajo court's jurisdiction.

Choosing to "confront the issue . . . whether the Tribe may assert jurisdiction over a nonmember for conduct on tribal land," and following the trend it perceived in cases such as *Atkinson* and *Hicks*, the panel ruled 2-1 that *Montana* applies to the jurisdictional issue regardless of the status of the land.  *Id.* at 1174-1179.  Applying *Montana* to the facts, *Ford* concluded that

> Although the tribe does have an interest in protecting the lives of its police officers on tribal roads, unfortunately that interest does not fit within the parameters of the self-government *Montana* exception.  That exception has been narrowly defined as *encompassing events that interfere with a Tribe's ability to enact or be governed by its own laws.  See Hicks,* 533 U.S. at 360-61, 121 S.Ct. 2304.

*Id.* at 1182-1183 (emphasis added).  According to the *Ford* majority, then, the Navajo Nation has an insufficient interest in protecting the safety of its own police officers—one of whom died in the line of duty while patrolling tribal lands on tribal roads using a tribal vehicle purchased by the Navajo Nation for her use—to justify the exercise of tribal civil jurisdiction over her parents' wrongful death claim against the party who allegedly caused her death.

What *does* it mean to have the "ability to enact and be governed by its own laws" if the Navajo Nation cannot extend the scope of its own laws to protect the very lives of its own police officers on its own lands, and in its own courts?  When *does* the exception for "conduct [that] threatens or has some direct effect on the political integrity, the economic security, or the health and welfare of the tribe" apply?

*Ford* expresses concern that "'if *Montana*'s second exception requires no more'" than actually causing injury or death to tribal members, "'the exception would severely shrink the rule,'" *id.* at 1181 (quoting *Strate*, 520 U.S. at 458), and then attempts to preserve the sanctity of the second *Montana* exception by narrowing it to the point of absolute abstraction, never to be applied in the real world.  If *Ford* is correct, then as a matter of federal law the Navajo Nation *cannot* make and enforce its own tort law protecting its members against the dangerously defective products of others—clearly "prevent[ing] the Tribe from enacting or being governed by its laws."  *Id.* at 1183.  And

(continued...)

That analysis bears upon this case for this reason: Riggs' defamation claim against Wood involves allegations of "fraud" that damaged Riggs' reputation among co-workers and others, causing injury to Riggs *on the Navajo Reservation*.  *Nelson* indicates that the Navajo courts' civil jurisdiction applies to provide a Navajo tort remedy for this injury.

---

[135](...continued)

*Ford* would necessarily subject claims of Navajo plaintiffs arising on the reservation "to a forum other than the one they have established for themselves."  *Fisher v. District Court of the Sixteenth Judicial District*, 424 U.S. 382, 387-388 (1976); *see Iowa Mutual*, 480 U.S. at 16 ("Adjudication of such matters by any nontribal court also infringes on tribal lawmaking authority, because tribal courts are best qualified to interpret and apply tribal law.").

Years ago, one discerning critic framed the essential query in these words: "If, Indians reasoned, justice is for society's benefit, why isn't our justice accepted?"  Vine Deloria, Jr., *Custer Died for Your Sins: An Indian Manifesto* 9 (1969).  A fair question, certainly, and one to which *Ford v. Todecheene* offers no satisfactory answer.

## VII.  ENFORCEMENT OF THE NAVAJO COURT ORDERS IN THIS FORUM

In remanding this case, the court of appeals stated:

> We are unwilling to enforce judgments of tribal courts acting beyond their authority, especially where defendants have a federal right "to be protected against an unlawful exercise of Tribal Court judicial power," *Nat'l Farmers,* 471 U.S. at 851, 105 S.Ct. 2447;  *see Wilson,* 127 F.3d at 810 (holding that "federal courts must neither recognize nor enforce tribal judgments if: (1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process of law").

309 F.3d at 1225.  On remand, this court must determine whether the Navajo Nation District Court had both subject-matter and personal jurisdiction over the County and Health District defendants for the purpose of adjudicating the Part II Plaintiffs' claims, and if so, whether and with what degree of recognition that court's orders must now be enforced against these defendants in this forum.

### A.  Theories re: the Navajo Court's Subject-Matter Jurisdiction in *Singer, et al. v. San Juan County, et al.*

"Key" to the Tenth Circuit's ruling in this case was "the question whether the courts of the Navajo Nation may exercise jurisdiction over a case brought by private individuals against a Utah county alleging violations of Navajo law"; according to the panel, "resolution of this question lies in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) (defining the scope of tribes' inherent sovereignty)."  309 F.3d at 1218.

### 1.  Navajo Court Jurisdiction as a Federal Question

Generally, the scope of tribal court's jurisdiction over non-Indian litigants presents a federal question over which federal district courts have jurisdiction.  *See National Farmers,*

471 U.S. at 853; *MacArthur*, 309 F.3d at 1224.  In contrast to cases such as *National Farmers* and *Iowa Mutual*, this case was commenced in this forum by the tribal court *plaintiffs* rather than the tribal court defendants—a distinction the court of appeals thought may be significant:

> Although a tribal court *defendant* may bring a federal cause of action for an injunction where the basis of the claim is assertion of "a right to be protected against an unlawful exercise of Tribal Court judicial power," *Nat'l Farmers,* 471 U.S. at 851, 852, 105 S.Ct. 2447, this right to be free from tribal court interference does not necessarily support a federal claim seeking enforcement of a tribal decree.  Although the sovereign powers of the Navajo Nation are held "only at the sufferance of Congress," *Wheeler,* 435 U.S. at 323, 98 S.Ct. 1079, these powers are rooted in Navajo, not federal, law.  "Indian tribes are neither states, nor part of the federal government, nor subdivisions of either. Rather, they are sovereign political entities possessed of sovereign authority not derived from the United States, which they predate." *NLRB v. Pueblo of San Juan,* 276 F.3d 1186, 1192 (10th Cir.2002) (en banc) (footnote omitted). To the extent appellants' complaint anticipates a defense arising under federal law, it runs up against the well-pleaded complaint rule.  *See Louisville & Nashville R.R. Co. v. Mottley,* 211 U.S. 149, 152, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

309 F.3d at 1224-1225.  The court of appeals also noted that "[b]ecause we recognize a federal right to be free from tribal court interference, it stands to reason that an action for a mere declaration that a tribal court defendant has no such right might be permitted as well." *Id.* at 1124 n.7 (citing Fed. R. Civ. P. 57; 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2767, at 650 (3d ed. 1998)).  But the *MacArthur* panel declined to decide "whether such relief is available at this interlocutory stage of the parties' tribal court litigation." *Id.*

     Since remand, the Part II Plaintiffs have asked that this court enforce the three Navajo court orders essentially "as issued," but they have also asserted that this court lacks

jurisdiction under Article III of the Constitution to determine the subject-matter jurisdiction

of the Navajo court that entered them:

> If Tribal Court jurisdiction is one of 'inherent sovereignty' under a Treaty, the supreme law of the land, (U.S. Constitution Article VI) under common law, then Congress is the one who defines jurisdiction. If Tribal Court jurisdiction is based upon a delegation of powers, then Article III courts have the say.

(Plaintiffs' Briefing on *Montana*, filed February 13, 2003 (dkt. no. 492), at 6.)

The scope of the subject-matter jurisdiction of tribal courts does not present a non-

justiciable "political question" committed to the policy discretion of the Legislative or

Executive Branches. Much of the existing legal authority defining the subject-matter

jurisdiction of Indian tribal courts over non-Indian litigants such as the County and Health

District defendants consists of "'judicially made' federal Indian law," that is, federal case law

precedent representing a species of "federal common law"—"which 'common law' federal

courts develop as 'a "necessary expedient" when Congress has not "spoken to a *particular*

issue."'" *Lara*, 541 U.S. at 207 (quoting *County of Oneida v. Oneida Indian Nation of N.Y.*,

470 U.S. 226, 233-237 (1985) (quoting "*Milwaukee v. Illinois*, 451 U.S. 304, 313-315

(1981)) (emphasis supplied by Court)). As such, Congress, in the exercise of its "plenary and

exclusive" power in Indian affairs remains free to "change 'judicially made' federal Indian

law through . . . legislation," but unless and until Congress acts, this "intricate web of

*judicially made* Indian law" remains among the "laws . . . of the United States" under which a

"federal question" may arise within the meaning of 28 U.S.C.A. § 1331. *Lara*, 541 U.S. at

206 (quoting *Oliphant*, 435 U.S. at 206 (emphasis supplied by Court)); *National Farmers*,

471 U.S. at 857 ("§ 1331 encompasses the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction").

As to the question "whether an Indian tribe retains the power to compel a non-Indian [litigant] to submit to the civil jurisdiction of a tribal court," the federal courts likewise remain empowered and duty-bound under Article III to answer that question "by reference to federal law." *National Farmers*, 471 U.S. at 852 (tribal jurisdictional question "is one that must be answered by reference to federal law and is a 'federal question' under § 1331"); *Iowa Mutual*, 480 U.S. at 16-20 (same jurisdictional query in case in § 1332 diversity jurisdiction).

That "federal question" is raised no less by an attempt to enforce a tribal court order in a federal forum than it is by an attempt to avoid its enforcement by resort to a federal forum, *National Farmers*, 471 U.S. at 852; *Iowa Mutual*, 480 U.S. at 16-20; *Strate*, 520 U.S. at 443-445; *Atkinson Trading Co.*, 532 U.S. at 648-649; *Nevada v. Hicks*, 533 U.S. at 356-357, particularly where, as here, plaintiffs seek declaratory relief establishing that the orders are enforceable. (*See* Amended Complaint at 99 (citing 28 U.S.C. §§ 2201, 2202).)  Implicit in the recognition of tribal court judgments by federal or state courts as a matter of comity or full faith and credit is the question whether the tribal court had subject-matter and personal jurisdiction to render an enforceable judgment—which necessarily implicates the federal question identified in *National Farmers*.  Though a plaintiff seeking enforcement of a tribal court judgment does not plead a cause of action created by federal law, the action nonetheless is one "arising under" federal law because it "turn[s] on substantial questions of federal law."

*See Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, ___ U.S. ___, 125 S. Ct. 2363, 2367, 162 L.Ed.2d 257 (June 13, 2005);[136] *cf.* Kaighn Smith, Jr., *Federal Courts, State Power, and Indian Tribes: Confronting the Well-Pleaded Complaint Rule*, 35 N.M.L. Rev. 1 (2005).

### 2.  Subject-Matter Jurisdiction Over the County and Health District Defendants Under the *Montana* Exceptions

The parties express drastically different views of the subject-matter jurisdiction of the Navajo Nation and the Navajo courts over the County and Health District defendants based upon the facts found—at least preliminarily—by the Navajo Nation District Court.

### (*i*) Plaintiffs' Theory re: Jurisdiction

The Part II Plaintiffs submit that a series of congressional enactments beginning with the Indian Civil Rights Act of 1968 and "post dating *Montana v. United States*" create a "presumption OF tribal jurisdiction over non-Indians within Indian Country, without variation between Navajo and non-Indian . . . ."  (Pltfs' Summ. Judg. Mem. (504), at 9.)

> Under . . . the clear and unambiguous language of statutes, this Court can sustain, under principals [sic] of full faith and credit, the Navajo Court Orders as an exercise of 'inherent sovereign' rights (**25 U.S.C. §1301(2)**) to 'enact and enforce laws' (**25 U.S.C. §3665**) within the confines of due process and equal protection to 'any person' (**25 U.S.C. §1302**) in 'Indian lands' the Tribes are

---

[136]

There is, however, another longstanding, if less frequently encountered, variety of federal "arising under "jurisdiction, this Court having recognized for nearly 100 years that in certain cases federal question jurisdiction will lie over state-law claims that implicate significant federal issues. *E.g.*, *Hopkins* v.*Walker*, 244 U.S. 486, 490-491 (1917). The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues, see ALI, Study of the Division of Jurisdiction Between State and Federal Courts 164–166 (1968).

125 S.Ct. at 2367.

'responsible' for governing, as the 'most appropriate' Courts for resolving civil disputes in 'suits at law' (**25 U.S.C. §1351**), based upon the Navajo Nation's right to enact and enforce their laws (**25 U.S.C §3665(1), 3601, 3602**), for Indians and non-Indians alike.  If the intent of Congress is clear and unambiguous, judicial inquiry stops. . . .

(*Id.* at 9-10 (emphasis in original; footnotes omitted) (citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 & n.21 (1978)).)  And any statutory ambiguity in this regard should be resolved by liberal construction, with "'doubtful expressions being resolved in favor of the Indians.'" (*Id.* at 11 (quoting *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918)).  According to the plaintiffs, "Congress has determined [that] the Tribe's are responsible for the governance of Indian lands, and their courts are the 'most' appropriate forums for doing so."  (*Id.* (citing 25 U.S.C.A. §§ 3601,3602, 3651, 3665).)[137]

Plaintiffs' presumption thus becomes essentially irrebuttable—the cited statutes create the presumption either by their plain meaning or by liberal construction of any ambiguous terms, allowing for no contrary result.  Plaintiffs assert as much, arguing that the presumption favoring tribal jurisdiction forecloses further judicial inquiry as to the extent of tribal jurisdiction:

Since Congress has the authority over defining Tribal sovereignty, and has affirmatively acted to define the Tribal Court's jurisdiction over 'Indians and non-Indians alike,' and not affirmatively restricted the jurisdiction to only Indians, *the Court is bound to presume the jurisdiction* and enforce the Navajo Court orders as being within the Navajo Court's jurisdiction.

("Plaintiffs' Briefing on *Montana*," filed February 13, 2003 (dkt. no. 492), at 10; *see also*

---

[137]Plaintiffs also point to excerpts from the legislative history of the Tribal Justice Support Act of 1993. (*See id.* at 11 n.6 (quoting S. Rep. No. 88, 103d Cong., 1st. Sess 8 (1993); H.R. Conf. Rep. No. 383, 103d Cong., 1st Sess. 13 (1993); "Plaintiffs' Briefing on *Montana*," filed February 13, 2003 (dkt. no. 492), at 9 (same).)

Pltfs' Summ. Judg. Mem. (504), at 20 ¶ 19 (same).)

Given this congressionally mandated presumption favoring tribal jurisdiction,

plaintiffs openly dispute *Montana*'s "general proposition" that "the inherent sovereign

powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450

U.S. at 565; "This presumption," plaintiffs contend, "is opposite Congress' presumption of

Tribal Court jurisdiction" found in post-*Montana* legislation and "case law prior to the

*Oliphant* 'inherent divestiture' theory . . . ." (*Id.* at 2-3.)[138]  According to the plaintiffs,

"[T]his Court has no subject matter jurisdiction over a *Montana* briefing, since Congress has

altered the presumptions under *Montana*, based upon inherent sovereignty and federal

common law, placing the Navajo Orders in a position of being fully enforced within the

fiduciary duty of the United States." (*Id.* at 5.)[139]

Plaintiffs' assertion that this court lacks subject-matter jurisdiction to determine the

Navajo court's jurisdiction appears to be grounded in a misapprehension of the reasoning of

*United States v. Enas*, 255 F.3d 662 (9th Cir. 2001) (en banc), *cert. denied*, 534 U.S. 1115

(2002).  Plaintiffs read *Enas* to say that "Tribal Courts' exercise of inherent sovereignty is not

a 'Constitutional' issue where the *Courts* have the ability to restrict a Tribe[']s inherent

sovereign authority, but one of federal common law wherein "*Congress [not the Courts] had

the power to expand and contract the inherent sovereignty that Indian tribes possess because*

---

[138]Plaintiffs pressed the identical argument in their Petition for a Writ of Certiorari, *Riggs v. San Juan County*, No. 02-1253 (U.S.S.Ct., filed February 6, 2003), at 12.  As noted above, certiorari was denied on June 2, 2003.  *See* 539 U.S. 902 (2003).

[139]Plaintiffs also assail *Oliphant* as being "unmoored from any Congressional affirmative diminishment of Tribal Court jurisdiction," (*id.* at 8), a statement that is essentially accurate, as far as it goes.  (*See supra*, at 75-77 & n. 81.)

*it has legislative authority over federal common law.*"  *Enas*, at 669-71."  (Pltfs' Cert. Pet. at 14 (emphasis in original).)

*Enas* considered whether the implicit divestiture of tribal criminal jurisdiction over nonmember Indians found in *Duro v. Reina* is a matter of constitutional interpretation not to be altered by subsequent legislation, or is a matter of federal common law, well within the power of Congress to change as it sees fit.  *Enas* adopted the latter view, as did *United States v. Lara* three years later.[140]  Nothing in *Enas*—or for that matter, in *Lara*—puts the question of the scope of Indian tribal jurisdiction over nonmembers out of the jurisdictional reach of the federal courts under Article III.  It remains the justiciable "federal question" that *National Farmers* says it is.  *Enas* and *Lara* simply indicate that if Congress is dissatisfied with the Court's delineation of the limits of tribal jurisdiction as a matter of federal common law, it may adjust those limits through further legislation, as it did in reviving tribal jurisdiction over nonmember Indians after *Duro v. Reina* in 1990.

Congress may "change 'judicially made' federal Indian law," and within constitutional limits, at least, the courts would be constrained to give effect to the legislative adjustment.[141]

_____

[140]In *United States v. Lara*, 324 U.S. 635, 639 (8th Cir. 2003) (en banc), the Eighth Circuit held that "the distinction between a tribe's inherent and delegated powers is of constitutional magnitude and therefore is a matter ultimately entrusted to the Supreme Court. . . . Once the federal sovereign divests a tribe of a particular power, it is no longer an inherent power and it may only be restored by delegation of Congress's power."  The Supreme Court reversed. *United States v. Lara*, 541 U.S. 193 (2004).

[141]As it turns out, then, the Court's contemporary formulation of the implied divestiture of inherent tribal sovereignty in *Oliphant*, et al, merely reflects the Court's transitory reading of the policies of the "political branches" of the federal government, gauged at a particular point in time.  Through the exercise of its "plenary and exclusive" power in Indian affairs, Congress remains free to "adjust" the legal status of Indian tribes and "relax restrictions on

(continued...)

144

The question raised by plaintiffs' "presumption" argument that this court must decide is whether such an "adjustment" has indeed occurred, displacing *Montana* as the governing law regarding Indian tribal civil jurisdiction over non-Indians.

### (*ii*) San Juan County's Theory re: Jurisdiction

The San Juan County defendants assert that as to them, "the Navajo Tribal Court merely claims jurisdiction without any analysis or other support."  (San Juan County Defendants' Memorandum Regarding Tribal Court Jurisdiction, filed February 20, 2003 (dkt. no. 499) ("Cnty. Juris. Mem."), at 5 ¶ 13 (citing Deccember 28, 1999 Order).)

As to *Montana*'s "consensual relationship" exception, the County defendants submit

---

[141](...continued)

tribal sovereignty previously imposed by the political branches," essentially as Congress sees fit, thereby supplanting the Court's "judicially-made" limitations on inherent tribal sovereignty.  *United States v. Lara*, 541 U.S. 193, 200, 204-205, 207 (2004).

It thus becomes possible for the Court to say of the 1990 legislative restoration of tribal criminal jurisdiction over nonmember Indians that "the tribes' possession of this additional criminal jurisdiction" over nonmember Indians "is consistent with our traditional understanding of the tribes' status as 'domestic dependent nations'"—after having previously held the tribes to have been *divested of that same jurisdiction* by reason of their "dependent" status.  *Lara*, 541 U.S. at 204-205 (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831)).  "True, the Court held in those cases that the power to prosecute nonmembers was an aspect of the tribes' external relations and hence part of the tribal sovereignty that was divested by treaties and by Congress," *id.* at 205—or by "implication as a necessary result of their dependent status," according to the Court's opinions at the time.  *See Duro v. Reina*, 495 U.S. 676, 686-689 (1990).

> But these holdings reflect the Court's view of the tribes' retained sovereign status as of the time the Court made them. They did not set forth constitutional limits that prohibit Congress from changing the relevant legal circumstances, *i.e.*, from taking actions that modify or adjust the tribes' status.
> . . . .
> The Court in these cases based its descriptions of inherent tribal authority upon the sources as they existed at the time the Court issued its decisions. Congressional legislation constituted one such important source. And that source was subject to change.
> . . . .
> Consequently we do not read any of these cases as holding that the Constitution forbids Congress to change "judicially made" federal Indian law through this kind of legislation. . . .

*Lara*, 541 U.S. at 205, 206, 207 (citations omitted).

that they did not enter into a consensual relationship with the Navajo Nation or its members:

the IHS contract

> was between a federal agency and the Health Services District, not San Juan County.  The land on which the clinic sits is fee land, owned by the State of Utah.  It is not owned by San Juan County.  San Juan County did not hire or employ the two tribal members left in this lawsuit, Riggs and Dickson.  San Juan County did not hire Singer, a non-Indian. The only connection San Juan County Defendants have with the Health Services District, as pertaining to this specific lawsuit, is the creation of the San Juan Health Services District pursuant to *Utah Code Ann.* §§ 17A-2-130, *et seq.* In order to facilitate the delivery of medical care to residents of remote San Juan County.  Once created, San Juan Health Services District became an independent entity . . . .

(*Id.* at 10.)

Concerning *Montana*'s second exception, the County defendants submit that there wa no conduct by the San Juan County Defendants at issue in this matter which would "threaten or have a direct effect on the political integrity, the economic security, or the health and welfare of the tribe," *Montana*, 450 U.S. at 565, because San Juan County Defendants did not operate the Montezuma Creek Clinic nor did they contract with anyone to provide Health Services to the Navajo Tribe."  (*Id.*)  They argue that they can be considered as "state actors" within the rationale of *Nevada v. Hicks*, and that "the Indians' right to make their own laws and be governed by them does not exclude all state regulatory authority on the reservation," including the County's creation of the San Juan Health Services District pursuant to Utah law.  (*Id.* at 11.)  They also emphasize the non-tribal ownership of "the land on which the dispute arose": "['] **The absence of tribal ownership has been virtually conclusive of the absence of tribal civil jurisdiction**.[']" (*Id.* (quoting *Hicks*, 533 U.S. at 360 (emphasis supplied by County defendants).)

146

Concerning the County defendants sued individually, they argue that under *Nevada v. Hicks*, "it does not matter whether San Juan County Defendants were sued in both their personal and official capacity," because if tribal jurisdiction was to apply, """the operations of the [state] government may at any time be arrested at the will of the [tribe],""" ostensibly an undesirable result.  (*Id.* at 12 (quoting *Hicks*, 533 U.S. at 365 (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1880)); *see also Hicks*, 533 U.S. at 365 ("We think . . . that the distinction between individual and official capacity suits is irrelevant.").)

The County defendants thus count themselves among those who can enter a reservation to enforce State laws without being subjected to the jurisdiction of the tribal courts for having done so, consistent with *Nevada v. Hicks*.  *See Hicks*, 533 U.S. at 365-366 ("Nothing in the federal statutory scheme prescribes, or even remotely suggests, that state officers cannot enter a reservation (including Indian-fee land) to investigate or prosecute violations of state law occurring off the reservation"); *id.* at 358 n.2 ("Our holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law.").

> The Navajo Tribe cannot regulate . . . the actions of the San Juan County Defendants when they act pursuant to Utah law or federal law.  If the tribe cannot regulate these actions then, under *Nevada [v. Hicks]*, the tribe certainly does not possess jurisdiction over San Juan County Defendants for claims stemming from their performance of their duties under state law."

(Cnty. Juris. Mem. at 13.)    Concerning defendant Halls, in particular, the County defendants submit that "[t]ribal courts lack jurisdiction over state officials for causes of action related to the performance of official duties."  (Cnty. Juris. Mem. at 14.)  "In *Nevada*

*[v. Hicks]*, the Supreme Court stated that 'state officials . . . are properly held accountable for misconduct and civil rights violations in either State or Federal Court, but not in Tribal Court,' and Halls is a State official."  (*Id.* (citing *Hicks*, 533 U.S. at 364, and *Arnold v. McClain*, 926 F.2d 963 (10th Cir. 1991)).[142]

### (*iii*) The Health District's Theory re: Jurisdiction

The Health District defendants assert that "[p]laintiffs cannot overcome the overwhelming presumption <u>against</u> the existence of subject matter jurisdiction in the Navajo Tribal Court," and that "contrary to plaintiffs' arguments, this Court has authority to determine the subject matter jurisdiction of the Navajo Tribal Court, and <u>Montana</u> continues to govern the subject matter analysis."  (San Juan Health District Defendants' Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no. 496), at 2, 4.)

Beginning with *Montana*'s first exception, the Health District defendants argue that the plaintiffs cannot identify a "consensual relationship" within the scope of that exception: plaintiff Singer's employment with the District was not "with the Tribe or its members" because Singer is not a Navajo member; and as to Riggs and Dickson, "the consensual relationship is inapplicable because" according to *Nevada v. Hicks*, "the exception covers only private commercial relationships, and it cannot be extended to the official actions of governmental officials and employees."  (San Juan Health District Defendants' Memorandum Regarding Subject Matter Jurisdiction and in Support of Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no. 497) ("Dist. Summ. Judg, Mem."), at 10 (citing

---

[142]The County defendants also noted that *Hicks* held that tribal courts lack jurisdiction to entertain lawsuits under 42 U.S.C.A. § 1983.  (Cnty. Juris. Mem. at 13 (citing *Hicks*, 533 U.S. at 366-367).)

*Hicks*, 533 U.S. at 359 n.3).)

And the District relies on *Montana Dept. of Transp. v. King*, 191 F.3d 1108 (9th Cir. 1999), which held that a tribe lacked jurisdiction to enforce its employment preference requirements against a state agency that had detailed crews of its existing employees to perform highway maintenance on state rights-of-way traversing the reservation.  The State right-of-way did not involve a consensual relationship under *Montana*, the Ninth Circuit concluded, because "transfers of property interests between governmental entities create property rights;  they generally do not create continuing consensual relationships."  191 F.3d at 1113 (citations omitted).  The second *Montana* exception also did not apply because tribal control of state highway maintenance "was not necessary to preserve the right of the tribe to 'make their own laws and be ruled by them.'"

> The Community agreed to the right of way, and the State of Montana became responsible to maintain the road at its own expense.  Thus, the Community's assertion of authority over the State's own employees goes beyond the "internal functioning of the tribe and its sovereignty" and instead impinges on one of the State of Montana's sovereign responsibilities—maintaining Highway 66 and the right of way at its own expense.

*Id.* at 1114.  The Health District defendants argue that "[l]ike the highway in <u>King</u>, the Health District's Montezuma Creek Clinic was located on non-Indian land and was operated as a service to County residents."  (Dist. Summ. Judg. Mem. at 12.)

As to *Montana*'s second exception, the Health District defendants submit that the exception requires more than "a showing that the safety of tribal members has been jeopardized," citing *Strate*, 520 U.S. at 458-459, and that "[p]laintiffs' claims have absolutely nothing to do with internal tribal self-government"—as exemplified by *Montana*'s examples

149

of tribal powers —"but rather address their own treatment as individuals and the alleged treatment of certain patients at the Clinic."  (*Id.* at 13.)

### B.  Analysis & Conclusions re: the Navajo Court's Subject-Matter Jurisdiction in *Singer, et al. v. San Juan County, et al.*

#### 1.  *Montana &* the Plaintiffs' "Congressional Presumption"

The Part II Plaintiffs would reconcile the existing case precedent concerning tribal jurisdiction over non-Indians with the current federal policies encouraging tribal self-determination by simply discarding the case law and keeping the policies.

In *Lara*, the Supreme Court validated the essential premises underpinning the plaintiffs' "congressional presumption" theory, *viz.*, that Congress may rewrite the federal law of Indian tribal jurisdiction over nonmembers through simple legislation, and may "remov[e] the restrictions on the tribes' inherent authority" without any need to delegate federal authority to the tribes.  *Lara*, 541 U.S. at 207.  "*Oliphant* and *Duro* make clear that the Constitution does not dictate the metes and bounds of tribal autonomy, nor do they suggest that the Court should second-guess the political branches' own determinations."  *Id.* at 205.  *Lara* did not read *Montana*, *Duro* or other cases "as holding that the Constitution forbids Congress to change 'judicially made' federal Indian law through this kind of legislation."  *Id.* at 207.

The question pressed upon this court by plaintiffs' argument is whether Congress through more recent legislation has in fact "relax[ed] the restrictions imposed by the political branches on the tribes' inherent [civil] authority" articulated in *Montana* and its progeny, as plaintiffs now insist.

150

The post-*Montana* legislative acts cited by plaintiffs include the Indian Tribal Justice Act of 1993, the Indian Tribal Justice Technical and Legal Assistance Act of 2000, and Pub. L. No. 101-511's amendment to 25 U.S.C.A. § 1301(2) (2001), relaxing the implied restrictions on tribal criminal jurisdiction over nonmember Indians delineated in *Duro*. As we have already seen, these examples of recent legislation are framed in terms firmly supportive of tribal self-government and effective tribal court systems. (*See supra* at 64-73.) The legislative history of the 1993 Act cited by plaintiffs reflects this policy, *see* H.R. Rep. No. 103-205, at 5-31 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 2425-2452; H.R. Conf. Rep. No. 103-383, at 9-14 (1993); *see also* S. Rep. No. 103-88 (1993); so does the legislative history of the 2000 Act. *See* S. Rep. No. 106-219 (1999); H.R. 106-819, Part 1(2000). For example, in its 1993 Report, the Senate Committee on Indian Affairs observed:

> Tribal justice systems are critical to the maintenance and enhancement of the inherent and delegated sovereignty of tribal governments. Except when the Congress has established that federal jurisdiction is exclusive, tribal courts hear cases on virtually all aspects of governmental and private activity. The scope of tribal court jurisdiction is now becoming better understood, as several Supreme Court rulings and numerous federal court decisions have acknowledged by holding that exhaustion of tribal court remedies is required before appeals involving the exercise of jurisdiction by a tribal court can be made to federal court. In addition, when federal courts do review decisions of tribal courts, they employ the same standard of review that is applied in reviewing federal district court decisions. FMC v. Shoshone Bannock Tribes, 905 F.2d 1311, 1313 (9th Cir. 1990).

> It is the Committee's view that strong tribal justice systems are necessary both as a function of the exercise of tribal sovereignty and as a means to assure the fair and just administration of the laws enacted by tribal governing bodies and laws enacted by the Congress that require implementation by tribal governments. . . .

S. Rep. No. 103-88, at 3, 1993 WL 304728 (1993).

Yet these Acts do *not* enact into positive law any language explicitly reviving inherent tribal civil authority over non-Indians beyond the limits now set by *Montana*, *Strate*, *Atkinson*, and *Hicks*.

The 1990 amendment to 25 U.S.C.A. § 1301(2) enlarged the definition of tribal "powers of self-government" to mean "the inherent power of Indian tribes, hereby recognized and affirmed, *to exercise criminal jurisdiction over all Indians*," but it did not add the phrase "to exercise civil jurisdiction over all *persons*," or "over all members and nonmembers," or the like—which plainly would have achieved the result that plaintiffs now urge.  25 U.S.C.A. § 1301(2) (2001) (emphasis added).[143]

Neither did the 1993 Act or the 2000 Act.

This may explain why the Court did not address these statutes in deciding *Atkinson* or *Hicks*, and why no federal court of appeals to date, at least, has held that either or both of these Acts impliedly limited or overruled *Montana* and *Strate*.  Nor does the legislative history suggest that Congress intended to "adjust" or "relax" the limitations on tribal civil jurisdiction over non-Indians prescribed by *Montana* or *Strate*.  The committee reports say nary a word on the subject, and several make no reference to either *Montana* or *Strate*.  *See* H.R. Rep. No. 103-205, at 5-31 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 2425-2452; H.R. Conf. Rep. No. 103-383, at 9-14 (1993); S. Rep. No. 103-88 (1993); S. Rep. No. 106-219

---

[143]It does not appear that the issue of tribal civil jurisdiction over non-Indians under *Montana* was even on the table at that time.  *See generally* Nell Jessup Newton, *Permanent Legislation to Correct* Duro v. Reina, 17 Am. Indian L. Rev. 109 (1992) (describing process leading to the enactment of the permanent amendment to § 1301(2)); Philip S. Deloria & Nell Jessup Newton, *The Criminal Jurisdiction of Tribal Courts Over Non-Member Indians*, 38 Fed. B. News & j. 70 (1991); *see also* H.R. Rep. No. 102-61, at 7 (1991); S. Rep. No. 102-168 at 4 (1991) (describing amendment as "recogniz[ing] and reaffirm[ing] the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians"); H.R. Conf. Rep. No. 102-261 (1991).

(1999); H.R. 106-819, Part 1(2000).

In Section 2 of the Indian Tribal Justice Act of 1993, Congress made express findings concerning the importance of tribal courts:

> (5) tribal justice systems are an essential part of tribal governments and serve as important forums for ensuring public health and safety and the political integrity of tribal governments;
>
> (6) Congress and the Federal courts have repeatedly recognized tribal justice systems as the appropriate forums for the adjudication of disputes affecting personal and property rights; . . .

25 U.S.C.A. § 3601 (2001).  The Senate Committee on Indian Affairs explained the significance of these findings:

> Finding (5) was added to reflect the decision of the United States Supreme Court in the case of Montana v. United States, 450 U.S. 544 (1981), with regard to the authority of Indian tribal governments to provide for the protection of the health and safety of reservation residents and the political integrity of the tribe. From all of the testimony presented to the Committee, it is clear that tribal justice systems are an integral part of the efforts of Indian tribal governments to exercise that authority.
>
> Finding (6) was added to emphasize that tribal courts are permanent institutions charged with resolving the rights and interests of both Indian and non-Indian individuals. The language tracks similar language of the Supreme Court in its ruling in Santa Clara Pueblo v. Martinez, 436 U.S. 49, 1978, in which the Court stated that "[t]ribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians,", Id at 65.
>
> This recognition of tribal court jurisdiction and authority is found in numerous other rulings of the Supreme Court and the federal courts, See e.g., Iowa Mutual Insurance Co. v. LaPlante, 480 U.S. 9, (1987):
>
> > "although the criminal jurisdiction of the tribal courts is subject to substantial limitation, their civil jurisdiction is not similarly restricted." Id at 15;

> adjudication of reservation affairs "by any non-tribal court * * *
> infringes upon tribal law-making authority, because tribal courts
> are best qualified to interpret and apply tribal law." Id at 17; . . .

S. Rep. No. 103-88, at 8, 1993 WL 304728 (1993).  Given this reading of *Montana*, *Martinez*

and *Iowa Mutual*, Congress likely saw no need to alter the legal framework established by

those cases.

The 2000 Act incorporated Findings 5 and 6 in its own legislative findings, nearly

verbatim, without further explanation.  *See* 25 U.S.C. § 3651(5), (6) (2001).[144]  In discussing

"Civil Legal Matters," the Senate Committee on Indian Affairs made no reference to

jurisdictional questions.  S. Rep. No. 106-219, at Part B (1999).  The House Committee

Report was silent on the subject as well.  H.R. Rep. No. 106-819 Part 1 (2000).

Some scholarly commentary has suggested a legislative "fix" for the implied

divestitures by *Oliphant* and *Montana*,[145] but this court has yet to find any commentary

asserting that such a fix has already been accomplished by the existing legislation.

*Lara* certainly "gives the green light" to further consideration of such legislative

"adjustment" by the Congress, and clearly indicates that if Congress "enact[s] a new statute,

relaxing restrictions on the bounds of the inherent tribal authority that the United States

recognizes," then "that fact makes all the difference."  541 U.S. at 207.  But absent a new

statute, this court must follow the law as propounded by controlling Supreme Court

---

[144]Finding 6 of the 2000 Act amplifies the 1993 Act's Finding by noting the recognition of "tribal justice systems as the *most* appropriate forums for the adjudication of disputes affecting personal and property rights on Native lands."  25 U.S.C.A. § 3651(6).

[145]*See, e.g.*, Frank Pommersheim, *Is There a Little (or Not So Little) Constitutional Crisis Developing in Federal Indian Law?: A Brief Essay*, 5 U. Pa. J. Const. L. 271, 284-285 (2003); L. Scott Gould, *Tough Love for Tribes: Rethinking Sovereignty After* Atkinson *and* Hicks, 37 New Eng. L. Rev. 669, 674-675 (2003).

precedent, consistent with the court of appeals' mandate in this case, and exercise its

jurisdiction over "federal questions" under Article III to determine the reach of Navajo tribal

civil jurisdiction over the defendants in this case.

## 2.  The Defendants' Reading of *Montana*

The County defendants' reading of *Montana*—and even more so, *Nevada v.*

*Hicks*—suggests at least some yearning for the relative simplicity of a "bright line" test for

the reach of tribal civil jurisdiction, such as land status,[146] or status as a State or local

government official.[147]  In a similar vein, the Health District defendants read *Hicks* to say that

*Montana*'s "consensual relationship" exception "covers only private, commercial

relationships, and cannot be extended to the official actions of governmental (Health District)

officials and employees,"[148] but this seems to read *Hicks* more broadly that *Hicks* read itself:

"Our holding in this case is limited to the question of tribal-court jurisdiction *over state*

*officers enforcing state law*," thus leaving open "the question of tribal-court jurisdiction over

nonmember defendants in general," *Hicks*, 533 U.S. at 358 n.2 (emphasis added), and

likewise leaving open the question of tribal jurisdiction over state officials not directly

engaged in law enforcement activity: "We do not say state officers cannot be regulated; we

---

[146](*See* Cnty Juris. Mem. at 11 (absence of tribal ownership has been "['**]virtually conclusive of the absence of tribal civil jurisdiction**.[']" (quoting *Hicks*, 533 U.S. at 360 (emphasis supplied by County defendants))); *but cf. Hicks*, 533 U.S. at 382 & n.4 (Souter, Kennedy & Thomas, JJ. concurring) ("It is the membership status of the unconsenting party, not the status of real property, that counts as the primary jurisdictional fact," but "[l]and status, for instance, might well have an impact under one (or perhaps both) of the *Montana* exceptions." (citations omitted)).

[147](*Cf.* Cnty. Juris. Mem. at 11-14.)

[148](San Juan Health District Defendants' Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no. 496), at 3.)

say they cannot be regulated in the performance of their law enforcement duties.  Action

unrelated to that is potentially subject to tribal control depending on the outcome of *Montana*

analysis."  *Id.* at 373.  *Hicks* expressly stops short of insulating any general category of

nonmember conduct from tribal civil jurisdiction beyond its deliberately narrow holding as to

state law enforcement officers executing search warrants in investigating an off-reservation

offense.

Both Justices Ginsburg and Souter (joined by Justices Kennedy and Thomas)

recognized this limitation of the *Hicks* Court's holding in their concurring opinions, 533 U.S.

at 375-76 (Souter, Kennedy & Thomas, JJ. concurring); *id.* at 386 (Ginsburg, J. concurring),

with Justice Ginsburg penning a separate concurrence to make this precise point:

> I join the Court's opinion.  As the Court plainly states, and as Justice
> Souter recognizes, the "holding in this case is limited to the question of
> tribal-court jurisdiction over state officers enforcing state law." *Ante*, at 358, n.
> 2 (opinion of the Court); *ante*, at 376 (Souter, J., concurring).  The Court's
> decision explicitly "leave[s] open the question of tribal-court jurisdiction over
> nonmember defendants in general," *ante*, at 358, n. 2, including state officials
> engaged on tribal land in a venture or frolic of their own, see *ante*, at 19 (a
> state officer's conduct on tribal land "unrelated to [performance of his
> law-enforcement duties] is potentially subject to tribal control").
>
> I write separately only to emphasize that *Strate v. A-1 Contractors*, 520
> U. S. 438 (1997), similarly deferred larger issues.  *Strate* concerned a highway
> accident on a right-of-way over tribal land. For nonmember governance
> purposes, the accident site was equivalent to alienated, non-Indian land.  *Id.*, at
> 456. . . . But we "express[ed] no view on the governing law or proper forum"
> for cases arising out of nonmember conduct on tribal land." *Id.*, at 442.  The
> Court's opinion, as I understand it, does not reach out definitively to answer
> the jurisdictional questions left open in *Strate*.

533 U.S. at 386 (Ginsburg, J., concurring).  Nor was the point lost on our own court of

156

appeals.  *MacArthur*, 309 F.3d at 1227 n.9.[149]

An administrator's decision to discipline a skilled Physician's Assistant of long tenure for an erroneous entry on his first-ever time card in an agency where time-card errors seemingly ran rampant, or to retain a clinic office clerk as a "temporary" employee in perpetuity may be characterized in a number of ways, but cannot fairly be termed the "performance of . . . law enforcement duties."  533 U.S. at 373.  *Hicks* expressly left questions as to tribal control of such unrelated conduct to "the outcome of *Montana* analysis."  *Id.*[150]

*Strate*, *Atkinson* and *Hicks* leave essentially no room for doubt that *Montana*—with its "two prime exceptions" still intact—governs the issues now before this court on remand.

_____

[149]Footnote 9 of *MacArthur* reads:

> In another telling passage, the Court in *Hicks* stressed the narrowness of its holding: "We do not say state officers cannot be regulated;  we say they cannot be regulated in the performance of their law-enforcement duties.  Action unrelated to that is potentially subject to tribal control depending on the outcome of *Montana* analysis."  *Id.* at 373, 121 S.Ct. 2304.

In light of *Hicks*, then, *Montana Dept. of Transp. v. King*, 191 F.3d 1108 (9th Cir. 1999), cannot compel the conclusion that the Navajo Nation lacks the subject-matter jurisdiction to enforce the NPEA and other laws against non-Indian employers who, like the Health District, have satisfied *Montana* by entering into consensual relationships with employee tribal members on the Reservation.

[150]*Montana*'s first exception speaks of "nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements," 450 U.S. at 565.  Footnote 3 of *Hicks* commented that the action of a state game warden in obtaining a tribal court search warrant did not qualify "as an 'other arrangement' within the meaning of this passage," because when "[r]ead in context, an 'other arrangement' is clearly another *private consensual* relationship, from which the official actions at issue in this case are far removed."  *Hicks*, 533 U.S. at 359 n.3 (emphasis in original).

The Health District defendants read this footnote as expanding *Hicks*' narrow holding into a general rule immunizing "the official actions of governmental officials and employees" from tribal jurisdiction—a reading of *Hicks*' holding that plainly did not command the views of a majority of the Justices on the Court that decided the case, if anyone at all.

Nor does it persuade the court in this case.

### 3.  The Navajo Court's Findings of Jurisdictional Facts

In *Manygoats I*, the Navajo Supreme Court aptly observed that "jurisdiction is highly-factual.  Jurisdictional decisions in contemporary Indian affairs law are largely based upon facts going to the relationship of non-Indians with Indian nations and their members, and where certain activities took place."  *Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo 01/14/2000), at ¶ [23], *available at*

http://www.tribal-institute.org/opinions/2000.NANN.0000003.htm.[151]   According to our

_____

[151]More recently, the Navajo Supreme Court announced a higher pleading standard for jurisdiction over non-Navajos on fee land within the reservation:

> The facts the plaintiff must allege for jurisdiction over a non-Indian generally depend on the status of the land where the cause of action arose. If the case concerns tribal land the plaintiff needs only to allege specific facts showing that the cause of action arose on tribal land. See PacfiCorp v. Mobil Oil Corp., No. SC-CV-27-01, slip op. at 6 (Nav.Sup.Ct. November 24, 2003); Pfizer, No. SC-CV-01-02, slip op. at 8.

> If the cause of action arises on non-Indian owned fee land within the Navajo Nation the plaintiff has a higher burden. The plaintiff must fulfill one of the two exceptions set forth in *Montana v. United States*, 450 U.S. 544 (1981).  *Manygoats v. Cameron Trading Post*, No. SC-CV-62-00 (Nav.Sup.Ct. August 12, 2003). Under *Montana* the plaintiff must allege specific facts showing that the defendant either (1) has a consensual relationship with the Navajo Nation or its members that has a nexus to the dispute, or (2) that the defendant's conduct has a direct effect on the political integrity, economic security, or health or welfare of the Navajo Nation. *Pfizer*, No. SC-CV-01-02, slip op. at 4-5.  A bare statement that one or both of the exceptions is met, without more, is not enough.

> The high threshold of *Montana* requires, however, that district courts allow further fact finding when the plaintiff requests it. In some cases, the plaintiff might not have the evidence available to it to properly allege fulfillment of one of the *Montana* exceptions without discovery or an evidentiary hearing on the jurisdictional issues. A plaintiff might be unable to establish the fact-intensive exceptions without the ability to seek evidence from the defendant through litigation. Some evidence, such as relationships between the Nation or its members and the non-Indian defendant, or information concerning the harm the defendant's activities have on the Nation, might be in the sole possession of the defendant.  We therefore instruct the district courts that they must allow discovery or an evidentiary hearing, when properly requested, in cases concerning the *Montana* exceptions where the defendant or the court questions jurisdiction.

> Because the factual allegations necessary for jurisdiction vary depending on the status of the land, it is important that the plaintiff, at the outset, allege specific facts concerning whether the cause of action arose on tribal land or non-Indian owned fee land. A statement that the dispute

(continued...)

158

own court of appeals, "when reviewing tribal court decisions on jurisdictional issues, district courts should review tribal courts' findings of fact for clear error and conclusions of law de novo." *Mustang Production Co. v. Harrison*, 94 F.3d 1382, 1384 (10th Cir. 1996), *cert. denied sub nom. Mustang Fuel Corp. v. Hatch*, 520 U.S. 1139 (1997);[152] *accord Kerr-McGee Corp. v. Farley*, 115 F.3d 1498 (10th Cir. 1997), *cert. denied*, 522 U.S. 1090 (1998);

_____

[151](...continued)

occurs within "the Navajo Nation," or in "the territorial jurisdiction of the Navajo Nation" is no longer enough. Plaintiffs must affirmatively plead the status of the land.

*Dale Nicholson Trust v. Chavez*, No. SC-CV-69-00 (Navajo 01/06/2004) at ¶¶ [26]-[29], http://www.tribal-institute.org/opinions/2004.NANN.0000004.htm (footnotes omitted).

[152]*Mustang Production Co. v. Harrison* adopted the standard articulated by the Ninth Circuit in *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1313-14 (9th Cir. 1990), which requires deference to a tribal court's findings of fact and de novo review of its conclusions of law.

In *FMC*, the Ninth Circuit relied on the Supreme Court's decision in *National Farmers Union Insurance Co. v. Crow Tribe of Indians*, 471 U.S. 845, 856-57, 105 S.Ct. 2447, 2454, 85 L.Ed.2d 818 (1985), to determine the appropriate standard of review. Pointing to the Supreme Court's statement that "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court," *id.* at 856, 105 S.Ct. at 2454, the *FMC* court reasoned that a tribal court's factual findings should be reviewed for clear error, 905 F.2d at 1313. The Supreme Court further stated in *National Farmers Union* that mandatory exhaustion of tribal court remedies is helpful because it provides other courts with the "benefit of their expertise." 471 U.S. at 857, 105 S.Ct. at 2454. The Ninth Circuit interpreted this to mean that while federal courts may be guided by a tribal court's expertise, they have no obligation to defer to a tribal court's decision, and thus legal questions should be reviewed *de novo*. *FMC*, 905 F.2d at 1313-14.

We are persuaded by the Ninth Circuit's analysis. . . .

94 F.3d at 1384. In *Smith v. Salish Kootenai College*, 378 F.3d 1048 (9th Cir. 2004), *rehearing en banc granted*, 407 F.3d 1267 (9th Cir. May 13, 2005), the Ninth Circuit elaborated upon this standard: "However, the application of the facts to governing law is reviewed de novo as a mixed question of law and fact. See *Suzy's Zoo v. Comm'r of Internal Revenue*, 273 F.3d 875, 878 (9th Cir. 2001)." 378 F.3d at 1051 n.1. And, according to *Smith*, "The party asserting that the tribal court had jurisdiction has the burden of proving the facts necessary to support jurisdiction." *Id.* (citing *Strate v. A-1 Contractors*, 520 U.S. at 456). *But see* Alex Tallchief Skibine, *Deference Owed Tribal Courts' Jurisdictional Determination: Towards Co-Existence, Understanding, and Respect Between Different Judicial Norms*, 24 N.M. L. Rev. 191 (1994) (tribal court findings on mixed questions of fact and law should be reviewed under clearly erroneous standard).

159

*Atkinson Trading Co. v. Shirley*, 210 F.3d 1247 (10th Cir. 2000), *reversed on other grounds*,

532 U.S. 645 (2001).[153]  This court thus gives considerable deference to the Navajo court's

findings of fact concerning its own jurisdiction, and has not conducted a *de novo*

reconsideration of the evidence presented in that forum.

The Navajo Nation District Court in *Singer, et al. v. San Juan County,* Case No. SR-

CV-162-99-CV, made at least a few findings as to facts supporting the exercise of the Navajo

court's jurisdiction.  The December 28, 1999 Order began with territorial contacts and tribal

relationships, specifically, that "the area in which the subject health care facility is located is

within the territorial jurisdiction of the Navajo Nation," that "two of the three plaintiffs are

members of the Navajo Tribe of Indians, the third is married to an enrolled member; and they

ALL have significant contact with the Navajo Nation, as does the clinic itself as a major

health care provider to the Navajo and other local Native Americans . . . ."  (*Id.* at [1].)[154]

Opining that plaintiffs' claims "raise[d] issues clearly extending well beyond the mere loss of

income or loss of a job," and went "directly into the wellbeing of the plaintiffs and Navajo

Nation citizens" and "as argued by the plaintiffs, go to the soul of a person and their

---

[153]As the Tenth Circuit explained in *Atkinson*, the *National Farmers* case generally requires exhaustion of tribal remedies on jurisdictional issues in part because "the rule would encourage tribal courts to explain 'the precise basis for accepting jurisdiction' and 'provide other courts with the benefit of their expertise . . . in the event of further judicial review.' *Id.* at 857."  *Atkinson*, 210 F.3d at 1250-1251 (quoting *National Farmers*, 471 U.S. at 857).

[154]According to plaintiffs, the Navajo court found that Mrs. Singer enjoyed "a unique 'in-law' status within the Tribe," and thus comes within the scope of protection afforded by the Navajo Preference in Employment Act, *Navajo Nation Code*, title 15, §§ 601 *et seq*. (1995).  (Amended Complaint at 104.)  However, the court made no specific findings concerning Ms. Singer's compliance with the NPEA's residency requirement, *see Navajo Nation Code*, title 15, § 614(A), nor did it address the requirement that she first exhaust her administrative remedies under the NPEA before coming into court.  (*See supra* at 125-130.)

inalienable rights" which "exceeds monetary value," (*id.* at [2]), the Navajo court identified "financial harm suffered by the plaintiffs which has injured their families" as well as "harm to their reputations" as a consequence of the defendants' conduct.  (March 1, 2000 Order at 9.)

Besides causing irreparable injury to important personal interests of the individual plaintiffs, the Navajo court found that the Health District's conduct implicated important considerations of Navajo public policy concerning the welfare of Navajos in the workplace, and threatened to have a "chilling effect" on Navajos who assert employment rights protected by Navajo law.  (*Id.* at [14], [15].)

The December 28, 1999 Order explained that the plaintiffs had "also raise[d] claims that the Native American, and in particular, *Navajo patients of Montezuma Creek Clinic, have likewise been and are being harmed* by the San Juan Health Services District['s] conduct, by way of: stopping emergency and routine ambulance and EMT service; stopping laboratory services; and billing of IHS patients," that resulted in "effectively turning away many patients, including diabetic patients" from the Montezuma Creek Clinic "for fear of their inability to pay for their care."  (*Id.* at [2] (emphasis added).))  The court noted that the District had contracted with the Indian Health Service to provide health care services for Navajo tribal members, (*id.* at [12]), and found that the Health District's conduct in managing the clinic—involving factual allegations well beyond the plaintiffs' pleaded employment grievances—was endangering the health and welfare of Navajo patients, "in violation of IHS contracts and regulations" and likewise implicating key Navajo public policy concerns.  (*Id.*

161

at [16] ("the defendants have placed at risk numerous patients").)

Applying the "*Montana* exceptions," the Navajo court concluded that (1) the Health District's conduct in "seeking out and entering into contracts with Navajo citizens, within the Navajo Nation boundaries," and then violating "the Navajo Nation's customs and traditions, Bill of Rights; the Navajo Preference in Employment Act;" among others, "all with impunity," in relation to those consensual relationships, satisfied *Montana*'s first "consensual relationships" exception; and (2) "the injury sustained by the plaintiffs so specifically directly effects [sic] the health and welfare of the Navajo Nation chapters and their residents," satisfying the second "*Montana* exception."  (*Id.* at [19]-[20]).

The balance of the Navajo court's factual findings focused on the Health District's conduct toward the plaintiffs as employees and toward Navajo patients seeking medical care at the clinic.  Almost all of the Navajo court's findings of fact and conclusions of law that serve as the basis for the granting of preliminary injunctive and other equitable relief were framed solely in terms of the Health District.

The Navajo court made no specific findings of jurisdictional fact concerning San Juan County, or by name, any of the individual County or Health District defendants, with the exception of Reid Wood.  Instead, as recounted above, the March 1, 2000 Order reduced the matter to a single conclusion:

> The Court has jurisdiction over the defendants partly because they are the named parties who have committed acts within the Navajo Nation territorial boundaries, and as well because the defendants became plaintiffs by filing their counterclaims.  In accord with *Dodge v. Nakai*, 298 F. Supp. 17 (Ariz. dist. 1968) and *Clark v. Barnard*, 108 U.S. [436] (1883). This court has jurisdiction.

162

(March 1, 2000 Order at 10.)

Perhaps court and counsel assumed that all could be tarred using the same brush.

Yet Due Process—Navajo and Federal—requires much more.

### (*i*) Fred Riggs

Mr. Riggs is a Navajo living and working on the Navajo Reservation.  He enjoys all of the protections afforded by Navajo law, including the guaranties of Navajo Preference in Employment Act, and there can be no genuine doubt that he may invoke the jurisdiction of the Navajo courts to resolve disputes and remedy injuries affecting him that arise or occur within Navajo country.

### (*ii*) Allison Dickson

Like Riggs, Mr. Dickson is a Navajo living and working on the Navajo Reservation, well within the civil authority and protection of the Navajo Nation and the jurisdiction of the Navajo courts.

### (*iii*) Donna Singer

In contrast to Riggs and Dickson, Ms. Singer is not a Navajo, and at all times pertinent to the Navajo court proceeding, it remains uncontroverted that she resided outside of the Navajo Reservation.  Singer is married to a Navajo, and worked as the manager of the Montezuma Creek Clinic, located within the boundaries of the Navajo Reservation, until her employment was terminated by the Health District in December of 1998.  She has since returned to work at the clinic under new management.

Of the three plaintiffs, her jurisdictional status quickly proves to be the most

163

problematic.

Navajo culture and Navajo law affords a special status to nonmember spouses of

Navajo members.  According to *Means v. District Court*,

> While there is a formal process to obtain membership as a Navajo, see 1
> N.N.C. §§  751-759 (1995), that is not the only kind of "membership" under
> Navajo Nation law.  An individual who marries or has an intimate relationship
> with a Navajo is a *hadane* (in-law). The Navajo People have *adoone'e* or clans,
> and many of them are based upon the intermarriage of original Navajo clan
> members with people of other nations. The primary clan relation is traced
> through the mother, and some of the "foreign nation" clans include the "Flat
> Foot-Pima clan," the "Ute people clan," the "Zuni clan," the "Mexican clan,"
> and the "Mescalero Apache clan." See, Saad Ahaah Sinil: Dual Language
> Navajo-English Dictionary, 3-4 (1986).  The list of clans based upon other
> peoples is not exhaustive.  A *hadane* or in-law assumes a clan relation to a
> Navajo when an intimate relationship forms, and when that relationship is
> conducted within the Navajo Nation, there are reciprocal obligations to and
> from family and clan members under Navajo common law. . . .

*Means v. District Court of the Chinle Judicial District*, No. SC-CV-61-98 (Navajo S. Ct.

05/11/1999), at ¶ [73].  *Means* held that Russell Means, a non-Navajo "in-law"or *hadane*

residing with his Navajo wife on the Navajo Reservation had

> by reason of his marriage to a Navajo, longtime residence within the Navajo
> Nation, his activities here, and his status as a hadane, consented to Navajo
> Nation criminal jurisdiction. This is not done by 'adoption' in any formal or
> customary sense, but by assuming tribal relations and establishing familial and
> community relationships under Navajo common law.

*Id.* at ¶ [74].  *See generally*, Paul Spruhan, *Case Note:* Means v. District Court of the Chinle

Judicial District *and the Hadane Doctrine in Navajo Criminal Law*, 1 Tribal L.J.

(2000/2001), *at* http://tlj.unm.edu/articles/volume_1/spruhan/index.php.

In this case, the Navajo court referred to "Mrs. Singer in her tribal in-law status," and

observed that "[t]he Navajo clan system, *applicable to in-laws through their spouses*,

demonstrates the unique bonding of Navajo's to other Tribal members *or non-tribal members as family*, and the familial duties inherent to care for other members of the Tribal family," ostensibly as a basis for its conclusion that Singer, Riggs and Dickson had standing to raise claims alleging injury to the interests of Navajo patients of the Montezuma Creek Clinic, none of whom had been joined as parties to the lawsuit.  (December 28, 1999 Order at [12].)

As outlined above, the NPEA extends the protection of its provisions to non-Navajo spouses of Navajo members, but requires that they reside "within the territorial jurisdiction of the Navajo Nation for a continuous one-year period immediately preceding the application for Navajo preference consideration" and coverage by the NPEA's protections.  Navajo Nation Code, tit. 15, § 614(A) (1995).  On the present record, it appears that Ms. Singer had not satisfied this requirement by the time of the termination of her employment by the Health District in December of 1998.  Thus, the scope of the law's protection under the NPEA, including the "just cause" requirement, did not extend to Ms. Singer's employment as manager of the Montezuma Creek Clinic.

Whether the protection of Navajo common-law tort law encompasses Singer because of her *hazha'aad* ("in-law") status,[155] even though she did not reside within the Navajo Nation at times relevant to her claims, remains unclear under the existing reported Navajo case law, *viz.*, *Means v. District Court*.  But even assuming that it does, Navajo court jurisdiction over her claims as a non-Indian plaintiff against non-Indian defendants arising from conduct on non-Indian fee lands within and beyond the boundaries of the Navajo Nation

---

[155]The term *hadane* is generally understood to be a masculine reference; *hazha'aad* is the corresponding feminine reference.

appears to be foreclosed by controlling Supreme Court precedent.

Concerning litigation arising on non-Indian fee land within reservation boundaries where neither the tribe nor its members are involved as parties, *Strate v. A-1 Contractors* held that the "general principle" of *Montana* applies, rather than its exceptions, and a tribal court does not have jurisdiction to adjudicate the dispute between non-Indian parties.  In *Strate*, Gisela Fredericks, the non-Indian spouse of a tribal member, filed suit in tribal court against non-Indian defendants arising out of a traffic accident on a state highway right-of-way within the boundaries of the Fort Berthold Reservation in Montana. The Supreme Court held that the state right-of-way was the jurisdictional equivalent of non-Indian fee land, that *Montana* applied, and that because the lawsuit did not directly involve the tribe or its members, or any "consensual relationship" with the tribe or its members, the tribal court lacked jurisdiction over the dispute.  *Strate* also concluded that requiring a non-Indian plaintiff to pursue her claim against non-Indian defendants in state court rather than tribal court did not threaten the tribe's political integrity or self-government sufficiently to trigger *Montana*'s second exception.

*Strate v. A-1 Contractors* stands for the proposition that civil actions between non-Indian litigants arising from events occurring on non-Indian land within reservation boundaries "fall within state or federal regulatory and adjudicatory governance," and that absent express authorization by federal treaty or statute, "tribal courts may not entertain claims against nonmembers arising out of" such circumstances.  520 U.S. at 442.  In the *Strate* Court's view, neither of *Montana*'s exceptions applied to a dispute arising from a

166

highway motor vehicle accident that "is 'distinctly non-tribal in nature.'" *Id.* at 457 (quoting *Strate*, 76 F.3d 930, 940 (8th Cir. 1996) (en banc)).  The dispute itself did not arise from a "consensual relationship" with an Indian tribe or its members, and did not implicate "'the right of reservation Indians to make their own laws and be ruled by them,'" *id.* at 457, 459:

> Gisela Fredericks may pursue her case against A-1 Contractors and Stockert in the state forum open to all who sustain injuries on North Dakota's highway.  Opening the Tribal Court for her optional use is not necessary to protect tribal self-government; and requiring A-1 and Stockert to defend against this commonplace state highway accident claim in an unfamiliar court is not crucial to "the political integrity, the economic security, or the health and welfare of the [Three Affiliated Tribes]."

*Id.* at 459 (quoting *Montana*, 450 U.S. at 566) (footnotes omitted).

Based upon the Navajo court's factual findings, and even taking as true the well-pleaded factual allegations of the Amended Complaint and the "Statement of Material Fact" set forth in plaintiffs' summary judgment memorandum,[156] this court concludes that the Navajo Nation District Court did not have subject-matter jurisdiction over the Health District with respect to the employment-related claims pleaded by plaintiff Donna Singer, a non-Indian and a non-resident of the Navajo Nation.  To avail herself of the protections of the Navajo Preference in Employment Act, she must first satisfy its residency requirement affecting non-Indian spouses of tribal members,[157] and the Navajo court made no specific

---

[156](*See* Pltfs' Summ. Judg. Mem. (504), at 2-8 ¶¶ 1-27.)

[157]As written, "the Navajo Preference in Employment Act ("NPEA") included spouses of Navajos and Indians from other Indian nations in the protected classifications of the Act, but provided that only Navajos could file labor complaints with the Commission. 15 N.N.C. §§ 610(B), 614 (1995)." *Staff Relief, Inc. v. Polacca*, No. SC-CV-86-98 (Navajo S. Ct. 08/18/2000), at ¶ [21], *available at* http://www.tribal-institute.org/opinions/2000.NANN.0000003.htm ; *see* Navajo Nation Code, tit. 15, § 610(B) ("Any Navajo may file a charge . . . claiming a violation of his or her rights under the Act.").  The Navajo Supreme

(continued...)

factual findings  that Ms. Singer had satisfied that requirement as of the time she commenced

and prosecuted her action in the Navajo court.

As to Ms. Singer's common–law tort claims (*e.g.*, defamation, infliction of emotional

distress) against the non-Indian County and Health District defendants, controlling Supreme

Court precedent indicates that the Navajo court lacked subject-matter jurisdiction of her

claims against those defendants.  *See Strate*, 520 U.S. at 456-459.  Ms. Singer's *hazha'aad*

("in-law") status under Navajo common law does not alter her status as a "non-Indian" under

federal law, and where the question is whether tribal jurisdiction extends to non-Indian

litigants in a particular case, federal law governs.  Therefore, with the possible exception of

her claim against one Health District Board member, Roger Atcitty, who is an enrolled

Navajo tribal member living within Navajo Nation boundaries (*see* Amended Complaint at

106), *Strate* denies Ms. Singer the option of pursuing her employment-related claims in the

courts of the Navajo Nation because the Navajo courts lack the subject-matter jurisdiction

required to adjudicate them.  As a nonmember suing nonmember defendants located in Utah,

---

[157](...continued)

Court made short work of that anomaly: "We rectify that shortcoming by ruling that under basic principles of equal protection of law, any person who is injured by a violation of NPEA may file a claim with the Commission," including plaintiff Polacca, the non-Navajo spouse of a tribal member:

> The Navajo Nation may, at its option, deny certain benefits or privileges to non-Navajos without offending equal protection of the law, but as we have noted before, the NPEA is a general labor code.  *Arizona Public Service Co. v. Office of Navajo Labor Relations*, 6 Nav. R. 246, 248 (1990) . As such, it must be read to protect all employees within the Navajo Nation where NPEA provides protection in employment.  Accordingly, we hold that on remand, Polacca has standing to pursue his claim against SRI.

*Id.* at ¶ [22].  *Polacca* did not discuss the residency requirement of § 614(A) of the NPEA, and it does not appear that the Navajo Supreme Court has addressed § 614(A) in the five years since *Polacca* was decided.  Absent clear Navajo case authority to the contrary, this court assumes that § 614(A) continues to define when "NPEA provides protection in employment" for non-Navajo spouses of tribal members.

her remedy would lie in the Utah State courts, and if she asserts federal claims, in federal district court.

### (*iv*) San Juan County

Named as a defendant "as governing authority over the San Juan Health District and in its own right," (Navajo Ct. Cmplt. at 2 ¶ 2), San Juan County was not alleged to have directly engaged in any of the conduct resulting in Ms. Singer's termination, Mr. Rigg's diminishment in status and pay, or Mr. Dickson's continuation as something less than a full-time, permanent regular employee of the Health District.  Instead, plaintiffs allege that "San Juan County Commissioner's took steps to purposefully avoid taking responsibility for the SJHSD's acts," (*id.* at 35 ¶ 311), even though the County purportedly "can withdraw powers from any District governance board member or employee at any time under Utah Code 17A-2-1326(6)." (Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct., filed May 28, 2003), at ii.)  Other allegations appear to be quite innocuous, *e.g.*, Navajo Ct. Cmplt. at 12 ¶ 107 ("San Juan County has given SJHSD money."); *id.* at ¶ 108 ("San Juan County has expanded the number of board members from five to six and then to seven.").  The gist of plaintiffs' claim is that at the time their claims arose, the County exercised complete control over the Health District.  (*See generally* Pltfs' Summ. Judg. Mem. (504), at 2-3 ¶¶ 2-10.)

The Navajo court made very few findings concerning San Juan County itself, even then largely recounting witness testimony: "San Juan County Commissioner Mark Maryboy testified that San Juan County has a deliberate pattern of not treating the Navajo people

equally; violating the rights of Navajo and other Native American employees, and retaliation and discrimination against Navajo and other Native Americans that has continued for generations."  (December 28, 1999 Order at [15].)

Assertions such as this may provide some background and context for the plaintiffs' claims, and perhaps for the court's findings concerning the Health District's conduct, but by themselves they fail to provide a viable factual predicate for the exercise of Navajo civil jurisdiction over the County in relation to these plaintiffs' claims,[158] even apart from the application of *Montana* and its "two prime exceptions."

### (*v*) San Juan County Commissioners

Similar deficiencies weaken the Navajo court's findings of fact concerning the San Juan County Commissioners.  Plaintiffs assert that "[t]he facts of the Commissioners sitting on the District's board, financing the District, setting policy for the district, making appointments, being Directed by the County's administrator, advised by the County Attorney, all were fully resolved in Navajo Court."  (Pltfs' Summ. Judg. Mem. (504), at 3 ¶ 10.) Assuming this is so, the Navajo court made very few findings to that effect, and nowhere in the three orders did it find that "[i]n actuality, the County and District were alter egos of each other," as plaintiffs themselves assert.  (*Id.*)

The Navajo Court focused on the employment relationships between Singer, Riggs

---

[158]The Navajo court made no finding that the Health District was "at all times herein and throughout this legal action, San Juan County's alter ego," or that "San Juan County is responsible for all of SJHSD's actions" (Navajo Ct. Cmplt. at 2 ¶ 3, 33 ¶ 301'); nor did the plaintiffs or the court articulate any viable legal theory under which the County could be held vicariously liable under Navajo, state, federal or international law for the Health District's employment actions.

and Dickson and the Health District, and on the District's conduct adversely affecting those relationships to the detriment of these plaintiffs; it also addressed actions by the District that allegedly had adverse effects on Navajo patients of the Montezuma Creek Clinic. But it made virtually no findings concerning the actions of any County Commissioner, beyond global references to "the defendants" as a whole.

The Part II Plaintiffs have failed to point to facts bringing the individual San Juan County Commissioners within the subject-matter jurisdiction of the Navajo courts under either of the *Montana* exceptions, or for that matter, under Navajo tort law or the NPEA. *See* Navajo Nation Code tit. 7, § 253(B) (1995).

### (*vi*) San Juan County Attorney Craig Halls

Apparently, defendant Craig Halls, the San Juan County Attorney, was named as a defendant because he gave legal advice—or failed to give legal advice—to County and Health District officials on a range of subjects, and "held himself out as SJHSD's legal representative on January 19, 1999," at or about the time of Singer and Riggs' grievance hearings. (*See* Navajo Ct. Cmplt. (Modified) at 12-13 ¶¶ 109-122; *id.* at 37 ¶¶ 313-316.) Plaintiffs allege that Halls "had a responsibility to ensure that the San Juan Personnel and Policies adhered to the NPEA and Utah Code 17A-2-601 [through] -603," and to "inform the San Juan Service District's trustees of SJHSD's noncompliance with NPEA and the Utah Special District Personnel Management employment laws," (*id.* at 12-13 ¶¶ 115-116), but "purposely avoided any responsibility for SJHSD's actions after being appraised [sic] of their violations of statutes on January 19, 1999." (*Id.* at 37 ¶ 315.)

171

The December 28, 1999 Order recites that District administrator Rick Bailey testified "that he relied on Craig Halls' advice to proceed as her grievance hearing officer anyway," even though Bailey "had actually participated in the decision to terminate Ms Singer." (December 28, 1999 Order at [6].)  The Navajo court makes no further findings concerning Halls, other than the global reference to "the defendants."  Plaintiffs do not point to any facts in the Navajo court record that would serve as a basis for the exercise of tribal civil jurisdiction over Halls either under Navajo law or the *Montana* exceptions.  (*See* Pltfs' Summ. Judg. Mem. (504), at  2-8 ¶¶ 1-27.)

### (*vii*) County Administrator Richard "Rick" Bailey

Plaintiffs alleged that as San Juan County administrator and "San Juan Health District CEO," Bailey committed "Malfeasance in Office" by failing to inform the Health District Board that defendant Reid Wood had "made material misrepresentations to him," and that "by doing little or nothing to rectify the claims of the plaintiffs," Bailey "has endangered the financial well being of SJHSD, and the public safety, health and welfare of the Navajo Nation surrounding Montezuma Creek Clinic."  (Navajo Ct. Cmplt. (Modified) at 38-39 ¶¶ 321-322, 327.)  They further allege that "Mr. Bailey issued grievance decision letters for Mrs. Singer and Mr. Riggs a) without clear charges, b. without clearly identified evidence to justify Mr. Woods' actions, c. without mentioning NPEA; and, d. without referencing the mandates of Utah's Special District Personnel Management Act among other acts."  (*Id.* at 38 ¶ 326.)

In addition to the reference to Bailey's testimony quoted above, the Navajo court

172

found that "Rick Bailey told Ms. Singer that she was viewed as an 'enemy to the hospital' (December 28, 1999 Order at [7]); and in the March 1, 2000 Order, the court recounts that "the person who initiated the termination process, was also the grievance hearing officer (unbeknown to Singer) and admitted he had a problem with being so[,] thinking that it was improper for him to proceed by his own judgment[,] but did nonetheless," with apparent reference to Bailey.  (March 1, 2000 Order at 7.)  But the court makes no other findings as to Bailey, and offers no explanation of the basis for exercising Navajo civil jurisdiction over Bailey individually, in contrast to the Health District itself.

### (*viii*) Summary re: the County Defendants

As summarized above, the Navajo court orders are essentially devoid of findings of jurisdictional fact as to San Juan County, its named defendant Commissioners, the County Attorney, or Mr. Bailey.  Plaintiffs' counsel hotly disputes the County defendants' characterization of the County's role in the Health District's affairs, but the plaintiffs fail to marshal the evidentiary facts that would vindicate the Navajo court's conclusion that it had subject-matter jurisdiction over the County defendants, in contrast to the plaintiffs' former employer, the Health District.  (*See* Pltfs' Summ. Judg. Mem. (504), at 2-10 ¶¶ 1-27.)  Nor does *subject-matter* jurisdiction over the *County* defendants arise from the filing of a counterclaim solely against a non-Indian litigant by "the defendants"—a counterclaim that is pleaded solely in terms of injuries to and relief sought by the Health District alone.  (*See* "Answer to Complaint for Damages and Counterclaim, filed June 23, 1999, in *Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court,

Shiprock District), at 28-42 ¶¶ 1-70, *available in* Pertinent Parts Navajo Ct. R. ("Complaint for Damages" Tab).)[159]

While this court declines to adopt the County defendants' view of the governing law after *Nevada v. Hicks*, it does not require a strained reading of the controlling precedents to conclude that the Navajo court lacked subject-matter jurisdiction over San Juan County, the County Commissioners, the County Attorney, and County administrator Bailey, based upon the limited fact findings made by that court.  The Navajo court did not identify any consensual relationship between any County defendant and the Navajo Nation and its members that would satisfy *Montana*'s first exception.  Nor did it find facts showing conduct on the part of any County defendant that threatened or had some direct effect on the political integrity, the economic security, or the health or welfare of the Navajo Nation.[160]

Remembering that "[t]he District Courts of the Navajo Nation shall have original jurisdiction over . . . [a]ll civil actions in which the defendant is a resident of Navajo Indian Country, or has caused an action to occur within the territorial jurisdiction of the Navajo

---

[159]Filing of pleadings asserting affirmative claims may reflect a litigant's submission to the *in personam* jurisdiction of the forum court, but it cannot confer *subject-matter* jurisdiction that the court would not otherwise have.  *Cf. Finley v. United States*, 490 U.S. 545, 559 (1989) ("A party beyond the reach of a federal court's process may voluntarily submit to its jurisdiction over his person, but he cannot create subject-matter jurisdiction—by waiver, estoppel, or the filing of a lawsuit—over a non-Article III case."); *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) (parties cannot confer subject-matter jurisdiction on federal court by consent, estoppel, or waiver, but "[n]one of this is true with respect to personal jurisdiction.").  "One of the most basic principles of our jurisprudence is that subject-matter jurisdiction cannot be conferred upon a court by consent of the parties." *Gosa v. Mayden*, 413 U.S. 665, 707 (1973) (Marshall, Brennan & Stewart, JJ.,dissenting).

[160]The plaintiffs have failed to sustain their burden to establish the requisite jurisdictional facts.  *See, e.g.*, *Smith v. Salish Kootenai College*, 378 F.3d 1048, 1051 n.1 (9th Cir. 2004) ("The party asserting that the tribal court had jurisdiction has the burden of proving the facts necessary to support jurisdiction." (citing *Strate v. A-1 Contractors*, 520 U.S. at 456)), *rehearing en banc granted*, 407 F.3d 1267 (9th Cir. May 13, 2005).

174

Nation," *Navajo Nation Code*, tit. 7, § 253(B) (1995), the Navajo court made no findings of fact as to individual residence or any specific conduct on the part of the named individual County defendants that "has caused an action"—or any injury to plaintiffs Riggs or Dickson—"to occur within the territorial jurisdiction of the Navajo Nation."

The same cannot be said for the San Juan Health Services District.

### (*ix*) San Juan Health Services District

"[S]ued as the employer of the plaintiffs and, at all time herein and throughout this legal action, San Juan County's alter ego," (Navajo Ct. Cmplt. at 2 ¶ 3), the Health District stands out as the primary target of the plaintiffs' claims, the Navajo court's factual findings, and the relief granted to plaintiffs in the three orders now at issue.

In its December 28, 1999 Order, the Navajo court found that the Health District was an "employer" covered by the NPEA; that the District had violated the NPEA's requirements in several respects by the actions it had taken with respect to Singer and Riggs, and otherwise; that the District had denied Dickson full-time permanent status in violation of its own policies; that the District's wrongful conduct was causing irreparable injury to plaintiffs Singer, Riggs and Dickson and to their relationships with their families and community; that other conduct by the District unrelated to plaintiffs' employment threatened serious injury to the interests of Navajo patients seeking health care at the Montezuma Creek Clinic, to whom the District was legally obligated to provide services under its contract with the Indian Health Service; and that plaintiffs had presented sufficient evidence to warrant issuance of preliminary injunctive and other equitable relief.  (December 28, 1999 Order, *passim*.)

175

The Navajo court found both *Montana* exceptions to have been satisfied by the Health District's conduct: (1) the conduct of the District in "seeking out and entering into contracts with Navajo citizens, within the Navajo Nation boundaries," and then violating "the Navajo Nation's customs and traditions, Bill of Rights; the Navajo Preference in Employment Act;" among others, "all with impunity," comes within *Montana*'s "consensual relationships" exception, and (2) that "the injury sustained by the plaintiffs so specifically directly effects [sic] the health and welfare of the Navajo Nation chapters and their residents pursuant to the *Montana* exceptions." (*Id.* at [19]-[20].)  The Navajo court thus found that the District entered into "consensual relationships with the tribe['s] . . . members, through . . . contracts, . . . or other arrangements," *Montana*, 450 U.S. at 565, by employing the Navajo plaintiffs, Riggs and Dickson, during its reign at the Montezuma Creek Clinic. (*See* December 28, 1999 Order at [20].[161])

In this setting, "The 'consensual relationship' with Navajos is an employer-employee one, and employment is a contract." *Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. 01/14/2000), at ¶ [45].  Remembering that *Atkinson* "requires that the . . . regulation imposed by the Indian tribe have a nexus to the consensual relationship itself," 532 U.S. at 656, "Such a nexus clearly exists here.  The regulation at

---

[161]According to that court, "[t]he defendants" failed to show how the District

can benefit itself . . . by *voluntarily seeking out and entering into contracts with Navajo citizens, within the Navajo Nation boundaries*, and then treat the Navajo Nation's customs and traditions; Bill of Rights; *the Navajo Preference in Employment Act; the Utah merit system requirements*, and [IHS] contract obligations, all with impunity, and believe that the district is somehow immune from claims injury; . . .

(*Id.* at [20] (emphasis added).)

issue is the NPEA, which governs the terms and conditions of *employment* of Navajo workers

on the Nation's territory. The relevant consensual relationship is an *employment contract*

between Cameron and its Navajo workers; therefore, the nexus requirement is met."

*Manygoats v. Atkinson Trading Co., Inc.*,  No. SC-CV-62-2000 (Navajo S. Ct. 08/12/2003),

at ¶ [41] (emphasis in original).

Indeed, "Regardless of the selection criteria or method used to create it, the employer-

employee relationship is a contractual relationship."  1 Mark A. Rothstein, et al., *Employment*

*Law* § 1.27, at 112 (2d ed. 1999).  Like Navajo law, Utah law recognizes the contractual

nature of employment relationships, including employment "at will": "Under Utah law, an

employment relationship entered into for an indefinite period of time is presumed to be

at-will and gives rise to *a contractual arrangement* where the employer or the employee may

terminate the employment for any reason, except as provided by law." *Rackley v. Fairview*

*Care Centers, Inc.*, 2001 UT 32, ¶ 12, 23 P.3d 1022, 1026 (emphasis added) (citing *Ryan v.*

*Dan's Food Stores, Inc.*, 972 P.2d 395, 400 (Utah 1998); *Fox v. MCI Communications Corp.*,

931 P.2d 857, 859 (Utah 1997); *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 53-55 (Utah 1991);

*Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989); *Bihlmaier v. Carson*, 603

P.2d 790, 792 (Utah 1979)).

> [W]hen a contract for employment or personal services does not recite a fixed
> term, the law in Utah does not call for the judicial reformation of the contract
> to impose a term, especially where, as here, neither party disputes the contract
> was of indefinite duration. Indeed, in a case in which we traced the historical
> development of the law associated with employment contracts, we specifically
> noted that courts long ago repudiated a common law rule under which a term
> was implied when an employment contract did not specify a duration.  *Berube*
> *v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1040-41 (Utah 1989).  In its place,

courts in Utah and elsewhere adopted *the at-will employment rule*, under which employment contracts that did not specify a duration were generally presumed to be terminable at will.  *Id.* at 1041. In time, Utah recognized an exception under which an employee could rebut the at-will presumption associated with indefinite-length contracts by showing the parties intended the contract be terminable for cause.  *Johnson*, 818 P.2d at 1000-01 & n. 9; see also *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 54 (Utah 1991). Significantly, nothing in *Johnson*, *Brehany*, or *Berube* suggests that a court should sua sponte impose a term on an indefinite-length employment contract that provides for termination for cause.

*Uintah Basin Medical Center v. Hardy*, 2002 UT 92, **21,  54 P.3d 1165, 1170 (emphasis added & footnote omitted).[162]  *See, e.g., Francisconi v. Union Pacific R. Co.*, 2001 UT App 350, ¶ 9, 36 P.3d 999, 1002 ("Because Francisconi's *employment contract* with Union Pacific did 'not have a specified term of duration,' it is presumed to be an at-will arrangement." (emphasis added)).[163]

In Utah, "An at-will employee may overcome the at-will presumption by showing, among other things, that: ""*a statute or regulation restricts the right of an employer to terminate an employee under certain conditions*;"" *Rackley v. Fairview Care Centers, Inc.*, 2001 UT 32, at ¶ 13, 23 P.3d at 1026 (quoting *Burton v. Exam. Ctr. Indus. & Gen. Med. Clinic, Inc.*, 2000 UT 18, ¶ 6, 994 P.2d 1261 (quoting *Fox*, 931 P.2d at 859)) (emphasis

---

[162]The *Hardy* opinion noted that "[a]lthough *Berube* was a plurality opinion, a majority of the court concurred in the portion of the opinion that traced the historical development of the common law of employment contracts."  2002 UT 92, at ¶ 21 n.8, 54 P.3d at 1170 n.8.

[163]It appears that the Health District has resisted this concept in the past, as reflected in their written employment policies.  (*See* Navajo Ct. Cmplt. at Exh. 18 ("5.6  At Will Termination.  The hiring of an employee (whether full-time, part-time, or short-term) is not a contractual relationship between San Juan Health Care Services and the employee, and either party may terminate the employment relationship at will.").)

added).[164]  The NPEA may be just such a statute, because its effects are at least two-fold: the

NPEA imposes specific regulatory restrictions on employer conduct, enforceable by the

ONLR and the Labor Commission; it also writes "the requirements of the Act" into all

employment contracts "as affirmative contractual obligations of the contracting parties."

Navajo Nation Code, tit. 15, § 609(A) (1995).  Riggs and Dickson's employment contracts

would thus include the NPEA's "just cause" and formal notice requirements, among other

terms defining their relationships with the District.

　　　　*Montana* reaffirms that the Navajo Nation has inherent civil authority over contractual

relationships between non-Indians and tribal members, even as to activities on non-Indian fee

land within its boundaries.  Employment contracts simply represent one species of

"consensual relationship" within *Montana*'s first exception.  So the employment of Riggs and

Dickson satisfies *Montana*'s first exception and establishes the subject-matter jurisdiction of

the Navajo Nation and the Navajo courts over Riggs and Dickson's employer, the San Juan

Health Services District, as to the District's conduct of those contractual employment

relationships—at least as to cognizable civil claims arising from those relationships.[165]

---

　　　　[164]Utah cases have consistently held that there is "an implied covenant of good faith and fair dealing in
either at-will or other sorts of employment contracts."  *Dubois v. Grand Central*, 872 P.2d 1073, 1078 (Utah Ct.
App.1994).  As is true of other contracts, implied covenants of good faith and fair dealing cannot create "new,
independent rights or duties not agreed upon by the parties"; nor can implied covenants "change an indefinite term,
at-will employment contract into a contract that requires an employer to have good cause to justify a discharge."
*Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991).  Thus, any "just cause" requirement must arise from some
other legal source.

　　　　[165]It is unclear, *e.g.*, that Navajo law recognizes a common-law cause of action for "wrongful hiring," (*see*
Navajo Ct. Cmplt. at 22-23 ¶¶ 215-220), that would hold the District liable to the plaintiffs because "[b]ut for the
hiring of Mr. Wood, the employee plaintiffs may never have been harmed."  (*Id.* at 22 ¶ 217.)  *Hicks* clearly holds
that Indian tribal courts lack jurisdiction to entertain claims under 42 U.S.C.A. § 1983, 533 U.S. at 366-369, but the
import of that ruling for the claims of Riggs and Dickson remains unclear.  *Cf. MacArthur*, 309 F.3d at 1218 n.2.

*See United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d

901 (9th Cir. 1994).

Under the Navajo Supreme Court's reasoning in the *Manygoats* opinions, the

District's employment of Navajo members—here, plaintiffs Riggs and Dickson—also

implicates the exercise of tribal power "necessary to protect tribal self-government or to

control internal relations," *Montana*, 450 U.S. at 564.  The protection of tribal members'

interests in continuing employment finds its place among those core interests well within the

scope of the Navajos' right "to make their own laws and be governed by them," *Hicks*, 533

U.S. at 361.  That right must include the tribe's sovereign "police" power to protect the

health, safety and welfare of its constituents.  *See Arizona Public Service Co. v. Office of*

*Navajo Labor Relations*, No. A-CV-08-87 (Navajo S. Ct. 10/08/1990), at ¶¶ [102], [104]

("The Navajo nation, as a sovereign, at all times retains the power to protect the health,

welfare and safety of its citizens, using police power," and the NPEA "is traditional

employment and civil rights legislation well within the police power of the Navajo Nation.");

*id.* at ¶ [108] ("Among the purposes of NPEA is the protection of the health, safety and

welfare of Navajo workers.  15 N.T.C. § 602(a)(6).").  *Montana*'s second exception for

conduct that "threatens or has some direct effect on . . . the economic security, or the health

or welfare of the tribe" echoes these same police power concerns.[166]

---

[166]The Senate Committee on Indian affairs reads *Montana* this way.  25 U.S.C.A. § 3601(5) reflects "the decision of the United States Supreme Court in the case of Montana v. United States, . . . with regard to *the authority of Indian tribal governments to provide for the protection of the health and safety of reservation residents* and the political integrity of the tribe.  From all of the testimony presented to the Committee, it is clear that tribal justice systems are an integral part of the efforts of Indian tribal governments to exercise that authority." S. Rep. No. 103-

(continued...)

The Navajo Supreme Court has declared that "the overriding authority of the Navajo Nation to protect its workers is essential to the economic interests of the Navajo Nation. . . . Employment is a vital right, and the power to regulate employment relations is essential to the Navajo Nation's economic interests. " *Staff Relief, Inc. v. Polacca*, No. SC-CV-86-98 (Navajo S. Ct. 08/18/2000), at ¶¶ [23], [24], *available at* http://www.tribal-institute.org/opinions/2000.NANN.0000003.htm.  "[T]he Navajo Nation retains the right and the duty to protect its members, the public at large, and its territory," and the Navajo Nation Council "recognized that the regulation of employment relations and the protection of workers are essential when it adopted the Navajo Preference in Employment Act. See, 15 N.N.C. § 602(A)(6)." *Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. 01/14/2000), at ¶ [47].  In the Navajo Supreme Court's view, "Those are among the most important government powers generally," *id.*, a view that would find widespread acceptance well beyond the Navajo Nation's boundaries.

In a tribal community that depends so heavily on the wage economy, regulation of the terms and conditions of Navajo employment and protection of the employment security of tribal members finds its footing in governmental interests certainly no less significant than the tribe's interest in regulation of consumer credit transactions—and the Supreme Court vindicated *exclusive* Navajo jurisdiction over consumer credit transactions between tribal members and non-Indians in *Williams v. Lee*, decided in 1959.  *Williams v. Lee* and more recently, *Iowa Mutual* recognized that "[a]djudication of such matters by any non-tribal court

---

[166](...continued)
88, at 8, 1993 WL 304728 (emphasis added).

also infringes upon tribal law-making authority, because tribal courts are best qualified to interpret and apply tribal law." *Iowa Mutual*, 480 U.S. at 16.[167]  This is no less true of tribal employment laws today than it was of tribal consumer credit laws in 1959, or now.

This court is satisfied that the Navajo Nation and the Navajo courts have inherent civil authority and adjudicative jurisdiction over the Health District under *Montana*'s second exception as well.

Based upon the inherent authority of the Navajo Nation as an Indian nation, the recognition of its authority in the Navajo Nation's 1868 Treaty with the United States of America, and the 1933 Act enlarging the boundaries of the Navajo Reservation to include, *inter alia*, the land on which the Montezuma Creek Clinic now sits, this court concludes that the Navajo Nation District Court had subject-matter jurisdiction of plaintiffs Riggs and Dickson's claims against the San Juan Health Services District arising from their respective employment relationships at that facility.  *See Montana v. United States*, 450 U.S. at 565-566; *Manygoats v. Cameron Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. 01/14/2000), at ¶ [40]; *Manygoats v. Atkinson Trading Co., Inc.*,  No. SC-CV-62-2000 (Navajo S. Ct. 08/12/2003) at ¶¶ [41], [43]-[44];  Navajo Nation Code, tit. 7, § 253(B) (1995).

---

[167]*See Winer v. Penny Enterprises, Inc.*, 2004 ND 21, 674 N.W.2d 9 (2004) (state court lacks subject matter jurisdiction over non-Indian motorist's action against Indian motorist to recover for injuries sustained in automobile accident on state highway within exterior boundaries of Indian reservation; "If *Strate* signals a drastic departure from the state court jurisdictional principles enunciated in *Williams v. Lee* and its progeny, it is well hidden in the *Strate* decision." ¶ 18, 674 N.W.2d at 16).

### (*x*)  Health District Board Members

Besides naming the Health District as a defendant, plaintiffs joined the individual members of the District's governing board, either in their official capacity or in both their official and individual capacities.[168]  The Navajo court's orders do not discuss the individual Board members at all, apart from the global reference to "the defendants."  Nor do plaintiffs point to any facts in the Navajo court record that would serve as a basis for the exercise of civil jurisdiction under *Navajo Nation Code* § 253(B) over those non-Navajo Board members who were sued in their individual capacity.  (*See* Pltfs' Summ. Judg. Mem. (504), at 2-8 ¶¶ 1-27; cf. Navajo Ct. Cmplt (Modified) at 13-15 ¶¶ 123-125, 128-129, 148; *id.* at 35-37 ¶¶ 308-309(a)-(h); *id.* at 39 ¶ 336.)

The relevant provisions of the Navajo Preference in Employment Act may govern the conduct of plaintiffs' *employer*, the Health District, but the NPEA says nothing about extending liability under its remedial provisions to individual directors or trustees governing an "employer" entity.  *See* Navajo Nation Code, tit. 15, §§ 603(C) ("employer" defined); *id.* at § 604(8) ("All employers shall not penalize, discipline, discharge or take action against any Navajo employee without just cause.").  Nor have plaintiffs identified any other cognizable claim for which the non-Navajo Board members may be haled into tribal court under § 253(B).

The controlling case authority in this Circuit counsels that district courts should give

---

[168]The original defendant Board members included Commissioner Bill Redd, Commissioner J. Tyron Lewis, Roger Atcitty, Karen Adams, John Lewis, Commissioner Mark Maryboy (official capacity only), and Patsy Shumway (official capacity only). (S*ee* Navajo Ct. Cmplt. at 2-3 ¶¶ 4-7, 12-14, 16; Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct., filed May 28, 2003), at iii-iv.)

considerable deference to a tribal court's findings of fact on jurisdictional issues, but such deference becomes purely academic where no findings were made.  Plaintiffs offer no assistance in this regard, leaving this court with no basis to conclude otherwise than that the Navajo court lacked subject-matter jurisdiction over the non-Indian Board member defendants.

### (*xi*) Roger Atcitty

The court also concludes that the Navajo court had exclusive subject-matter jurisdiction over plaintiffs' claims against defendant Roger Atcitty based upon his tribal membership and his residence.  The Navajo court's subject-matter jurisdiction over Roger Atcitty, an enrolled Navajo tribal member living within Navajo Nation boundaries, (*see* Amended Complaint at 106), raises no *Montana* issue, and would clearly be established by § 253(B) of Title 7 of the *Navajo Nation Code*—had the court made specific factual findings to that effect.  Navajo Nation Code, tit. 7, § 253(B) (1995) ("The District Courts of the Navajo Nation shall have original jurisdiction over . . . [a]ll civil actions *in which the defendant is a resident of Navajo Indian Country*, . . ." (emphasis added)).  Absent such findings, it nevertheless appears that the requisite jurisdictional facts concerning Atcitty are uncontroverted.  Thus, this court concludes that the Navajo court had *exclusive* subject-matter jurisdiction of the claim(s) of Singer, Riggs and Dickson against him, insofar as the claim(s) arose within the boundaries of the Navajo Reservation, and insofar as the claim(s) actually exist.  *See Fisher v. District Court of the Sixteenth Jud. Dist.*, 424 U.S. 382, 386-389 (1976); *Williams v. Lee*, 358 U.S. 217, 220-223 (1959).

184

### (*xii*) Lauren "Laurie" Schafer

Plaintiffs sued Lauren ("Laurie") Schafer as "SJHSD Personnel Director of Nursing," (Navajo Ct. Cmplt. (Modified) at 3 ¶ 11), apparently on the theory that "Mrs. Schafer acted in concert with Mr. Woods and Mrs. Nielsen to harm the defendants," in three alleged particulars:

> 342.   Mrs. Schafer knew Mrs. Singer was not a dishonest person and did nothing to help her.
>
> 343.   Mrs. Schafer knew Mr. Wood's charge of fraud for Mr. Riggs and Mrs. Singer was false.
>
> 344.   Mrs. Schafer could have helped provide a pre-discharge and pre-discipline hearing for Mrs. [S]inger and Mr. Riggs, but did not.

(*Id.* at 40 ¶¶ 342-2-345; *see id.* at 6 ¶ 39 ("Mrs. Schafer knew Mrs. Singer had many serious and weighty matters to attend to at Montezuma Creek Clinic as part of her employment position and yet did nothing to put the time card mistake into the perspective of a reasonable person, and did nothing to prevent her discharge.").)

The Navajo court orders discuss none of this, referring instead to "[a] letter from Lauren Schafer critical of Ms. Singer" that had been kept in a file in the District CEO's office, and to Schafer's testimony that "after a 'scrupulous examination' of Singer's record for over nine months, Ms. Schafer had not discovered one piece of evidence as to Ms. Singer's intent to commit fraud."  (December 28, 1999 Order at [10]; *accord* March 1, 2000 Order at 7 (same).)

It remains a mystery what Schafer did that purportedly "caused an action to occur within the territorial jurisdiction of the Navajo Nation," *Navajo Nation Code*, tit. 7, § 253(B),

bringing her within the civil jurisdiction of the Navajo court as a defendant sued in her individual capacity—particularly with respect to the claims of plaintiffs Riggs and Dickson. For their part, plaintiffs offer little or no assistance in resolving that question.  (*See* Pltfs' Summ. Judg. Mem. (504), *passim*.)[169]

It appears that the few facts bearing upon Ms. Schafer's relationship to *Singer, et al. v. San Juan County, et al.*, that may be gleaned from the orders and plaintiffs' memoranda had to do with plaintiff *Singer*'s wrongful discharge claims.  And if Ms. Singer was not properly before the Navajo court, then the plaintiffs' allegations concerning Schafer are entirely irrelevant.  Absent factual findings bringing Schafer within the jurisdiction of the Navajo court under *Navajo Nation Code*, tit. 7, § 253(B), there is no need to apply the *Montana* exceptions before concluding that the Navajo court lacked subject-matter jurisdiction over Ms. Schafer.

### (*xiii*) Reid Wood

Named as a defendant in his capacity as "interim" and then "permanent" Health District CEO, Reid Wood was a central character in the events recounted above that form the factual basis for plaintiffs Singer, Riggs and Dickson's employment-related claims.  (*See supra*, at 12-26.)  It was Wood who took adverse action against Singer and Riggs based upon the "time card" errors that occurred in November of 1998, terminating Singer and

---

[169]Apparently plaintiffs' notion—unhampered by bothersome concepts of duty, breach of duty, and causation—was that Ms. Schafer should be held jointly and severally liable to all three plaintiffs for *$18,000,000* in compensatory and punitive damages for failing to intervene on Ms. Singer's behalf in the adverse employment action taken by other Health District administrators that led to Singer's termination from employment.  (*See* Navajo Ct. Cmplt. (Modified) at 42-45 ("Prayer for Relief").)  Plaintiffs offer *no* explanation why Ms. Schafer should be held liable to Riggs or Dickson for $1.00, let alone $12,000,000.00.  *See* Navajo R. Civ. P. 11.

disciplining Riggs by placing him on "probation."  It was Wood who allegedly made various comments that the plaintiffs found to be demeaning.  And it is Wood who was the one individual defendant about whose conduct the Navajo court made findings as to culpability, *viz.*, that he had denied the plaintiffs due process and equal protection in taking adverse action based upon "the phony fraud charge that still maliciously clouds Mr. Riggs' and Ms. Singer's name," ostensibly resulting in actual, even "irreparable injury" to the plaintiffs. (December 28, 1999 Order at [15].)  Wood is also the one to whom a remark comparing Navajo Certificates of Indian Blood to "dog tags" was attributed—a comparison the Navajo court found to be reprehensible.  (*See* March 1, 2000 Order at 8 ("something this Court would prefer to the evidence on only one time – in its life time").)

It seems apparent that the Navajo court found that Wood was properly before that court, at least on plaintiffs' civil rights claims and on Singer and Riggs' defamation claims arising from the "time card" controversies.  (*See also* March 1, 2000 Order at 9 (defendants failed to "recognize, much less rectify, the harm to [plaintiffs'] reputations").)  The legal and factual basis for asserting tribal civil jurisdiction over Wood's alleged "dog tag" remark is far less apparent.[170]

Based upon the record now before this court, the court is not persuaded that the

---

[170]The potential imposition of civil damages liability on Wood for what Dickson described as "racially insensitive remarks" (ONLR Complaint of Allison Dickson at 1, *available in* Pertinent Parts Navajo Ct. R. ("ONLR Complaint" Tab)), itself raises questions under the free speech clause of the Indian Civil Rights Act, 25 U.S.C.A. § 1302(1) (2001) ("No Indian tribe in exercising powers of self-government shall— (1) make or enforce any law . . . abridging the freedom of speech").  In contrast to a defamatory statement, Wood's remark published no false statement of fact to others concerning Dickson or any other person.  *See generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974).  Liability for intentional infliction of emotional distress may also require more than proof of "insensitivity" or tastelessness of the speech at issue in order to overcome the free speech guaranty.  *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46 (1988).

Navajo court's preliminary finding concerning Wood's "phony fraud charge," (*viz.*, that his "malicious" characterization of Riggs and Singer's time-card errors as "fraud" may constitute actionable defamation that caused injury to plaintiff Riggs' reputation), is "clearly erroneous."  To that extent, at least, this court concludes that the Navajo Nation District Court had subject-matter jurisdiction over defendant Wood for the purpose of plaintiff Riggs' defamation claim.

The Navajo court's findings concerning Dickson's employment status claims afford no discernable basis for asserting subject-matter jurisdiction over Wood as an individual defendant for purposes of adjudicating those claims; in essence, Dickson's employment claim amounts to contractual dispute with the District itself.  (*See* December 28, 1999 Order at [8]-[9].)[171]

**(*xiv*) Summary**

Based largely upon the findings of jurisdictional fact made by the Navajo Nation District Court in its orders in *Singer, et al. v. San Juan County, et al.*, this court concludes that the Navajo court had subject-matter jurisdiction over the San Juan Health Services District for the purposes of adjudicating at least some of plaintiffs Riggs and Dickson's employment-related claims against the District as their employer, consistent with the *Navajo Nation Code* and controlling Supreme Court precedent.  This court concludes that the Navajo court likewise had subject-matter jurisdiction of Riggs' defamation claim against the District

---

[171]The Navajo court made no findings of jurisdictional fact concerning any other claim Riggs or Dickson may have had against Wood personally, as distinguished from their claims against the District, that would satisfy Navajo Nation Code, tit. 7, § 253(B).

and Wood, (*see* Navajo Ct. Cmplt. at 23-24 ¶¶ 222-223, 228), and of Singer, Riggs and

Dickson's claims against defendant Atcitty.

### C.  Navajo Court Judgments in the Federal Courts

#### 1.  Comity vs. Full Faith and Credit

In their Amended Complaint, by motion—and at one point, by petition for a writ of

mandamus—the Part II Plaintiffs have raised the question of what degree of recognition

should be afforded to orders of the Navajo courts.  As the court of appeals explained, they

> seek enforcement of the Navajo court injunction under Full Faith and Credit
> Clause of the Constitution or, in the alternative, comity principles.  Under the
> Full Faith and Credit Clause,
>
>> Full Faith and Credit shall be given in each State to the public
>> Acts, Records, and judicial Proceedings of every other State.
>> And the Congress may by general Laws prescribe the Manner in
>> which such Acts, Records and Proceedings shall be proved, and
>> the Effect thereof.
>
> U.S. Const. art.  IV, § 1.  Full faith and credit principles are also in place as a
> matter of statute:
>
>> Such Acts, records, and judicial proceedings or copies thereof,
>> so authenticated, shall have the same full faith and credit in
>> every court within the United States and its Territories and
>> Possessions as they have by law or usage in the courts of such
>> State, Territory or Possession from which they are taken.
>
> 28 U.S.C. § 1738.  According to appellants, tribes historically have been
> viewed as territories of the United States.  In fact, Supreme Court cases point
> in opposing directions.  *Compare United States ex rel. Mackey v. Coxe,* 59
> U.S. (18 How.) 100, 103, 15 L.Ed. 299 (1855) (holding that the Cherokee
> Nation was a "territory" for purposes of a federal letters of administration law),
> *with New York ex rel. Kopel v. Bingham,* 211 U.S. 468, 474-75, 29 S.Ct. 190,
> 53 L.Ed. 286 (1909) (citing, with approval, *Ex Parte Morgan,* 20 F. 298, 305
> (W.D.Ark.1883), which held that the Cherokee Nation was not a "territory"
> within the meaning of the federal extradition statute).  *See generally Wilson v.*

189

> *Marchington,* 127 F.3d 805, 808-09 (9th Cir.1997) (discussing the issue at length and ultimately holding that neither the Full Faith and Credit Clause nor 28 U.S.C. § 1738 is applicable to tribal judgments).

309 F.3d at 1225.  The court of appeals did not decide the merits of this issue because the Part II Plaintiffs had not raised it before this court prior to the filing of their interlocutory appeal.  *Id.*  Instead, it proceeded upon "the assumption that the Navajo Nation injunction is enforceable in federal court as a matter of comity."  *Id.*

Following remand to this court, plaintiffs Singer, Riggs and Dickson amended their pleadings to say that they "now seek to have the orders enforced under principals [sic] of full faith and credit, or in the alternative, comity," (Amended Complaint at 115), and urge that of the two approaches, full faith and credit should apply.[172]  They subsequently filed a Rule 56 motion to that same effect,[173] as well as a petition for a writ of mandamus filed first with the court of appeals,[174] and later, with the United States Supreme Court.  (*See* Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct., filed May 28, 2003), at 22 ("WHY FULL FAITH AND CREDIT IN FEDERAL COURTS

---

[172](*See* Plaintiffs' Briefing on *Montana*, filed February 13, 2003 (dkt. no. 492), at 10-11; "Federalism and Article III Court Limitations in Defining Navajo Tribal Court Jurisdiction" [unsigned original document submitted by plaintiffs' counsel], filed February 24, 2003 (dkt. no. 502), at 16-17 & n.21.)

[173](*See* Plaintiffs' Motion for Summary Judgment for Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and Response of the District and County's Briefs and Motions for Summary Judgment [& Memorandum in Support], filed February 28, 2003 (dkt. no. 504).)  Among other things, plaintiffs point to references to "territory" or "territories" in the *Revised Statutes of the United States* dealing with Indian tribes. (*See* Exh. J in Pltfs' 12/19/03 Compendium A/B, *excerpting* 1 Charles J. Kappler, *Indian Affairs: Laws and Treaties* 3-20 (2d ed. 1904), *available at* http://digital.library.okstate.edu/kappler/Vol1/HTML_files/AFF0003A.html.)

[174](*See* Pltfs' Mandamus Pet.)

SHOULD APPLY").)[175]  The defendants, in turn, have responded that "to the extent the tribal

court's orders can be enforced in federal court, it is only through principles of comity."  (San

Juan Health District Defendants' Memorandum Regarding Subject Matter Jurisdiction and in

Support of Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no.

497), at 28.)

As the court of appeals indicated, the existing case law on the degree of recognition to

be afforded Indian tribal court judgments by the federal courts seemingly "points in opposing

directions."  Cohen's *Handbook* originally took the position that "[t]he decisions of Indian

tribal courts, rendered within their jurisdiction and according to the forms of law or custom

recognized by the tribe, are entitled to full faith and credit in the courts of the several states,"

relying primarily on two Eighth Circuit cases, *Standley v. Roberts*, 59 F. 836, 845 (8th Cir.

1894), *appeal dismissed*, 166 U.S. 1177 (1896), and *Raymond v. Raymond*, 83 F. 721, 722

(8th Cir. 1897).  Cohen, *Handbook* (1942 ed.) at 145 & nn. 209-210; *id.* at 275 & nn. 73-74

(same).  But the 1982 revision of that work explained that the question whether 28 U.S.C.A.

§ 1738 "includes Indian tribes has resulted in conflicting decisions of state courts," citing *Jim

v. CIT Financial Services Corp.*, 87 N.M. 362, 533 P.2d 751 (1975) (§ 1738 includes Indian

tribes), *In re Buehl*, 87 Wash. 2d 649, 555 P.2d 1334 (1976) (citing *Jim*), and *Brown v.

Babbitt Ford*, 117 Ariz. 192, 571 P.2d 689 (Ct. App. 1977) (§ 1738 does not include Indian

---

[175]In their Supreme Court mandamus petition, Plaintiffs asserted that "Full Faith and Credit will allow
Tribal injunctions for emergencies and endangerment to life, to be rapidly carried out"; otherwise, "[a]ll Tribal
rulings in conformity with limits of the statutes, as obligated by Treaty and BIA-judicial program contract, and
official Executive agency action, are *ipso facto*, worthless in a non-Indian Utah Federal Court, as shown by this
case."  (*Id.* at 22, 23 (footnote omitted).)

tribes); that "[t]he Supreme Court construed the term territory in an earlier statute to include

Indian tribes," and that "other federal decisions have reached the same conclusion," citing

*United States ex rel. Mackey v. Coxe*, 59 U.S. (18 How.) 100, 103 (1856), and three Eighth

Circuit cases circa 1984, including *Standley v. Roberts*.  *Handbook* (1982 ed.) at 385 & nn.

47-49.[176]  But the treatise does not take a decisive stance: "Tribal laws in matters within a

tribe's jurisdiction are entitled to recognition outside reservation boundaries either as a matter

of comity or full faith and credit."  *Id.* at 246 (footnotes omitted).

     *Standley* does not reflect what now appears to be the prevailing view:

>      The majority of the state and tribal courts that have considered the
> question have concluded that Indian tribes do not constitute "Territories" or
> "Possessions" within the meaning of the Full Faith and Credit Act.  As for the
> states, only two-Idaho and New Mexico-have held that the term "Territories,"
> as used in the Full Faith and Credit Act, is "broad enough to include Indian
> tribes."  In these states, the judgments of tribal courts must be accorded full
> faith and credit by state courts, and vice versa.  However, most states decline

---

[176]*See also Mehlin v. Ice*, 56 F. 12, 19 (8th Cir. 1893); *Exendine v. Pore*, 56 F. 777 (8th Cir. 1893); *Cornells v. Shannon*, 63 F. 305 (8th Cir. 1894); *Raymond v. Raymond*, 83 F. 721 (8th Cir. 1897).  As one recent commentary explains:

> [T]he Eighth Circuit decided several similar cases, each involving collateral attacks to tribal court judgments.  These included *Mehlin v. Ice*, *Exendine v. Pore*, *Standley v. Roberts*, and *Cornells v. Shannon*.  In *Mehlin* and *Exendine*, which were argued in the same term and decided in 1893, the Eighth Circuit concluded that judgments of the Cherokee Nation "are on the same footing with the proceedings and judgments of the courts of the territories of the Union, and are entitled to the same faith and credit."  In *Cornells*, a Muscogee (Creek) Nation judgment was also construed equivalent to judgments of the territorial courts, to be afforded the same respect and the same faith and credit.  Likewise, the *Standley* decision recognized the validity of a Choctaw quiet title action.  Curiously, none of these early cases pursues the analogy of tribes to territories so as to reach the precise question of whether full faith and credit was due tribal court judgments under the general full faith and credit statute, 28 U.S.C. § 1738.  These opinions nonetheless indicate that by the turn of the last century, federal courts treated tribal court judgments with the same respect as those of any other court within the federal union.

Stacy L. Leeds, *Cross-Jurisdictional Recognition and Enforcement of Judgments: a Tribal Court Perspective*, 76 N.D. L. Rev. 311, 319-320 (2000) (footnotes omitted); *see also Raymond v. Raymond*, 83 F. 721, 722 (8th Cir. 1897) (judgment of Cherokee courts "entitled to all the faith and credit accorded to the judgments and decrees of territorial courts").

to accord full faith and credit to tribal court judgments, except when required
to do so by federal law.  Indeed, a "majority of state courts that have
considered the question have opted for comity," finding that tribes are not
territories for the purposes of full faith and credit.

Steven J. Gunn, *Compacts, Confederacies, and Comity: Intertribal Enforcement of Tribal Court Orders*, 34 N.M. L. Rev. 297, 303 (2004) (footnotes omitted).  As Judge Canby recently explained:

> Some state courts have simply given full faith and credit.  E.g., In re Buehl, 87 Wash.2d 649, 555 P.2d 1334 (1976).  Others, while denying the applicability of the full faith and credit clause, have nevertheless given full effect to tribal judgments or decrees as a matter of "comity."  E.g., In re Lynch's Estate, 92 Ariz. 354, 377 P.2d 199 (1962); Matter of Marriage of Red Fox, 23 Or.App. 393, 542 P.2d 918 (1975); Wippert v. Blackfeet Tribe, 201 Mont. 299, 654 P.2d 512 (1982).  Federal courts have done the same.  See, e.g., AT & T Corp. v. Coeur d'Alene Tribe, 295 F.3d 899, 903 (9th Cir. 2002).  A few states have legislated or adopted court rules on the subject; South Dakota, for example, permits recognition of tribal judgments as a matter of comity if a list of conditions is met, including impartiality of the tribal proceedings. S.D. Cod. Laws 1-1-25; see Red Fox v. Hettich, 494 N.W.2d 638 (S.D. 1993).  Other state statutes or rules vary greatly in the degree to which the condition recognition of tribal court judgments. . . .

William C. Canby, Jr., *American Indian Law in a Nutshell* 227 (4th ed. 2004).

New Mexico and Idaho have addressed the question fairly recently, adopting the view
that Indian tribes are "territories" or "possessions" within the meaning of 28 U.S.C.A. §
1738.  *See Halwood v. Cowboy Auto Sales, Inc.*, 124 N.M. 77, 79-82, 946 P.2d 1088, 1090-
1093 (Ct. App. 1997) (Navajo court "award of punitive damages against a non-Indian for
conduct occurring on a Navajo reservation is entitled to full faith and credit in New Mexico
courts"), *cert. denied*, 123 N.M. 626, 944 P.2d 274 (1997); *Jim v. CIT Financial Services*

*Corp.*, 87 N.M. 362, 363,  533 P.2d 751, 752 (1975);[177] *Sheppard v. Sheppard*, 104 Idaho 1,

655 P.2d 895 (1982) (adopting full faith and credit approach to tribal court orders).  Several

state courts have expressly declined to extend full faith and credit to tribal orders, judgments

and decrees.  *See In re Day*, 272 Mont. 170, 900 P.2d 296, 301 (1995); *Brown v. Babbitt*

*Ford, Inc.*, 571 P.2d 689, 694 (Ariz. Ct. App. 1977) (holding that the "word 'territory' as

used in 28 U.S.C. § 1738 was not intended to apply to [Indian tribal governments]");

*Desjarlait v. Desjarlait*, 379 N.W.2d at 144  (holding that Full Faith and Credit Clause

applies only to states, not tribes); *Fredericks v. Edie-Kirschmann Ford*, 462 N.W.2d 164

(N.D. 1990) (same); *Lohnes v. Cloud*, 254 N.W.2d 430, 433 (N.D. 1977) (same).

"Numerous states have, by case law, statute, or court rule, expressly adopted comity

as their policy for the recognition and enforcement of tribal court decisions. Among these

states are Arizona, Connecticut, Michigan, Minnesota, Montana, New Jersey, North Dakota,

Oklahoma, Oregon, South Dakota, Washington, Wisconsin, and Wyoming."  Gunn,

---

[177]In *Jim*, the New Mexico Supreme Court announced its agreement "with the dissenting opinion of Judge Hernandez" of the New Mexico Court of Appeals "insofar as he held that the laws of the Navajo Tribe of Indians are entitled by Federal Law, 28 U.S.C. § 1738, to full faith and credit in the courts of New Mexico because the Navajo Nation is a 'territory' within the meaning of that statute. Cf. *Mackey et al. v. Coxe*, 59 U.S. (18 How.) 100, 15 L.Ed. 299 (1855); . . ." 87 N.M. at 363,  533 P.2d at 752.  Citing *Standley*, Judge Hernandez had concluded that the Navajo code provisions governing repossession of consumer goods

> were a legitimate exercise of the authority residing in the Navajo Tribe to which we should accord full faith and credit. To do so would not only constitute compliance with § 1738, *supra*, but would also constitute compliance with those authorities that have given full faith and credit to the judgments and orders of the courts of several of the Indian Tribes.  See *Standley v. Roberts*, 59 F. 836 (8th Cir. 1894); *Mehlin v. Ice*, 56 F. 12 ([8th Cir.] 1893); *Cornells v. Shannon*, 63 F. 305 (8th Cir. 1894).

*Jim v. CIT Financial Services Corp.*, 86 N.M. 784, 792, 527 P.2d 1222, 1230 (Ct. App. 1974) (Hernandez, J., dissenting).

194

*Compacts, Confederacies, and Comity*, at 303 n.43.[178]

Congress has enacted legislation mandating the "full faith and credit" recognition of tribal court judgments and orders in very specific contexts.[179]  As noted above, the Indian Child Welfare Act of 1978, Pub. L. No. 95-608, Title I, § 101, 92 Stat. 3069, 3071 (1978), *codified at* 25 U.S.C.A. § 1911(d) (2001), requires the "United States, every State, every territory or possession of the United States, and every Indian tribe" to "give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and

---

[178]*See, e.g.,* Okla. Stat. tit. 12, § 728 (permitting the Supreme Court of the State of Oklahoma to extend full faith and credit to tribal court judgments); Wis. Stat. § 806.245 (granting full faith and credit to judgments of Wisconsin Indian tribal courts); Wyo. Stat. Ann. § 5-1- 111 (granting full faith and credit to judicial decisions of the Eastern Shoshone and Northern Arapaho Tribes of the Wind River Reservation); *Desjarlait v. Desjarlait*, 379 N.W.2d 139 (Minn. Ct. App. 1985); *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D. 1985); *Wippert v. Blackfeet Tribe*, 654 P.2d 512 (Mont. 1982); *Malaterre v. Malaterre*, 293 N.W.2d 139 (N.D. 1980); *Red Fox v. Red Fox*, 542 P.2d 918 (Or. Ct. App. 1975); *In re Lynch's Estate*, 377 P.2d 199 (Ariz.1962).
Plaintiffs cite to Utah Code Ann. 9-9-209 (2003) as having some bearing upon the question:

**9-9-209.   Tribal ordinance or custom given full force and effect.**
Any tribal ordinance or custom adopted by an Indian tribe, band, or community in the exercise of any authority that it may possess shall, if not inconsistent with any applicable civil law of the state, be given full force and effect in the determination of civil causes of action.

But this provision, read in context, governs in situations in which the State of Utah has assumed jurisdiction over Indian country pursuant to Public Law 280, Pub. L. No. 83-280, 67 Stat. 588 (1953), as amended by the Indian Civil Rights Act of 1968 to require tribal consent.  *See* Utah Code Ann. §§ 9-9-201 through 9-9-213 (2003); Pub. L. No. 90-284, Title IV, §§ 401-406, 82 Stat. 78-80 (1968), codified at 25 U.S.C.A. § 1321-1326 (2001).  Utah has never assumed jurisdiction over the portion of the Navajo Reservation in Utah, so the provisions of Utah Code Ann. §§ 9-9-201 *et seq.* have no relevance to this case.

[179]*See* Maine Indian Claims Settlement Act of 1980, Pub. L. No. 96-420, § 6, 94 Stat. 1785 (1980), *codified at* 25 U.S.C.A. § 1725(g) (2001); Indian Land Consolidation Act, Pub. L. No. 97-459, § 208, 96 Stat. 2517 (1983), *codified at* 25 U.S.C.A. § 2207 (2001); National Indian Forest Resources Management Act, Pub. L. No. 101-630, Title III, § 307, 104 Stat. 4532, 4537 (1990), *codified at* 25 U.S.C.A. § 3106(c) (2001); American Indian Agricultural Resource Management Act, Pub. L. No. 103-177, Title I, § 103, 107 Stat. 2011, 2015 (1993), *codified at* 25 U.S.C.A § 3713(c) (2001); Violence Against Women Act, Pub. L. No. 103-322, Title IV, § 40221a, 108 Stat. 1930 (1994), *codified at* 18 U.S.C.A. § 2265 (2000 & Supp. 2005) (full faith and credit for tribal court domestic violence protection orders); Full Faith and Credit for Child Support Orders Act, Pub. L. No. 103-383, 108 Stat. 4063 (1994), *codified at* 28 U.S.C.A. § 1738B (Supp. 2005).

credit to the public acts, records, and judicial proceedings of any other entity." The Utah

courts have acknowledged this, at the same time that they indicate that full faith and credit

recognition does not generally apply to tribal court judgments:

> Although Indian tribes and nations *are not states whose judgments are entitled
> per se to full faith and credit*, ICWA specifically directs that "every State . . .
> shall give full faith and credit to the . . . judicial proceedings of any Indian
> tribe applicable to Indian child custody proceedings to the same extent that
> such entities give full faith and credit to the ... judicial proceedings of any
> other entity." 25 U.S.C.A. § 1911(d) (West 2001). Accordingly, *as required by
> statute*, the child custody orders rendered by the Tribal Court *are entitled to
> full faith and credit*, so long as they comply with the requirements of the
> [Utah] Foreign Judgment Act.

*Searle v. Searle*,  2001 UT App 367, ¶ 24, 38 P.3d 307, 314-315 (2001) (emphasis added &

footnote omitted).

In *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997), *cert. denied*, 523 U.S. 1074

(1998), the Ninth Circuit reasoned that these congressional enactments granting "full faith

and credit" recognition in specific contexts indicate that Indian tribal court judgments or

tribal laws do not routinely command such recognition under 28 U.S.C.A. § 1738: "Because

Indian nations are not referenced in the statute, the question is whether tribes are 'territories

or possessions" of the United States under the statute. The United States Supreme Court has

not ruled on the precise issue and its pronouncements on collateral matters are inconclusive. .

. ." 127 F.3d at 808.  "In our view," the *Wilson* court explained, "the decisive factor in

determining Congress's intent was the enactment of subsequent statutes which expressly

extended full faith and credit to certain tribal proceedings:"

> If full faith and credit had already been extended to Indian tribes, enactment of
> the Indian Land Consolidation Act, the Maine Indian Claims Settlement Act,

196

and the Indian Child Welfare Act would not have been necessary.  Further, the separate listing of territories, possessions and Indian tribes in the Indian Child Welfare Act provides an indication that Congress did not view these terms as synonymous.  Thus, we conclude that Congress did not extend full faith and credit to the tribes under 28 U.S.C. § 1738.

Further, if Congress had specifically intended to include Indian tribes under the umbrella of 28 U.S.C. § 1738, it could have easily done so either by specifically referencing them in the 1804 amendments, or by further amending the statute once ambiguous judicial constructions appeared.  It chose not to, but rather elected to create a special exception in cases of Indian child custody determinations and land trusts.

127 F.3d at 809.  "Given this history," the Ninth Circuit concluded, "it would be imprudent

of us to now construe the phrase 'territories and possessions' in the 1804 statute to assume

the meaning of the language Congress used in the Indian Child Welfare Act ('every territory

or possession of the United States, *and every Indian tribe*') (emphasis added) . . . ."  *Id.* at

809.

Certainly, there are policy reasons which could support an extension of full faith and credit to Indian tribes.  Those decisions, however, are within the province of Congress or the states, not this Court.  Full faith and credit is not extended to tribal judgments by the Constitution or Congressional act, and we decline to extend it judicially.

*Id.* (footnote omitted).

"Like their state court counterparts," and the Ninth Circuit in *Wilson*, "most tribal

courts have concluded that the full faith and credit doctrine is not applicable in Indian

country."  Gunn, *Compacts, Confederacies, and Comity*, at 304.[180]

---

[180] *But see Eberhard v. Eberhard*, 24 Indian L. Rptr. 6059 (Cheyenne River Sioux Tribal Ct. App. 1997) (§ 1738's reference to "any court of any such State, Territory or Possession" is "a geographic, rather than political, designation"), *excerpted in* Robert N. Clinton, Carole E. Goldberg & Rebecca Tsosie, *American Indian Law: Native Nations and the Federal System* 269-83 (4th ed. 2003).

(continued...)

197

In particular, the "Navajo Nation Court of Appeals articulated the prevailing tribal view when it stated that Indian tribes 'stand beyond the bounds of [the] rule of [full faith and credit], such as it presently exists and governs the constitutional relationships of the states of the United States.'" *Id.* (quoting *In re Guardianship of Chewiwi*, 1 Navajo Rptr. 120, 125 (Navajo Ct. App. 1977)).  In 1977, the Navajo Court of Appeals wrote:

> It should not be necessary for this court to remind anyone that Indian nations and tribes were not signatories to the United States Constitution and were not intended to be included within the scope of the mandate of Article IV, Section 1.  Nor does Title 28, United States Code, Section 1738, which was written to effectuate the mandate of Article IV, Section 1, provide a clear guide to the relationship between Indian courts.
> . . . .
> It is our opinion that 28 U.S.C. 1738 does not purport to govern the relationship between Indian courts. The constitutional provision upon which it is based did not envision Indian courts being in existence nor did the act itself. The status of the decisions of Indian courts is generally determined not in relation to "full faith and credit", but to the concept of the exclusive jurisdiction of each Indian court over certain matters, sanctioned by federal law and United States Supreme Court decisions.
>
> We think, rather, that the issue presented when the decision of any state or Indian court is presented to the courts of the Navajo Nation for enforcement is one of comity. Navajo court will honor and enforce foreign judgments upon consideration of the right of the foreign court to issue the judgment, of the propriety of the proceeding, and of any relevant public policy of the Navajo Nation.

*In re Guardianship of Chewiwi*, 1 Navajo Rptr. 120 (Navajo Ct. App. 1977), at ¶¶ [38], [41]-[42], *available at* http://www.tribal-institute.org/opinions/1977.NANN.0000003.htm;[181]

---

[180](...continued)

[181]The Navajo court distinguished *Jim* on the ground that "the real issue presented by the facts of that case related to the conflicts of law doctrine. The Supreme Court determined that, under New Mexico's Uniform

(continued...)

*accord Yazza v. Smith*, No. SC-CV-21-99 (Navajo 2001), *available at*

http://www.tribal-institute.org/opinions/2001.NANN.0000004.htm (applying principles of

comity, not full faith and credit, to enforcement of state court order); *Rough Rock Community*

*School v. Navajo Nation*, No. SC-CV-06-94 (Navajo 1996) (same),[182] *available at*

http://www.tribal-institute.org/opinions/1996.NANN.0000014.htm;  *Anderson Petroleum*

*Servs., Inc. v. Chuska Energy & Petroleum Co.*, 4 Navajo Rptr. 187 (Navajo D. Ct. 1983)

(same).  These cases make it plainly apparent that the Navajo courts have rejected the view

now urged by Singer, Riggs and Dickson, *viz.*, that the Navajo Nation is a "territory" of the

United States within the meaning and scope of § 1738 and subject to "full faith and credit"

recognition.[183]

      The question of recognition of tribal court judgments in state, federal and other tribal

courts has been the subject of considerable academic analysis, criticism and debate.[184]  More

---

[181](...continued)

Commercial Code, parties to a contract may determine which law, given the applicability of more than one, shall govern." *Id.* at ¶ [39].

[182]"The Navajo Nation law of recognition of foreign court decisions, statutes or acts of state (also known as "public acts") is comity. *in re Guardianship of Chewiwi*, 1 Nav. R. 120, 126 (1977); *Anderson Petroleum Serv., Inc. v. Chuska Energy & Petroleum Co.*, 4 Nav. R. 187, 189-91 (W.R. Dis. Ct. 1983); *Pela v. Peabody Coal Co.*, No. A-CV18-89, slip op. at 16-17 (decided September 28, 1990). Under the Navajo Nation doctrine of comity, a foreign statute, court decision or public act must comply with Navajo Nation public policy." *Id.* at ¶ [21].

[183]The plaintiffs' argue that "this Court can sustain, under principals [sic] of full faith and credit, the Navajo Court Orders as an exercise of 'inherent sovereign' rights," because the Navajo Nation is a federal "territory" under § 1738 by virtue of Congress' plenary power over Indian affairs. (Plaintiffs' Motion for Summary Judgment for Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and Response of the District and County's Briefs and Motions for Summary Judgment [& Memorandum in Support], filed February 28, 2003 (dkt. no. 504), at 10; "Plaintiffs' Briefing on *Montana*," filed February 13, 2003 (dkt. no. 492), at 10-11.)

    These propositions appear to be contradictory only because they really are contradictory.

[184]*See, e.g.*, Stacy L. Leeds, *Cross-Jurisdictional Recognition and Enforcement of Judgments: a Tribal*

(continued...)

recently, a 2004 symposium presented by the *University of New Mexico Law Review*

(Volume 34, No. 2, Spring 2004) addressed enforcement of tribal court judgments from

several perspectives.[185]  Consensus among scholars and judges on this question seems a

distant prospect at best.  Those advocating full-faith-and-credit recognition emphasize the

enforcement of tribal court judgments in state and federal courts; "most of the scholarship

advocating adoption of a comity model focuses on the obligation of tribal courts to enforce

federal or state judgments."  Robert N. Clinton, Carole E. Goldberg & Rebecca Tsosie,

*American Indian Law: Native Nations and the Federal System* 293 (4th ed. 2003).

In this case, the *MacArthur* panel assumed (without deciding) that the view reflected

in the Navajo precedents and a majority of the other jurisdictions that have considered it is

the correct one.  For their part, the defendants have aligned themselves with that view, citing

*Wilson*.

The "Indian Territory" cases like *Standley* did not construe § 1738, and if extended

beyond their specific historical context, they may be read too broadly— illustrating the perils

---

[184](...continued)
*Court Perspective*, 76 N.D. L. Rev. 311 (2000); Robert N. Clinton, *Comity & Colonialism: the Federal Courts' Frustration of Tribal<-- -->Federal Cooperation*, 36 Ariz. St. L.J. 1 (2004); Philip S. Deloria & Robert Laurence, *Negotiating Tribal-State Full Faith and Credit Agreements: The Topology of the Negotiation and the Merits of the Question*, 28 Ga. L. Rev. 365 (1994); Paul E. Frye, *Lender Recourse in Indian Country: a Navajo Case Study* 21 N.M. L. Rev. 275, 314-318 (1991); William V. Vetter, *Of Tribal Courts and "Territories": Is Full Faith and Credit Required?*, 23 Cal.W.L.Rev. 219 (1987); Note, *Recognition of Tribal Decisions in State Courts*, 37 Stan. L.Rev. 1397, 1414 (1985); Fred Ragsdale, *Problems in the Application of Full Faith and Credit for Indian Tribes*, 7 N.M.L. Rev. 133 (1977).

[185]*See, e.g.*, Gunn, *Compacts, Confederacies, and Comity*; Robert Laurence, *Tremors: Justice Scalia and Professor Clinton Re-shape the Debate over the Cross-boundary Enforcement of Tribal and State Judgments*, 34 N.M. L. Rev. 239 (2004); Kelly Stoner & Richard A. Orona, *Full Faith and Credit, Comity, or Federal Mandate? A Path That Leads to Recognition and Enforcement of Tribal Court Orders, Tribal Protection Orders, and Tribal Child Custody Orders*, 34 N.M. L. Rev. 381 (2004); among others.

of generalization in a field in which history so often proves decisive.[186]   Nevertheless, these cases remain matters of some consequence in this circuit: because the Eighth Circuit Court of Appeals of the 1890s handled appeals from the District of Utah and nearby districts that were later incorporated into the Tenth Circuit, its cases have binding precedential effect in this District, unless and until they are overruled by the Tenth Circuit.  *See, e.g.*, *1st Nat. Credit Corp. v. Von Hake*, 511 F.Supp. 634, 641 n.7 (D. Utah 1981).[187]   Neither the Tenth Circuit nor the Eighth Circuit have expressly overruled *Standley* or the other 1890s "Indian Territory" cases on this point.

This court has explored the question in some detail, first because the plaintiffs have pressed the issue since the remand,[188] but even more so to indicate that resolution of the full faith and credit vs. comity issue in this circuit will require something more than the rote application of *Wilson v. Marchington*'s reading of § 1738.

---

[186]*See* Vine Deloria, Jr., *Indian Law and the Reach of History*, 4 J. Contemp. L 1 (1978); Vine Deloria, Jr., *Laws Founded in Justice and Humanity: Reflections on the Content and Character of Federal Indian Law*, 31 Ariz. L. Rev. 203 (1989).

[187]In *Von Hake*, this court noted that

under the Evarts Act, or Circuit Court of Appeals Act of 1891, Act of March 3, 1891, [c. 517,] 26 Stat. 826, federal courts of appeals were established in nine designated  circuits. Utah was located in the Eighth Circuit under that scheme. In 1929, Utah was transferred to the newly created Tenth Circuit pursuant to the Act of February 28, 1929, c. 363, 45 Stat. 1346, where it has since remained. This Court is, as a general rule, required to follow the decisions of the Court of Appeals for this Circuit, 1B Moore's Federal Practice P 0.402(1) at 61-62 & nn. 28-30 (2d ed. rev. 1980), whatever its numerical designation may be or have been.

*Id.*

[188]Plaintiffs' counsel has pressed the issue here and elsewhere.  (*See, e.g.*, Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct., filed May 28, 2003), at 22; Reply Brief to Respondent San Juan Health Services District's Brief in Opposition, filed July 30, 2003, 2003 WL 22428215, at *3-*6.)

Though the Part II Plaintiffs have now raised the question of enforcement of the three orders at issue both as a matter of full faith and credit or comity, this court need not decide *which* of these doctrines govern recognition of Navajo court judgments.  Under either approach—and absent specific legislative mandate to the contrary—this court is *not* required to enforce interlocutory, non-"final" orders of the Navajo courts.

### 2.  Full Faith and Credit, Comity & the Problem of Non-Final Judgments

According to the second *Restatement of Conflict of Laws*, "A judgment will not be recognized or enforced in other states insofar as it is not a final determination under the local law of the state of rendition."  *Restatement (Second) of Conflict of Laws* § 107 (1971).  This general rule "applies to non-final judgments, whether at law or in equity," and "judgments where the amount of recovery is uncertain," *id.* § 107 cmt. a, concerning which the *Restatement* says this: "A judgment for the payment of money will not be enforced in other states unless the amount to be paid has been finally determined under the local law of the state of rendition."  *Id.* § 108.

The rationale for this rule is simple and straightforward:

> A judgment will not be given greater effect abroad than it enjoys at home.  A judgment will not have the force of res judicata in the state of rendition as to issues that remain subject to final determination.  The judgment should neither be recognized nor enforced in other states as to such issues. . . .

*Id.* § 107 cmt. b.

The rule of §§ 107 and 108 applies between jurisdictions under the Full Faith and Credit Clause: "While not explicit in Article IV, section 1, only judgments that are both valid

and final generally are entitled to full faith and credit." *Matter of Estate of Jones*, 858 P.2d

983, 985 (Utah 1993) (citing *New York ex rel. Halvey v. Halvey*, 330 U.S. 610, 614 (1947)).

> To be "valid," for purposes of full faith and credit, a judgment must
> have been rendered by a court with competent jurisdiction and in compliance
> with the constitutional requirements of due process.
> . . . .
> The second requirement for full faith and credit is that the judgment be
> final according to the laws of the state of rendition.  See *Halvey*, 330 U.S. at
> 614, 67 S.Ct. at 906; *Thorley v. Superior Court*, 78 Cal.App.3d 900, 144
> Cal.Rptr. 557, 561 (1978) (citing Restatement (Second) of Conflicts of Laws, §
> 107 (1971)); *Andre*, 106 Idaho at 462, 680 P.2d at 1362.

*Id.* at 985, 986.

The *Restatement* view has found general acceptance and recent application, including

application to foreign judgments for which recognition was sought under principles of

comity.  *See, e.g.*, *Rash v. Rash*, 173 F.3d 1376, 1380 (11th Cir. 1999); *Korea Water*

*Resources Corp. v. Lee*, 115 Cal. App. 4th 389, 402, 8 Cal. Rptr. 3d 853, 862 (Ct. App. 4th

Dist. 2004); .*Cahaly v. Benistar Property Exchange Trust Co., Inc.*, 268 Conn. 264, 275, 842

A.2d 1113, 1120 (2004).  For example, in *Bianchi v. Savino Del Bene Intern. Freight*

*Forwarders*, 329 Ill. App. 3d 908, 925, 264 Ill. Dec. 379, 393, 770 N.E.2d 684, 698 (2002),

an action brought by a former employee seeking to discover the employer's assets in aid of

enforcement of an Italian judgment for wrongful termination was dismissed because the

Italian judgment did not determine the actual amount of money owed to the former employee

as damages, and was therefore unenforceable in Illinois under the *Restatement* rule.

In federal courts, preliminary injunctions are inescapably interlocutory: "The grant or

denial of a preliminary or temporary injunction does amount to an adjudication of the

ultimate rights in controversy and is not conclusive on the parties or the court in subsequent

proceedings."  19 Fed. Proc. L. Ed. *Injunctions and Restraining Orders* § 47:34 (footnote

omitted) (citing *Williams v. Eaton*, 443 F.2d 422 (10th Cir. 1971), among others.)  "'The

preliminary injunction was by its very nature interlocutory, tentative and impermanent.'"

*United States ex rel. Bergen v. Lawrence*, 848 F.2d 1502, 1512 (10th Cir. 1988) (quoting

*Madison Square Garden Boxing, Inc. v. Shavers*, 562 F.2d 141, 144 (2d Cir. 1977)).

And a finding of a "likelihood of success on the merits" under either Fed. R. Civ. P.

65 or Navajo Rule 65 does not equate with the conclusive determination of the merits

reflected in a final judgment.  Even the statement that the plaintiffs "stand more than an

excellent prospect of success in prevailing on the merits in these proceeding[s] given the

presentation and testimony to date" proves to be tentative and inconclusive, particularly

where "the plaintiffs need 'only show that they have raised questions going to the merits so

serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus

for more deliberate investigation' . . . ." (December 28, 1999 Order at [16], [18] (quoting *Tri-

State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351,

358 (10th Cir. 1986)).

"As the term is used in the Restatement, . . . a judgment is not a final judgment if

further judicial action by the court rendering the judgment is required to resolve the matter

litigated."  *Restatement (Second) of Conflict of Laws* § 107 cmt. a.  The *Restatement*

prescribes that "[t]he local law of the state of rendition determines whether or not a judgment

is final and, if not, what issues remain subject to final determination."  *Id.* § 107 cmt. c.

### 3.  Final Judgments Under Navajo Law

Rule 65 of the Navajo Rules of Civil Procedure governs preliminary injunctions, and largely parallels the corresponding Federal Rule 65.  Neither Rule contemplates the entry of a final order or final judgment under its provisions for "preliminary" relief; that subject is covered elsewhere.  *See* Fed. R. Civ. P. 54, 58; Navajo R. Civ. P. 54, 58(a).[189]

The *Navajo Nation Code* defines a "judgment":

> In all civil cases, judgment shall consist of an order of the court awarding money damages to be paid to the injured party, or directing the surrender of certain property to the injured party, or the performance of some other act for the benefit of the injured party or a declaration of rights of the moving party.

Navajo Nation Code, tit. 7, § 701(A) (1995).  It also directs that "[t]he judge shall render judgment in accordance with the verdict of the jury and existing law."  Navajo Nation Code, tit. 7, § 702 (1995).  Appeals in the Navajo courts are taken from "final judgments" and "final

---

[189]Navajo R. Civ. P. 54 reads:

**54(a) Judgment.** Except for default judgments, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled.  A default judgment shall not be different in kind or exceed the amount requested in the prayer for relief.

**54(b) Multiple Claims or Multiple Parties.**  During a lawsuit the court may enter judgments that dispose of fewer than all of the parties or claims.  Unless specifically excepted by other rules or by caselaw these are not final judgments from which an appeal lies.  Unless a stay is granted pursuant to Rule 62(e) such judgment can be enforced after entry.

**54(c) Costs.**  In the judgment the court may order one or more of the parties to pay the costs. Costs include filing fees, costs of service, jury, and witness costs.

Navajo R. Civ. P. 58(a) reads:

**58(a) Entry.**  All judgments shall be in writing and signed by the judge who heard the case.  The signing of the judgment constitutes entry of judgment.  The clerk of the court must make every attempt to forward the judgment to the parties immediately after entry.  The judgment is not effective before entry, except that for circumstances and on notice as justice may require, the court may enter a judgment nunc pro tunc, and the reasons shall be entered of record.

orders." Navajo Nation Code, tit. 7, § 801 (1995).[190]

None of the three orders now at issue meet that description. Under Navajo law, "it is the substance, not the title of the document which determines whether a final judgment has been made." *Litzin v. Farmington Motors, Inc.*, No. SC-CV-20-99 (Navajo S. Ct. 05/28/1999), at ¶ 18, *available at*

http://www.tribal-institute.org/opinions/1999.NANN.0000005.htm. *Litzin* explains that—however it may be captioned—a document "is a final judgment because the document disposes of the case. '[A] final order results after all the substantial rights of the parties have been litigated and decided on the merits by the district court . . . . [T]he entry of the final decision must preclude further proceedings in the lower tribunal.' *Billie v. Abbott*, 5 Nav. R. 201, 203 (1987)." *Id.* at ¶ [22].[191]

That seems pretty clear.

And far from disposing of the case or precluding further proceedings, the first page of the December 28, 1999 Order recited that, having before it "the matter of the application of the plaintiffs for a preliminary injunction pursuant to Rule 65(c) of the Navajo Nation Rules

---

[190]Navajo Nation Code, tit. 7, § 801(A) reads in part:

Every person aggrieved by any final judgment or other final order of a District Court of the Navajo Nation, or such other final administrative orders as provided by law and desiring to appeal shall within 30 days after the day such judgment or order is rendered appeal to the Supreme Court stating fully the grounds for appeal.

"Interlocutory appeals are not allowed within the Navajo court system." *Billie v. Abbott*, 5 Nav. R. 201, 203 (1987).

[191]In *Litzin*, "actual, statutory, and punitive damages and costs were awarded to Litzin, which are clear indicators that the substantial rights of the parties were litigated and the merits were decided. In essence, the very fact that the District Court awarded damages concludes that the substantial rights of the parties were litigated and decided on the merits. Therefore, the District Court has disposed of the case and reached a final judgment." *Id.* at ¶ [22].

of Civil Procedure, *pending trial in chief* in the matter of the initial complaint drawn by the plaintiffs," the application was "ripe for decision."  (December 28, 1999 Order at [1] (emphasis added).)  The December 28, 1999 Order, at page [22], and the March 1, 2000 Order, at page 15, expressly contemplated an "initial pretrial conference" to be held "on the limited factual; legal; and damage issues remaining."  (*Id.* at [22]; March 1, 2000 Order at 15 (same, to be scheduled in April of 2000).)  Clearly, "all the substantial rights of the parties" had not yet "been litigated and decided on the merits by the district court"; nor had further proceedings been precluded by the termination of the litigation.  *Billie v. Abbott*, 5 Nav. R. 201, 203,  No. A-CV-29-87 (Navajo S. Ct. 07/29/1987), at ¶ [19], *available at* http://www.tribal-institute.org/opinions/1987.NANN.0000019.htm .[192]

These three Navajo court orders "as issued" were not final under the law of the Navajo Nation—"the local law of the state of rendition"—and need "not be recognized or enforced" by this court, either as matter of full faith and credit or as a matter of comity.

---

[192]*Billie v. Abbott* (1987) elaborated upon the question of finality:

We took the opportunity to touch upon the concept of finality of district court orders in the context of appellate jurisdiction in *Chuska Energy Company v. The Navajo Tax Commission*, 5 Nav. R. 98 (1986). There we recognized that a final court order results after all the substantial rights of the parties have been litigated and decided on the merits by the district court. *Chuska Energy Company, Id.* We further said that, "the entry of the final decision must preclude further proceedings in the lower tribunal." *Id.* at 102.

In effect, an order that precludes further proceedings on the merits will terminate a case. Thus, an order that terminates a case is final for purposes of appealability, even where it does not determine the merits of a case. In this case, the order denying the motion to dismiss did not terminate the case.  We hold that an order denying a motion to dismiss is interlocutory and not final for purposes of appealability.

Interlocutory appeals are not allowed within the Navajo court system.  *Chuska Energy Company, Id.* . . .

*Id.* at ¶¶ [19]-[21] (footnote omitted).

*Restatement (Second) of Conflict of Laws* § 107.

### 4.  Preliminary Injunctive & other Equitable Relief in the *Singer, et al. v. San Juan County, et al.* Navajo Court Orders

The soundness of the *Restatement* view declining recognition and enforcement of interlocutory orders from another jurisdiction seems apparent when considered in the context of this case.  Besides a lack of requisite finality, enforcement of the three Navajo court orders "as issued" run into additional difficulty because of the nature of the relief granted.

The preliminary *injunctive* relief ordered as against the County and Health District defendants by the Navajo court in each of the three orders now at issue was rendered moot by reason of factual circumstances that had changed before this action was even commenced.  At this point, it remains uncontroverted that *none* of the defendants retained any authority over the administration or management of the Montezuma Creek Clinic or over employment decisions at the clinic *after January 1, 2000.*  The Navajo Nation had made its own contractual arrangements with Utah Navajo Health Systems to assume responsibility for that facility as of that date, and Utah Navajo Health Systems currently employs all of the Part II Plaintiffs—Singer, Riggs and Dickson—at the Montezuma Creek Clinic.

As the court of appeals recently explained,

"[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).  "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).  "The crucial question is whether 'granting a present determination of the issues offered . . . will have some effect in the real world.'" *Davidson*, 236 F.3d at 1182, quoting

> *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir.
> 1999).

*Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1256 (10th Cir. 2004).

In *Utah Animal Rights Coalition*, the court of appeals held that the plaintiff's request for

preliminary injunctive relief involving city permits for protests that had been planned for the

2002 Winter Olympics: "The alleged violation took place in 2001, the Olympics have come

and gone, and neither temporary restraining order, preliminary injunction, nor permanent

injunction could have any present-day effect." *Id.* at 1257.

A claim is moot when there is no reasonable expectation that the alleged violation of

law will recur and interim relief or events have eradicated the effects of the violation in

question. *See, e.g., Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1524

(10th Cir. 1992) (citing *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). "'Past

exposure to illegal conduct does not in itself show a present case or controversy regarding

injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" *F.E.R. v.

Valdez*, 58 F.3d 1530, 1534 (10th Cir. 1995) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-

96 (1974)). There must be an actual, ongoing dispute. If the movant is no longer in harm's

way, injunctive relief becomes moot. *See  McAlpine v. Thompson*, 187 F.3d 1213, 1218

(10th Cir. 1999) (release on parole moots an inmate's request for injunctive relief regarding

prison conditions and regulations); *Bauchman for Bauchman v. West High School*, 132 F.3d

542, 548 (10th Cir. 1997) (graduation from high school moots student's request for injunctive

relief concerning content of high school course curriculum); *cf.  Honig v. Students of Cal.

Sch. for the Blind*, 471 U.S. 148  (1985) (appeal from preliminary injunction order vacated

209

when propriety of that relief was rendered moot by subsequent events).[193]

A preliminary injunction represents an award of extraordinary relief, and its enforcement is not justified if there is no likelihood that the complained of behavior will continue. *See, e.g., Securities and Exchange Comm'n v. Pearson*, 426 F.2d 1339, 1343 (10th Cir. 1970). The court of appeals has explained that

> [a]n exception to the mootness doctrine arises in cases which are "capable of repetition, yet evading review." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 377, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979) (quoting *Southern Pacific Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). . . . To meet this exception, two conditions must be satisfied: "(1) the challenged action . . . [must be] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there . . . [must be] a reasonable expectation that the same complaining party ... [will] be subjected to the action again." *Id.*

*Fischbach v. New Mexico Activities Ass'n*, 38 F.3d 1159, 1161 (10th Cir. 1994).[194]  But as was the case in *Fishbach*, "[n]either requirement of this exception is met in this case."  *Id.*

Singer, Riggs and Dickson are no longer employed by the Health District; they continue to work at the Montezuma Creek Clinic, but at the behest of another employer. They no longer have any direct concern with whether the District complies with the NPEA or other requirements of Navajo law, or whether it adopts a merit system for its employees, or

---

[193]Even if neither party raises mootness as an issue, the court has "an affirmative obligation to consider this [jurisdictional] issue *sua sponte*." *Moongate Water Co., Inc. v. Dona Ana Mutual Domestic Water Consumers Ass'n*, 420 F.3d 1082, 1088 (10th Cir. 2005) (citing *Tandy v. City of Wichita*, 380 F.3d 1277, 1290 n.15 (10th Cir. 2004)).

[194]*See Riley v. INS*, 310 F.3d 1253, 1257 (10th Cir. 2002) (exceptions to mootness include cases in which "(1) secondary or collateral injuries survive after resolution of the primary injury; (2) the issue is deemed a wrong capable of repetition yet evading review; (3) the defendant voluntarily ceased an allegedly illegal practice but is free to resume it at any time; or (4) it is a properly certified class action." (internal quotation marks omitted)).

engages in nepotism.  The portions of the Navajo court orders affecting plaintiffs' future status as Health District employees cannot "have any present-day effect" in "the real world," *Utah Animal Rights Coalition*, 371 F.3d at 1256, 1257; neither can the portions of the order addressing the Health District's administration of health care services and its advertising of employment opportunities at the clinic.  Even as to the billing of IHS-eligible Navajo patients, counsel have long since advised this court that those billing practices have ceased. As to those matters, "This controversy is over, and it will not recur."  *Utah Animal Rights Coalition*, 371 F.3d at 1257.[195]

Of the preliminary injunctive relief granted in the December 28, 1999 Order, only the requirement that the Health District "delete and expunge all the charges and writings pertaining to the December 2nd through December 8th charges of fraud, discipline, and termination, from Mr. Riggs and Ms. Singer's personnel file" addressed a matter that still remained within the Health District's purview after it relinquished control over the Montezuma Creek Clinic in January of 2000, and that was not resolved by subsequent events.

---

[195]Nor may plaintiffs avoid the mootness issue by pressing for *declaratory* relief that the Navajo court orders were enforceable.

It is well settled that mootness principles "govern[ ] cases brought . . . under the Declaratory Judgment Act."  *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 n. 3 (10th Cir.1994), superseded by statute on other grounds as stated in *Walker v. UPS Inc.*, 240 F.3d 1268, 1278 (10th Cir.2001); *Esparza*, 862 F.2d at 791-92 (claims for prospective declaratory and injunctive relief mooted by Colorado Supreme Court decision).  Otherwise, a declaratory judgment could be an improper advisory opinion.  *Cox*, 43 F.3d at 1348.  "[W]ith respect to declaratory relief, we look beyond the initial controversy which may have existed at one time and decide whether the facts alleged show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Beattie v. United States*, 949 F.2d 1092, 1094 (10th Cir. 1991) (internal quotation marks, brackets, and ellipses omitted).

*Moongate Water Co., Inc. v. Dona Ana Mutual Domestic Water Consumers Ass'n*, 420 F.3d 1082, 1088 (10th Cir. 2005).

It may well be that as to expungement of plaintiffs' Health District files, "the passage of time ha[s] rendered the injunction superfluous," *Rio Grande Silvery Minnow v. Keys*, 355 F.3d 1215, 1219 (10th Cir. 2004), but in this regard, the record now before this court is unclear.

The other equitable relief ordered by the Navajo court in favor of Singer, Riggs and Dickson, *viz.,* the award of back pay, back benefits, and similar monetary relief, was and is wholly unliquidated as to amounts.  That relief remains interlocutory and provisional in nature, notwithstanding the brief time frame mandated by that court in its March 1st and March 6th Orders within which the defendants were required to comply.

Absent real numbers, all this court could do is "declare" that the Navajo court made a preliminary finding of liability for back pay, etc., pending a trial on the merits— which would add nothing to the Navajo orders themselves and would afford no relief of any substance in favor of the Part II Plaintiffs in this forum.

Whatever the merit of the Navajo court's preliminary findings of liability may be, this court cannot sit as a Navajo district court to complete that tribunal's work in making final determinations as to amount.  Nor may this court exercise its own judicial power to compel the Health District defendants to pay to these plaintiffs an unknown and undetermined amount of money, particularly in advance of the trial on the merits that was still pending before the tribal forum at the time these three orders were entered.  *See* 25 U.S.C.A. § 1302(8) (2001)

Ironically, the Part II Plaintiffs commenced this action seeking enforcement of the Navajo court orders, but at this point they have placed little or nothing before this court that it

may now enforce.

### D.  Attorney's Fees Awards Under Navajo Law

In the Navajo courts, "The general rule for awarding attorney's fees is set forth in

*Yazzie v. Herrick*, 5 Nav. R. 129, 131 (1987)[:]"

> The attorney's fees rule within the Navajo Nation is that each party in litigation is responsible for their own attorney's fees . . . . Recognized exceptions are (1) when a statute provides for attorney's fees . . . ; (2) when a case presents a special set of circumstances . . . ; and (3) if a pleading or document is not submitted in good faith, or it contains material misstatements of fact or law, or is not made upon adequate investigation or research.
>
> Thus, a party must prove that his case is an exception to the rule before he is entitled to attorney's fees.

*Largo v. Gregory & Cook, Inc.*, No. A-CV-11-93 (Navajo 02/17/1995), at ¶¶ [68]-[70],

*available at* http://www.tribal-institute.org/opinions/1995.NANN.0000001.htm.

In granting "attorney's fees, costs and expenses associated with this proceeding" to

Singer, Riggs and Dickson in its December 28, 1999 Order, the Navajo court did not cite or

discuss *Yazzie v. Herrick*, or any other precedent; nor did it identify which of the "recognized

exceptions" to the Navajo Nation's general rule it was relying on in making its award.  The

court simply remarked that "[o]ne way irreparable injuries may be partially compensated for

is by the payment of accrued legal fees and costs, and all expenses necessary for the plaintiffs

to defend their rights as the Court will order herein."  (December 28, 1999 Order at [16].)

As for a statutory basis for a fee award, the Navajo Preference in Employment Act

provides for an award of attorney's fees to a prevailing claimant.  Section 612(A) of the

NPEA states, "[i]f, following notice and hearing, the Commission finds that respondent has violated the Act, the Commission shall: . . . (2) In the case of an individual suit initiated pursuant to § 610(H), award costs and attorney's fees if the respondent's position was not substantially justified."  Navajo Nation Code, tit. 15, § 612(A)(2) (1995).  Like the rest of the NPEA's enforcement provisions, the question of attorney's fees is first committed to the discretion of the Navajo Nation Labor Commission, not to the district courts.[196]  The December 28, 1999 Order gives no indication that it is enforcing a Labor Commission award, or indeed, that the Labor Commission had made any finding of an NPEA violation before that order was entered.

Apart from the NPEA, the Navajo common law rule regarding attorney's fees appears wholly consistent with the general rule of most American jurisdictions that "damages in a tort action do not ordinarily include compensation for attorney's fees or other expenses of the litigation."  *Restatement (Second) of Torts* § 914(1) (1979).  The Navajo court's passing reference to partial compensation for "irreparable injuries" sheds little light on the basis in Navajo law for the preliminary relief awarding attorney's fees, costs and expenses in the December 28, 1999 and March 1, 1990 Orders.

---

[196]In *Largo*, there was a dispute as to whether the Navajo Nation Labor Commission correctly applied the "substantially justified" standard in awarding attorney's fees.  The court articulated the proper standard of review for an award under the NPEA:

> Section 12 of the NPEA leaves to the Commission the task of evaluating whether a respondent's position is "substantially justified."  On appeal, our review is limited to determining whether the Commission's decision was arbitrary, capricious, or not supported by the evidence.  Only if the decision was clearly an abuse of the Commission's discretion will it be overturned.

*Largo*, at ¶ [76].

### E.  Plaintiffs' Standing re: Navajo Patients

Much of the preliminary injunctive relief granted in the Navajo court's December 28,

1999 and March 1, 2000 Orders involved alleged injury to the interests of Navajo patients

seeking medical care at the Montezuma Creek Clinic—none of whom were before that court

as plaintiffs.  The December 28, 1999 Order touched upon the question of the standing of

Singer, Riggs and Dickson seek relief on behalf of those patients:

> As in the case of Halona v. Navajo Nation, 1 Nav. R. 189, the key to
> this case lies "not in non-Indian analysis" as to any matter of standing.  Id. at
> 199.  The fact that makes this case most distinguishable . . . is that the plaintiffs
> have a privilege and a duty under Navajo custom and tradition for Mrs. Singer
> in her in-law status and Mr. Riggs and Mr. Dickson in their enrolled status, to
> look out for the welfare of their fellow Navajo "citizens".  In Halona, this tribal
> status raises issues "peculiar to Navajo tradition and law."  The Navajo clan
> system, applicable to in-laws through their spouses, demonstrates the unique
> bonding of Navajo's to other tribal members or non-tribal members as family,
> and the familial duties inherent to care for other members of the Tribal family
> as demonstrated by the plaintiffs in this case and by the common nature of
> Navajo custom and tradition, and not dissimilar from the familial duties as
> found among other tribes that remain likewise in their nearest to original
> condition in respect to their customs or traditions.

(December 28, 1999 Order at [12].)   The Navajo court thus expressed an expansive view of

the plaintiffs' standing to assert the interests of the clinic's Navajo patients, based upon

Navajo clan, familial and community obligations.

Plaintiffs cite to *Judy v. White*, No. SC-CV-35-02 (Navajo S. Ct. 08/02/2004),

concerning "how standing differs in the Navajo Nation when public concerns are

involved."[197]   *Judy* involved a lawsuit challenging two Navajo Nation Council resolutions

increasing council delegate and presidential compensation for lack of compliance with the

---

[197](Letter to the Court from Susan Rose, Esq., dated September 24, 2004.)

Title II Amendments, and seeking to enjoin the Navajo Nation's chief financial officer from complying with those resolutions.  Asserting its power of judicial review,[198] the Navajo Supreme Court discussed the issue of plaintiffs' standing:

> The doctrine of standing has its origins in federal law.  For more than 200 years, federal courts have interpreted whether cases are properly before them through the development of doctrines of justiciability including standing, ripeness, and mootness. These doctrines are derived from, and intertwined with, the "case and controversy" language within the Constitution. In its theoretical form, justiciability considers whether the dispute sought to be adjudicated can be presented in an adversarial context, in a form historically viewed as capable of judicial resolution by English/American courts. See *Halona v. MacDonald*, 1 Nav. R. 189 (Nav. Ct. App. 1978); *Flast v. Cohen*, 392 U.S. 83 (1968).  The history of the U.S. Constitution and federal courts' justiciability considerations is vast and remarkable, and in its review we are once again sharply reminded that it is not our Diné history, nor that of our own tripartite government.

*Id.* at ¶ [24] (footnote omitted).  Acknowledging that "[o]ur judicial system mimics the American adversarial system in some ways," the court stated that "we will not interpret unintended limitations on the district courts based on federal court case law or inapplicable U.S. legislation."

> That is not to say that we do not recognize the doctrine of standing, but that we do so pursuant to our own common values of substantial justice rather than as the term is understood in federal courts.  Navajo courts will take their own path in judicial review, as required by the "Navajo higher law in fundamental customs and traditions, as well as substantive rights found in the Treaty of 1868, the Navajo Nation Bill of Rights, the Judicial Reform Act of 1985, and the Title Two Amendments of 1989."  *Bennett v. Navajo Board of Election Supervisors*, 6 Nav. R. 319, 324 (Nav. Sup. Ct. 1990).

> Standing may become an issue in any matter before the courts, and *we*

---

[198]"'The Navajo Courts have the power to determine the validity of resolutions passed by the Navajo Tribal Council.' *Thompson v. Navajo Nation*, 6 Nav. R. 181, 183 (Nav. Sup. Ct. 1990), citing *Halona v. McDonald*, 1 Nav. R. 189 (Nav. Ct. App. 1978) (emphasis added).

*limit our discussion today to standing as it relates to public-law matters and the judicial review of government action.*  We have considered standing on numerous occasions without articulating a specific test for the district courts to follow. We undertake no such effort today, because we believe that absent specific legislative limitations, *anyone may bring a public-law dispute to the Navajo Nation courts.*  For our courts to close their doors to legislative review based on standing, either as a matter of convenience or to avoid considering sensitive political issues, is an abrogation of our judicial responsibilities and abhorrent to Diné concepts of participatory governance and due process. "One of the major differences between Western principles of adjudication and Navajo legal procedure as participatory democracy is that it is essentially egalitarian.

Egalitarianism is the fundamental principle of participatory democracy. The egalitarian principle is the ability of the people as a whole to make law." *Downey v. Bigman*, 7 Nav. R. 176, 177 (Nav. Sup. Ct. 1995). It is not for us to choose who may request judicial review. We have never held otherwise.

*Id.* at ¶¶ [26]-[27] (emphasis added).  *Judy v. White* thus expands upon *Halona v. McDonald*[199] and stands for the proposition that *anyone* has standing to challenge the validity of any legislative action of the Navajo Nation Council in the Navajo courts.[200]

Even so, the Navajo Supreme Court has taken a less expansive view of the standing of litigants to assert the interests of third parties not before the court.  *Manygoats*, for example, denied Atkinson Trading Company standing to assert equal protection claims on behalf of its non-Navajo employees:

---

[199]As the *Judy* court explains:

White suggests that *Halona* precludes standing. He argues that *Halona* limits suits by private citizens to matters for which legislative acts intend improper expenditures of the public treasury. . . .  [W]e view *Halona* from a different perspective. While the practical aspects of *Halona* pointed to public expenditures for private purposes, we believe the reasoning behind the decision is most instructive here. The Court's ultimate holding was not that a private citizen was entitled to challenge the expenditure of public monies for private purposes, but that a private citizen had standing to challenge the legitimacy of public acts.

*Id.* at ¶ [22].

[200]But here, no action of the Navajo Nation Council was at issue.

217

> We summarily dismiss the Trading Post's contention that it is denied equal protection of the law because only Navajos can bring claims under the NPEA. We cannot address that claim in this case, because the Trading Post has no standing to assert the rights of its non-Navajo employees. There is no case or controversy on that issue, and there would be one only if a non-Navajo employee attempted to make a claim under the NPEA and it was rejected.

*Manygoats I* at ¶¶ [51]; *accord Manygoats II* at ¶ [46]. Years earlier, the Navajo Court of Appeals reached a similar conclusion as to claims of third party creditors who were not parties to *Hall v. Arthur*, 3 Nav. R. 35 (Navajo Ct. App. 12/16/1980):

> To provide guidance for the future we hold that in cases such as this, in which there are obligations to third parties, it is not appropriate for the Courts of the Navajo Nation to award damages based upon the amount owed to persons, or corporations, or governments which are not a party to the litigation. All that a District Court could properly do under such circumstances would be to determine the relative rights of the parties before it.

> Not only is it inappropriate for a District Court to determine the amount owed to a person not a party to the litigation, it is also not appropriate for a court to determine which of two parties is liable to such person not a party to the court. . . . .

*Id.* at ¶¶ [52]-[53].

This court need not decide whether these plaintiffs had standing in the Navajo court to assert the interests of the non-party Navajo patients under Navajo law, because the preliminary relief granted for their benefit by the Navajo court has by now been rendered moot. Nevertheless, the court has raised the question, in part to emphasize the importance of reading cases like *Judy v. White* and *Halona v. McDonald* in their essential context, but also to emphasize that in the context of a federal district court, invoking *this* court's power to recognize and enforce judgments of a Navajo court raises questions of standing *in this forum*, particularly where litigants call upon this court to use its power to enforce injunctive relief

218

for the benefit of persons not before the court.  In federal court a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982).  When a party invokes the jurisdiction of this court, he or she does so subject to the constitutional and prudential constraints that govern this court's exercise of its own judicial power.

### F.  Governmental Immunity & The Health District Defendants

Early in these proceedings, Judge Kimball of this court entered a Memorandum Decision and Order, filed October 30, 2000 (dkt. no. 81) ("October 30, 2000 Decision"), dismissing the claims of Singer, Riggs and Dickson against the County and Health District defendants on sovereign immunity grounds.  *See MacArthur, et al. v. San Juan County, et al.*, Civil No. 2:00-CV-584DAK, 2000 U.S. Dist. LEXIS 16859 (D. Utah, decided October 30, 2000).

Having decided that the Navajo court has subject-matter jurisdiction over Riggs and Dickson's claims against the San Juan Health Services District and defendant Wood, this court must now determine whether the adjudication of those claims in the Navajo court was barred by sovereign immunity, as Judge Kimball previously ruled.  His initial Memorandum Decision held that the District, as a political subdivision of the State of Utah, was immune from suit in the Navajo court because the State had not waived the common-law immunity of its subdivisions from suit in tribal courts, and that the individual Health District defendants

219

were likewise immune from suit in tribal court under Utah law.[201]

### 1. The October 30, 2000 Decision & Law of the Case

The Health District defendants now submit that the court's prior Decision was the correct one, and that the "law of the case" doctrine precludes relitigation of that issue following remand, relying on *Arizona v. California*, 460 U.S. 605 (1983), and *Montana v. United States*, 440 U.S. 147 (1979),[202] as authority.  (Dist. Summ. Judg. Mem. at 14.)

As the Court explained in *Arizona v. California*, "Unlike the more precise requirements of res judicata, law of the case is an amorphous concept.  As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  460 U.S. at 418 (citing 1B J. Moore & T. Currier, *Moore's Federal Practice* ¶ 0.404 (1982)) (footnote omitted).  But as the Court pointed out, "Law of the case directs a court's discretion, it does not limit the tribunal's power."  *Id.* (citing *Southern R. Co. v. Clift*, 260 U.S. 316, 319 (1922) and *Messenger v. Anderson*, 225 U.S. 436, 444 (1912)).[203]

The Tenth Circuit recently expressed essentially the same understanding:

---

[201]The court reached the same conclusion as to the County defendants, but this court's current ruling on the jurisdictional question renders further consideration of their sovereign immunity defense unnecessary.

[202]This *Montana* case held that collateral estoppel barred the United States from relitigating in federal district court the validity of a State gross receipts tax on public contractors that had previously been upheld in Montana state court litigation—litigation over which the United States had exercised direct control.  440 U.S. at 153-164.  It thus proves inapposite to the issue at hand

[203]If "law of the case" is the "doctrine holding that a decision rendered in a former appeal of a case is binding in a later appeal," *Black's Law Dictionary* 893 (7th ed. Bryan A. Garner, ed. 1999), then the doctrine would have no application here because, as the Health District defendants point out, the court of appeals "declined to review the Court's decision on sovereign immunity," and thus rendered no decision in the former appeal.  *See MacArthur*, 309 F.3d at 1227-1228.

The law of the case doctrine sets forth the fairly straightforward legal and pragmatic principle of certainty throughout the proceedings of a case: "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983).  However, courts are quick to recognize the flexibility of the rule and are permitted to overturn erroneous rulings as the underlying policy of the rule is one of efficiency, *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981) (citations omitted), not restraint of judicial power, *Messinger v. Anderson*, 225 U.S. 436, 444 (1912).  Indeed, the presence of new evidence or subsequent contradictory precedent or a determination that the previous ruling was clearly erroneous are legitimate bases for not applying the law of the case doctrine. *Major*, 647 F.2d at 112.

*Prairie Band of Potawatomi Nation v. Wagnon*, 402 F.3d 1015, 1018 (10th Cir. 2005).

Until it becomes embodied in a final judgment, a legal ruling remains interlocutory and subject to revision by the court that made it.  *See, e.g.*, *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982) ("A district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment . . . ."); *Collins v. State*, 60 F.3d 837 (Table), 1995 WL 405112, at *1 (10th Cir. 1995) (unpublished disposition) ("All orders prior to the district court's final order . . . were interlocutory; that is, subject to change while the case was ongoing.").  Fed. R. Civ. P. 54(b) spells this out as to rulings that may be dispositive of claims:

any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and *the order or other form of decision is subject to revision at any time before the entry of judgment* adjudicating all the claims and the rights and liabilities of all the parties. [Emphasis added.]

The *MacArthur* panel vacated the prior order of this court dismissing the claims of plaintiffs Singer, Riggs and Dickson and the matter was remanded for further proceedings.  309 F.3d at

1228.  The court's Rule 54(b) certification of that dismissal order[204] no longer has any force

or effect, and the October 30, 2000 Decision continues to be interlocutory.  At most, then, as

to prior rulings of this court, "law of the case" serves as a guide for the exercise of the court's

discretion in departing from the prior rulings.

> At the trial court level, the doctrine of the law of the case is little more
> than a management practice to permit logical progression toward judgment.
> Prejudgment orders remain interlocutory and can be reconsidered at any time,
> but efficient disposition of the case demands that each stage of the litigation
> build on the last, and not afford an opportunity to reargue every previous
> ruling.  In the end, however, the doctrine of the law of the case does not
> require or encourage a trial court to render a judgment erroneous in law.

1B James Wm. Moore, et al., *Moore's Federal Practice* ¶ 0.404[1] at II-3 (2d ed. rev. 1996)

(footnotes omitted).

### 2.  State Sovereign Immunity & Tribal Courts

As to the merits of their sovereign immunity defense, the Health District defendants

submit that "Utah and its political subdivisions are immune from suit in the Tribal Court.

'Sovereign immunity is a common law doctrine which precludes litigation against an un-

consenting government.'" (Dist. Summ. Judg. Mem. at 15 (quoting *Montana v. Gilham*, 932

F. Supp. 1215, 1219 (D. Mont. 1996), *aff'd*, 133 F.3d 1133 (9th Cir. 1997)).)  "As

independent sovereigns, states enjoyed this immunity before the Constitution was ratified,

and they retain it today 'except as altered by the plan of the Convention or certain

constitutional Amendments.'" (*Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 713 (1999)).)  In

the context of the Constitutional Convention, the Supreme Court has "found a surrender of

---

[204](*See* Order, filed March 6, 2001 (dkt. no. 168).)

immunity against particular litigants in only two contexts: suits by sister States, *South Dakota v. North Carolina*, 192 U.S. 286, 318 (1904), and suits by the United States, *United States v. Texas*, 143 U.S. 621 (1892)."  *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 781 (1991).   "We have not found a surrender by the United States to suit by the States, *Kansas v. United States*, 204 U.S. 331, 342  (1907); . . .  nor . . . a surrender by the States to suit by foreign sovereigns, *Monaco [v. Mississippi*, 292 U.S. 313 (1934)]," *id.* at 782 (citation omitted); nor did the Court find a surrender of immunity by the States to suit by Indian tribes, as was attempted in *Blatchford*:

> Respondents argue that Indian tribes are more like States than foreign sovereigns. That is true in some respects: They are, for example, domestic. The relevant difference between States and foreign sovereigns, however, is not domesticity, but the role of each in the convention within which the surrender of immunity was for the former, but not for the latter, implicit. *What makes the States' surrender of immunity from suit by sister States plausible is the mutuality of that concession*. There is no such mutuality with either foreign sovereigns or Indian tribes. We have repeatedly held that Indian tribes enjoy immunity against suits by States . . . as it would be absurd to suggest that the tribes surrendered immunity in a convention to which they were not even parties.  But if the convention could not surrender the tribes' immunity for the benefit of the States, we do not believe that it surrendered the States' immunity for the benefit of the tribes.

*Id.*  (emphasis added & citation omitted).  In relation to Indian tribes, then, the original sovereign immunity of the States stands undiminished.

In *Montana v. Gilham*, 133 F.3d 1133 (9th Cir. 1997), the plaintiff sued the State of Montana in the Blackfeet tribal court for injuries suffered in an auto accident on a state highway within the reservation boundaries, seeking to hold Montana liable for its governmental decisions concerning highway design.  Rejecting the State's assertion of

sovereign immunity, the tribal court entered judgment against it, and Montana challenged the

tribal court judgment in federal court.  The Ninth Circuit framed the immunity issue in two

parts: "Whether the State of Montana is immune from suit in tribal court involves two

questions: (1) whether Montana has sovereign immunity from suit in the tribal courts, and (2)

if so, whether Montana waived this immunity . . . ."  133 F.3d at 1135 (footnote omitted).

> As Hamilton famously observed: "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind; and the exemption as one of the attributes of sovereignty is now enjoyed by the government of every state in the union." The Federalist No. 81, p. 548-49 (J. Cooke ed.1961).  As Chief Justice John Marshall more colloquially put it: '[it] is not rational to suppose that a sovereign power should be dragged before a court." 3 Elliot, Debates in the Several State Conventions on the Adoption of the Federal Constitution 555 (2d ed. 1863).

> The States and Indian tribes, as co-existing sovereigns with significant and complex commercial, governmental and property interrelationships, often require a mechanism to determine their respective rights and interests.  Finding a forum to resolve disputes is problematic, for each sovereign naturally defends the jurisdictional reach of its own courts and resists being "dragged before" the courts of the other. See, e.g., *Wippert v. Blackfeet Tribe*, 260 Mont. 93, 859 P.2d 420 (1993).

*Id.* (footnote omitted).  After considering the nature of sources of State and tribal sovereignty,

the *Gilham* panel "conclude[d] that the States have retained their historic sovereign immunity

from suits by individuals and that nothing in the inherent retained powers of tribes abrogates

that immunity."  *Id.* at 1137 (footnote omitted).

> This result is consistent with immunity decisions in other contexts. For example, the United States, as a superior sovereign, is absolutely immune from unconsented suit in tribal court.  *United States v. Yakima Tribal Court*, 806 F.2d 853, 858-60 (9th Cir. 1986).  Further, tribes have retained their sovereign immunity even from claims raised in a compulsory counterclaim by a State to an action filed by the tribe.  *Oklahoma Tax Com'n v. Citizen Band Potawatomi*

> *Indian Tribe of Okla.*, 498 U.S. 505, 509-10, 111 S.Ct. 905, 909-10, 112
> L.Ed.2d 1112 (1991).

*Id.* at 1137 n.1.  Finding that Montana had not waived its sovereign immunity from suit in

tribal court, *Gilham* dismissed the action on relatively narrow grounds:

> In reaching our conclusions about Montana's immunity from Gilham's
> tort action in tribal court, we do not intend to paint with too broad a stroke.
> The jurisdictional reach of tribal courts is an important and vital matter.
> Development of tribal court systems is a critical component of tribal self-
> government, one which courts have encouraged. See, e.g., *Iowa Mut. Ins. Co.*,
> 480 U.S. at 14-15, 107 S.Ct. at 975-76; *National Farmers Union Ins. Co. v.
> Crow Tribe of Indians*, 471 U.S. 845, 856-57, 105 S.Ct. 2447, 2453-54, 85
> L.Ed.2d 818 (1985).
>
> Immunity from tort actions by individuals is also a crucial constituent
> of sovereignty, both for the tribes and the States. It is consistent with the
> recognition of sovereignty that both the tribes and the States are immune from
> unconsented tort actions by individuals in each other's courts. "A real
> sovereign, a state, a nation is always sovereign. In none of its activities is it
> ever subject to a higher human will, individual or collective." *Berizzi Bros. Co.
> v. S.S. Pesaro*, 271 U.S. 562, 568, 46 S.Ct. 611, 70 L.Ed. 1088 (1926).  In the
> absence of congressional action or compact between State and tribe, we do
> best by respecting the sovereignty of both the Blackfeet Nation and Montana.

*Id.* at 1140 (footnote omitted).[205]

In the October 30, 2000 Decision, the court agreed with the reasoning of *Gilham* that

absent an express waiver of immunity, a State cannot be sued in tribal court.  The court also

found that the same reasoning applied to the State's political subdivisions, including counties

and special services districts.  Finding no waiver of that immunity by the State of Utah, the

court concluded that political subdivisions of the State of Utah remained immune from suit in

---

[205]*Gilham* expressly "decline[d] to address whether agents of a State may be sued in tribal court or
whether States may be subject to a contract suit in tribal court. Our holding," the panel emphasized, "is limited
to the facts presented by this case: an individual filing a tort action against Montana in Blackfeet tribal court."
*Id.* at 1140 n.8.

tribal court because "Utah law is clear that political subdivisions enjoy the same immunity possessed by the State of Utah.  *See* Utah Code Ann. § 60-3-2, -3."  (*Id.* at 14.)

Five years later, that analysis remains sound.

### 3.  The Utah Governmental Immunity Act

Historically, the ability to sue the State of Utah or one of its political subdivisions rested on a determination of whether the governmental entity was protected by the common law doctrine of sovereign immunity.  That changed in 1965, when the Utah Legislature enacted the Utah Governmental Immunity Act (the "Act"), which barred all causes of action against the state and its political subdivisions unless expressly authorized by statute. Specifically, the Act provided that "all governmental entities," including school districts, "are immune from suit for any injury which results from the exercise of a governmental function."  Utah Code Ann. §§ 63-30-2(3), (7), - 3(1) (1997 & Supp.2000). . . .

*Tindley v. Salt Lake City School Dist.*, 2005 UT 30, ¶ 9,  116 P.3d 295, 298 (Utah 2005).

As a special service district created under Utah Code Ann. § 17A-2-1304, the Health District is a "governmental entity" within the meaning of the Act.  *See* Utah Code Ann. § 63-30-2(4) & (7) (Supp.1999) (repealed 2004)[206] ( "'Governmental entity' means the state and its political subdivisions" and includes "any county, . . . *special improvement* or taxing *district*, or other governmental subdivision or public corporation." (emphasis added)).

*Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1163-64 (Utah 1993),

---

[206]As *Tindley* notes,

In 2004, the legislature repealed the Governmental Immunity Act, codified at Utah Code Ann. §§ 63-30-1 to -38 (1997 & Supp.2003). In its place, the legislature enacted the Governmental Immunity Act of Utah, codified at Utah Code Ann. §§ 63-30d-101 to -904 (2004). Pursuant to the provisions of the new act, all injuries alleged to have been caused by a governmental entity before July 1, 2004, are governed by the former act.

2005 UT 30, ¶ 1 n.1, 116 P.3d at 297 n.1.  Plaintiffs' claims in this case are thus governed by the older version of the statute.

"established a three-step analysis for determining whether a governmental entity is entitled to immunity under the Act[:].

> First, was the activity the entity performed a governmental function and therefore immunized from suit by the general grant of immunity contained in section 63-30-3? [Utah Code Ann. § 63-30-3(1).] Second, if the activity was a governmental function, has some other section of the Act waived that blanket immunity? Third, if the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in this case?

*Ledfors*, 849 P.2d at 1164.

The first question in this case, then, is whether the District's operation of the Montezuma Creek Clinic was a "governmental function,"[207] which was defined by a 1987 amendment to mean:

> any act, failure to act, operation, function, or undertaking of a governmental entity whether or not the act, failure to act, operation, function, or undertaking is characterized as governmental, proprietary, a core governmental function, unique to government, undertaken in a dual capacity, essential to or not essential to a government or governmental function, or could be performed by private enterprise or private persons.

Utah Code Ann. § 63-30-2(4)(a) (repealed 2004).  According to *Tindley*,

> The 1987 amendment substantively expanded the scope of immunity established by the Act, providing immunity for activities that were once deemed proprietary and, therefore, had not been covered by immunity under the common law. See *Laney*, 2002 UT 79 at ¶ 53, 57 P.3d 1007 ("By defining a governmental function as any act of a governmental entity, whether or not the activity is characterized as governmental or proprietary, the 1987 amendment effectively grants immunity protection for some activities that

---

[207]"This inquiry [was] mandated by section 63-30-3(1), which establishes the general principle of governmental immunity subject to certain exceptions. "Except as may be otherwise provided in this chapter, all governmental entities are immune from any injury which results from the exercise of a governmental function." *Lyon v. Burton*, 2000 UT 19, 2000 UT 55, ¶ 14, 5 P.3d 616, 621 (Utah 2000) quoting Utah Code Ann. § 63-30-3(1) (repealed 2004) (emphasis added)).

were formerly considered proprietary and were not entitled to immunity.").

*Tindley*, 2005 UT 30, at ¶ 21, 116 P.3d at 301.  Defined this broadly, "governmental

function" appears to encompass the operation of hospitals and clinics by Utah special

services districts.  *See Carter v. Milford Valley Memorial Hosp.*, 2000 UT App 21, ¶14, 996

P.2d 1076, 1079 (2000).

The second issue under *Ledfors* is whether the Act has provided an exception to that

immunity through an express waiver:

> Scattered sections of the Act waive immunity under particular
> circumstances. Thus, the Act permits claims against governmental entities that
> involve contract obligations, see Utah Code Ann. § 63-30-5 (1997); property,
> see id. §§ 63-30-6, -10.5; defective public buildings and improvements, see id.
> § 63-30-9; and negligent acts and omissions of public employees. See id. §
> 63-30-10. The Act specifically waives immunity for injuries caused by
> dangerous or defective highways. See id. § 63-30-8. When immunity is
> waived, the "liability of the [governmental] entity [is] determined as if the
> entity were a private person." Id. § 63-30-4(1)(b).

*Trujillo v. Utah Dept. of Transp.*, 1999 UT App 227, ¶ 16, 986 P.2d 752, 757.  Of possible

consequence here is the express waiver "as to any contractual obligation," Utah Code Ann. §

63-30-5(1) (1997) (repealed 2004), and as to "injury proximately caused by the negligent act

or omission of an employee within the scope of employment," Utah Code Ann. § 63-30-10

(Supp. 2003) (repealed 2004).

The next question is whether the Act contains an exception to that waiver. Section

63-30-10 had several subsections that exclude certain activities from the waiver and thereby

retain immunity.

For certain kinds of claims, however, such waivers of immunity are restricted by a number of exceptions. See Utah Code Ann. § 63-30-10 (1997). Thus, although the Act waives immunity for liability from injuries caused by defective conditions of public buildings and highways, and by the negligence of public employees, immunity is retained "if the injury ar[ose] out of, in connection with, or result[ed] from" one of nineteen enumerated circumstances. Id. For example, immunity is retained if an injury resulted from a failure to revoke a permit, see id. § 63-30-10(3), or make an inspection.  See id. § 63-30-10(4).  Immunity is also retained with respect to injuries caused by natural conditions on public land. See id. § 63-30-10(11). Of particular significance in this appeal, immunity is retained for injuries that arise out of "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." Id. § 63-30-10(1).

*Trujillo*, 1999 UT App 227, at ¶ 17, 986 P.2d at 757-758.

Through such an exception to its general waiver, the Act expressly immunizes the State and its political subdivisions against claims of "abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, or violation of civil rights," Utah Code Ann. § 63-30-10(2) (Supp. 2003) (repealed 2004)—covering most if not all of plaintiffs' tort claims pleaded in the Navajo court proceeding.  *See Oliver v. Woods*, 21 F.Supp.2d 1325, 1332 (D.Utah 1998) ("claims for intentional infliction of emotional distress are barred by § 63- 30-10(2) (barring claims for 'infliction of mental anguish')"), *reversed on other grounds*, 209 F.3d 1179 (10th Cir. 2000); *Petersen v. Board of Education*, 855 P.2d 241, 242 (Utah 1993) (section maintains immunity for assault, even where liability is alleged to arise from the Board's negligence in hiring and supervising the assailant).

The Act provides that with very limited exceptions, an action brought under its provisions "against a governmental entity or its employee for an injury caused by act or omission that occurs during the performance of the employee's duties, within the scope of

229

employment, or under color of authority *is a plaintiff's exclusive remedy*," Utah Code Ann. §

63-30-4(3)(a) (Supp. 2003) (repealed 2004) (emphasis added),[208] and that "[t]he district

courts shall have exclusive original jurisdiction over any action brought under" the Act.  Utah

Code Ann. § 63-30-16(1) (Supp. 2003) (repealed 2004).[209]

The Tenth Circuit reads the latter provision as "'a positive expression of policy

against suits against Utah in United States courts,'" and one that could not be waived by the

State merely entering an appearance and litigating in a case in federal court.  *Sutton v. Utah*

*State School for the Deaf and Blind*, 173 F.3d 1226, 1235 (10th Cir. 1999) (quoting *Richins*

*v. Industrial Constr., Inc.*, 502 F.2d 1051, 1055 (10th Cir.1974)).  In the face of that

provision, only an "extraordinarily effective waiver" of the State's immunity would be

effective to subject the State to the jurisdiction of a forum other than its own.  *Id.*

### 4.  Counterclaims & the Waiver of State Immunity

In *Sutton*, the court of appeals found such a waiver of Eleventh Amendment immunity

in the State's removal of a state court action to federal court, where it proceeded to litigate

the merits:

> [T]he Eleventh Amendment bar to suit against Utah was effectively waived by
> the Office of the Attorney General of Utah. That office not only caused the
> removal of the case from state to federal court; the Attorney General's Office
> for the State has also litigated the merits of the case following its October 17,

---

[208]The Act makes an exception for actions against the government employee "whose act or omission gave rise to the claim" where "the employee acted or failed to act through fraud or malice," who may be held personally liable.  Utah Code Ann. § 63-30-4(3)(b)(i), (4)(a) (Supp. 2003) (repealed 2004).

[209]Utah law mandates strict compliance with the requirements of the Utah Governmental Immunity Act. See, e.g., *Hall v. Utah State Dept. of Corrections*, 2001 UT 34, ¶ 14, 24 P.3d 958, 963; *Rushton v. Salt Lake County*, 1999 UT 36, ¶ 19, 977 P.2d 1201, 1203-1204.

230

> 1996, removal. The Attorney General's Office filed in federal court on October
> 25, 1996, its motion to dismiss with prejudice under Fed.R.Civ.P. 12(b)(6)
> (failure to state a claim for relief), App. at 76-77, and its supporting
> memorandum for dismissal, id. at 78-91, and its reply memorandum of
> November 18, 1996, on the lack of merit of the amended complaint, id. at
> 142-151.

*Id.*  In the Tenth Circuit's view, "an unequivocal intent to waive immunity seems clear when

a state, facing suit in its own courts, purposefully seeks a federal forum."  *Id.* at 1234 (citing

*Wisconsin Dep't of Corrections v. Schacht*, 524 U.S. 381, 393-398 (1998) (Kennedy, J.,

concurring)).

By contrast, in *Mescalero Apache Tribe v. New Mexico*, 131 F.3d 1379 (10th Cir.

1997), the court of appeals held that the fact that the State filed a counterclaim in a federal

court proceeding in which it had raised its Eleventh Amendment immunity did not amount to

a waiver:

> "A state may waive its Eleventh Amendment immunity and consent to suit in
> federal court."  *Johns v. Stewart*, 57 F.3d 1544, 1553 (10th Cir. 1995).
> However, we apply "a stringent test" to determine if such a waiver has
> occurred.  Id.  The waiver must be "unequivocal" which means "'only where
> stated "by the most express language or by such overwhelming implication
> from the text [of a state statutory or constitutional provision] as [will] leave no
> room for any other reasonable construction."'"  *Id.* (quoting *Atascadero State
> Hosp. v. Scanlon*, 473 U.S. 234, 239-40, 105 S.Ct. 3142, 3146, 87 L.Ed.2d 171
> (1985) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347,
> 1360-61, 39 L.Ed.2d 662 (1974))). We conclude that the State did not waive
> its Eleventh Amendment immunity by filing a counterclaim in the
> circumstances of this case. See *Santee Sioux Tribe of Nebraska v. Nebraska*,
> 121 F.3d 427, 431 (8th Cir. 1997) ("[T]he Nebraska assistant attorney
> general's conduct in answering the complaint and filing a counterclaim does
> not constitute a waiver of Nebraska's Eleventh Amendment immunity.");
> *American Fed'n of State, County and Mun. Employees v. Corrections Dep't*,
> 783 F.Supp. 1320, 1327 (D.N.M. 1992) (holding that state did not waive
> Eleventh Amendment immunity by removing case to federal court); see also
> *National R.R. Passenger Corp. v. Rountree Transp. and Rigging, Inc.*, 896

231

> F.Supp. 1204, 1206-07 (M.D.Fla.1995) (noting that courts which find waiver
> by filing and prosecuting counterclaims still require state defendants to
> "announce their waiver of Eleventh Amendment immunity unequivocally.").
> The State has continued to assert Eleventh Amendment immunity, which is
> hardly consistent with the kind of unequivocal waiver necessary to waive that
> immunity.

131 F.3d at 1385 n.4.

Relying on the analogy of *Mescalero Apache Tribe v. New Mexico*, the Health District

defendants argue that "[b]ecause the Health District continued to assert its immunity while

asserting a counterclaim, it did not waive its sovereign immunity from suit."  (Dist. Summ.

Judg. Mem. at 21.)

The Navajo court rejected this argument, (*see* March 1, 2000 Order at 10 ("the

defendants waived any rights of immunity when they filed counterclaims and fully

participated in the Court proceedings")), and plaintiffs insist that under the analogy of *Sutton*,

the District waived its sovereign immunity "when it freely chose to bring Navajo legal

violations into Navajo court."  (Pltfs' Summ. Judg. Mem. (504), at 19 ¶ 16.)

### 5.  The Health District's Counterclaim

Of the two Tenth Circuit cases, *Mescalero Apache Tribe v. New Mexico* appears to

correspond more closely to this case.  The Health District did not "purposefully seek a [tribal]

forum" when "facing suit in its own courts," in contrast to the State of Utah in *Sutton*.  Like

the State of New Mexico in *Mescalero Apache Tribe*, the District continued to assert its

sovereign immunity defense to plaintiffs' claims in tribal court, even after it filed its

counterclaim against plaintiff Singer.

Plaintiffs' waiver theory is further complicated by this court's determination that the

Navajo court lacked subject-matter jurisdiction over Ms. Singer's claims against the District; Singer was the sole defendant named in the District's counterclaim.[210]   If the Navajo court had no subject-matter jurisdiction over Singer's claims against the District because of her status as a non-Indian litigant, it follows that it had no subject-matter jurisdiction over the District's counterclaim against her.  Any waiver of sovereign immunity occasioned by the filing of the counterclaim would be ineffectual because matters pertaining to Singer were not properly before the Navajo court in the first place.

### 6.  Sovereign Immunity & Reciprocity

The Health District defendants also suggest that "[t]he fact that Indian tribes enjoy immunity from suit in state courts also supports the conclusion that states retain sovereign immunity from suit in tribal court," citing *Kiowa Tribe v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754 (1998).  (Dist. Summ. Judg. Mem. at 17.)  "Given that tribes are immune from suit," they continue, "this lack of 'mutuality of concession' supports a finding that states are not subject to suit in tribal court."  (*Id.* at 18 (quoting *Blatchford*, 501 U.S. at 782).)  This argument echoes the court's earlier observation that "there has been no mutuality of concession with Indian tribes, as there was when the states surrendered some of their immunity to the federal government."  (October 30, 2000 Decision at 16.)

Tribal immunity applies to activities of the tribe whether on or off the reservation, and whether the activity is deemed governmental or commercial.  *Kiowa Tribe*, 523 U.S. at 756.

---

[210](*See* "Answer to Complaint for Damages and Counterclaim, filed June 23, 1999, in *Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV,  at 28-42, *available in* Pertinent Parts Navajo Ct. R. ("Complaint for Damages" Tab).)

The immunity embraces tribal agencies, *see Hagen v. Sisseton-Wahpeton Community College*, 205 F.3d 1040 (8th Cir. 2000), tribal housing authorities, *see Snowbird Constr. Co., Inc. v. United States*, 666 F. Supp. 1437, 1441 (D. Idaho 1987), and "subordinate economic organizations," *see Dixon v. Picopa Constr. Co.*, 160 Ariz. 251, 772 P.2d 1104, 1108 (1989); *White Mountain Apache Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654, 656 (1971).   At least in the absence of some "mutuality of concession" between State and tribal governments, why would it make sense to hold a political subdivision of the State to be subject to tribal court jurisdiction when corresponding tribal entities remain immune from suit in state or federal court?

Again, Navajo case law proves to be instructive.

In *Billie v. Abbott*, the Navajo Supreme Court outlined the Navajo courts' view of the sovereign immunity of state governments:

> Abbott also claims that under Utah's sovereign immunity statute, UTAH CODE ANN. § 63-30-3 (Supp.1979), Billie is barred from suing a Utah official in Navajo court.  This would be true if Billie is strictly a resident of Utah suing in Utah state court and not a resident of the Navajo Reservation. A suit against a state in its own court is governed by the state's own laws. The question remains whether the Navajo court should recognize Utah's defense of sovereign immunity.
>
> Although Abbott has not argued that any federal law may have limited the power of the Navajo Nation over a state official, we feel obligated to make that inquiry. Our review of the Treaty of 1868 has not disclosed any such limitation on Navajo sovereignty. And we have not found any federal statute with such limitation. The fact is suits against state political sub-divisions in tribal courts are not unknown. See, e.q., *National Farmers Union Ins. Cos. v Crow Tribe*, 471 U.S. 845 (1985) (question of whether tribal court has jurisdiction over state school); *Hubbard v. Chinle School Dist. Nos. 24/25*, 3 Nav. R. 167 (1982).

*Billie v. Abbott*, No. A-CV-34-87 (Navajo S. Ct. 11/10/1988), at ¶¶ [41]-[42], *available at*

http://www.tribal-institute.org/opinions/1988.NANN.0000012.htm.  *Billie* read *Nevada v.*

*Hall*, 440 U.S. 410 (1979), to hold that "when a state is sued in another sovereign's court, the

rule governing state suability in its own court is not controlling because '[s]uch a claim

necessarily implicates the power and authority of a second sovereign.'  *Id.* at 416.  And "if a

state's sovereign immunity is to be recognized by the second sovereign, then 'its source must

be found in an agreement, express or implied, between the two sovereigns, or in the voluntary

decision of the second to respect the dignity of the first as a matter of comity.' *Id.* at 416." *Id.*

at ¶ [43].

> The Navajo Nation does not grant immunity from suit to any state as a matter
> of comity. We have also not found any agreement, express or implied, between
> the Navajo Nation and Utah which would require this Court to recognize
> Utah's defense of sovereign immunity.  We have previously said that the states
> of the Union are foreign governments in relation to the Navajo Nation.
> *Hubbard*, 3 Nav. R. at 169.  In *Hubbard* we further ruled that the Navajo
> Nation courts have jurisdiction over suits against a state.  *Id.* at 170.  The
> reverse, however, a suit against the Navajo Nation in Utah court, would be
> barred by tribal immunity from suit, not as a matter of comity, but based upon
> federal pre-emption.

*Id.* at ¶ [44].

While *Billie* rejected a blanket rule of intergovernmental immunity in favor of a State,

state agencies, subdivisions or officers, *Hubbard v. Chinle School Dist. Nos. 24/25*, 3 Nav. R.

167 (Navajo Ct. App. 1982), had already indicated that Navajo courts may decline to exercise

tribal jurisdiction over another governmental entity, by agreement or as a "'voluntary

decision . . . to respect the dignity of the [other] as a matter of comity'" in particular cases.  In

*Hubbard*, the Navajo Court of Appeals affirmed the district court's dismissal of an action

against a local school district brought by two Navajo former employees, and did so on the basis of comity between sovereigns. *Hubbard* found that the Navajo court had jurisdiction over the school district as a State instrumentality,[211] but counseled restraint in the exercise of that jurisdiction.

More recently, in *Office of Navajo Labor Relations ex rel Bailon v. Central Consolidated School District No. 22*, the Navajo Supreme Court again considered the question of jurisdiction over a local school district. As to sovereign immunity, the court stated:

> [C]urrent analysis has moved beyond its prior focus on intergovernmental immunity. As for the arguments about bilateral relations, deference to other sovereigns, mutuality, reciprocity, and comity, the New Mexico Supreme Court ruled that Indian nations and their entities can be sued in the New Mexico court system when doing business outside the Indian nation, but not when an action arises within Indian country. Compare *Padilla v. Pueblo of Acoma*, 107 N.M. 174, 754 P. 2d 845 (1988) (an Acoma Pueblo construction company, owned by the Pueblo, could be sued for off-reservation activities) with *Defeo v. Ski Apache Resort*, 120 N.M. 640, 904 P. 2d 1065 (N.M. App. 1995) (no jurisdiction over an Indian nation where the personal injury took place within Indian country). Principles of reciprocity, comity and bilateral relations would prompt us to rule that we will treat the State of New Mexico and its instrumentalities the same way it treats Indian nations and their

---

211

As to whether the Navajo Nation court should entertain actions against the state of Arizona; this has been answered in the Navajo Court of Appeals (now Navajo Supreme Court) ruling in *Hubbard v. Chinle School District, et. al.*, 3 Nav. R. 167 (1982). *Hubbard* involved a suit by Arizona state school district employees against the Chinle school district in Chinle District Court. The district court ruled that it had jurisdiction, but exercised discretion under the doctrine of comity and declined jurisdiction. On appeal, Navajo Nation Court of Appeals ruled that Navajo Nation courts do indeed have jurisdiction over suits against a foreign sovereign, using international law as the basis for its rationale. Accordingly, the appeals court ruled that the State of Arizona is a foreign government and it should be recognized as such. The jurisdiction of Navajo Nation courts is inherent and existed prior to the creation of the State of Arizona.

*Tracy v. Yazzie*, No. WR-CV-313-85 (Navajo S. Ct. 09/16/1986) at ¶ [14], *available at* http://www.tribal-institute.org/opinions/1986.NANN.0000009.htm .

instrumentalities.

No. SC-CV-13-98 (Navajo S. Ct. 06/05/2003), at ¶ [25], *available at*

http://www.tribal-institute.org/opinions/2003.NANN.0000007.htm.

The common thread connecting the reasoning of *Billie*, *Hubbard*, and *Central Consolidated School District No. 22* appears to be an evolving *reciprocity* between the Navajo courts and the State courts. *See also Alden v. Maine*, 527 U.S. at 749 ("the immunity of one sovereign in the courts of another has often depended in part on comity or agreement"). In light of *Hubbard*, *Billie*, and *Central Consolidated School District No. 22*, it would appear that at least in the absence of a specific agreement with the State of Utah, the Navajo courts would "treat the State of [Utah] and its instrumentalities" as Utah "treats Indian nations and their instrumentalities" within and beyond reservation boundaries. But the Utah courts have not yet addressed the immunity of Indian tribes and instrumentalities with any degree of specificity.

As the *Billie* court pointed out, "a suit against the Navajo Nation in Utah court, would be barred by tribal immunity from suit, not as a matter of comity, but based upon federal pre-emption." Indeed, *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751 (1998), so held: "Tribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." 523 U.S. at 760. *Kiowa* thus extended "the judge made doctrine of sovereign immunity to pre-empt the authority of the state courts to decide for themselves whether to accord such immunity to Indian tribes as a matter of comity." *Id.* at 760 (Stevens,

237

Thomas & Ginsburg, dissenting).

In light of *Kiowa*, the Utah courts would be constrained to recognize the Indian nations' sovereign immunity as a matter of federal law,[212] and of course, this court anticipates that the Utah courts would follow the law.  If reciprocity and comity are the guiding principles, the Navajo courts would likewise be constrained to recognize the sovereign immunity of the State of Utah, its agencies and subdivisions as a matter of comity under Navajo law.  *Central Consolidated School District No. 22*, at ¶ [25].

In this case, the Navajo Nation District Court did not address considerations of comity between sovereigns in assuming jurisdiction over San Juan County and the San Juan Health Services District and granting preliminary injunctive relief; instead, it rejected the defendants' assertions of sovereign immunity on the grounds that State sovereign immunity does not extend to local political subdivisions, and that the defendants had waived any immunity by filing counterclaims and fully participating in the Navajo court proceeding. (*See* December 28, 1999 Order at [19]; March 1, 2000 Order at 10-11.)  As explained above, neither of these grounds have substantive merit.

Given the United States Supreme Court's recent reaffirmation of the scope of tribal immunity under federal law, and given the Navajo Supreme Court's recent elaboration upon Navajo principles of comity and reciprocity between governments, it appears reasonable to infer that, given the opportunity, the Utah courts would respect Navajo tribal immunity as to

---

[212]"Like foreign sovereign immunity, tribal immunity is a matter of federal law." *Kiowa*, 523 U.S. at 759.

Navajo agencies and subdivisions, and that the Navajo Supreme Court would give deference to the State of Utah's sovereign immunity and its limited statutory waiver of that immunity, allowing claims against its subdivisions to be brought exclusively in the Utah district courts.[213]  The Navajo Supreme Court has long been familiar with limited waivers of sovereign immunity, such as the Navajo Sovereign Immunity Act, *Navajo Nation Code*, tit. 1, §§ 553, 554 (1995), with its exclusive forum provisions.  *See, e.g.*,  *Raymond v. Navajo Agricultural Products Industry*, No. SC-CV-26-94 (Navajo S. Ct. 07/20/1995), *available at* http://www.tribal-institute.org/opinions/1995.NANN.0000013.htm (employee's wrongful discharge claims did not fall within the Navajo Sovereign Immunity Act's four express exceptions to tribal immunity from suit).

As the Ninth Circuit concluded in *Montana v. Gilham*, "In the absence of congressional action or compact between State and tribe, we do best by respecting the sovereignty of both the [Navajo] Nation and [Utah]," 133 F.3d at 1140, by acknowledging the limitations that exist, and giving deference to considerations of comity and reciprocity in respecting the immunity of sovereigns.

### 7.  Plaintiffs' Claims & the Utah Governmental Immunity Act

Riggs and Dickson's employment-related claims against the District involve a contractual relationship, and arguably come within Utah's waiver of immunity "as to any

---

[213]The Navajo Supreme Court acknowledges that "[o]rdinarily, a legislative body must waive sovereign immunity through explicit language in the statute. See, e.g., *United States v King*, 395 U.S. 1, 4 (1969)."  *Tso v. Navajo Housing Authority*, No. SC-CV-10-02, at ¶ [32] (Navajo S. Ct. 08/26/2004), *available at* http://www.tribal-institute.org/opinions/2004.NANN.0000013.htm (emphasis added).

contractual obligation." Utah Code Ann. § 63-30-5(1) (1997) (repealed 2004).  This seems particularly true of Dickson's claim that his retention as a "temporary" employee violated the District's own written employment policy, rather than Navajo law.  But the Utah Governmental Immunity Act's exclusive remedy provision still applies, as does the  Act's specification that "[t]he district courts shall have exclusive original jurisdiction over any action brought under" the Act, Utah Code Ann. § 63-30-16(1) (Supp. 2003) (repealed 2004). This "'positive expression of policy against suits against Utah in United States courts,'" would seem to apply equally against suits in Indian tribal courts—indeed, as against *any* forum save the designated one, the Utah state district courts.  *Sutton v. Utah State School for the Deaf and Blind*, 173 F.3d at 1235 (quoting *Richins*, 502 F.2d at 1055).

### (*i*) Contractual Claims

The State of Utah's waiver of sovereign immunity to allow claims as to "any contractual obligation" may permit employment-related contractual claims against subdivisions such as the Health District, but Riggs and Dickson would need to pursue those claims against the District in the designated state forum.  Utah Code Ann. § 63-30-5(1) (1997) (repealed 2004).  Remembering that the NPEA writes "the requirements of the Act" into all employment contracts "as affirmative contractual obligations of the contracting parties,"  Navajo Nation Code, tit. 15, § 609(A),  Riggs and Dickson's employment contracts included the NPEA's "just cause" requirement, among others, overcoming the "at-will" presumption under Utah law.  *See Rackley v. Fairview Care Centers, Inc.*, 2001 UT 32, at ¶ 13, 23 P.3d at 1026.  Federal and state courts likely would apply Navajo law to relationships

that are governed by Navajo law under traditional choice of law rules.  *See, e.g.*, *United States v. Jarvison*, 409 F.3d 1221, 1225 (10th Cir. 2005) ("Navajo law is the appropriate law under which to evaluate the validity of the marriage" between "two Navajo tribal members who live completely within the boundaries of the Navajo Reservation.").[214]  The NPEA expressly provides that "[i]n addition to the sanctions prescribed by the Act, violation of the Act shall also provide grounds for the Navajo Nation to invoke *such remedies for breach* as may be available under the transaction document or applicable law," *Navajo Nation Code*, tit. 15, § 609(A) (emphasis added), suggesting that Riggs and Dickson could pursue claims against the District in Utah state court for breach of contract, and avoid the bar of the District's governmental immunity.[215]  Concededly, that would submit their dispute "to a forum other than the one [Navajos] have established for themselves," *Fisher v. District Court*, 424 U.S. at 387-388, but Navajo principles of comity and reciprocity between sovereigns would appear to sanction that result.

---

[214]Navajo law governs legal relationships within the scope of its powers of self-government.  "[B]ecause the Navajo Nation retains sovereign authority to regulate domestic relations laws, including marriage of its Indian subjects, Navajo law is dispositive as to the validity of the marriage in question.  See *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) ('Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members')." *United States v. Jarvison*,  409 F.3d at 1225.  As explained above, the Navajo Nation possesses the inherent civil authority to regulate employment contracts involving Navajo members within Navajo boundaries.

[215]No cause of action for breach of contract was pleaded in either the original or amended Navajo court complaints, and from the Navajo court's orders, it appears that no contractual theory had been asserted by Riggs or Dickson, at least as of March of 2000.  Instead Dickson's claim concerning the District's alleged failure to abide by its written employment policy concerning job tenure was wedged into two of the plaintiffs' civil rights claims (free speech, due process), and at least one paragraph of the "malfeasance in office" claim.  (*See* Navajo Ct. Cmplt. at 18 ¶ 175 ("SJHSD refuses to hire Mr. Dickson as a regular employee"); 18 ¶ 180 ("Mr. Dickson spoke out about the CIB policy and Mr. Wood[']s reference liking [sic] it to a 'dog tag' and has not been given his full time status."); 22 ¶¶ 213-214 (denial of "any type of a fair and impartial hearing to be given his permanent full time status"); 39 ¶ 347 ("Mr. Woods [sic] refused to give Mr. Allison Dickson his full time permanent employment status").)

(*ii*) **Intentional Tort Claims**

The Utah Governmental Immunity Act shielded the Health District defendants from liability for most intentional torts.  Utah Code Ann. § 63-30-10(2) (Supp. 2003) (repealed 2004).[216]

This is no less true as to defendant Atcitty.  Adjudication of the plaintiffs' claims in the Navajo Nation District Court against defendant Atcitty personally, arising from his conduct as a member of the Health District's governing board, is likewise barred by the Utah Governmental Immunity Act, absent a finding that Atcitty acted due to fraud or malice.  Utah Code Ann. § 63-30-4(3)(b)(i), (4)(a) (Supp. 2003) (repealed 2004).  The term "employee" was defined by the Act to include "a governmental entity's officers, employees, servants, *trustees*, commissioners, *members of a governing body*, *members of a board*, members of a commission, members of an advisory body," among others.  Utah Code Ann. § 63-30-2(2)(a) (Supp. 2003) (repealed 2004) (emphasis added).[217]  The Act plainly included all members of the Health District board.

---

[216]

> Section 63-30-10(2) was intended to protect the State from tort liability for the intentional tortious conduct of its own agents and employees. That, of course, is a legitimate purpose consistent with the general law of agency. As a general rule, masters and principals are not liable for the intentional torts of agents or employees unless the tort is committed within the scope of employment. See *Hodges v. Gibson Products Co.*, 811 P.2d 151, 156 (Utah 1991); *Birkner v. Salt Lake County*, 771 P.2d 1053, 1056-59 (Utah 1989); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 70, at 505 (5th ed. 1984). It is also a general rule that intentional torts such as assault and battery are not within the scope of employment. See *Birkner*, 771 P.2d 1056-59; *Hodges*, 811 P.2d at 156-57.

*S.H. By and Through R.H. v. State*, 865 P.2d 1363, 1366 (Utah 1993) (Stewart, J., dissenting).

[217]Atcitty's immunity would apply regardless of whether the conduct in question occurred within or outside the Navajo Reservation boundaries.

Though the Navajo court had subject-matter jurisdiction over the territory, and over parties and conduct causing injury within that territory, that court could not proceed to adjudicate the liability of the Health District or its officials acting within the scope of their employment, absent an effective waiver of their immunity from suit in tribal court.

The single exception to this conclusion involves plaintiff Riggs' defamation claim against defendant Wood.  As outlined above, the Utah Governmental Immunity Act in force in 2000 excepted claims of libel and slander, *i.e.*, defamation, from the Act's more general waiver of immunity as to actions involving injuries caused by government employees.  Utah Code Ann. § 63-30-10(2) (Supp. 2003) (repealed 2004).   The Act insulated individual employees from personal liability for such injuries unless "the employee acted or failed to act due to fraud or malice."  Utah Code Ann. § 63-30-4(4)(a) (Supp. 2003) (repealed 2004).  The Act also excepted actions or proceedings against "the employee . . . whose act or omission gave rise to the claim" from the Act's exclusive remedy provision if "the employee acted or failed to act through fraud or malice."  Utah Code Ann.§ 63-30-4(3)(b) (Supp. 2003) (repealed 2004).  Thus, a plaintiff asserting a fraud-based or malice-based claim may bring a civil action directly against an individual employee, independent of the remedies provided by the Act, and in effect, sovereign immunity no longer shields the employee against personal liability as  adjudged in a forum of the plaintiff's choosing.

In this case, the Navajo court found that Wood likely had published "the phony fraud charge that still maliciously clouds Mr. Riggs' . . . name," resulting in injury to Riggs'

reputation.  (December 28, 1999 Order at [15]; *see also* March 1, 2000 Order, at 9.)[218]  As explained above, this court has given deference to that finding as not "clearly erroneous," justifying the exercise of Navajo civil jurisdiction over Wood for purposes of that claim. That court's preliminary finding that Wood's conduct was "malicious" likewise excepts Wood from the immunity otherwise afforded him by the Utah Governmental Immunity Act, and plaintiff Riggs may pursue his defamation claim in the Navajo courts.

### (*iii*) Civil Rights Claims

Under controlling Supreme Court precedent, the Navajo Nation District Court lacked subject matter jurisdiction under 42 U.S.C.A. § 1983 of any of these plaintiffs' claims arising from the alleged deprivation of a right guaranteed by the Constitution and laws of the United States.  *See Nevada v. Hicks*, 533 U.S. at 366-369.

Riggs and Dickson did not invoke § 1983 in their pleadings as the basis for their freedom of speech, due process, and equal protection claims,[219] based upon rights "as protected by the . . . the United States," so the jurisdictional footing for those claims remains unclear.[220]

---

[218]From the Navajo court's orders at issue, this court could glean no similar finding of malice pertaining to plaintiffs' other tort claims (*e.g.* intentional infliction of emotional distress, violation of civil rights), so the Act's exception of such claims from its waiver of immunity would still apply to bar plaintiffs' claims.  Utah Code Ann. § 63-30-10(2) (Supp. 2003) (repealed 2004); *see Apffel v. Huddleston*, 50 F. Supp. 2d 1129, 1141 (D. Utah 1999) (plaintiffs fail to allege any *well-pleaded facts* that defendants acted with 'malice', i.e., that defendants acted with any 'ill will' toward Mr. Apffel. . . . Thus, plaintiffs' claims are barred under the Utah Governmental Immunity Act and should be dismissed." (citation omitted)).

[219]The free assembly claim pleaded in their Navajo court Complaint appears to be asserted solely on behalf of Ms. Singer.  (*See* Navajo Ct. Cmplt. at 19 ¶¶ 184-190) ("Freedom to Assemble as Protected by the Navajo Nation, the United Nations, and the United States.").

[220]Had they brought § 1983 claims in a federal or state district court, the Health District would have been

(continued...)

244

If pleaded as direct claims under the federal constitutional provisions they invoke,[221] those claims would not lie against the Health District or its officials in their official capacity, *see Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994); *Simmat v. U.S. Bureau of Prisons*, 413 F.3d 1225, 1231 (10th Cir. 2005) ("a *Bivens* claim lies against the federal official in his individual capacity—not, as here, against individuals in their official capacity"),[222] and in this Circuit, would not lie against local officials in their *individual* capacity.[223]

---

[220](...continued)

unable to raise its sovereign immunity as a bar to the claims, even in the state court. *See  Howlett by and through Howlett v. Rose*, 496 U.S. 356, 361-383 (1990) (states cannot apply sovereign immunity rules to bar § 1983 claims against local governments in state court);  *Martinez v. California*, 444 U.S. 277, 284 (1980) ("it is clear that the California immunity statute does not control this [§ 1983] claim even though the federal cause of action is being asserted in the state courts").

Section 1983's "history and purposes . . . together with the way it has been interpreted, render it a powerful legislative sword."  1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 1:1 (4th ed. Rev. 2004).  Here, the plaintiffs cast aside the sword of § 1983 in favor of the untested steel of civil rights litigation against subdivisions of a State in a tribal court.

[221]*See, e.g., Davis v. Passman*, 442 U.S. 228 (1979) (permitting employment discrimination claim against a member of Congress under Due Process Clause); *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (permitting implied action under Fourth Amendment against federal narcotics agents).

[222]*See* 1 Sheldon H. Nahmod, *Civil Rights and Civil Liberties Litigation: The Law of Section 1983* § 6:59 (4th ed. Rev. 2004) ("the Court's message is clear: § 1983 plaintiffs are to pursue only their § 1983 damages remedies against local governments, and cannot rely on Fourteenth Amendment damages remedies."); *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 712 (1978) (Powell, J., concurring) (discussing whether the Court should "imply cause of action directly from the Fourteenth Amendment").

[223]This Circuit takes the position that a *Bivens*-style action implied directly under the Fourteenth Amendment will not lie against state or local employees in their individual capacities where § 1983 is available, *see Stanko v. Maher*, 419 F.3d 1107, 1110 (10th Cir. 2005) ("*Bivens* creates a remedy for violations of constitutional rights committed by federal officials acting in their individual capacities.  Mr. Maher is a state brand inspector. Therefore, this action arises, if at all, pursuant to 42 U.S.C. § 1983 rather than *Bivens*."), joining other circuits that have reached the same conclusion.  *See, e.g., Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 732 n. 3 (7th Cir. 1994); *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992), *cert. denied*, 506 U.S. 1081 (1993); *Pauk v. Board of Trustees of the City Univ. of New York*, 654 F.2d 856, 865 (2d Cir.1981) ("when § 1983 provides a remedy, an implied cause of action grounded on the Constitution is not available."); *Turpin v. Mailet*, 591 F.2d 426, 427 (2d Cir. 1979) (en banc) (per curiam), *cert. denied sub nom. Turpin v. City of West Haven*, 449 U.S. 1016 (1980).  *Cf. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977) ("The question of whether . . . we should, by analogy to our decision in *Bivens* . . . imply a cause of action directly

(continued...)

Moreover, the concerns expressed in *Nevada v. Hicks* concerning tribal court jurisdiction over § 1983 actions would also seem to apply to causes of action implied directly under the Fourteenth Amendment.  If "a tribe's inherent adjudicative jurisdiction over nonmembers is at most only as broad as its legislative jurisdiction," as augmented by specific federal legislation, the Navajo Nation did not adopt the Fourteenth Amendment in the exercise of its legislative jurisdiction, and "no provision in federal law provides for tribal-court jurisdiction over" actions implied directly under the Fourteenth Amendment.  533 U.S. at 367, 368.  A *Bivens*-style claim under the Fourteenth Amendment would prove no more removable to federal court than the § 1983 actions addressed in *Hicks*.  *See id.* at 368.  The *Hicks* Court's reasoning as to § 1983 actions seems equally applicable to any cause of action implied directly under the United States Constitution.

Plaintiffs invoke the Indian Civil Rights Act, 25 U.S.C.A. § 1302, as a basis for their civil rights claims against the District.  ICRA guides the exercise of the powers of tribal self-government, but does not apply to constrain the conduct of the State of Utah or its subdivisions.  The Health District thus cannot violate that statute, and may not be haled into court on allegations of ICRA violations.[224]  The same is true of the Navajo Bill of Rights, Navajo Nation Code, tit. 1, §§ 1-9 (1995), which serves as a fundamental organic document

---

[223](...continued)
from the Fourteenth Amendment which would not be subject to the limitations contained in § 1983, is one which has never been decided by this Court.").

[224]The argument that the Navajo court must exercise its adjudicative authority over the District in order to assure the Navajo people "equal protection of the laws" misapprehends that court's duty under the Act, *viz.*, to assure Navajo people the equal protection of Navajo laws in the Navajo Nation's exercise of its powers of self-government.

of the Navajo Nation, but does not bind the United States or the States.[225]

Plaintiffs' reliance on the United Nations' Universal Declaration of Human Rights as a legal footing for their civil rights claims against the Health District also proves to have been misplaced.  (*See* Navajo Ct. Cmplt. at 5 ¶ 27 & Exh. 4; *id.* at 26 ¶¶ 242, 244 (equal protection).)  The Supreme Court recently observed that "the Declaration does not of its own force impose obligations as a matter of international law," and by itself it cannot support creation of cause of action that a federal district court could hear under the applicable jurisdictional statutes.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S.Ct. 2739, 2767 (2004).[226]  The Navajo courts may take a different view of the status of the Declaration under international law, but this court remains constrained by the Supreme Court's view that "a claim under the 'present-day law of nations' as an element of common law is circumscribed to 'norm[s] of international character accepted by the civilized world and defined with a

---

[225]*See* Navajo Nation Code, tit. 1, §§ 3, 4 (1995):

> Life, liberty and the pursuit of happiness are recognized as fundamental individual rights of all human beings.  Equality of rights under the law shall not be denied or abridged *by the Navajo Nation* on account of sex nor shall any person within its jurisdiction be denied equal protection *in accordance with the laws of the Navajo Nation*, nor be deprived of life, liberty or property, without due process of law. . . .

> The *Navajo Nation Council* shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition *the Navajo Nation government* for a redress of grievances.

*Id.* (emphasis added.)

[226]*Sosa* cites to Humphrey, "The UN Charter and the Universal Declaration of Human Rights," in *The International Protection of Human Rights* 39, 50 (E. Luard ed.1967) (quoting Eleanor Roosevelt calling the Declaration "'a statement of principles ... setting up a common standard of achievement for all peoples and all nations'" and "'not a treaty or international agreement ... impos[ing] legal obligations'").

specificity comparable to the features of the 18th-century paradigms we have recognized.,'"

namely violation of safe conduct, infringement of the rights of ambassadors, and piracy, and

that those norms must be "specific, universal and obligatory," *id.*, 124 S. Ct. at 2761-2762,

2765, and its view that the Universal Declaration of Human Rights is not quite universal

enough. *Id.* at 2767 (plaintiff "cannot say that the Declaration . . . establish[es] the relevant

and applicable rule of international law").[227]

    Assuming that plaintiffs' assertion here and at the court of appeals that "[t]hey

brought only Navajo law claims before the Navajo tribunal" is in fact correct,[228] then Riggs

and Dickson's claims as to rights of free speech, due process and equal protection "as

protected by the Navajo Nation" would need to find a footing in either the Navajo Preference

in Employment Act[229] or an as-yet-unspecified common-law cause of action under Navajo

---

[227]*Sosa* concedes that the Declaration "has nevertheless had substantial indirect effect on international law." *Id.* (quoting Ian Brownlie, *Principles of Public International Law* 535 (6th ed. 2003) (calling the Declaration a "good example of an informal prescription given legal significance by the actions of authoritative decision-makers")).

[228]309 F.3d at 1218 n.2. (*See also* Tr. 2/24/2003, at 40:19-25, 41:14-20 (the "Navajo court orders address Navajo law issues, Navajo torts, Navajo denial of rights and harm to Navajo patients" (Ms. Rose)).) Plaintiffs' counsel made essentially the same representation to the United States Supreme Court in 2003. (*See* Petition for Writ of Mandamus and Prohibition, *In re Riggs*, Case No. 02-1774, 2003 WL 22428213 (U.S.S.Ct., filed May 28, 2003), at 1 ("The *Navajo injunction and subsequent orders cite to no relief beyond Navajo law relief.*") (emphasis in original); *id.* at 5 n.12 ("all tort claims are Navajo tort claims"); Reply Brief to Respondent San Juan Health Services District's Brief in Opposition, filed July 30, 2003, 2003 WL 22428215, at *7 ("The Relief *sought here*, is purely Navajo law/Indian civil rights relief within the Navajo Court's *exclusive* jurisdiction.") (emphasis in original); Petitioner's Rule 15 Supplemental Brief, filed September 14, 2003, 2003 WL 22428219,at *1 ("This case involves this Court enforcing Navajo Court orders under 28 U.S.C. 1738 full faith and credit, against all respondents as listed in the petition, for Navajo law violations, harming two Navajo enrolled members and the spouse of a Navajo enrolled member, within Navajo borders.")

[229]Of the four civil rights claims, only the equal protection claim makes explicit reference to the NPEA. (*See* Navajo Ct. Cmplt. at 26 ¶ 244; Navajo Ct. Cmplt. (Modified) at 26-27 ¶ 244 (same).) Otherwise, the plaintiffs' pleadings refer to the NPEA in one introductory paragraph listing several bases for the plaintiffs' pleadings. (*See id.* at 5 ¶ 27 ("That these proceedings are brought under Navajo law, including but not limited to . . . the *Navajo Preference in Employment Act*, . . .").); Navajo Ct. Cmplt. (Modified) at 4 ¶ 17 (same).) The plaintiffs'

(continued...)

law that protects  "Navajo civil rights as defined within Navajo custom and traditions."[230]

(December 28, 1999 Order at [19].)

But like other intentional torts, the Utah statute excepts injuries resulting from

"violation of civil rights" from its general waiver as to injury claims.  Utah Code Ann. § 63-

30-10(2) (Supp. 2003) (repealed 2004).  *Seare v. University of Utah School of Medicine*, 882

P.2d 673, 679 (Utah Ct. App. 1994) ("the state has expressly declared that

it maintains its immunity from civil rights claims. Utah Code Ann. § 63-30-10(2) . . . .").[231]

---

[229](...continued)

"Memorandum of Law" annexed as "Attachment C" to the original Complaint advised the Navajo court that it "may look to the (1) *Navajo Preference in Employment Act ('NPEA')*, (2) contractual fiduciary responsibilities; (3) the Navajo Nation Bill of Rights; (4) common law and customs and traditions; (5) United Nations Declaration of Human Rights, and, in certain respects (6) Utah law, for its jurisdiction."  ("Attachment C" to Navajo Ct. Cmplt. at 3, *available in* Pertinent Parts Navajo Ct. R. ("Memorandum SMJ" Tab).)  The Memorandum argues the applicability of the NPEA for four pages, even quoting Navajo Nation Code, tit. 15, § 610(K), empowering the *Navajo Nation Labor Commission* to grant "preliminary relief in the form of an injunction or other equitable remedy," but without any reference to the Labor Commission's primary jurisdiction and the corresponding exhaustion requirement.  It also refers to § 614's coverage of non-Navajo spouses, but without mention of its one-year residency requirement. (*Id.* at 4.)

[230](*See* Navajo Ct. Cmplt. at 17-22 ¶¶ 170-214; *id.* at 26-31 ¶¶ 243-280; *cf. id.* at 39 ¶ 347 ("Mr. Woods [sic] refused to give Mr. Allison Dickson his full time permanent employment status"))  This appears to be particularly crucial to Dickson because he pleaded no claim of breach of contract before the Navajo court, and apart from the free speech and due process claims, no other cognizable pleaded claim addresses the dispute over his "temporary" employment status.  (*See id.* at 17-33 ¶¶ 170-300 ("PLAINTIFFS' CLAIMS" [excluding plaintiffs' "backdrop" pleading as to "misfeasance and malfeasance," *see supra* n. 31]); Navajo Ct. Cmplt. (Modified) at 18-35 ¶¶ 170-300 (same); *id.* at 40-42 ¶¶ 349-352 ("Supplemental Claims").)

[231]The Navajo court argued with this: "The defendants have . . . [f]ailed to show how a service district, a minor political subdivision is an "arm of the state" with immunity under Alden, et al. v. Maine, . . . when Alden exempts minor political subdivisions from immunity, and [f]ailed to show how civil rights violations were given immunity, when Alden v. Maine exempts those types of injuries from immunity, and Alden did not address Navajo civil rights as defined within Navajo custom and traditions . . . ." (December 28, 1999 Order at [19] (citing *Alden v. Maine*, 527 U.S. 706 (1999)).)

*Alden*'s reference to immunity as an "arm of the State," alluded to in the December 28, 1999 Order, pertains to the States' Eleventh Amendment immunity from suit in federal court, not common-law sovereign immunity from suit without its consent.  To that extent, the Navajo court was correct in noting that Eleventh Amendment immunity did not extend to political subdivisions, including special service districts.  *See* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3524, at 130 (2d ed. 1984) ("If the defendant is a county, municipality, municipal agency, or an officer thereof, the general rule is that the Eleventh Amendment will not bar the action since these entities are not considered arms of the state." (footnote omitted).)  But Eleventh Amendment

(continued...)

The Health District thus remains immune from liability on those claims, even if brought in the designated forum.

### 8. Summary

Having reviewed the court's prior ruling concerning the sovereign immunity of the Health District defendants in light of subsequent developments and this court's examination of plaintiffs' claims and the Navajo court orders, this court concludes that adjudication of Riggs and Dickson's claims against San Juan Health Services District in the Navajo Nation District Court was barred by sovereign immunity.  Adjudication in the Navajo court of Riggs' defamation claim against Wood in his individual capacity was not barred by the Utah Governmental Immunity Act, based upon that court's preliminary finding that Woods' conduct was "malicious," which excepts him from coverage under the Act, *see* Utah Code Ann. § 63-30-4(3)(b), (4)(a) (Supp. 2003) (repealed 2004).

---

[231](...continued)
immunity does not apply in tribal court, and these defendants did not attempt to raise Eleventh Amendment immunity before the Navajo court.

*Alden* held that the States' sovereign immunity from private suit *in their own courts* is beyond congressional power to abrogate by Article I legislation, just as the States' Eleventh Amendment immunity from suit in federal court had been held to be beyond Congress' Article I powers in *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), and *Blatchford v. Native Village of Noatak*.  *Alden* observed that "sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself."  527 U.S. at 728.  The Eleventh Amendment "confirmed rather than established sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment alone but by fundamental postulates implicit in the constitutional design."  *Id.*

As the court explained in its initial decision in this case, "*Alden* is relevant only to the extent that it provides a comprehensive history of sovereign immunity and the presuppositions behind the Eleventh Amendment."  (October 30, 2000 Decision at 17-18.)

## SUMMARY & CONCLUSION

The Tenth Circuit's mandate in this case "require[d] a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions" in addressing the issues on remand concerning the extent of the Navajo court's jurisdiction. 309 F.3d at 1228 (quoting *National Farmers,* 471 U.S. at 855-856 (footnote omitted)). As detailed herein, admittedly at some length, this court has sought to abide by that mandate in reaching its conclusions on those issues.

This court has examined with care each treaty, statute, regulation and reported court opinion cited by any party as bearing upon the issues on remand. This court has also perused the extensive legal literature discussing Indian tribal sovereignty; federal Indian policy; the allocation of jurisdiction among federal, state and tribal governments in the context of our federal system; and more specifically, the exercise of Indian tribal jurisdiction over non-Indians in light of *Montana* and its progeny. Some of the references shed more light on these subjects than others, but all have proven instructive in some respect.

This court has undertaken to make the best sense it can of the Supreme Court case law on the subject—including precedent that several Justices have already conceded is seemingly inconsistent, *see Nevada v. Hicks*, 533 U.S. 353, 376 (2001) (Souter, Kennedy & Thomas, JJ., concurring)[232]—and in so doing, has sought to give due deference to the policies of the

---

[232]"Justice Souter wrote, "Petitioners are certainly correct that '[t]ribal adjudicatory jurisdiction over

(continued...)

251

Congress and the Executive Branch, recognizing that those policies have shaped "the metes and bounds of tribal sovereignty." *Lara*, 541 U.S. at 202.  The court has detailed its reasoning in that regard, in part because this court's reading of the relevant legal authority differs from that of counsel on all sides of this case.  As best it can, the court has made explicit the specific reasons for that difference.

The court has also made the best sense it can out of a chaotic record, attempting to find order and sequence amidst shotgun pleadings rife with strident characterizations and prolix, meandering stream-of-consciousness argumentation.  The preceding pages serve as the official record of that earnest effort.

So often, many claims are pleaded and many theories are argued, where one good claim or one sound theory would do.  Labels too often displace facts, and characterization so often fails to perform the essential functions of description and sequence.  Important issues are obfuscated by disjoint plaintiffs, unconnected defendants and obtuse allegations.  Rule 8 speaks volumes in its simple requirement that a pleading set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."

And any argument—particularly any legal argument—finds its true force in the soundness and clarity of its reasoning, not the depth and persistence of its animus.

For the reasons set forth in some detail above, this court concludes that based upon the

---

[232](...continued)

nonmembers is . . . ill-defined,' since this Court's own pronouncements on the issue have pointed in seemingly opposite directions."  533 U.S. at 376 (comparing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 (1978), and *United States v. Mazurie*, 419 U.S. 544, 557 (1975), with *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209 (1978)).  *See also id.*, 533 U.S. at 387 (O'Connor, Stevens & Breyer, JJ. concurring in judgment) ("Part II of the Court's decision [in *Hicks*] is unmoored from our precedents").

findings of fact reflected in the Navajo court's December 28, 1999 and March 1, 2000

Orders, the Navajo Nation and the Navajo Nation District Court for the District of Shiprock,

New Mexico, had civil regulatory authority and adjudicative subject-matter jurisdiction,

respectively, over the San Juan Health Services District with respect to its employment of

plaintiffs Fred Riggs and Allison Dickson, and jurisdiction of at least some of the

employment-related claims pleaded by those plaintiffs under *Navajo Nation Code* § 253(B),

consistent with *Montana v. United States*, 450 U.S. 544 (1981).  Non-Navajos and non-tribal

entities who enter into employment relationships with Navajo members within the boundaries

of the Navajo Nation have "enter[ed] consensual relationships with . . . its members" within

the meaning of *Montana*'s first exception, and the Navajo courts have subject-matter

jurisdiction of disputes between Navajos and nonmember employers arising out of those

relationships.  Employer-employee relationships involving tribal members likewise have a

"direct effect on the . . . the economic security, or health or welfare of the tribe" within the

meaning of *Montana*'s second exception, bringing those relationships within the limited

scope of the Navajo Nation's inherent civil authority over non-Indians conducting activities

on non-Indian fee lands within the reservation boundaries for that reason as well.  In

extending the coverage of the Navajo Preference in Employment Act to those relationships,

the Navajo Nation exercised its lawful civil regulatory authority, an aspect of the Navajos'

long-acknowledged power to "make their own laws and be ruled by them," *Williams v. Lee*,

358 U.S. at 220, reflecting its inherent sovereignty as recognized and enlarged by treaty and

Acts of Congress.  Plaintiffs Riggs and Dickson are entitled to declaratory relief, at least to

253

that extent.  *See* 28 U.S.C.A. §§ 2201-2202 (1994).

The Navajo court also had subject-matter jurisdiction of plaintiffs' employment-related claims against defendant Roger Atcitty, a Navajo tribal member residing on the Navajo Reservation.[233]  For Riggs and Dickson, their claims against Atcitty reflect a dispute arising among tribal members, over which tribal court subject-matter jurisdiction is exclusive.  *See Fisher v. District Court of the Sixteenth Jud. Dist.*,  424 U.S. 382, 386-389 (1976).  The Navajo court also has exclusive subject-matter jurisdiction over Singer's claim against Atcitty, at least to the extent that her claim arose within Reservation boundaries.  *See Williams v. Lee*, 358 U.S. 217, 222-223 (1959).

Of Riggs and Dickson's claims against their employer, the San Juan Health Services District, it appears that those claims which seek directly to enforce the Navajo Preference in Employment Act were not properly before the Navajo Nation District Court at the time the three orders at issue were entered.  The NPEA assigns the Office of Navajo Labor Relations and the Navajo Nation Labor Commission primary jurisdiction over alleged violations of its requirements.  In its December 28, 1999 and March 1, 2000 Orders, the Navajo court made no findings invoking any exception to the requirement under Navajo law that plaintiffs must first exhaust their administrative remedies under the NPEA before seeking relief under that law in the Navajo courts.[234]  Nor does it appear that plaintiffs had been dismissed by the

---

[233]*See* Navajo Nation Code, tit. 7, § 253(B) (1995) ("The District Courts of the Navajo Nation shall have original jurisdiction over . . . [a]ll civil actions in which the defendant is a resident of Navajo Indian Country").

[234]As discussed above, this exhaustion requirement may initially embrace the plaintiffs' non-NPEA claims against the District as well.  (*See supra*, at 125-128.)

Labor        Commission, or that they were seeking to enforce any order of the Labor Commission in their Navajo court proceeding.  The Navajo court's preliminary findings in its December 28, 1999 and March 1, 2000 Orders do not establish a basis for exercising its jurisdiction over plaintiffs Riggs and Dickson's NPEA claims absent proof of exhaustion of the prescribed administrative remedies.

Aside from claims arising directly under the NPEA, the Navajo Nation District Court correctly concluded that it had subject-matter jurisdiction over plaintiffs Riggs and Dickson's employment-related common-law tort claims, particularly Mr. Riggs' defamation claim against the Health District and defendant Wood, alleging injury to his reputation—what amounts to an injury to Riggs' relationship with his peers and co-workers at the Montezuma Creek Clinic and member of his community on the Reservation.

Under controlling Supreme Court precedent, the Navajo Nation District Court did not have subject-matter jurisdiction over the claims of plaintiff Donna Singer, a non-Indian non-resident of the Navajo Reservation, against the Health District and the non-Indian defendants. *Strate v. A-1 Contractors*, 520 U.S. 438 (1997).  Nor did that court have subject-matter jurisdiction over San Juan County, the named San Juan County Commissioners, the San Juan County Attorney, County administrator Bailey, or the non-Navajo members of the Health District's governance board under *Navajo Nation Code*, tit. 7, § 253(B), based upon the limited preliminary factual findings set forth in that court's December 28, 1999 and March 1, 2000 Orders.

This court need not decide whether Navajo court's conclusion that plaintiffs Riggs

and Dickson had standing to assert claims on behalf of the past, present and future Navajo patients of the Montezuma Creek Clinic—*none* of whom appeared as plaintiffs in the Navajo court proceeding—was correct, or whether the question of standing may or must be re-examined in this action as part of the jurisdictional analysis, because subsequent events have rendered moot the preliminary injunctive relief granted by the Navajo court on the patients' behalf in December of 1999; the County and Health District defendants had no participation in, or authority or control over the management and operation of the Montezuma Creek Clinic from and after January 1, 2000, when Utah Navajo Health Systems assumed responsibility for that facility under its contract with the Navajo Nation.  Further enforcement of that relief—particularly for the benefit of unspecified, unidentified and absent plaintiffs—as against these defendants more than five years after that date would serve no practical purpose.

For essentially the same reason, much of the injunctive relief granted by the Navajo court in favor of plaintiffs Riggs and Dickson on their own pleaded employment-related claims was also rendered moot, and to that extent, the Navajo court's preliminary injunction is no longer capable of specific enforcement in this forum.  As to the remainder of the relief granted, *viz.,* expungement of all "charges and writings" referring to the time card issue from plaintiff Riggs' personnel file, this court declines to enforce the preliminary injunctive relief on Riggs' tort law claims as a matter of either full faith and credit or comity because the Navajo court orders—by their express terms—are preliminary and interlocutory orders, not final judgments of that court.  *See Restatement (Second) of Conflict of Laws* § 107 (1971).

256

The interlocutory nature of the three orders at issue also dooms plaintiffs' effort to enforce the other equitable relief granted them by the Navajo court, *viz.*, back pay, back benefits, etc.  That relief calls for the payment of money, but in amounts that were not set forth with any particularity in the Navajo court's December 28, 1999, March 1, 2000 and March 6, 2000 Orders.  Absent the requisite factual findings by the Navajo court liquidating those sums, the Navajo court orders leave this court with nothing to enforce.

Essentially the same is true as to the Navajo court's preliminary award of "attorney's fees, costs and expenses associated with these proceedings to date" in favor of the plaintiffs, but without specific findings as to amount.  Without a definitive answer to the "how much" question, this court remains at a loss as to how to enforce another court's order requiring defendants to pay money to the plaintiffs.

In any event, adjudication of Riggs and Dickson's claims against the Health District was barred by the District's immunity as defined by the Utah Governmental Immunity Act.  The State of Utah has not consented to suit against the State or its subdivisions in tribal courts.  Its limited statutory waiver of that immunity extends only to the exclusive remedy under the Act in its exclusively designated forum, the Utah state district courts.  While that limited waiver encompasses contract claims and claims involving injuries resultingfrom employee conduct, the Act excepts most intentional tort claims, including defamation, emotional distress, interference with contract, and civil rights violations, from the waiver.

Adjudication in the Navajo Nation District Court of the plaintiffs' claims against defendant Atcitty arising from his conduct as a member of the Health District's governing

257

board is likewise barred by the Utah Governmental Immunity Act, absent a finding that Atcitty acted due to fraud or malice.

This court gives effect to the limited nature of that waiver under the principles of sovereign immunity articulated in *Montana v. Gilham*, 133 F.3d 1133, 1136-1140 (9th Cir. 1997), and recognizing that under Navajo case law decided since the orders at issue were entered, the Navajo Supreme Court would likely honor the Health District's immunity under evolving principles of comity and reciprocity. *See Office of Navajo Labor Relations ex rel Bailon v. Central Consolidated School District No. 22*, No. SC-CV-13-98 (Navajo S. Ct. 06/05/2003), at ¶ [25], *available at*

http://www.tribal-institute.org/opinions/2003.NANN.0000007.htm.

Only Riggs' defamation claim against defendant Wood was excepted from the effect of the immunity afforded by the Utah Governmental Immunity Act, based upon the Navajo court's preliminary finding that Wood acted through malice in publishing "the phony fraud charge that still maliciously clouds Mr. Riggs' . . . name."  (December 28, 1999 Order at [15].)

For all of the reasons explained above,

**IT IS ORDERED** that the Plaintiffs' Motion for Summary Judgment for Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and Response of the District and County's Briefs and Motions for Summary Judgment [& Memorandum in Support], filed February 28, 2003 (dkt. no. 504), is GRANTED IN PART, but only to the extent that plaintiffs are entitled to entry of judgment declaring that consistent with *Montana*

*v. United States*, 450 U.S. 544 (1981), the Navajo Nation and the Navajo Nation District Court for the District of Shiprock, New Mexico, had civil regulatory authority and adjudicative subject-matter jurisdiction under *Navajo Nation Code*, tit. 7, § 253(B), respectively, over the San Juan Health Services District with respect to its employment relationships with plaintiffs Fred Riggs and Allison Dickson; the Navajo court also had subject-matter jurisdiction of plaintiff Riggs' defamation claim against defendant Wood, and of plaintiffs Singer, Riggs and Dickson's employment-related claims against defendant Atcitty, under *Navajo Nation Code*, tit. 7, § 253(B), consistent with *Montana v. United States* and *Nelson v. Pfizer, Inc.*, among other authorities; based upon the Navajo court's preliminary finding that Wood acted through malice, the Utah Governmental Immunity Act does not bar Riggs' claim against Wood; the plaintiffs' motion is DENIED as to all claims asserted by plaintiff Donna Singer, with the exception of her claim against defendant Atcitty, a Navajo member, because the Navajo Nation District Court for the District of Shiprock, New Mexico did not have adjudicative subject-matter jurisdiction of her claims against the non-Indian defendants under *Montana v. United States*, 450 U.S. 544 (1981), and *Strate v. A-1 Contractors*, 520 U.S. 438 (1997);  the plaintiffs' motion is DENIED as to defendants San Juan County, San Juan County Commissioners Tyron Lewis and Bill Redd, the San Juan County Attorney Craig Halls and County administrator Bailey because the Navajo Nation District Court for the District of Shiprock, New Mexico did not have adjudicative subject-matter jurisdiction under *Navajo Nation Code*, tit. 7, § 253(B) of plaintiffs Riggs and Dickson's claims against these defendants; and the plaintiffs' motion is DENIED in all other

respects because, *inter alia*, the Navajo court orders that plaintiffs seek to enforce in this forum are non-final and interlocutory in nature, and in large part have been rendered moot;

**IT IS FURTHER ORDERED** that San Juan Health District Defendants' Motion to Dismiss or for Summary Judgment, filed February 20, 2003 (dkt. no. 496), is GRANTED IN PART, to the extent that the defendants are entitled to entry of a judgment declaring that the Navajo Nation District Court for the District of Shiprock, New Mexico did not have adjudicative subject-matter jurisdiction under *Navajo Nation Code*, tit. 7, § 253(B) of the plaintiffs' claims against defendants John Lewis, Karen Adams, Patsy Shumway, and Lauren Schafer; that the Utah Governmental Immunity Act bars adjudication in the Navajo Nation District Court of plaintiffs' claims against Atcitty arising from his conduct as a member of the Health District governing board; the Act also bars adjudication in the Navajo court of Riggs and Dickson's claims against the San Juan Health Services District because its limited waiver of the District's governmental immunity does not extend to adjudication of individual claims against the District in Indian tribal courts; and

**IT IS FURTHER ORDERED** that "Plaintiffs' Motion for this Court to Address the Defendants' Immunity Issue and Full Faith and Credit Issue in any Order on Jurisdiction," filed September 24, 2004 (dkt. no. 661), is GRANTED IN PART, to extent that those issues

have been addressed in this Memorandum Opinion and Order.

DATED this 12 day of October, 2005.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge