IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| DR. STEVEN MACARTHUR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil No.  2:00-CV-584BSJ |
| vs. | ) | |
| | ) | |
| SAN JUAN COUNTY, et al., | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER RE: PLAINTIFFS'** |
| Defendants. | ) | **MOTIONS FOR** |
| | ) | **RECONSIDERATION** |
| DONNA SINGER, FRED RIGGS, and | ) | **(Fed. R. Civ. P. 59(e)/60(b)),** |
| ALLISON DICKSON, | ) | **AND OTHER MATTERS** |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| SAN JUAN COUNTY, SAN JUAN | ) | |
| HEALTH SERVICES DISTRICT, | ) | |
| COMMISSIONER TYRON LEWIS, | ) | |
| COMMISSIONER BILL REDD, | ) | |
| CRAIG HALLS, RICHARD BAILEY, | ) | |
| REID WOOD, ROGER ATCITTY, | ) | |
| JOHN LEWIS, KAREN ADAMS, | ) | |
| PATSY SHUMWAY, and LAUREN | ) | |
| SCHAFER, | ) | |
| | ) | |
| Defendants. | ) | |

```
┌─────────────────────────────────┐
│            FILED                │
│  CLERK, U.S. DISTRICT COURT     │
│  December 15, 2005 (5:01pm)     │
│      DISTRICT OF UTAH           │
└─────────────────────────────────┘
```

\* \* \* \* \* \* \* \* \*

This court entered its final Declaratory Judgment (28 U.S.C.A. § 2201(a)) &

Judgment & Order of Dismissal in the above-captioned action on October 31, 2005 (dkt. no.

848) ("October 31st Judgment").  On November 7, 2005, plaintiffs Singer, Riggs and

Dickson filed a Motion for Clarification, Reconsideration and Amendment of that judgment

(dkt. no. 849), with a supporting memorandum (dkt. no. 850).  On November 10, 2005,

plaintiff Valdez filed a "Motion to Reconsider and Amend the October 31, 2005 Order and

Allow Her to Amend Her Amended Complaint," (dkt. no. 855), with a supporting

memorandum (dkt. no. 856); plaintiffs Lyman and MacArthur also filed a "Motion to

Reconsider and Amend the October 31, 2005 Order and Allow Her to Amend Their

Amended Complaint," (dkt. no. 857), with a supporting memorandum (dkt. no. 858).[1]

The defendants filed a series of responsive memoranda,[2] and plaintiffs Singer, Riggs

and Dickson filed three reply memoranda.[3]  The motions were calendared for hearing on

November 30, 2005.  At the November 30th hearing, Susan Rose, Esq. appeared on behalf of

the plaintiffs; Carolyn Cox, Esq. and Robert R. Harrison, Esq. appeared on behalf of the San

Juan Health Services District defendants; and Jesse Trentadue, Esq. appeared on behalf of the

San Juan County defendants.  The court heard the arguments of counsel, and having reviewed

---

[1] Plaintiffs also filed a "Motion to Correct Plaintiffs Motion to Clarify, Reconsider and Amend," on November 9, 2005 (dkt. no. 853), seeking to remove a redundant page 9 from the Memorandum in Support of Plaintiffs Singer, Riggs, Dickson's Motion for Clarification, Reconsideration and Amendment, filed November 7, 2005 (dkt. no. 850).

[2] (*See* Memorandum in Opposition to Plaintiffs' Motion for Clarification, Reconsideration and Amendment, filed November 14, 2005 (dkt. no. 859; San Juan County Defendants' Memorandum in Opposition to Plaintiffs' Motions to Reconsider, filed November 20, 2005 (dkt. no. 862); Memorandum in Opposition to Plaintiffs' Motion for Clarification, Reconsideration and Amendment, filed November 21, 2005 (dkt. no. 863); "Memorandum in Opposition to Plaintiffs Lyman's and MacArthur's  Motion to Reconsider and Amend the October 31, 2005 Order, and to Allow Her [sic] to Amend Her [sic] Amended Complaint," filed November 21, 2005 (dkt. no. 864); Memorandum in Opposition to Plaintiff Helen Valdez' Motion to Reconsider and Amend the October 31, 2005 Order, and to Allow Her to Amend Her Amended Complaint," filed November 21, 2005 (dkt. no. 865).)

[3] (*See* "Plaintiff Singer/Riggs/Dickson's Reply to the Defendants' Opposition to the Rule 60 Motion to Correct, Ammend [sic] and Reconsider the Court's October 12, 2005 Order," filed November 25, 2005 (dkt. no. 866); "Plaintiff Singer/Riggs/Dickson's Reply to the Defendants **COUNTY** Opposition on Rule 60 Motion to Correct, Ammend [sic] and Reconsider," November 29, 2005 (dkt. no. 867); "Plaintiff Singer/Riggs/Dickson's Reply to the Defendants Second Opposition on Rule 60 Motion to Correct, Ammend, [sic] and Reconsider," filed November 29, 2005 (dkt. no. 868).)

and considered the memoranda submitted by the parties as well as this court's prior opinions and orders, ruled on the plaintiffs' motions, denying them in each instance.  (*See* Minute Entry, dated November 30, 2005 (dkt. no. 871).)

For the sake of clarity of the record in this matter, the court has elected to elaborate upon the reasons for its rulings on the plaintiffs' three Rule 59(e)/Rule 60 motions as well as setting forth in writing the court's rulings on prior motions heard on October 25, 2005.

### A.  Applicable Standards under Fed. R. Civ. P. 59(e) & 60(b)

According to the court of appeals, "The Federal Rules of Civil Procedure provide that a post-judgment motion may 'aris[e] under either Rule 59(e) (motion to alter or amend the judgment) or Rule 60(b) (relief from judgment for mistake or other reason). The[se] two rules serve different purposes and produce different consequences, both substantive and procedural.' *Sanders v. Clemco Indus.*, 862 F.2d 161, 168 (8th Cir. 1988) (citation and footnote omitted)." *Jennings v. Rivers*, 394 F.3d 850, 854 (10th Cir. 2005).

In this case, plaintiffs' counsel has asserted *both* Rule 59(e) and Rule 60(b) as bases for plaintiffs' three motions for reconsideration, filed within ten days of the entry of the court's October 31st Judgment.[4]  Counsel points to Rule 60(a) as well.

---

[4]Rule 60(b) reads in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (4) the judgment is void; . . . or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

Fed.R.Civ.P. 60(b)(1), (4) & (6).

Generally, Rule 59(e) motions "should be granted only to correct manifest errors of law or to present newly discovered evidence."  *Adams v. Reliance Standard Life Ins. Co.*, 225 F.3d 1179, 1186 n. 5 (10th Cir. 2000); *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir.1997) (same); *see also Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir.1995) (noting that the requirements for motions for reconsideration are "an intervening change in the controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice").

> Motions for "reconsideration" will not be granted absent "highly unusual circumstances"—they do not provide litigants with an opportunity for a "second bite at the apple" or allow them, like Emperor Nero, to "fiddle as Rome burns", or license a litigation "game of hopscotch", allowing parties to switch from one legal theory to a new one "like a bee in search of honey". Such motions are not vehicles for relitigating old issues.  Courts properly decline to consider new arguments or new evidence on reconsideration where those arguments or evidence were available earlier.

Steven Baicker-McKee, William M. Janssen & John B. Corr, *Federal Civil Rules Handbook* 962 (2006 ed.) (footnotes omitted).

Rule 60(b)(1) provides that

> "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment .... for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect...."  It "is an extraordinary procedure" which "'seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the incessant command of the court's conscience that justice be done in light of all the facts.'"  *Cessna Fin. Corp.*, 715 F.2d at 1444 (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) (additional internal quotation marks omitted)).  The rule "should be liberally construed when substantial justice will thus be served."  *Id.*

> "The guidelines governing a district court's consideration of a Rule 60(b)(1) motion ... are well established."  *Id.* at 1445.  Whether the movant has

-4-

> demonstrated "mistake, inadvertence, surprise, or excusable neglect" is an
> issue to be "litigated on the merits."  *Id.*  "The trial court must determine
> whether excusable neglect has in fact been established, resolving all doubts in
> favor of the party seeking relief."  *Id.*

*Jennings v. Rivers*, 394 F.3d 850, 855-856 (10th Cir. 2005); *see also Yapp v. Excel Corp.*,

186 F.3d 1222, 1231 (10th Cir. 1999) ("Rule 60(b)(1) motions premised upon mistake are

intended to provide relief to a party in only two instances: (1) when the party has made an

excusable litigation mistake or an attorney in the litigation has acted without authority; or (2)

when the judge has made a substantive mistake of law or fact in the final judgment or order.

See *Cashner*, 98 F.3d at 576 (citing 7 James Wm. Moore et. al., Moore's Federal Practice ¶

60.22[2] (2d ed.1985))." . . . [T]he kinds of mistakes remediable under a Rule 60(b)(1)

motion are litigation mistakes that a party could not have protected against."); *Cashner v.*

*Freedom Stores, Inc.*, 98 F.3d 572, 577 (10th Cir. 1996) ("If the mistake alleged is a party's

litigation mistake, we have declined to grant relief under Rule 60(b)(1) when the mistake was

the result of a deliberate and counseled decision by the party.").  Relief is available under

Rule 60(b)(1) "only for obvious errors of law, apparent on the record.  *Alvestad v. Monsanto*

*Co.*, 671 F.2d 908, 912-13 (5th Cir.) (relief under Rule 60(b)(1) limited to 'perfunctory

correction' of obvious errors of law), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 489, 74 L.Ed.2d

632 (1982); see also *Rocky Mountain Tool & Mach. Co. v. Tecon Corp.*, 371 F.2d 589,

596-97 (10th Cir. 1966) ('palpably erroneous award' of interest from date of filing

counterclaim rather than from date of entry of judgment correctable under Rule 60(b)(1))."

*Van Skiver v. United States*, 952 F.2d 1241, 1244 (10th Cir. 1991).

Rule 60(b)(4) provides for relief where "the judgment is void":

> A judgment is void for Rule 60(b)(4) purposes if the "rendering court was powerless to enter it." *V.T.A., Inc. v. Airco, Inc.*, 597 F.2d 220, 224 (10th Cir. 1979). A judgment may in some instances be void for lack of subject matter jurisdiction.  E.g. *id.*; *In re Four Seasons Securities Laws Litigation*, 502 F.2d 834, 842 (10th Cir. 1974).  "However, this occurs only where there is a plain usurpation of power, when a court wrongfully extends its jurisdiction beyond the scope of its authority." *Kansas City Southern Ry. Co. v. Great Lakes Carbon Corp.*, 624 F.2d 822, 825 (8th Cir. 1980) (citations omitted); accord *Nemaizer v. Baker*, 793 F.2d 58, 65 (2d Cir.1986) (observing that collateral attack is permitted under Rule 60(b)(4) where there is "a clear usurpation of power by a district court, and not an error of law in determining whether it has jurisdiction") (citations omitted).

> A court does not usurp its power when it erroneously exercises jurisdiction. *Kansas City Southern*, 624 F.2d at 825.  "Since federal courts have 'jurisdiction to determine jurisdiction,' that is, 'power to interpret the language of the jurisdictional instrument and its application to an issue by the court,' error in interpreting a statutory grant of jurisdiction is not equivalent to acting with total want of jurisdiction." *Id.* (quoting *Stoll v. Gottlieb*, 305 U.S. 165, 171, 59 S.Ct. 134, 83 L.Ed. 104 (1938)); see also *Lubben v. Selective Serv. Sys. Local Board No. 27*, 453 F.2d 645, 649 (1st Cir.1972) ("While absence of subject matter jurisdiction may make a judgment void, such total want of jurisdiction must be distinguished from an error in the exercise of jurisdiction.") (footnote omitted).  There must be "no arguable basis on which [the court] could have rested a finding that it had jurisdiction." *Nemaizer*, 793 F.2d at 65.

*Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1342, 1346 (10th Cir. 2000), *cert. denied*, 533 U.S. 915 (2001); *see also* Annotation, *Lack of Jurisdiction, or Jurisdictional Error, as Rendering Federal District Court Judgment "Void" for Purposes of Relief under Rule 60(b)(4) of Federal Rules of Civil Procedure*, 59 A.L.R. Fed. 831 (1982 & Supp. 2005).

Rule 60(b)(6) "permits the district court to reverse its order for 'any other reason justifying relief from the operation of the judgment,'" *Searles v. Dechant*, 393 F.3d 1126, 1131 (10th Cir. 2004), "other than the more specific circumstances set out in Rules

60(b)(1)–(5).” *Gonzalez v. Crosby*, ___ U.S. ___, 125 S.Ct. 2641, 2646 (2005) (citing

*Liljeberg v. Health Services Acquisition Corp.*, 486 U. S. 847, 863, n. 11 (1988); *Klaprott v.*

*United States*, 335 U. S. 601, 613 (1949) (opinion of Black, J.)).

According to the court of appeals:

> We have described Rule 60(b)(6) as a "grand reservoir of equitable power to do justice in a particular case." *Pierce v. Cook & Co.*, 518 F.2d 720 (10th Cir. 1975) (en banc) (citation omitted), *cert. denied*, 423 U.S. 1079, 96 S.Ct. 866, 47 L.Ed.2d 89 (1976). In *Pierce*, we were confronted with "[t]he kind of legal error that provides the extraordinary circumstances justifying relief under rule 60(b)(6)." *Van Skiver v. United States*, 952 F.2d 1241, 1244 (10th Cir. 1991), *cert. denied*, 506 U.S. 828, 113 S.Ct. 89, 121 L.Ed.2d 51 (1992). We granted Rule 60(b)(6) relief in *Pierce* based on a post-judgment change in the law "arising out of the same accident as that in which the plaintiffs . . . were injured." 518 F.2d at 723. Absent a post-judgment change in the law in a factually-related case, however, "we have held that 'a change in the law or in the judicial view of an established rule of law' does not justify relief under Rule 60(b)(6)." *Van Skiver*, 952 F.2d at 1245 (quoting *Collins v. City of Wichita*, 254 F.2d 837, 839 (10th Cir. 1958)).

*Johnston v. Cigna Corp.*, 14 F.3d 486, 497 (10th Cir. 1993) (footnote omitted). "Relief

under Rule 60(b)(6) is discretionary and is warranted only in exceptional circumstances. . . ."

*Id.* (citing *Pelican Prod. Corp. v. Marino*, 893 F.2d 1143, 1147 (10th Cir.1990)). A Rule

60(b)(6) motion "might contend that a subsequent change in substantive law is a 'reason

justifying relief,' Fed. Rule Civ. Proc. 60(b)(6), from the previous denial of a claim[,] *E.g.*,

*Dunlap v. Litscher*, 301 F. 3d 873, 876 (CA7 2002)," *Gonzalez v. Crosby*, 125 S. Ct. at

2647, but even so, the "cases have required a movant seeking relief under Rule 60(b)(6) to

show 'extraordinary circumstances' justifying the reopening of a final judgment." *Id.* at

2649.

Moreover, as to relief under Fed. R. Civ. P. 60(a):

> Rule 60(a) may be relied on to correct what is erroneous because the thing spoken, written, or recorded is not what the person intended to speak, write, or record. *Allied Materials Corp. v. Superior Prods. Co.*, 620 F.2d 224, 226 (10th Cir. 1980). Rule 60(a) may not be used to change something that was deliberately done, *Security Mut. Casualty Co. v. Century Casualty Co.*, 621 F.2d 1062, 1065 (10th Cir. 1980), even though it was later discovered to be wrong. *Allied Materials*, 620 F.2d at 226. A correction under Rule 60(a) should require no additional proof. See, e.g., *Trujillo v. Longhorn Mfg. Co.*, 694 F.2d 221, 226 (10th Cir. 1982).

*McNickle v. Bankers Life and Cas. Co.*, 888 F.2d 678, 682 (10th Cir. 1989).

And to the extent that plaintiffs MacArthur, Lyman and Valdez again seek leave to amend their complaint, even though Rule 15(a) states that "leave [to amend] shall be freely given when justice so requires," the court of appeals observes that "'this presumption is reversed in cases, such as here, where a plaintiff seeks to amend a complaint after judgment has been entered and a case has been dismissed.' *Bressner v. Ambroziak*, 379 F.3d 478, 484 (7th Cir. 2004); see also *Ahmed*, 297 F.3d at 207-08 (liberality of Rule 15 no longer applicable once judgment has been entered)." *The Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1087-1088 (10th Cir. 2005).

## B. Singer, Riggs & Dickson's Rule 59(e)/60(b) Motion

Plaintiffs Singer, Riggs and Dickson seek relief from this court's October 31st Judgment under Fed. R. Civ. P. 59(e) and 60(a), (b)(1), (4) & (6), but without detailing the specific relief sought. (*See* Memorandum in Support of Plaintiffs Singer, Riggs, Dickson's Motion for Clarification, Reconsideration and Amendment, filed November 7, 2005 (dkt. no. 850) ("Pltfs' Mem. (850)"), *passim*.) The motion appears to be premised upon five core assertions:

(1) Congress has legislatively overruled *Montana v. United States*, as well as *Strate v. A-1 Contractors*, *Atkinson Trading Co. v. Shirley*, and *Nevada v. Hicks*, reviving inherent tribal civil authority over non-Indians in "Indian country" in all circumstances;

(2) The equal protection clause of the Indian Civil Rights Act, 25 U.S.C.A. § 1302(8) (2001), mandates the exercise of co-extensive tribal civil jurisdiction over tribal members and non-Indians in "Indian country" in all circumstances;

(3) This court lacks authority to review a tribal court order or judgment "for *federal* legal soundness except for Habeas relief[,] 25 USC [§] 1303," (Pltfs' Mem. (850), at 7);

(4) The County and the Health District have no governmental immunity because they are not the State or an "arm of the State" (*id.* at 7); and

(5) Under "the Court's analysis of . . . federal preemption doctrine, all the Navajo law and Orders and Judgments are enforceable at any time, interlocutory or not, without regard to commity [sic] or reciprocity of state and tribal immunity," (*id.* at 6).

With the exception of plaintiffs' equal protection theory under 25 U.S.C.A. § 1302(8), each of these propositions was addressed in some detail in this court's October 12th Memorandum Opinion & Order (dkt. no. 837), *MacArthur v. San Juan County*, 391 F. Supp. 2d 895 (D. Utah 2005), and upon examination, each proposition was shown to lack legal merit.

**(1) Plaintiffs have not shown that Congress has legislatively overruled *Montana v. United States*, *Strate v. A-1 Contractors*, *Atkinson Trading Co. v. Shirley*, and *Nevada v. Hicks*, reviving inherent tribal civil authority over non-Indians in "Indian country" in all circumstances**

Plaintiffs' Rule 59(e)/60(b) motion revives their centerpiece legal theory that the analysis of inherent Indian tribal civil authority over non-Indians under *Montana* and its progeny represents an "'old-law' analysis" superseded by recent congressional legislation. (Pltfs' Mem. (850), at 1, 3-6 & nn. 2, 6-7, 10-11; *see also* "Plaintiffs' Briefing on *Montana*," filed February 13, 2003 (dkt. no. 492), at 2-10;[5] "Federalism and Article III Court Limitations in Defining Navajo Tribal Court Jurisdiction" [unsigned original document submitted by plaintiffs' counsel], filed February 24, 2003 (dkt. no. 502), at 7-15;[6] Plaintiffs' Motion for Summary Judgment for Enforcement of the Navajo Court Orders under Full Faith and Credit or Comity and Response of the District and County's Briefs and Motions for Summary Judgment [& Memorandum in Support], filed February 28, 2003 (dkt. no. 504) ("Pltfs' Summ. Judg. Mem. (504)"), at 9-14 ("Pro[-]Tribal Presumptions").)  In plaintiffs' view, "Congress . . . has extinguished the *Montana* analysis altogether."  ("Plaintiff Singer/Riggs/ Dickson's Reply to the Defendants Second Opposition on Rule 60 Motion to Correct, Ammend, [sic] and Reconsider," filed November 29, 2005 (dkt. no. 868), at 2.)

---

[5]As previously noted, plaintiffs "incorporate[d] the briefing done in their Supreme Court petition and Writ of Mandamus petitions into this briefing," apparently referring to their "Petition for a Writ of Certiorari, *Riggs v. San Juan County*, No. 02-1253 (U.S.S.Ct., filed February 6, 2003), and "Petition for a Writ of Mandamus and Prohibition," *In re: Riggs, et al. v. San Juan County, et al.*, Case No.  03-4036 (10th Cir., filed February 13, 2003), copies of which are lodged in this court's file.

[6]As previously explained, this submission consisted of exhibits that were supposed to be appended to "Plaintiffs' Motion to Allow Plaintiffs Corrections of Factual Assertions in the February 24, 2003 Hearing,"(dkt. no. 571), which was served on opposing counsel on or about February 24, 2003, but was not filed with the court until November 18, 2003.  *Cf.* Fed. R. Civ. P. 5(d).

Plaintiffs again cite to the Indian Tribal Justice Act of 1993,[7] the Indian Tribal Justice Technical and Legal Assistance Act of 2000,[8] the Indian Civil Rights Act of 1968 ("ICRA"),[9] as amended by Pub. L. No. 101-511,[10] this time adding to that list the Indian Self-Determination and Education Assistance Act of 1975,[11] the Indian Self-Determination and Education Assistance Contract Reform Act of 1994,[12] and the Tribal Self-Governance Act of 1994.[13]  (Pltfs' Mem. (850), at 3-4 & n.7.)

According to plaintiffs' counsel, the cited statutes "constitute a plan whereby the federal government turned operations of the federal Courts of Indian Offenses over to individual Indian Nations."  (*Id.* at 4.)

> The Indian Nations individually volunteered for the program and met federal criteria, by government-to-government contract, on one statutory condition–that under the Indian Civil Rights Act (25 USC 1301 et seq, particularly 1302) and federally approved Indian Nation law, that includes here, the Navajo Nation Bill of Rights, Navajo customs and traditions, and Navajo statutes, and Navajo Rules of Civil Procedure and Rules of Evidence (patterned nearly identical to the federal, similarly to state rules) '*any person*',

---

[7]Pub. L. No. 103-176, 107 Stat. 200 (1993), *codified at* 25 U.S.C.A. §§ 3601 *et. seq.* (2001).

[8]Pub. L. No. 106-559, 114 Stat. 2778 (2000), *codified at* 25 U.S.C.A. §§ 3651 *et seq.* (2001).

[9]Pub. L. No. 90-284, Title II, 82 Stat. 77 (1968), *codified at* 25 U.S.C.A. §§ 1301-1303 (2001).

[10]Pub. L. No. 101-511, Title VIII, § 8077(b), (c), 104 Stat. 1892 (1990), *codified at* 25 U.S.C.A. § 1301(2) (2001); *see also* Pub. L. No. 102-137, 105 Stat. 646 (1991).

[11]Pub. L. No. 93-638, 88 Stat. 2203 (1975), *codified at* 25 U.S.C.A. §§ 450-450n (2001).  Plaintiffs' counsel suggests that this legislation was enacted in 1993 or 1994, (Pltfs' Mem. (850), at 3 & n.7), but that is simply not true.

[12]Pub. L. 103-413, Title I, 108 Stat. 4250 (1994), *codified at* 25 U.S.C.A. §§ 450 note, 450b, 450c, 450e, 450f, 450j, 450j-1, 450k-450m, 450m-1 (2001).

[13]Pub. L. 103-413, title II, 108 Stat. 4270 (1994) (*codified at* 25 U.S.C.A. §§ 458aa-458hh (2001)).  *See also* Tribal Self-Governance Amendments of 2000, Pub. L. 106-260, 114 Stat. 711 (2000) (establishing Tribal Self-Governance Program within the Indian Health Service).

not "any Indian" would be treated equally under ICRA.  **25 USC 450***l* and
notes statutorily memorializes the model agreement and Congressional
demands including the application of ICRA to the contract.  EXHIBIT 1.  This
plan for Indian Nation Independence is consistent with history.

(*Id.* at 4-5 (emphasis in original; footnotes omitted).[14])

As recounted in some detail in this court's October 12th Memorandum Opinion &

Order, the Navajo Nation did *not* "volunteer" to take over "operations of the federal Courts of

Indian Offenses" under a Pub. L. 93-638 Indian Self-Determination Act contract.

*MacArthur*, 391 F. Supp. 2d at 966-967.  The BIA courts of Indian offenses were entirely

displaced by the Navajo Nation Council's creation of the Navajo courts in *1959*, nine years

before the enactment of the Indian Civil Rights Act and sixteen years before the enactment of

Pub. L. 93-638.  *Id.*  The Bureau of Indian Affairs has continued to provide partial funding

for the Navajo court system since that time, but the operation of the Navajo Nation Judicial

Branch continues to embody the exercise of inherent Navajo sovereignty as recognized and

enhanced by federal treaty and statutes.  Indeed, the Navajo judiciary may well be startled by

counsel's assertion that the Navajo courts are acting as contract administrators of "federal

Courts of Indian Offenses" in adjudicating the matters brought before them, applying

"federally approved . . . Navajo customs and traditions" and "BIA ratified, trained, funded"

Navajo law.  (Pltfs' Mem. (850), at 3, 4.)

---

[14]The referenced "Exhibit 1" is an unauthenticated, undated and incomplete copy of an "Agreement
Between the Secretary of the Department of the Interior and the Navajo Nation" purportedly made pursuant to Title I
of the Indian Self-Determination and Education Assistance Act of 1975 (25 U.S.C.A. §§ 450 *et seq.*) concerning the
administration of a "Judicial Program."  (Pltfs' Mem. (850), at Exh. 1.)  This document appears to be an excerpt
from a compilation of documents received by plaintiffs' counsel from the Bureau of Indian Affairs in March 2003
pursuant to a Freedom of Information Act request.  (*See* Memorandum in Support of Plaintiffs' Motion to Correct
their Submission of the BIA Contract with the Navajo Nation Judicial Program, filed March 28, 2003 (dkt. no. 536),
and documents annexed thereto.)

Nothing in Pub. L. 93-638, as amended by the 1994 legislation, or in the contracts made pursuant to its provisions purports to define, limit or expand the substantive extent of Navajo civil or criminal authority or adjudicative jurisdiction, or to limit or supersede the effect of *Montana v. United States*, 450 U.S. 544 (1981), or later cases that follow it.  The contract language simply acknowledges the substantive limitations that exist under ICRA and Navajo law.

Plaintiffs insist that the congressional legislation they cite has "lift[ed] the *Montana* presumptions and restrictions" and creates a presumption of tribal civil jurisdiction over tribal members and non-members alike, with no distinction as to land tenure within "Indian country" as defined under 18 U.S.C.A. § 1151 (2000).  (*Id.* at 3.)[15]  Yet as explained in the October 12th Memorandum Opinion & Order, nothing in the language or legislative history of the 1990, 1993 and 2000 legislation addresses the question of the scope of inherent tribal civil jurisdiction over non-members after *Montana*.  *See MacArthur,* 391 F. Supp. 2d at 993-996.

When Congress acts to override the Court's reading of federal law, it usually makes its purpose explicit.  For example, the 1990 and 1991 amendments to 25 U.S.C.A. § 1301 were explicitly intended to overrule *Duro v. Reina*, 495 U.S. 676 (1990), as to the scope of inherent tribal criminal jurisdiction over non-member Indians, as clearly reflected in its

---

[15]Plaintiffs argue that under the Navajo treaties, the statutes enlarging the Navajo Reservation and "under 18 U.S.C. 1151 defining Indian country, . . . the Navajo have 'exclusive sovereignty' over ALL land within the Utah Navajo border," regardless of *Montana*'s limitation of inherent tribal civil authority over non-Indian conduct on non-Indian lands.  (Pltfs' Mem. (850), at 5.)  *But cf. Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 653-654 n.5 (2001) ("Although § 1151 has been relied upon to demarcate state, federal, and tribal jurisdiction over criminal and civil matters, . . . [s]ection 1151 simply does not address an Indian tribe's inherent or retained sovereignty over nonmembers on non-Indian fee land.").

legislative history.  *See United States v. Lara*, 541 U.S. 193, 199 (2004).

Similarly, the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991), legislatively overruled no less than six prior Supreme Court rulings construing federal anti-discrimination statutes, as clearly reflected in its findings and statement of legislative purposes, *id.* at §§ 2, 3, 105 Stat. 1071, and it legislative history.  *See, e.g.,* H.R. Rep. No. 102-40(I) (1991); H.R. Rep. No. 102-40(II) (1991); Interp. Mem., 137 Cong. Rec. S 15276 (Oct. 25, 1991); Roger Clegg, *Introduction: a Brief Legislative History of the Civil Rights Act of 1991*, 54 La. L. Rev. 1459 (1994).

No expressions of that kind are to be found with reference to the legislation relied upon by the plaintiffs.  To the contrary, the 1993 and 2000 legislation reflects the Senate Indian Affairs Committee's reading of *Montana* as confirming the existence of tribal civil authority over members and non-members.  *See MacArthur*, 391 F. Supp. 2d at 995 & n. 144.

*Lara* establishes that Congress may redefine the scope of tribal authority over non-members by legislative adjustment, as it did in response to *Duro v. Reina* concerning tribal criminal jurisdiction.  Congress has not yet done so with reference to *Montana* or its progeny, including *Strate*, *Atkinson*, and the problematic *Nevada v. Hicks*, decided in 2001.  So *Montana* continues to govern inherent Indian tribal civil authority over non-Indians conducting activities on non-Indian lands within reservation boundaries.  *See MacArthur*, 391 F. Supp. 2d. at 950-955, 968-971, 993-996; *accord*, *Nelson v. Pfizer, Inc.*, No. SC-CV-01-02 (Navajo S. Ct. November 17, 2003); *Manygoats v. Atkinson Trading Company, Inc.*, No. SC-CV-62-200 (Navajo S. Ct. August 12, 2003); *Manygoats v. Cameron*

-14-

*Trading Post*, No. SC-CV-50-98 (Navajo S. Ct. January 14, 2000); *cf. Dale Nicholson Trust v. Chavez*, No. SC-CV-69-00 (Navajo S. Ct. January 6, 2004) (jurisdiction over state officers after *Nevada v. Hicks*).

> **(2) The equal protection clause of the Indian Civil Rights Act, 25 U.S.C.A. § 1302(8) (2001), does not mandate the exercise of co-extensive tribal civil jurisdiction over tribal members and non-Indians in "Indian country" in all circumstances.**

Plaintiffs' counsel insists that the equal protection language of the Indian Civil Rights Act of 1968, 25 U.S.C.A. § 1302(8), mandates the exercise of general Indian tribal civil jurisdiction over tribal members and non-members alike as to any matter arising in "Indian country" as defined by 18 U.S.C.A. § 1151 (2000). If tribal jurisdiction over non-Indian litigants is not co-extensive with jurisdiction over tribal member litigants, plaintiffs insist, tribal courts cannot treat litigants equally or provide equal justice to all persons, as § 1302(8) requires.

Section 1302 reads:

No Indian tribe in exercising powers of self-government shall—

(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of *the people* peaceably to assemble and to petition for a redress of grievances;

(2) violate the right of *the people* to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and *the person* or thing to be seized;

(3) subject *any person* for the same offense to be twice put in jeopardy;

(4) compel *any person* in any criminal case to be a witness against himself;

(5) take any private property for a public use without just compensation;

(6) deny to *any person* in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

(7) require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and [1] a fine of $5,000, or both;

(8) deny to *any person* within its jurisdiction the equal protection of its laws or deprive *any person* of liberty or property without due process of law;

(9) pass any bill of attainder or ex post facto law; or

(10) deny to *any person* accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

25 U.S.C.A. § 1302 (2001) (emphasis added).  Through § 1302, "Congress statutorily imposed on tribal governments a list of specific restraints consisting almost entirely of language copied verbatim from the Constitution, mainly from the Bill of Rights."  Note, *The Indian Bill of Rights and the Constitutional Status of Tribal Governments*, 82 Harv. L. Rev. 1343, 1345 (1969).

The original draft of the Act would have applied all constitutional guarantees to the tribes with some minor exceptions.  Testimony in subcommittee hearings, however, demonstrated that strict application of certain constitutional guarantees would be destructive to Indian culture, and a substitute draft was adopted which enumerated some, but not all constitutional guarantees.  The wording of the final version of the bill was taken nearly verbatim from the United States Constitution.

Comment, Martinez v. Santa Clara Pueblo: *The Scope of Indian Equal Protection*, 1976 Utah L. Rev. 547, 548 (1977) (footnotes omitted); *see also United States v. Wheeler*,  435 U.S.

313, 327-328 (1978) ("the Indian Civil Rights Act of 1968, 82 Stat. 77, 25 U.S.C. § 1302, made most of the provisions of the Bill of Rights applicable to the Indian tribes").

Section 1302(8) forbids any Indian tribe in the exercise of its powers of self-government to "deny to any person within its jurisdiction the equal protection of its laws."  Plaintiffs' counsel contends that this equal protection guarantee requires that "'*any person*', not any Indian', would be treated equally" by tribal courts and that the Navajo courts apply Navajo law "'uniformly' to all persons within the Navajo borders without exception as to the type of land ownership under [18] U.S.C. 1151."  (Pltfs' Mem. (850), at 4 & n. 9.)  The equal and uniform application of Navajo law in turn requires the Navajo courts to exercise co-extensive civil jurisdiction over tribal members and non-members alike; after all, counsel continues, "*Oliphant* and its progeny never discussed the application of ICRA demands on Indian Nation tribunals, nor the constitutionality of the Indian Civil Rights Act, to restrict it." (*Id.* at 6.)

In fact, *Oliphant* discussed ICRA's relationship to tribal jurisdiction over non-Indians in a footnote:

> Respondents do contend that Congress has "confirmed" the power of Indian tribes to try and to punish non-Indians through the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U.S.C. § 476, and the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302.  Neither Act, however, addresses, let alone "confirms," tribal criminal jurisdiction over non-Indians.  The Indian Reorganization Act merely gives each Indian Tribe the right "to organize for its common welfare" and to "adopt an appropriate constitution and bylaws." With certain specific additions not relevant here, the tribal council is to have such powers as are vested "by existing law."  The Indian Civil Rights Act merely extends to "any person" within the tribe's jurisdiction certain enumerated guarantees of the Bill of Rights of the Federal Constitution.

As respondents note, an early version of the Indian Civil Rights Act extended its guarantees only to "American Indians," rather than to "any person." The purpose of the later modification was to extend the Act's guarantees to "all persons who may be subject to the jurisdiction of tribal governments, whether Indians or non-Indians." Summary Report on the Constitutional Rights of American Indians, Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., 10 (1966). But this change was certainly not intended to give Indian tribes criminal jurisdiction over non-Indians. Nor can it be read to "confirm" respondents' argument that Indian tribes have inherent criminal jurisdiction over non-Indians. Instead, the modification merely demonstrates Congress' desire to extend the Act's guarantees to non-Indians if and where they come under a tribe's criminal or civil jurisdiction by either treaty provision or Act of Congress.

*Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 195 n.6 (1978).

Looking to the legislative history of § 1302(8), its sponsor, Senator Sam Ervin of North Carolina, had redrafted his Indian civil rights bill in 1967 "according to the recommendations of the Interior Department, but on one critical point he deviated from them[:]"

Interior originally worded its "equal protection" provision in such a way as to limit its application to *members of the tribe* located within its jurisdiction. Sam Ervin's revision, however, guaranteed equal protection to *any person* within the tribe's jurisdiction. The significance of the altered wording was that it might be construed to extend equal benefits of tribal affiliation to non-Indians residing, leasing, or owning property on reservations, and subject to regulations established by the tribal councils.

Donald L. Burnett, Jr., *An Historical Analysis of the 1968 'Indian Civil Rights' Act*, 9 Harv. J. Legis. 557, 602 n.239 (1972) (emphasis in original). This view necessarily assumed that Indian tribes had at least *some* authority over non-Indians within reservation boundaries,

evidenced by rulings such as *Williams v. Lee*, 358 U.S. 217 (1959).[16]  The legislative history also reflects considerable concern for the protection of tribal civil and criminal jurisdiction over tribal members, but this arose in the context of the unilateral extension of *state* jurisdiction over Indian country without tribal consent under Public Law 83-280, enacted in 1953.  *See id.* at 568-569, 596-599.  The 1968 Act amended Public Law 83-280 to require tribal consent by referendum to any future extension of state jurisdiction over Indian country and to provide a mechanism for retrocession of state jurisdiction to the tribes and the federal government.  Pub. L. No. 90-284, Title IV, 82 Stat. 78-80 (1968), *codified at* 25 U.S.C.A. §§ 1321-1326 (2001).  *See also* 1 American Indian Policy Review Comm'n, *Final Report* 151-152 (1977).

Section 1302(8) thus guarantees the equal protection of tribal law to tribal members and non-members alike, *cf. Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62-63 & n.14 (1978), and was intended to guide and constrain the exercise of tribal authority within the tribes' existing jurisdiction, but did not undertake to define or enlarge its scope.

Nine years later, the American Indian Policy Review Commission observed that "[t]he question of jurisdiction of tribal governments has grown increasingly complex in recent years," and that "[t]ribal governments are emerging from an essentially dormant period forcibly imposed upon them by Federal policies directed toward their ultimate destruction." 1 American Indian Policy Review Comm'n, *Final Report* 153 (1977).  Though "[t]here is an

---

[16]While some concern was expressed by 'white businessmen on the reservations" in the wake of decisions such as *Williams v. Lee*, 358 U.S. 217 (1959), as to whether they could "expect impartial treatment from a native tribunal" where they were required to litigate in tribal courts, *id.* at 573 n.101, Senator Ervin's legislative inquiry did not address the precise scope of tribal jurisdiction over non-Indians.

established legal basis for tribes to exercise jurisdiction over non-Indians" as summarized in its *Final Report*, the Commission acknowledged that "the parameters of jurisdiction and authority of tribal governments" remained uncertain and were subject to "case by case determination" based in part on the "multiplicity of circumstances and variance in resources and capabilities of the tribes" at that time.  *Id.* at 154.[17]

While the enactment of the 1968 Indian Civil Rights Act "demonstrated that: (1) Congress confirmed that Indian tribes exercise jurisdiction over non-Indians when carrying out their powers of self-government, and (2) both Indians and non-Indians now have available 'sources of protection against arbitrary tribal action. . . .' *United States v. Mazurie*, 419 U.S. at 558 n.12," (Brief for Respondents, *Oliphant v. Suquamish Indian Tribe*, No. 76-5729, filed November 4, 1977, 1977 WL 189289, at 61), nothing in the language of § 1302, its legislative history or its subsequent construction has been read to mandate that Indian tribes exercise civil authority over non-Indians coextensive with tribal civil authority over tribal members.  *See, e.g.*, *Felix S. Cohen's Handbook of Federal Indian Law* 255 (Rennard Strickland, et al., eds. 1982) ("The breadth of retained power over non-Indians in civil matters has not been finally resolved."); *see also* Robert J. McCarthy, *Civil Rights in Tribal Courts: the Indian Bill of Rights at Thirty Years*, 34 Idaho L. Rev. 465, 505-510 (1998).

---

[17]

      The resolution of these issues is complicated by the varying land distribution patterns within the different reservations, the difference in physical, economic and human resources between small tribes and large tribes, differences in the availability and value of natural resources over which the various governments are contending for control, and differences in proximity to large metropolitan areas.

*Id.* at 153.

**(3) Plaintiffs' assertion that this court lacks authority to review a tribal court order or judgment "for *federal* legal soundness except for Habeas relief[,] 25 USC [§] 1303," has no substantive merit.**

Plaintiffs Singer, Riggs and Dickson brought Navajo tribal court orders into this forum seeking this court's aid in enforcing those orders against the named defendants.  On remand, the court of appeals observed:

> We are unwilling to enforce judgments of tribal courts acting beyond their authority, especially where defendants have a federal right "to be protected against an unlawful exercise of Tribal Court judicial power," *Nat'l Farmers,* 471 U.S. at 851, 105 S.Ct. 2447; *see Wilson,* 127 F.3d at 810 (holding that "federal courts must neither recognize nor enforce tribal judgments if: (1) the tribal court did not have both personal and subject matter jurisdiction; or (2) the defendant was not afforded due process of law").

*MacArthur v. San Juan County*, 309 F.3d 1216, 1225 (10th Cir. 2002).  As explained in the October 12th Memorandum Opinion & Order, this court must examine the subject-matter jurisdiction of the Navajo court as a predicate for any enforcement of its orders in this court, and that examination raises a federal question.  *See MacArthur*, 391 F. Supp. 2d at 985-988.  That examination is not a matter of "injecting federal law in place of Navajo customs, traditions and statutory law" without constitutional or statutory authority.  (Pltfs' Mem. (850), at 2; *see id.* at 7 (review "would interject federal law into Navajo law, diminishing their independence").)  It is a matter of determining the legal basis for the exercise of federal judicial power where that power has been invoked by plaintiffs' pleadings seeking to enforce the Navajo court's orders in this forum.

**(4) Plaintiffs' assertion that the County and the Health District have no governmental immunity because they are not the State or an "arm of the State" has no substantive merit.**

Plaintiffs' counsel submits that this court's dismissal of Riggs and Dickson's claims against the Health District and defendant Atcitty reflected the "application of state sovereign immunity to a political subdivision (for the first time since Lord Coke in England . . .)," (Pltfs' Mem. (850), at 1 (footnote omitted)),[18] which may overstate things a bit.

The doctrine of sovereign immunity from private suit finds its roots in the English common law. *See, e.g.*, 3 William Blackstone, *Commentaries on the Laws of England* \*254-\*257 (1768); Guy I. Seidman, *The Origins of Accountability: Everything I Know about the Sovereign's Immunity, I Learned from King Henry III*, 49 St. Louis U. L.J. 393 (2005).

> The doctrine of sovereign immunity comprises two distinct rules, which are not always separately recognized. The one rule holds that the King or the Crown, as the font of law, is not bound by the law's provisions; the other provides that the King or Crown, as the font of justice, is not subject to suit in its own courts. See, *e.g.*, Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 3-4 (1963). The one rule limits the reach of substantive law; the other, the jurisdiction of the courts. We are concerned here only with the latter rule, which took its common-law form in the high middle ages. "At least as early as the thirteenth century, during the reign of Henry III (1216-1272), it was recognized that the king could not be sued in his own courts." C. Jacobs, Eleventh Amendment and Sovereign Immunity 5 (1972). See also 3 W. Blackstone, Commentaries, \*244-\*245;

---

[18]Sir Edward Coke (1522-1634) wrote extensively about the English common law, *see, e.g.*, Sir Edward Coke, *Institutes of the Lawes of England* (1608), and wrote an opinion as chief justice of England's Court of Common Pleas in *Dr. Bonham's Case* (1610), 8 Co. Rep. 107a, 114a C.P. 1610, *available at* http://press-pubs.uchicago.edu/founders/documents/amendV_due_processs1.html, that is frequently credited as "providing an early foundation for the idea that courts might invalidate legislation that they found inconsistent with a written constitution." *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 162 (1996) (Souter, J., dissenting). Under Coke's leadership in 1628, the House of Commons forced Charles I of England to accept Coke's "Petition of Right" by withholding appropriations of revenues. *See also* Catherine Drinker Bowen, *The Lion and the Throne: The Life and Times of Sir Edward Coke* (1957); *The Selected Writings and Speeches of Sir Edward Coke* (Steve Sheppard, ed. 2003) (3 vols.).

Jaffe, *supra*, at 2 ("By the time of Bracton (1268) it was settled doctrine that the King could not be sued *eo nomine* in his own courts").

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 102-103 (1996) (Souter, Ginburg & Breyer, JJ., dissenting) (footnote omitted).[19]  Sovereign immunity was a privilege understood in the English common law to be reserved solely to the Crown: "the law ascribes to the king the attribute of *sovereignty*, or pre-eminence," according to Blackstone, 1 William Blackstone, *Commentaries on the Laws of England* *241 (1765); it was the King against whom "no suit or action can be brought . . . even in civil matters, because no court can have jurisdiction over him."  *Id.* at *242.

The common-law doctrine of the immunity of counties and other local governmental units "is generally considered to have originated with the English case *Russell v. The Men of Devon*," 2 Term Rep. 667, 100 Eng. Rep. 359 (1788)."  1 Shepard's Editorial Staff, *Civil Actions Against State and Local Government: Its Divisions, Agencies and Officers* § 1.6, at 19 (2d ed. 1992).

Both of the common-law doctrines of sovereign immunity and local governmental

---

[19]As Justice Souter explains:

The first of these notions rests on the ancient maxim that "the King can do no wrong." See, *e.g.*, 1 W. Blackstone, Commentaries *244.  Professor Jaffe has argued this expression "originally meant precisely the contrary to what it later came to mean," that is, "'it meant that the king must not, was not allowed, not entitled, to do wrong.'" Jaffe, 77 Harv. L. Rev., at 4 (quoting Ehrlich, Proceedings Against the Crown (1216-1377) p. 42, in 6 Oxford Studies in Social and Legal History (P. Vinogradoff ed. 1921), at 42); see also 1 Blackstone, *supra*, at *246 (interpreting the maxim to mean that "the prerogative of the crown extends not to do any injury").  In any event, it is clear that the idea of the sovereign, or any part of it, being above the law in this sense has not survived in American law.  See, *e.g.*, *Langford v. United States*, 101 U.S. 341, 342-343 (1880); *Nevada v. Hall*, 440 U.S. 410, 415 (1979).

*Id.* 517 U.S. at 103 n.2.

immunity found their way into American jurisprudence:

> These doctrines were recognized by the individual states of the United States from the outset. One court observed that the English common law doctrines of immunity seem to have been windblown across the Atlantic as were the pilgrims on the Mayflower and landed as by chance on Plymouth Rock, for the first American case arose in Massachusetts. The cases . . . set the tumbleweed in motion and nearly every state adopted the doctrine of immunity of the state for the torts of its officers.

*Id.* § 1.6, at 20 (footnotes omitted) (citing *Mower v. Leicester*, 9 Mass. 247 (1812)). The American "doctrine of sovereign immunity . . . had its origins in the 'familiar doctrine of the common law,' *The Siren*, 74 U.S. 152, 153 (1869), 'derived from the laws and practices of our English ancestors,' *United States v. Lee*, 106 U.S. 196, 205 (1882)." *Seminole Tribe*, at 130 (Souter, Ginsburg & Breyer, JJ., dissenting) (footnote omitted).

> Although statutes came to affect its importance in the succeeding centuries, the doctrine was never reduced to codification, and Americans took their understanding of immunity doctrine from Blackstone, see 3 W. Blackstone, Commentaries on the Laws of England ch. 17 (1768). Here, as in the mother country, it remained a common-law rule. See generally, Jaffe, 77 Harv. L. Rev., at 2-19; Borchard, Governmental Responsibility in Tort, VI, 36 Yale L. J. 1, 17-41 (1926).

*Id.* at 131. "Sovereign immunity is a common-law doctrine that long predates our Constitution and the Eleventh Amendment, although it has, of course, been carried forward in our jurisprudence." *Employees of Dept. of Public Health and Welfare of Missouri v. Department of Public Health and Welfare of Missouri*, 411 U.S. 279, 288 (1973) (Marshall, J., concurring in result).

> The doctrine of sovereign immunity, strictly defined, is comprised of two separate principles which traditionally have shielded states from litigation in their own courts. The first principle is that a state is immune from suit in its own courts without its consent. . . . The second principle encompassed by

-24-

> sovereign immunity is that a state is immune from liability for torts committed
> by its officers agents and employees.

1 Shepard's Editorial Staff, *Civil Actions Against State and Local Government: Its Divisions,*
*Agencies and Officers* § 1.1, at 2 (footnotes omitted).  *See also* 57 Am. Jur. 2d *Municipal,*
*County, School and State Tort Liability* § 10 (2001) ("Sovereign immunity presents a
complete bar to suits against the state and it embraces two distinct principles: immunity from
liability and immunity from suit.").

It is true that *Alden v. Maine*, 527 U.S. 706 (1999), observed that an "important limit
to the principle of sovereign immunity is that it bars suits against States but not lesser
entities.  The immunity does not extend to suits prosecuted against a municipal corporation or
other governmental entity which is not an arm of the State."  527 U.S. at 756 (citing *Mt.*
*Healthy City Bd. of Ed.  v. Doyle*,  429 U. S. 274, 280 (1977); *Lincoln County  v. Luning*, 133
U. S. 529 (1890)).  But "[i]n many jurisdictions, a distinction is recognized between
sovereign immunity, which applies to the state, state agencies, and state officers and
employees, and the immunity of political subdivisions of the state such as counties and
municipal corporations.  The latter type of immunity is commonly referred to as
governmental immunity."  1 Shepard's Editorial Staff, *Civil Actions Against State and Local*
*Government: Its Divisions, Agencies and Officers* § 1.1, at 2-3 (footnotes omitted).

As noted above, the doctrine of local governmental immunity finds its own common-
law roots.  Justice Traynor, writing for the majority in *Muskopf v. Corning Hospital District*,
55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457 (1961), reviewed its history:

> The rule of county or local district immunity did not originate with the

concept of sovereign immunity. The first case to hold that local government units were not liable for tort was *Russell v. Men of Devon*, 100 Eng.Rep. 359. The case involved an action in tort against an unincorporated county. The action was disallowed on two grounds: since the group was unincorporated there was no fund out of which the judgment could be paid; and "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." 100 Eng.Rep. 359, 362. The rule of the *Russell* case was first brought into this country by *Mower v. Inhabitants of Leicester*, 9 Mass. 247, 249. There the county was incorporated, could sue and be sued, and there was a corporate fund out of which a judgment could be satisfied. Ignoring these differences, the Massachusetts court adopted the rule of the *Russell* case, which became the general American rule.

359 P.2d at 459.

According to the Utah Supreme Court,

Sovereign immunity was a settled feature of the common law when Utah became a state and adopted its constitution. In *Wilkinson v. State*, 42 Utah 483, 492-93, 134 P. 626, 630 (1913), this court stated:

[I]n the absence of either express constitutional or statutory authority an action against a sovereign state cannot be maintained. The doctrine is elementary and of universal application, and so far as we are aware there is not a single authority to the contrary.

See also *State v. District Court*, 94 Utah 384, 389, 78 P.2d 502, 504 (1937) ("The State cannot be sued unless it has given its consent or has waived its immunity."); *Campbell Bldg. Co. v. State Road Comm'n*, 95 Utah 242, 249, 70 P.2d 857, 861 (1937) ("[A]ction may not be maintained unless the state has, through legislative or constitutional action, given consent to be sued.").

*Tiede v. State*, 915 P.2d 500, 504 (Utah 1996).[20] Under Utah common law, "The recognition

---

20

      Sovereign immunity--the principle that the state cannot be sued in its own courts without its consent--was a well-settled principle of American common law at the time Utah became a state. *Wilkinson v. State*, 42 Utah 483, 492- 93, 134 P. 626, 630 (1913); *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Memphis and Charleston Railroad v. Tennessee*, 101 U.S. 337, 25 L.Ed. 960 (1880). See generally, E.M. Borchard, "Government Liability in Tort," 34 Yale L.J. 1, 129 (1924), 229 (1925). Article I, § 11 of the Utah Constitution, which prescribes that all courts

(continued...)

of sovereign immunity where properly applicable is hardly open to question in this state," and "sovereign immunity" was understood by the Utah courts to extend to local government entities without any semantic distinction. *Nestman v. South Davis County Water Improvement Dist.*, 16 Utah 2d 198, 398 P.2d 203 (1965); *see also Lund v. Salt Lake County*, 58 Utah 546, 200 P. 510, 515 (1921) (referring to "the doctrine maintained with practical unanimity in nearly every jurisdiction of the country to the effect that municipal corporations, especially county organizations, are not liable in such cases unless made so by express statute.")[21]

As recounted in the October 12th Memorandum Opinion & Order, Utah's common-law sovereign and governmental immunity doctrines were superseded by the enactment in 1965 of the Utah Governmental Immunity Act, "'which barred all causes of action against the state and its political subdivisions unless expressly authorized by statute.'" *MacArthur*, 391 F. Supp. 2d at 1037 (quoting *Tindley v. Salt Lake City School Dist.*, 2005 UT 30, ¶ 9, 116

---

[20](...continued)

shall be open and persons shall not be barred from using them to redress injuries, was not meant to create a new remedy or a new right of action. *Brown v. Wightman*, 47 Utah 31, 34, 151 P. 366, 366-67 (1915). Consequently, Article I, § 11 worked no change in the principle of sovereign immunity, and sovereign immunity is not unconstitutional under that section. It was so held in *Brown v. Wichita State University*, 219 Kan. 2, 8-12, 547 P.2d 1015, 1022-24 (1976), which involved a similar provision of the Kansas Constitution. We concur in the reasoning and result of that decision.

Madsen v. Borthick, 658 P.2d 627, 629 (Utah 1983).

[21]Utah courts did draw a distinction between "governmental" and "proprietary" functions, the latter being held to be outside the scope of governmental immunity—a distinction that proved troublesome at best. *See Standiford v. Salt Lake City Corp.*, 605 P.2d 1230, 1233-1236 (Utah 1980); *Hansen v. Salt Lake County*, 794 P.2d 838 (Utah 1990). Such a distinction was very common in state common-law doctrines of local government immunity. *See, e.g.*, 1 Shepard's Editorial Staff, *Civil Actions Against State and Local Government: Its Divisions, Agencies and Officers* § 1.1, at 3.

P.3d 295, 298 (Utah 2005)).[22]

In 1978, the Utah Governmental Immunity Act was amended, "cleaning up the prose and broadening the grant of immunity to include claims for 'any injury which results from the exercise of a governmental function, governmentally-owned hospital, nursing home, or other governmental health care facility.' 1978 Utah Laws ch. 27, § 2, at 92 (emphasis added)."

*Hansen v. Salt Lake County*, 794 P.2d at 843.

> These health care activities were not defined as governmental functions; rather, immunity was expanded to include them in reaction to one of our cases holding that such activities were not governmental functions.  See *Standiford*, 605 P.2d at 1238 (Hall, J., dissenting) (referring to legislature's reaction to *Greenhalgh*, 530 P.2d 799).  This new immunity was clearly subject to the exception language in the beginning of the amended sentence. See Utah Code Ann. § 63-30-3 (Supp. 1979).  It also preserved this court's responsibility to interpret the scope and meaning of "governmental function."

*Id.* (footnote omitted).  By its 1978 amendment, "the legislature 'resolved the health care classification question' by its amendment in 1978 granting immunity for such activities, subject to the Act's exceptions. . . . The legislature did not define operation of a governmental health care facility as a governmental function; it granted immunity despite our holding in *Greenhalgh* [*v. Payson City*, 530 P.2d 799, 801 (Utah 1975)] that such activities were not governmental functions."  *Id.*  The Utah Legislature largely eliminated any

---

[22]

In 1965, the Utah Legislature passed the Governmental Immunity Act, codifying the sovereign immunity doctrine in Utah.  See *DeBry v. Noble*, 889 P.2d 428, 432 (Utah 1995) (citing 1965 Utah Laws 390, ch. 139, § 3).  The Act first grants general immunity from suit to governmental entities, then narrows that general grant by waiving immunity for certain claims, and finally broadens immunity again with exceptions to the waivers that result in retaining immunity under certain circumstances.  See *Hansen v. Salt Lake County*, 794 P.2d 838, 842 (Utah 1990).

*Trujillo v. Utah Dept. of Transp.*, 1999 UT App 227, ¶ 14, 986 P.2d 752, *757.

governmental-proprietary distinction by amendment in 1987.  *See Tindley*, 2005 UT 30, ¶ 21,

116 P.3d at 301; *Carter v. Milford Valley Memorial Hosp.*, 2000 UT App 21, ¶14, 996 P.2d

1076, 1079 (2000).

Thus, at the time that plaintiffs commenced their lawsuit in the Navajo Nation District

Court, there appeared to be no question that special districts such as the San Juan Health

Services District were "governmental entities" covered by the Utah Governmental Immunity

Act, and that the Act governed private civil actions brought against such entities or their

officers, directors or employees arising from the operation of a health care facility such as the

Montezuma Creek Clinic.  *See MacArthur*, 391 F. Supp. 2d at 1037-1040, 1045-1052.

The court resolved the question of declaratory relief as to whether the Navajo Nation

District Court may exercise its jurisdiction to grant judicial remedies against the Health

District defendants by reference to recent case law from the Navajo Supreme Court

indicating that as a matter of comity and reciprocity, the Navajo courts would abide by the

governmental immunity of States and their subdivisions where those same States would

respect the immunity of Indian tribes and their instrumentalities.  *See Office of Navajo Labor*

*Relations ex rel Jones v. Central Consolidated School District No. 22*, No. SC-CV-13-98

(Navajo S. Ct. 06/05/2003), at ¶ [25].[23]  *See MacArthur*, 391 F. Supp. 2d at 1042-1045, 1052,

1055-1056.  Resort to considerations of comity is commonplace when one sovereign is sued

in the courts of another sovereign.  *See, e.g.*, *Nevada v. Hall*, 440 U.S. 410 (1979); 1

Shepard's Editorial Staff, *Civil Actions Against State and Local Government: Its Divisions,*

---

[23]*Available at* http://www.tribal-institute.org/opinions/2003.NANN.0000007.htm.

*Agencies and Officers* § 1.4, at 13-15.

Plaintiffs' counsel now argues that the Navajo court orders at issue may be enforced in this court "without regard to commity [sic] or reciprocity of state and tribal immunity," (Pltfs' Mem. (850), at 6), but without making any reference to or analysis of *Jones* or the principles of comity among separate sovereigns upon which *Jones* is footed. Instead plaintiffs' counsel submits that the defendants raised only Eleventh Amendment immunity before the Navajo court; that they waived any immunity by filing a counterclaim on behalf of the Health District against plaintiff Singer and by defending plaintiffs' claims on the merits in that forum; and that "federal preemption doctrine" overcomes state law immunity of a "political subdivision . . . carrying out federal proprietary commercial activities in the Navajo Nation." (*Id.* at 1, 6, 7, 8, 9 & Exh. 3.)   "Because these political subdivisions are not the state," counsel insists, "state immunity analysis need not apply."  (*Id.* at 7.)

The copy of the defendants' "Findings of Fact Conclusions of Law and Closing Arguments Against Granting of Preliminary Injunctive Relief, " filed November 29, 1999, in *Donna Singer, et al. vs. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation Dist. Ct.), and submitted by plaintiffs' counsel as an exhibit to the present motion, does in fact refer to the Eleventh Amendment immunity of States from suits by Indian tribes as discussed in *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 781 (1991).  (*Id.* at 17-18.)  It also refers to State sovereign immunity as discussed in *Alden v. Maine*, 527 U.S. 706 (1999), and argues that "a finding of authority in the Plaintiffs to bring the present action in tribal courts would invite claims by persons to do in tribal court against State and local

government officials what the Plaintiffs could not do in federal or state courts against these same Defendants."  (*Id.* at 18-20.)  It further argues that "Congress cannot use its plenary power over the Navajo Nation to deprive the state of Utah and its immunized officials of the sovereign right to extend immunity to county and special district officials," citing to *Alden* and *Seminole Tribe.*  (*Id.* at 21-23.)  The defendants' assertion of governmental immunity before the Navajo court obviously was not confined to an assertion of Eleventh Amendment immunity, and indeed, appears to address the "federal preemption doctrine" argument now asserted by plaintiffs in the present motion.

Rather than reflecting the "application of state sovereign immunity to a political subdivision," as plaintiffs contend, (Pltfs' Mem. (580), at 1), this court's analysis addressed the local governmental immunity of the Health District defendants as defined by the Utah Governmental Immunity Act.[24]  Perhaps it would clarify things simply to say that the Health District defendants are shielded by *governmental immunity* extended under the Act, in contrast to the *sovereign immunity* of States discussed in *Alden v. Maine* as being limited to States and entities that are "arms of the State."[25]  *See, e.g.*,  57 Am. Jur. 2d *Municipal, County, School and State Tort Liability* § 10 ("sovereign immunity refers to the immunity of

---

[24]Both plaintiffs' counsel and the Navajo court appear to have become ensnared in the distinction between state "sovereign immunity" discussed in *Alden* and "governmental immunity" afforded to counties and special service districts under the Utah Governmental Immunity Act.  (*See* December 28, 1999 Order at [19]-[20].)

[25]The Utah courts have applied the phrases "sovereign immunity" and "governmental immunity" to both doctrines without apparent distinction, as did the court's original October 30, 2000 Decision.  *See also Brittain v. State*, 882 P.2d 666, 668-69 (Utah Ct. App. 1994) ("The doctrine of sovereign or governmental immunity--requiring the consent of the State in order to subject it to suit in its own courts--is a deeply rooted and well recognized doctrine of American common law.").  Likewise, the Utah Governmental Immunity Act delineated the immunity of the State and its subdivisions from private suit—and the extent of its limited waiver of that immunity—without distinguishing between entities that are "arms of the State" and entities that are not.  *See* Utah Code Ann. §§ 63-30-1 *et seq.* (1997 & Supp. 2003) (repealed 2004).

the state from suit and from liability, while governmental immunity refers to the similar immunities enjoyed by the state's political subdivisions").[26]  And this court was concerned with the effect of *governmental immunity* under the Utah Governmental Immunity Act as a bar to litigation of plaintiffs' claims against the Health District defendants in tribal court, particularly in light of the Navajo principles of comity and reciprocity articulated in *Jones*. *See also* 57 Am. Jur. 2d *Municipal, County, School and State Tort Liability* § 1 ("governmental or sovereign immunity is best described as a bar to liability").[27]

This court rejected the Navajo court's legal conclusion that "the defendants" waived their immunity under the Utah Governmental Immunity Act through the Health District's filing of a counterclaim against plaintiff Singer, particularly where that court lacked subject-matter jurisdiction over the dispute between Singer and the Health District.  *See MacArthur*, 391 F. Supp. 2d at 1040-1041.  Plaintiffs' present motion points to nothing reflecting an

---

[26]Such a distinction may have substantive consequences under the Eleventh Amendment as construed in *Seminole Tribe* and *Alden*, but the Eleventh Amendment finds no application in the context of Indian tribal courts.

[27]Plaintiffs' counsel disputes the authority of a State "to immunize the lowliest worker in the lowliest political subdvisions" from civil liability through legislation such as the Utah Governmental Immunity Act.  (Pltfs' Reply Mem. (868), at 5-6.)  Yet,

> in most jurisdictions, immunity has been limited to varying degrees by the legislature, with or without constitutional sanction.  The state legislature generally is considered the appropriate branch of government to control immunity issues.  The authority of the legislature to control the entire field of immunity is based on the premise that the legislative branch of government is in a much better position than the judicial branch to restrict the application of immunity.  The legislature can supplement restrictions with proper legislation, such as statutory provision for liability insurance.  In the absence of a constitutional provision to the contrary, the state legislature ordinarily has the power to control immunity, even after it has been judicially abrogated.  The legislature may enact statutes restoring immunity or abolishing or defining the limits of governmental tort immunity.  State courts are without power to modify or abrogate constitutional or statutory immunity provisions.

1 Shepard's Editorial Staff, *Civil Actions Against State and Local Government: Its Divisions, Agencies and Officers* § 1.5, at 16-18 (footnotes omitted).

unequivocal intent on the part of the Health District defendants to waive their immunity under the Act—through their defense of plaintiffs' applications for preliminary injunctive relief, or otherwise.

Nor does the eleventh-hour attempt by plaintiffs' counsel in the present motion to "federalize" Navajo sovereignty and the operation of the Navajo courts suffice to overcome the Health District defendants' governmental immunity by virtue of "federal preemption" under the Supremacy Clause, U.S. Const., art. VI, § 2.

**(5)  Plaintiffs' assertion that under "the Court's analysis of . . . federal preemption doctrine, all the Navajo law and Orders and Judgments are enforceable at any time, interlocutory or not, without regard to commity [sic] or reciprocity of state and tribal immunity," lacks merit.**

Counsel makes repeated references to the Navajo Nation's contract with the Bureau of Indian Affairs for partial funding of its judicial program, to "[f]ederally ratified Navajo customs, traditions, and law," to "BIA ratified, trained, funded Navajo law," and "federally approved Indian Nation law," (Pltfs' Mem. (850), at 1, 3, 4),[28] all in an apparent attempt to invoke "federal preemption" to overcome the defendants' governmental immunity under Utah law.  (*See* "Plaintiff Singer/Riggs/Dickson's Reply to the Defendants Second Opposition on Rule 60 Motion to Correct, Ammend, and Reconsider," filed November 29, 2005 (dkt. no. 868) ("Pltfs' Reply Mem. (868)"), at 5-6 ("The argument that a state has inherent authority to immunize the lowliest worker in the lowliest political subdivisions for

---

[28](*See also* "Plaintiff Singer/Riggs/Dickson's Reply to the Defendants' Opposition to the Rule 60 Motion to Correct, Ammend [sic] and Reconsider the Court's October 12, 2005 Order," filed November 25, 2005 (dkt. no. 866), at 5 (discussing redress for "United States recognized, funded, and quarterly reviewed Navajo Nation law violations" in "a United States recognized, trained, funded U.S. domestic sovereign Treaty protected Navajo Nation Court").

-33-

Treaty violations, the Article VI supreme law of the land, outside the Eleventh Amendment, occurring in or severely effecting [sic] two federally statutory protected Navajo regulated places within the reservation borders" is "legally merit less or frivolous").)

This court did not suggest that the Utah Governmental Immunity Act shields the State of Utah or its subdivisions from liability under causes of action arising under the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States," and therefore coming within the scope of the Constitution's Supremacy Clause,  U.S. Const., art. VI, § 2.  That question did not arise in this case because plaintiffs insist that they have pursued causes of action arising exclusively under Navajo law in the Navajo court in obtaining the interlocutory orders that they now seek to enforce.

That the subject-matter jurisdiction of the Navajo courts and the scope of Navajo civil authority is delineated by federal law (as well as Navajo law) does not mean that the exercise of Navajo civil authority or the jurisdiction of the Navajo courts represents an extension of federal law.  The Navajo courts plainly are not federal instrumentalities—an "arm of the federal government" in the sense of merely being a "contracted out" version of the BIA Courts of Indian Offenses organized under Title 25 of the *Code of Federal Regulations*, as plaintiffs' counsel now seems to suggest.  *Cf. Colliflower v. Garland*, 342 F.2d 369, 378-379 (9th Cir. 1965) (Fort Belknap CFR court of Indian offenses was an "arm of the federal government" holding petitioner in federal custody for purposes of federal habeas corpus

-34-

relief).[29]

The judicial power exercised by the Navajo courts is vested in the Navajo Judicial Branch by the Navajo Nation's own organic laws rooted in its inherent sovereignty. *See, e.g., Bennett v. Navajo Bd. Of Election Supervisors*, No. A-CV-26-90, at ¶¶ [31]-[45] (Navajo S. Ct. 12/12/1990);[30] *MacArthur*, 391 F. Supp. 2d at 968-969 & n. 114. Navajo judicial power is not "the judicial Power of the United States" under Article III, or an extension of Congress' legislative authority under Article I or other provisions of the United States Constitution, and it cannot call upon the aid of the Supremacy Clause to overcome a State's legislative authority to define the immunity of its subdivisions and their officers from private suit arising from governmental conduct, or to obtain peremptory enforcement of Navajo court orders in other forums as a matter of "full faith and credit," as plaintiffs' counsel now appears to assert. (*See* Pltfs' Reply Mem. (868), at 5-6.) Counsel's characterization of modern Navajo sovereignty largely as an exercise in "BIA-approved" and supervised contract compliance appears to be directly at odds with the Navajo judiciary's expressed views on the

---

[29]Plaintiffs assert that "the Navajo Nation voluntarily submits itself to review, training, funding and quarterly review of its laws and judicial program to the Bureau of Indian Affairs," and suggests that the jurisdiction of the Navajo courts is determined largely as a matter of federal contract compliance. ("Plaintiff Singer/Riggs/Dickson's Reply to the Defendants' Opposition to the Rule 60 Motion to Correct, Ammend [sic] and Reconsider the Court's October 12, 2005 Order," filed November 25, 2005 (dkt. no. 866), at 5-6.)

[30]*Available at* http://www.tribal-institute.org/opinions/1990.NANN.0000016.htm.

subject,[31] pertinent Supreme Court case law,[32] and recent scholarship, *see, e.g.*, Sarah Krakoff, *A Narrative of Sovereignty: Illuminating the Paradox of the Domestic Dependent Nation*, 83 Or. L. Rev. 1109 (2004); David E. Wilkins, *The Navajo Political Experience* (rev. ed. 2003).

Given the evolving principles of comity and reciprocity articulated by the Navajo Supreme Court in *Jones*, as well as the interlocutory nature of the tribal court orders at issue, this court need not decide whether a Navajo court may impose civil liability upon a State or its subdivisions absent an unequivocal waiver of governmental immunity under the applicable state statute, or whether such a tribal court judgment would be enforceable in a federal court.  *Cf. Montana v. Gilham*, 133 F.3d 1133 (9th Cir. 1997) (tribal court may not impose liability on a State absent a waiver of its sovereign immunity).

### (6) This court has made no findings of fact in resolving the issues concerning the enforcement of the Navajo court orders at issue.

Plaintiffs assert that this court made its rulings in the October 12th Memorandum Opinion & Order by "finding new facts which were not a part of the Navajo trial record," and erred "in making new erroneous *Navajo* law fact findings," and that this court's October 31st Judgment "lacks a finding of facts required under FRCP at rule 52." (Pltfs' Mem. (850), at 2, 8, 9 (emphasis in original).)

---

[31]*See, e.g., Deal v. Blatchford*, 3 Navajo Rptr. 159, at ¶ [29] (Navajo Ct. App. 1982); *Arizona Public Service Co. v. Office of Navajo Labor Relations*, No. A-CV-08-87 (Navajo S. Ct. 10/08/1990), *available at* http://www.tribal-institute.org/opinions/1990.NANN.0000003.htm (Navajo Preference in Employment Act an exercise of inherent Navajo sovereignty recognized by 1868 Treaty).

[32]*See, e.g., Kerr-McGee Corp. v. Navajo Tribe of Indians*, 471 U.S. 195, 201 (1985) ("neither Congress nor the Navajos have found it necessary to subject the Tribal Council's tax laws to review by the Secretary of the Interior").

Contrary to counsel's assertion, this court made no "new fact findings" concerning pertinent jurisdictional facts. The October 12th Memorandum Opinion & Order reviewed the preliminary findings of fact made by the Navajo court as reflected in that court's written orders, and identified jurisdictional issues as to which the Navajo court made *no* findings of fact. For example, this court did not find that San Juan County and its officials "were not involved with the District," (Pltfs' Mem. (850), at 8); this court simply pointed out that the Navajo court made *no* specific findings that any of the County defendants *were* "involved with the District" concerning the employment actions of which the plaintiffs complained. *MacArthur*, 391 F. Supp. 2d at 1004-1007. This court likewise pointed out that the Navajo court also made *no* findings of fact concerning plaintiffs' exhaustion of their administrative remedies under the Navajo Preference in Employment Act—or any factual basis justifying excuse from that requirement, or facts showing that defendant Laurie Schafer "caused an action to occur within the territorial jurisdiction of the Navajo Nation," Navajo Nation Code, tit. 7, § 253(B) (1995), to the injury of plaintiffs Riggs or Dickson, bringing her within the civil jurisdiction of the Navajo court as a defendant sued in her individual capacity.

Concerning the NPEA exhaustion requirement, plaintiffs' counsel submits three "right to sue" letters received by Singer, Riggs and Dickson from the Office of Navajo Labor Relations, dated August 23, 1999. (Pltfs' Mem. (850), at 8 & Exh. 4.) These letters, captioned "Notice of Right to Proceed," authorized Singer, Riggs and Dickson "to initiate a proceeding *before the Navajo Nation Labor Commission* ('NNLC') regarding allegations that the San Juan Health Services" District had taken adverse employment action against each of

them without cause, or without just cause.  (*Id.* at Exh. 4 (emphasis added).)   They were issued "pursuant to Section 10.(F.) of the Navajo Preference in Employment Act," *Navajo Nation Code*, tit. 15, § 610(F) (1995), the Office of Navajo Labor Relations having "determined not to initiate a Commission proceeding on behalf of the individual charging party."  (*Id.* (emphasis in original).)

Not one word of these notices speaks of commencing a civil action in Navajo Nation District Court.  They do speak of "the institution of proceedings before the NNLC" and of the plaintiffs' right to "retain legal representation to assist you with the proceeding before the NNLC."  (*Id.*)  Plaintiffs' lawsuit in the Navajo Nation District had already been filed for more than four months before these notices were issued.  These notices neither authorized the commencement of that action nor excused Singer, Riggs and Dickson from proceeding first before the Navajo Nation Labor Commission to obtain their NPEA remedies.

The submission of these notices in this forum at this stage thus cannot mitigate the Navajo court's failure to make any findings that the NPEA's exhaustion requirement had either been satisfied or somehow excused at the time that Riggs and Dickson filed their lawsuit in the Navajo court and sought preliminary injunctive relief.  This court simply pointed out that the issue was not addressed in written findings, leaving the question of the Navajo court's jurisdiction over plaintiffs' NPEA claims unresolved.  *See MacArthur*, 391 F. Supp. 2d at 981-982, 1054.

The Navajo court's orders refer to "[a] letter from Lauren Schafer critical of Ms. Singer" that had been kept in a file in the District CEO's office, and to Schafer's testimony

that "after a 'scrupulous examination' of Singer's record for over nine months, Ms. Schafer

had not discovered one piece of evidence as to Ms. Singer's intent to commit fraud,"

(December 28, 1999 Order at [10]; *accord* March 1, 2000 Order at 7 (same)), but as this

court has already pointed out, "the few facts bearing upon Ms. Schafer's relationship to

*Singer, et al. v. San Juan County, et al.*, that may be gleaned from the orders and plaintiffs'

memoranda had to do with plaintiff *Singer*'s wrongful discharge claims," and Ms. Singer's

claims against defendant Schafer were not properly before that court under *Montana* and

*Strate v. A-1 Contractors*, 520 U.S. 438 (1997).  *MacArthur*, 391 F. Supp. 2d at 1013-1014

(emphasis in original).

This court examined the enforceability of the Navajo court orders at issue in the

context of cross-motions for summary judgment filed by plaintiffs Singer, Riggs and Dickson

and the Health District defendants under Fed. R. Civ. P. 56 following remand by the court of

appeals, reviewing the Navajo court's legal conclusions *de novo* and its findings of fact under

the "clearly erroneous" standard.  This court did not engage in a *de novo* review of the

evidence in the Navajo court record and made no additional findings of jurisdictional fact

beyond those made by the Navajo court in its December 28, 1999 and March 1, 2000 Orders.

It may be true, as plaintiffs' counsel insists, that "the tribal court record shows the county

dominated and permeated all the health districts' acts," (Pltfs' Reply Mem. (868), at 5), but

the Navajo court made no specific findings to that effect, and this court declines counsel's

invitation to infer such findings from the Navajo court's conclusory statements concerning

"the defendants."

Absent findings of the requisite jurisdictional facts by the Navajo court, subject-matter jurisdiction over the San Juan County defendants and the individual Health District defendants (except Atcitty and Wood) was not established under the applicable provisions of the *Navajo Nation Code*, let alone *Montana*'s "two prime exceptions."  *Strate*, 520 U.S. at 452.

### (7) Plaintiffs' remaining allegations of error fail to meet the applicable standards under Fed. R. Civ. P. 59(e), or Fed. R. Civ. P. 60(a), (b)(1), (4) & (6).

In addition to the five core assertions and the question of "fact findings," discussed above in some detail, plaintiffs raise a scattering of issues as "other errors."  The defendants correctly respond that plaintiffs Singer, Riggs and Dickson have failed to assert any basis for relief under Rules 59(e), 60(a), or 60(b)(1), (4) or (6) sufficient to meet the applicable standards under those rules—no "manifest errors of law" or "obvious errors of law,"  no "newly discovered evidence," no intervening change in the law, no "plain usurpation of power," and no "'extraordinary circumstances' justifying the reopening of a final judgment."

As explained in this court's October 12th Memorandum Opinion and Order, Utah Code Ann. §§ 9-9-201 through 9-9-213 (2003) has no bearing upon the issues in this case.  *See MacArthur*, 391 F. Supp. 2d at 1019 n. 178.  That chapter does not bar claims in the Utah courts based upon Navajo law;[33] nor does it prohibit violations of Navajo law as a matter of Utah law.  (*See* Pltfs' Mem. (850), at 7; Pltfs' Reply Mem. (868), at 6.)  Utah Code Ann. §§

---

[33] Neither does the second section of Article III of the Utah Constitution, or the corresponding provision of Utah's Enabling Act, *see* Act of July 16, 1894, ch. 138, § 3 (second), 28 Stat. 107, also cited by plaintiffs.  (*See* Pltfs' Mem. (850), at 7.)

9-9-201 *et seq*. governs the extension of Utah state criminal and civil jurisdiction over Indian reservations with tribal consent under 25 U.S.C.A. §§ 1321-1326—which to date has *not* occurred in Utah. *See State of Utah v. Reber*, 2005 UT App. 485, ¶ 6, ___ P.3d. ___, ___, 538 Utah Adv. Rep. 67.

Similarly, *In re Blue Lake Forest Products, Inc.*, 30 F.3d 1138 (9th Cir.), *cert. denied sub nom. Hongkong and Shanghai Banking Corp., Ltd. v. Hoopa Valley Tribe*, 513 U.S. 1059 (1994)—cited by plaintiffs' counsel as "support[ing] non Indians suing non Indians in Tribal Court for claims arising within reservation borders," (Pltfs' Reply Mem. (868), at 4)—involved competing claims to proceeds of the sale of tribal timber that was the subject of a contract between a tribally owned business venture and a non-Indian buyer who defaulted on its payments and filed bankruptcy. The Ninth Circuit held that the tribe was entitled to the proceeds of sale of tribal timber still in the debtor's possession, with nary a word about the jurisdiction of tribal courts over non-Indians.[34]

Disputing this court's conclusion that the Navajo court orders at issue in this case are not enforceable in this forum, plaintiffs concede that the orders "are interlocutory," but argue that they leave "only damages to be determined, not the merits of these claims," and that "[t]his Court can order the defendants to carry them out, paying amounts determined by [the] Navajo Court," (Pltfs' Reply Mem. (868), at 6), in a trial proceeding yet to be held by that

---

[34]Plaintiffs' supplemental citations to *Shivwits Band of Paiute Indians v. State of Utah*, ___ F.3d ___, (10th Cir. decided November 9, 2005), and *State of Utah v. Reber*, 2005 UT App 485, ___ P.3d ___ (decided November 10, 2005), add nothing pertinent to the analysis of the issues in this case. Both cases involved questions of the exercise of *state* jurisdiction over activities of Indians or their non-Indian lessees within "Indian country," and there is *no* exercise of state regulatory or adjudicative jurisdiction—civil or criminal—at issue in this case.

-41-

court.  The argument underscores once more the problematic nature of the enforcement of interlocutory orders of another court and the soundness of the *Restatement* rule requiring finality of foreign judgments.  *See MacArthur*, 391 F. Supp. 2d at 1023-1026.

Plaintiffs also assert that this court erred in "not discussing the inherit [sic] contempt and sanction powers of the Navajo Court in regulating conduct committed in its immediate presence," (Pltfs' Mem. (850), at 2).  The Navajo court's December 28, 1999 Order discussed "patterns" of "bad faith conduct toward the court" on the part of "the defendants and defendants' counsel," conduct that "only magnifies and exemplifies past and continued deprivations of the plaintiffs' inalienable rights, be they tribal or federal in nature" and "demonstrate[s] the arrogance of the defendants, their cultural insensitivity, and the contempt and disdain in which they hold this Court; the Navajo Nation judicial system; and Native Americans in general."  ("Findings, Opinion and Judgment at Preliminary Injunction," dated December 28, 1999, in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District  (a copy of which is annexed to the Amended Complaint (dkt. no. 744)), at [16], [18].)  Yet the Navajo court's December 28, 1999 Order imposed no specific sanction upon any defendant or upon the defendants' counsel in that proceeding based upon the described pattern of "bad faith conduct" that is distinguishable from the preliminary injunctive and other equitable relief that had ostensibly been granted on the merits.

The Navajo court's "Order Denying Defendants' Motion to Dissolve or Modify the Preliminary Injunction Order," dated March 1, 2000, recast that same preliminary relief in

more stringent terms, and referred to Navajo R. Civ. P. 11 and "the Court's recognized inherent authority to protect its judicial processes" in doing so, but made no specific findings of bad faith conduct on the part of any specific defendant and imposed no sanction distinguishable from the preliminary relief already granted on the merits of plaintiffs' application.

The "Special Order in Aid to Satisfaction of Preliminary Injunction," dated March 6, 2000, said nothing about bad faith conduct or sanctions, but the "Order Mandating that All Defendants' to be Bound by the Preliminary Injunction Order," signed April 27, 2000, recited that the court had made findings in the December 28, 1999 Order concerning misconduct and that "the new defendants," *viz.*, defendants' counsel and their insurer, "did participate in these activities"; it ordered that the new defendants be "bound in privity with the previous defendants" by the terms of the December 28, 1999 Order and "have responsibility for all legal liabilities incurred by the defendants as declared in the December 28, 1999, Preliminary Injunction Order," apparently as a sanction for litigation misconduct.

These "new defendants," Dennis Ickes and Truck Insurance, were dismissed from this case for lack of subject-matter jurisdiction on the part of the Navajo court, and the court of appeals affirmed their dismissal. *MacArthur v. San Juan County*, 309 F.3d 1216, 1222-1225 (10th Cir. 2002). So the only named parties against whom a discernable sanction had been imposed by the Navajo court are no longer here. *See MacArthur*, 391 F. Supp. 2d at 920-921 n. 35.) In preparing the October 12th Memorandum Opinion & Order, there appeared to be no point in further belaboring the Navajo court's power to impose sanctions for litigant or

attorney misconduct, particularly where the Navajo orders still at issue did not explicitly reflect the exercise of that power.  *See MacArthur*, 391 F. Supp. 2d at 1029-1030 (Navajo court orders did not explain basis in Navajo law for award of attorney's fees, costs and expenses against all of "the defendants").[35]

Finally, in asserting that "[t]he idea that all county governments will fail if Indian Nations have authority over their activities within the Indian Nation[']s borders is a legal absurdity," (Pltfs' Reply Mem. (868), at 5), plaintiffs' counsel may well be arguing an extracurricular issue with opposing counsel,[36] but this court has made *no such assertion at any point in this proceeding*.

### (8) Summary

Plaintiffs dispute the current authority of *Montana v. United States*, 450 U.S. 544 (1981), and the validity of the jurisdictional analysis mandated in this case by the court of appeals.  Plaintiffs' counsel has asserted essentially the same position regarding *Montana* since the matter was remanded in October of 2002, and the current Rule 59(e)/Rule 60(b) motion on behalf of Singer, Riggs and Dickson raises nothing new that warrants the abandonment of this court's jurisdictional analysis.

---

[35]Under the standards articulated by the Navajo court, the grant of preliminary injunctive and equitable relief was necessarily a *merits-based* determination.  (*See* December 28, 1999 Order at [3] (quoting Navajo R. Civ. P. 65(c); *id.* at [18]-[19] (quoting *Tri-State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 358 (10th Cir. 1986)).)  Findings of a "likelihood of success on the merits" cannot be grounded upon of litigation misconduct.  And the imposition of sweeping equitable relief or large monetary penalties upon all of "the defendants" without individualized findings as to culpable conduct would raise serious due process concerns. *See also* Georgene M. Vairo, *Rule 11 Sanctions: Case Law, Perspectives and Preventive Measures* § 7.05 (3d ed. Richard G. Johnson, ed. 2004).

[36]*See* Pamela Manson, *Tribal courts' power is limited*, S.L. TRIB., Nov. 7, 2005, at B1.

Plaintiffs' reading of the equal protection clause of 25 U.S.C.A. § 1302(8) as mandating a tribal court's exercise of co-extensive subject-matter jurisdiction over non-Indian and tribal member litigants indeed appears to be novel when considered in the larger context of federal Indian law scholarship.  But the court is not persuaded that the Supreme Court's construction of § 1302—as extending the Indian Civil Rights Act's guarantees "to non-Indians if and where they come under a tribe's criminal or civil jurisdiction" without defining the extent of tribal jurisdiction—reflects a manifest or obvious error of law warranting relief under Rule 59(e) or Rule 60(b).

Nor have plaintiffs shown manifest or obvious legal error in this court's conclusion that absent an unequivocal waiver, evolving Navajo principles of comity and reciprocity constrain the exercise of Navajo civil jurisdiction over the Health District and  defendant Atcitty where the governmental immunity afforded by the Utah Governmental Immunity Act would shield those defendants against litigation and liability outside of the limited waiver, exclusive remedy and exclusive forum provisions of that Act.  The Health District's counterclaim against plaintiff Singer did not amount to an unequivocal waiver of the District's governmental immunity, particularly where the Navajo court lacked subject-matter jurisdiction over the dispute between Singer and the District under controlling Supreme Court authority.  *See Strate v. A-1 Contractors*, 520 U. S. 438 (1997).

Contrary to plaintiffs' assertion, this court made no new or additional findings of fact in determining the enforceability of the Navajo court orders at issue, and no written findings of fact are required by Fed. R. Civ. P. 52(a).  Pointing out, for example, that the Navajo court

made no findings of jurisdictional fact as to the San Juan County defendants does not amount to a finding that such facts did *not* exist; it is simply an observation as to the content of the Navajo court orders at issue in this proceeding.  Both plaintiffs and the Health District defendants submitted the issues under Fed. R. Civ. P. 56 on the basis that there was no genuine issue of material fact in this proceeding and that the issues should be decided as a matter of law—as they were in this court's October 12th Memorandum Opinion & Order and its October 31st Judgment.

A preliminary injunction issued by another court is an interlocutory order, not a final judgment, and need not be enforced either as a matter of full faith and credit or comity.  *See MacArthur*, 391 F. Supp. 2d at 1023-1025; *Restatement (Second) of Conflict of Laws* § 107 (1971).  Federal recognition of Navajo sovereignty in the 1868 Treaty and subsequent legislation and the current federal policy encouraging tribal self-government and self-determination do not alter that rule as to preliminary judgments issued by tribal courts.  Nor does federal recognition, protection and support for tribal sovereignty enable Indian tribes to avail themselves of the benefit of the Supremacy Clause, U.S. Const., art. VI, § 2, in obtaining the peremptory enforcement of tribal court orders.

As explained above, the "other errors" cited by plaintiffs prove to be of no substantive consequence and plainly do not warrant relief from this court' October 31st Judgment under either Rule 59(e) or Rule 60(b).

Plaintiffs having failed to establish a basis for relief from this court's October 31st Judgment or for amendment or correction of that judgment pursuant to Fed. R. Civ. P. 59(e),

Fed. R. Civ. P. 60(b)(1), (4) or (6), or Fed. R. Civ. P. 60(a), their Motion for Clarification, Reconsideration and Amendment of that judgment (dkt. no. 849), must be DENIED in all respects.

### C.  MacArthur, Lyman & Valdez' Rule 59(e)/60(b) Motions

Following the entry of this court's October 31st judgment, plaintiffs MacArthur, Lyman and Valdez filed their *third* set of motions to reconsider this court's dismissal of their claims, this time under both Rules 59(e) and 60(b).  (*See* "Plantiff Valdez's Motion to Reconsider and Amend the October 31, 2005 Order and Allow Her to Amend Her Amended Complaint," filed November 10, 2005 (dkt. no. 855), and supporting memorandum (dkt. no. 856) ("Valdez Mem (856)"); "Plaintiff Lyman and MacArthur's Motion to Reconsider and Amend the October 31, 2005 Order and Allow Her to Amend Their Amended Complaint," (dkt. no. 857), and supporting memorandum (dkt. no. 858) ("Lyman/MacArthur Mem. (858)").)   The Health District Defendants filed two responsive memoranda (dkt. nos. 864, 865) and the San Juan County defendants filed one memorandum responding briefly to both motions (dkt. no. 862).  Plaintiffs filed no reply memoranda.

### (1) Procedural history re: MacArthur, Lyman and Valdez' Motions for Reconsideration.

By a bench ruling made in the context of the Final Pretrial Conference on November 15, 2002, this court dismissed plaintiffs MacArthur, Lyman and Valdez's claims pursuant to Fed. R. Civ. P. 16(c), based upon this court's determination that these plaintiffs' cognizable federal claims were frivolous, that is, that they lacked any arguable basis in law and/or fact, and did not raise any issue warranting a trial on the merits.  The court declined to exercise

supplemental jurisdiction over any remaining state law claims that may have raised a triable

issue.  *See* 28 U.S.C.A. § 1367(c) (1993).

Controversy then ensued concerning the proper form of written order reflecting that

ruling, and continued for some time.

Following the reported failure of a judicial settlement conference in September of

2004, plaintiffs MacArthur, Lyman and Valdez filed their first set of motions for

reconsideration of the November 15, 2002 bench ruling.  (*See* Plaintiff Valdez's Motion for

the Court to Reconsider its Motion to Dismiss Plaintiff's Valdez' Discrimination Claims

and Plaintiffs' Cross-Motion for Summary Judgment, filed October 26, 2004 (dkt. no.

664); Plaintiff MacArthur's Motion for the Court to Reconsider its Motion to Dismiss

Plaintiff's Claims and Plaintiffs' Cross-Motion for Summary Judgment, filed November

23, 2004 (dkt. no. 670); Plaintiff Lyman's Motion for the Court to Reconsider its Motion

to Dismiss Plaintiff's Valdez' [sic] Discrimination Claims and Plaintiffs' Cross-Motion

for Summary Judgment, filed December 28, 2004 (dkt. no. 695).)  Responsive

memoranda were filed by the defendants, followed by the plaintiffs' reply memoranda

and several additional motions.[37]

---

[37](*See* "Plaintiffs' MacArthur, Lyman, Valdez' Motion for Sanctions," filed January 25, 2005 (dkt. no. 703); San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff Valdez' Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Motion for Summary Judgment, filed November 29, 2004 (dkt. no. 673); San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff MacArthur's Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Cross-Motion for Summary Judgment, filed December 13, 2004 (dkt. no. 682); Motion for an Extension of Time to Respond to MacArthur's November 29, 2004 Motion for Summary Judgment (Health District), filed December 14, 2004 (dkt. no. 684); Health District Defendants' Joinder in Motion, filed December 21, 2004 (dkt. no. 690);  Motion for an Extension of Time to Respond to Lyman's December 26, 2004 Motion for Summary Judgment (Health District),

(continued...)

-48-

On June 13, 2005, this court entered its Memorandum Decision & Order (dkt. no. 742), detailing the reasons for the November 15, 2002 pretrial bench ruling and addressing the grounds asserted in MacArthur, Lyman and Valdez' motions for reconsideration, each of which was denied.

Following the issuance of the June 13th Memorandum Decision & Order, plaintiffs MacArthur, Lyman and Valdez filed their second motion for reconsideration, "Plaintiffs Rule 60 Motion to be Relieved of the June 13, 2005 Order of Dismissal, and Stipulated Pre Trial Order," filed July 8, 2005 (dkt. no. 758), with an accompanying memorandum in support (dkt. no. 759) ("Pltfs' Rule 60(b) Mem."). The plaintiffs' memorandum listed nine "categories of problems with the June 13, 2005 Order," including several purported "mistakes" within the meaning of Rule 60(b)(1). (*Id.* at 3-10.)

### (2) Plaintiffs' Asserted Rule 60(b)"Mistakes"

Plaintiffs asserted that the Final Pretrial Conference on November 14-15, 2002 was "converted . . . into a dismissal hearing, on motion[s] to dismiss filed on the eve of the pre trial . . . ." (Pltfs' Rule 60(b) Mem. at 3.) To the contrary, the November 14-15, 2002 proceeding was a final pretrial conference conducted pursuant to Fed. R. Civ. P. 16(c), as this court has elsewhere explained in some detail. (*See* Mem. Dec. & Order (dkt. no. 742), at 3-7, 168-178.) It was neither calendared nor conducted as a hearing on "motion[s] to dismiss

---

[37](...continued)

filed January 14, 2005 (dkt. no. 699); San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff Lyman's Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Cross-Motion for Summary Judgment, filed January 18, 2005 (dkt. no. 701); Joinder in San Juan County Defendants' Combined (1) Memorandum in Opposition to Plaintiff Lyman's Motion to Reconsider and (2) Motion for an Extension of Time to Respond to Cross-Motion for Summary Judgment, filed February 3, 2005 (dkt. no. 706).)

filed on the eve of the pre trial" by the defendants.[38]  Nor was it a Rule 56 summary judgment

proceeding in which MacArthur, Lyman and Valdez were required to shoulder the burdens

imposed by Rule 56(e) to proffer sworn averments raising genuine issues of material fact

concerning their claims.  The factual allegations supporting Plaintiffs' claims, as detailed in

the Proposed Pretrial Order, were taken as true, together with reasonable inferences drawn

therefrom, in evaluating whether those claims were "frivolous" under Fed. R. Civ. P.

16(c)(1).  (*See* Proposed Pretrial Order, received November 12, 2002, Exhibit B to

Memorandum in Opposition to Plaintiffs' Motion to Compel Production of the Stipulated

Pre-Trial Order and Motion for an Award of Fees and Costs, filed April 9, 2003 (dkt. no.

547).)

It is certainly true that, as plaintiffs' counsel suggests, (Pltfs' Rule 60(b) Mem. at 4),

consideration of dismissal pursuant to Rule 12(b)(6) is generally confined to what lies within

the four corners of the complaint and that in that context, the court does not make factual

findings,[39] but the Final Pretrial Conference was not a Rule 12(b)(6) hearing.

Plaintiffs complain that in the court's June 13th Memorandum Decision & Order

"there was an omission of the fact that Mrs. Valdez's sister in law stated she spoke to Judy K.

The SJHSD ER clerk, asking if Helen could be seen here? Then Lori Wallace said 'Just go to

---

[38]The defendants' Rule 12(b)(6) motions were not calendared until a scheduling conference on January 7, 2003, at which they were set for hearing on February 24, 2003.  (*See* Minute Entry, dated January 7, 2003 (dkt. no. 480).)

[39]Of course, the court made no factual findings at the Final Pretrial Conference.  *Cf.* Fed. R. Civ. P. 52(a). The court applied Fed. R. Civ. P. 16(c) standards to the factual allegations that counsel used to frame the proposed triable issues set forth in the Proposed Pretrial Order, determining whether those allegations and counsel's representations as to the facts, taken as true, raised an issue requiring a trial.

the Doctors'.  Valdez motion for reconsideration ex. 5.  Gonzales deposition at pg. 20, l. 1-

5." (Pltfs' Rule 60(b) Mem. at 4 n.1.)  However, the portion of Charleen Gonzales'

deposition cited by plaintiffs reads as follows:

>     Q.     Did either of you object to being – and by object, I mean, did
> either of you say to either Judy or Lori Wallace, "We don't want to go to Dr.
> Penn's office.  We want to stay here"?
>
>     A.     Not that I can recall.

(Deposition of Charleen Gonzales, dated January 7, 2002, at 20:1-5.)  On that same page, Ms.

Gonzales testified that Ms. Wallace did not speak directly to her:

>     Q. . . . . And when you described Ms. Wallace's comment, you said she
> came out and she told Judy to tell Helen to go to Dr. Penn's.  Did Lori Wallace
> ever talk to you directly?
>
>     A.     No, she didn't.  Helen was in the bathroom and, at the time, the
> two girls were talking.
>
>     Q.     So, did you just overhear their conversation?
>
>     A.     Yeah, uh-huh.

(*Id.* at 20:16-24.)  And this testimony remains uncontroverted in this record.

Plaintiffs also asserted that this court erred in recounting that Dr. MacArthur applied

for full provisional one-year medical staff privileges on December 9, 1999 "when in fact Dr.

MacArthur contests he filed it much earlier," and that "[t]he Court acknowledges that on

about November, 1999 Dr. MacArthur did a caesarian section with Dr. Nelson (Order pg. 8),

supporting Dr. MacArthur's allegation he applied much earlier."  (Pltfs' Rule 60(b) Mem. at

4 n.1.)  Yet the facts recited by the court in the Memorandum Decision & Order simply

reiterated the facts as recounted by plaintiffs' counsel at the Final Pretrial Conference:

MS. ROSE: Okay.  Dr. MacArthur went to San Juan County and applied for privileges.  He included as he knew he would have to as fundamental his medical license and his DEA license, and he was carrying medical insurance.  *This occurred sometime in December* although he did operate or at least watch an operation of Dr. Nelson that was a caesarian in the hospital I believe somewhere around November, although he may not have operated specifically I think he watched Dr. Nelson.

THE COURT: And what year was this?

MS. ROSE: This was in 1999.

(Transcript of Hearing, dated November 14, 2002, at 5:16-6:1 (emphasis added).  *See also* Proposed Pretrial Order at 24 ¶¶ 86, 90 ("Dr. MacArthur applied for privileges with the District first in or around October of 1999, then again on or about December 9, 1999," and "Dr. MacArthur submitted an application and a packet of documents to the District prior to December 9, 1999.  This first application can not be found.  Dr. MacArthur submitted another application on or about December 9, 1999 with a packet containing minimally his medical license and DEA license.").)

Plaintiffs further assert that this court "mistakenly found for purposes of RICO and the Sherman Antitrust Act, that hospitals are not involved in interstate commerce, the Court's order pg. 50."  (Pltfs' Rule 60(b) Mem. At 5-6.)   To the contrary, this court (1) made no *findings* at all; (2) did not decide whether hospitals are involved in interstate commerce; and (3) for purposes of these plaintiffs' federal antitrust claims, took the plaintiffs' allegations of an interstate commerce nexus as true.  As to plaintiffs' Hobbs Act allegations as part of their RICO claim, the court observed that "[t]hese *plaintiffs* are not engaged in the interstate transportation *of goods*, or *in the sale of merchandise* flowing through interstate commerce,"

-52-

(Mem. Dec. & Order, at 50 (emphasis added)), and *nothing* in the original or amended complaints, the Proposed Pretrial Order or counsel's various assertions, at the Pretrial Conference and elsewhere, suggests that they were.

As to their federal antitrust claims, plaintiffs asserted that this court "immunizes their acts finding them to be 'official' and 'discretionary' without specifying if the actions or the refusal to act was within an intent of the State to eliminate competition or to discriminate. 42 U.S.C 1985.  Town of Hallie v. City of Eau Claire, 471 U.S. 34, 39 (1985) . . . ." (Pltfs' Rule 60(b) Mem. at 7.)  But *Town of Hallie* involved the application of the "state action" doctrine, *see Parker v. Brown*, 347 U.S. 341 (1943), and this court did not rely upon the "state action" doctrine in dismissing the plaintiffs' federal antitrust law claims under Fed. R. Civ. P. 16(c)(1).  (*See* Mem. Dec. & Order (dkt. no. 742), at 111-125.)

Apart from specific causes of action, plaintiffs complained that the court relied on an amended complaint "non-existent at the time of the pretrial hearing oral dismissal" and a "pretrial order never part of the Court record made without knowledge of Mary Nielsen's deposition."  (Pltfs' Rule 60(b) Mem. at 5.)

The Proposed Pretrial Order was submitted by counsel pursuant to Fed. R. Civ. P. 16(c)(10) and DUCivR 7-1(d), ultimately to be entered in place of prior pleadings in defining the issues for trial.  The Proposed Pretrial Order served as the basis for the pretrial colloquy between court and counsel under Rule 16(c).  In this case, the Proposed Pretrial Order essentially mirrored the factual allegations of the plaintiffs proposed Amended Complaint, ostensibly submitted a week prior to the pretrial conference as conforming plaintiffs' claims

to the plaintiffs' view of the evidence at that time.  (*See* "Amended Complaint to Conform

to the Evidence & the 10th Cir. Court 10-7-02 Opinion," *annexed to* "Plaintiffs' Rule 15

Motion to Amend and Supplement Complaint to Conform to the Evidence & the 10th Cir.

Court 10-7-02 Opinion," and "Memorandum of Fact and Law in Support," filed

November 6, 2002 (dkt. no. 438) (hereinafter "Proposed Amended Complaint").)[40]  Both

documents—as proposed by counsel—plainly existed at the time of the pretrial conference.

The court's November 15, 2002 bench ruling obviated any need to sign and enter the

Proposed Pretrial Order because MacArthur, Lyman and Valdez' claims were not going to

proceed to trial.  To ensure a complete record of the Final Pretrial Conference in this action, a

copy of the Proposed Pretrial Order in .pdf file format was annexed as an Appendix to the

June 13, 2005 Memorandum Decision & Order as electronically docketed by the Clerk's

Office (dkt. no. 742); the court also granted plaintiffs' motion for leave to file the Proposed

Amended Complaint and directed that it be filed *nunc pro tunc* to November 14, 2002.

(Mem. Dec. & Order (dkt. no. 742), at 178-181, 187; *see* Amended Complaint, filed June 14,

2005, *nunc pro tunc* to November 14, 2002 (dkt. no. 744).)

Plaintiffs further objected that the June 13th  Memorandum Decision & Order "does

not take into consideration the evidence of the ex CFO Mary Nielson's deposition showing a

conspiracy to drive out" Dr. Nathaniel Penn, MD.  (Pltfs' Rule 60(b) Mem. at 6.)   They also

assert the lack "of a full and fair opportunity to develop the record based in part upon the

---

[40]As noted in a November 8, 2002 remark on the docket, the Proposed Amended Complaint was
accompanied by a separate addendum of "Pertinent Parts of the Navajo Court Record as Attachment to the Amended
Complaint," received by the Clerk of the Court on November 8, 2002 and lodged in the case file.

withheld evidence of Mary Nielson's deposition taken in her own case against SJHSD."
(Pltfs' Rule 60(b) Mem. at 7.)   The question of the deposition of Mary Nielson had been
raised by the plaintiffs in their first round of reconsideration motions and was considered as
part of the court's ruling on those motions in the June 13th Memorandum Decision & Order.
Ms. Nielson's deposition testimony did not bear directly upon the defendants' alleged
conduct toward plaintiffs MacArthur and Lyman, and far from being a "newly discovered"
witness, Ms. Nielson was known to plaintiffs' counsel well before pretrial; counsel
apparently had deposed Ms. Nielson in connection with the claims of other plaintiffs in this
action, indicating a fair opportunity to develop the record based upon Nielson's
testimony—had she been asked about Dr. Penn or Dr. Mena.

The plaintiffs' remaining "categories of problems," *e.g.*, a perceived clash between
Rule 8's "short and plain statement" requirement and "heightened pleading requirements"
purportedly in force at the time the original Complaint was filed, (Pltfs' Rule 60(b) Mem. at
5), reflected no obvious error of law on the part of the court in deciding to dismiss their
claims pursuant to Rule 16(b)(1).  The plaintiffs assert that "[o]ther numerous errors in law
are also in the Order," (Pltfs' Rule 60(b) Mem. at 6.), but counsel apparently did not deem
them significant enough either to identify them or support her assertion with citations to
pertinent authority.

The plaintiffs' second reconsideration motion was among those considered at the
October 25, 2005 hearing on pending motions, and for the reasons outlined above, this court
denied the motion.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Transcript of

-55-

Hearing, dated October 25, 2005, at 17:4-22:13, 22:23-24:14.)

### (3) MacArthur, Lyman & Valdez' Rule 59(e)/Rule 60(b) Motions

Plaintiffs MacArthur, Lyman and Valdez' third set of reconsideration motions, filed after the entry of the October 31st Judgment, raise essentially the same objections to this court's pretrial rulings as the prior motions did.

Plaintiffs' counsel persists in addressing the dismissal of plaintiffs' claims at the Final Pretrial Conference as either a Rule 12(b)(6) or Rule 56 matter—which the June 13, 2005 Memorandum Decision & Order makes clear it was not.  MacArthur, Lyman and Valdez' federal claims were dismissed pursuant to Rule 16(c)(1), applying a standard appropriate to the identification of frivolous claims.  (*See* Mem. Dec. & Order (dkt. no. 742), at 165-171.) The dismissal was not based on the defendants' Rule 12(b)(6) motions to dismiss, filed on the eve of the pretrial conference (dkt. nos. 443, 445, 447, 450, 452, 454, 456).  Nor were the plaintiffs required to shoulder the evidentiary burdens of a party opposing summary judgment under Rule 56.  Plaintiffs were called upon to identify triable issues bearing upon non-frivolous federal claims, Fed. R. Civ. P. 16(c)(1), that is, claims arising under federal law and having at least an arguable basis in law and fact.

In the Proposed Pretrial Order, counsel set forth the particulars of the claims of plaintiffs MacArthur, Lyman and Valdez—in terms nearly identical to the allegations of the Proposed Amended Complaint submitted a week earlier—as the plaintiffs' best articulation of those claims as of the time of pretrial.  As explained above, the Proposed Pretrial Order served as the basis for an extended colloquy between court and counsel concerning those

factual and legal particulars.  (*See* Transcript of Hearing, dated November 14, 2002, *passim*; Transcript of Hearing, dated November 15, 2002, *passim*.)  From that colloquy, it became apparent to the court that plaintiffs could not identify any triable issues bearing upon a cognizable federal cause of action, even taking plaintiffs' written factual allegations and counsel's verbal representations as true.

As explained in detail in the court's June 13th Memorandum Decision & Order, plaintiffs could not establish at pretrial an arguable basis in fact and law for their federal antitrust, civil RICO, 42 U.S.C.A. § 1983, EMTALA and other claims against the named defendants.  Dismissal of those claims as frivolous under Rule 16(c)(1) left plaintiffs MacArthur and Lyman with a handful of potentially viable state-law causes of action against specific individual defendants, over which this court declined to exercise supplemental jurisdiction.  *See* 28 U.S.C.A. § 1367(c) (1993).

Having revisited these questions in some detail once more at the November 30, 2005 hearing on plaintiffs' Rule 59(e)/Rule 60(b) motions, this court remains satisfied that the November 15, 2002 bench ruling was correct, for all of the reasons detailed in the June 13th Memorandum Decision & Order.

In early 2000, as plaintiffs' counsel again acknowledged at the November 30th hearing, both Dr. MacArthur and Ms. Lyman elected not to pursue their requests for practice privileges at San Juan Health Services District facilities, each for his or her own reasons, before any final decision on those requests had been made by the District.  In each instance, the request for privileges was under consideration at the time that MacArthur and Lyman

each decided to abandon the effort.  And counsel has still not furnished legal authority establishing that MacArthur or Lyman had a legal entitlement to practice privileges at a publicly owned health facility based upon the fact of licensure of each plaintiff as a health care professional by the State of Utah—though counsel persists in making that assertion.

Moreover, as explained above and in the June 13th opinion, according to the uncontroverted deposition testimony in the record in this case, no one ordered plaintiff Helen Valdez to leave the San Juan Hospital emergency room on the morning of April 14, 1999; nor did anyone tell her that if she stayed in the emergency room at that time, she would be refused examination and treatment.  Having been told of a conversation between hospital staff overheard by her sister-in-law who had accompanied her to the emergency room, Ms. Valdez left the emergency room of her own accord and returned home.

Even assuming her claim is timely, to sustain her EMTALA claim based upon the events of April 14, 1999, Ms. Valdez must at least allege facts showing that she was actually refused examination and treatment by the hospital in an instance where such examination and treatment was requested.  Counsel's conclusory assertion that EMTALA was violated cannot suffice.

Plaintiffs MacArthur, Lyman and Valdez have failed to proffer "newly discovered evidence" or show any manifest or obvious error of law in this court's June 13th Memorandum Decision & Order, or any other extraordinary circumstance justifying relief from this court's October 31st Judgment under either Rule 59(e) or 60(b).  These plaintiffs may pursue their viable state tort law claims in an appropriate forum, but they have asserted

no cognizable *federal* claim in this forum having an arguable basis in law or fact, and that survives Rule 16(c)(1) scrutiny in the context of the Final Pretrial Conference.  That was true on November 15, 2002, and it remains true today.

### D.  Rulings on Pending Motions Heard on October 25, 2005

On October 25, 2005, the court heard, considered and ruled upon a series of pending motions.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847).)

### (1)  "Plaintiffs Motion for Disqualification," filed June 17, 2005 (dkt. no. 745).

Plaintiffs' fifth recusal motion, filed June 17, 2005 (dkt. no. 745), seeks disqualification on the ground that Jesse Trentadue, counsel for the San Juan County defendants, is before this court as the named plaintiff in another civil action, *Trentadue v. Federal Transfer Center*, Civil No. 2:03-CV-946J.  Plaintiffs' counsel cited *no* case law or ethics opinion authority for disqualifying a judge because opposing counsel is before the same judge as a party in another case.  Plaintiffs again asked for assignment of "an out of state judge" without "any associations with the State of Utah," or "with cases involving opposing law firms," and for this court to order the chief judge of the court of appeals to designate one.

Defendants responded that this motion represents yet another inappropriate attempt by plaintiffs' counsel to "judge-shop" in light of this court's June 13, 2005 Memorandum Decision and Order, and is based on nothing more than the court's adverse rulings against plaintiffs.  The Health District Defendants asked for attorney's fees for responding to the motion.

-59-

The court heard and considered argument on this motion on October 25, 2005, and ruled that the motion is DENIED.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Transcript of Hearing, dated October 25, 2005 ("Tr. 10/25/05"), at 2:17-5:12.)

### (2)  Plaintiffs' Motion to Lift the Court's Protective Order for Depositions and other Records in this Case, etc., filed June 30, 2005 (dkt. no. 747).

Plaintiffs moved for "an order lifting the Protective order on depositions and other information that includes patient information, for the limited purpose of submitting the information to government entities for investigation and other law enforcement purposes," because plaintiffs "wish to submit the information gathered in this case" to federal and state agencies "for investigation of a pattern and practice of actions violating state and federal laws and regulations," including the Utah Department of Health, the U.S. Department of Justice, the Senate Indian Affairs Committee, U.S. Commission on Civil Rights, the HHS Inspector General's Office.  "Plaintiffs believe there is a public safety problem that requires investigation" of the Health District's operations.  (Plaintiffs' Motion to Lift the Court's Protective Order for Depositions and other Records in this Case, etc., filed June 30, 2005 (dkt. no. 747).)

Defendants responded that plaintiffs do not represent the federal and state agencies and have no standing to act on their behalf.  The agencies have expressed no interest in participating in the proceeding or obtaining the relief plaintiffs seek, and have their own powers to obtain documents and other information.  Plaintiffs replied that their obtaining, compiling and organizing of the information would save time for overburdened investigative agencies.

-60-

Noting that state and federal administrative agencies have their own investigative

powers, and that the protective order had been stipulated to by the parties in this action, the

court ruled that this motion is DENIED.  (*See* Minute Entry, dated October 25, 2005 (dkt. no.

847); Tr. 10/25/05, at 8:2-9:24.)

### (3)  Plaintiffs' Motion to Restrain All Members of the SJHSD Staff from Destroying Any Records at Least Until the Appeal Processes in this Case are Finished, filed June 30, 2005 (dkt. no. 751).

Plaintiffs requested an order prohibiting the destruction of any Health District records

"in regards to the issues in this case," pending completion of the appeal in this case, including

"executive session meeting minutes and records, incident reports, records of employee

discipline, and patient records going back to 1998," and if records have already been

destroyed, the plaintiffs demand "an immediate accounting of the missing information."

(Memorandum in Support of Plaintiffs' Motion to Restrain All Members of the SJHSD Staff

from Destroying Any Records at Least Until the Appeal Processes in this Case are Finished,

filed June 30, 2005 (dkt. no. 752), at 1-2.)

Defendants responded that plaintiffs seek preliminary injunctive relief without

satisfying the requirements of Fed. R. Civ. P. 65.  Plaintiffs replied that they need the records

preserved because they did not obtain full access to them through discovery, and claim to

invoke the court's inherent powers to govern the conduct of parties before the court rather

than injunctive relief under Rule 65.

Having heard and considered the arguments of counsel, the court ruled that this

motion is GRANTED IN PART, to the extent that all parties are required to maintain and

preserve all relevant documents and records kept in the ordinary course of business, keeping the same in their possession, custody and control until the completion of all appeals.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Tr. 10/25/05, at 9:25-12:2.)

**(4)  Plaintiffs' Motion to Clarify the Record and Hold a Full Disclosure Hearing, filed August 2, 2005 (dkt. no. 781).**

Plaintiffs seek to have defense counsel "to fully disclose all of their communication with each other, with their respective insurers, and with their clients," and to clarify her allegation that Mr. Harrison possessed certain records sought by plaintiffs in discovery (*e.g.*, the deposition of Health District financial officer Mary Nielson in another case), but never produced.  Harrison sent a letter to plaintiffs' counsel demanding that she retract the allegation in her Memorandum supporting her pending Rule 60(b) motion that Harrison had the deposition transcript but did not produce it.

Defendants responded that Harrison's letter does not furnish a basis for an evidentiary hearing or for disclosure of the communications, many of which are privileged.

Having heard and considered the arguments of counsel, the court ruled that this motion is DENIED.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Tr. 10/25/05, at 12:3-15:23.)

**(5)  Plaintiffs Singer, Riggs and Dickson's Motion to Certify a Question to the Utah Supreme Court, filed August 11, 2005 (dkt. no. 791).**

As counsel in a state court case, *Whaley v. Whaley*, No. 20050490SC, plaintiffs' counsel sought to raise Navajo jurisdictional issues before the Utah Supreme Court, and requested that this court certify three related questions to the Utah Supreme Court at the same

time.  But in her September 28th reply memorandum, plaintiffs' counsel indicates that the

Utah Supreme Court "summarily dismissed the Petition for an Extraordinary Writ in that case

that included largely the jurisdictional briefing before this court, without ruling on the

questions of jurisdiction before it."

The defendants responded that plaintiffs seek to certify questions to the Utah Supreme

Court as a matter of "uncertain" state law that are really federal questions to be determined

under federal law, not state law.

The issues before the court in this case concerning the enforcement of the Navajo

court's orders turn on questions of federal law and the law of the Navajo Nation.  The three

questions posed by plaintiffs dealt with treatment of Navajo jurisdiction and the effect of

Navajo judgments in the Utah state courts, and are not germane to the issues in this case.  In

any event, plaintiffs' counsel deemed the request moot and withdrew the motion to certify

questions.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Tr. 10/25/05, at 15:23-

16:4.)

**(6)   San Juan County Defendants' Motion for a Finding of Contempt and the Imposition of Sanctions, filed July 7, 2005 (dkt. no. 754).**

The San Juan County defendants sought a finding of contempt on the part of

plaintiffs' counsel for threatening to proceed further before the Navajo Nation District Court,

in violation of this court's January 29, 2004 Order (dkt. no. 603), enjoining the Plaintiffs

"from further proceedings in this matter and Navajo Tribal Court until such time when the

issue of the Navajo Tribal Court's subject matter jurisdiction has been decided by this

Court," if defendants did not meet plaintiffs' $2,500,000 settlement demand by June 29,

2005.

**(7) "Plaintiffs' Motion to Strike Def's Motion for Contempt," filed July 20, 2005 (dkt. no. 786).**

Plaintiffs responded by moving to strike the San Juan County defendants' motion, arguing that plaintiffs are entitled to bring claims directly against the defendants' insurers as direct or third-party beneficiaries of those policies, and are thus entitled to make settlement demands within policy limits beyond the reach of this court's January 29, 2004 Order. Defendants replied that their motion is not the proper subject of a motion to strike, and that this court's January 29, 2004 Order was entered in aid of its own jurisdiction and encompasses counsel's threats of further litigation made in the context of settlement negotiations.

At the hearing, in light of this court's October 12, 2005 Memorandum Opinion & Order, counsel for the San Juan County defendants withdrew the motion for a finding of contempt from further consideration, and this court DENIED the plaintiffs' motion to strike as moot.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Tr. 10/25/05, at 16:5-12.)

**(8) Defendants' Request for Miscellaneous Relief, filed February 17, 2005 (dkt. no. 711).**

This request for relief is set forth in the Health District defendants' "Joinder in San Juan County Defendant Craig Halls' Memorandum in Opposition to Plaintiffs' Motion for Sanctions," filed February 17, 2005 (dkt. no. 711), and asks that this court "exercise its latitude, whether under Rule 11 or in any other way the Court deems appropriate, to intervene in what has become an outrageous departure from standards of civil practice,"  (*id.* at 3),

referring to the motion and briefing tactics of plaintiffs' counsel.

Earlier, the Health District defendants had moved for a "protective order" precluding plaintiffs from filing additional motions pending the court's ruling on the issues on remand. (Motion for Protective Order, filed March 20, 2003 (dkt. no. 523).)

The San Juan County defendants filed a similar motion for a filing ban on March 27, 2003 (dkt. no. 534), and joined in the Health District defendants' motion (dkt. no. 538). At the December 19, 2003 hearing on motions, this court granted a preliminary injunction against further proceedings by plaintiffs in Navajo court pending resolution of the issues on remand, but did not otherwise restrain plaintiffs' ability to file motions, and the "protective order/filing ban" motions were terminated.

On August 30, 2005, the Health District Defendants filed a new motion for "protective order" that would bar plaintiffs from filing additional motions without prior court approval, pending the court's decision of the pending issues and motions. They asserted that plaintiffs filed multiple duplicative, repetitive and meritless motions that raise the same issues and repeated the same arguments, many of which have already been rejected. The defendants also asked for attorney's fees. The San Juan County defendants joined this motion on October 6, 2005 (dkt. no. 836). These motions were not calendared for hearing.

On October 12, 2005, this court issued its Memorandum Opinion and Order deciding the jurisdictional issues on remand. By October 25th, this development may have obviated the defendants' requests for interim relief against plaintiffs' filing of additional motions. In any event, the request for miscellaneous relief (dkt. no. 711) was DENIED AS MOOT. (*See*

Minute Entry, dated October 25, 2005 (dkt. no. 847); Tr. 10/25/05, at 16:12-19.)

In addition to the foregoing motions, the court had set the October 25th hearing as a status and scheduling conference concerning additional motions filed by the plaintiffs.  (*See* Order re: Pending Motions, filed August 26, 2005 (dkt. no. 811), at 5; Amended Notices of Hearing (dkt. nos. 809, 812, 831).)  Those motions included  Plaintiffs' Motion to Amend and Supplement the Complaint, filed March 25, 2005 (dkt. no. 716); Plaintiffs' Rule 60 Motion to be Relieved of the June 13, 2005 Order of Dismissal, and Stipulated Pre Trial Order, filed July 8, 2005 (dkt. no. 758), discussed above; "PlaintiffMacArthur [sic], Valdez and Lyman's Motion for the Court to Reconsider June 13, 2005 Order of Dismissal and Motion to Amend/Supplement Their First Amended Complaint," filed August 11, 2005 (dkt. no. 790); "PlaintiffMacArthur [sic], Valdez and Lyman's and Singer, Riggs and Dickson's, Motion for the Court to Appoint a Special Master for the District," filed August 11, 2005 (dkt. no. 793); "Plaintiffs' Application for an immediate Rule 65 Temporary Restraining Order and Preliminary Injunction," filed August 19, 2005 (dkt. no. 798); and Plaintiffs Motion to Use Subpoena Powers, filed September 9, 2005 (dkt. no. 829).

Based upon its examination of the moving papers submitted to the court and further discussion between court and counsel concerning these motions, the court concluded that there was no need for further hearing on these motions and that in each instance, the motions would be DENIED.  To the extent that the motions sought to revisit issues already addressed in the court's June 13th and October 12th opinions, they raised no "newly discovered evidence" or contrary legal authority bearing upon those issues.  To the extent that the

motions sought to raise matters involving parties and claims not already before the court, (*e.g.*, "PlaintiffMacArthur [sic], Valdez and Lyman's and Singer, Riggs and Dickson's, Motion for the Court to Appoint a Special Master for the District," filed August 11, 2005 (dkt. no. 793); "Plaintiffs' Application for an immediate Rule 65 Temporary Restraining Order and Preliminary Injunction," filed August 19, 2005 (dkt. no. 798)), the court concluded that those matters were beyond the scope of this action and were more properly the subject of another lawsuit, should the real parties in interest choose to file one.  (*See* Minute Entry, dated October 25, 2005 (dkt. no. 847); Tr. 10/25/05, at 16:20-30:20.)

### E.  Corrections to the October 12, 2005 Memorandum Opinion & Order and the October 31, 2005 Judgment.

In the course of examining the plaintiffs' Rule 59(e)/Rule 60(b) motions and reviewing the record in this proceeding, this court noted that the court's October 31st judgment inadvertently omitted reference to plaintiff Singer's claim against defendant Atcitty, which was dismissed as barred by the Utah Governmental Immunity Act under Navajo principles of comity and reciprocity articulated in *Jones*.  *See MacArthur*, 391 F. Supp. 2d at 1055-1056.  That dismissal will be reflected in a separate form of declaratory judgment to be entered forthwith by the Clerk of the Court.

The court has also discovered and corrected several typographical, grammatical and clerical errors in the October 12th Memorandum Opinion & Order.  The corrected text of the October 12th Memorandum Opinion & Order has been made available through publication by Thomson West in the permanent bound volume of the *Federal Supplement, Second Series* and on WESTLAW, and is the version cited throughout this memorandum opinion and order.

-67-

*See MacArthur v. San Juan County*, 391 F. Supp. 2d 895, (D. Utah 2005). A copy of the corrected text in .pdf file format is annexed hereto as an Appendix, and shall be entered on the docket as an attachment and made available by the Clerk of the Court.

For the reasons explained above,

**IT IS ORDERED** that plaintiffs Singer, Riggs and Dickson's Motion for Clarification, Reconsideration and Amendment (dkt. no. 849) is DENIED; plaintiff Valdez' "Motion to Reconsider and Amend the October 31, 2005 Order and Allow Her to Amend Her Amended Complaint," (dkt. no. 855), is DENIED; and plaintiffs Lyman and MacArthur's "Motion to Reconsider and Amend the October 31, 2005 Order and Allow Her to Amend Their Amended Complaint," (dkt. no. 857), is DENIED;

**IT IS FURTHER ORDERED** that "Plaintiffs Motion for Disqualification," filed June 17, 2005 (dkt. no. 745), is DENIED; Plaintiffs' Motion to Lift the Court's Protective Order for Depositions and other Records in this Case, etc., filed June 30, 2005 (dkt. no. 747), is DENIED; Plaintiffs' Motion to Restrain All Members of the SJHSD Staff from Destroying Any Records at Least Until the Appeal Processes in this Case are Finished, filed June 30, 2005 (dkt. no. 751), is GRANTED IN PART, to the extent that all parties are required to maintain and preserve all relevant documents and records kept in the ordinary course of business, keeping the same in their possession, custody and control until the completion of all appeals; Plaintiffs' Motion to Clarify the Record and Hold a Full Disclosure Hearing, filed August 2, 2005 (dkt. no. 781), is DENIED; Plaintiffs Singer, Riggs and Dickson's Motion to Certify a Question to the Utah Supreme Court, filed August 11, 2005 (dkt. no. 791) is

WITHDRAWN; San Juan County Defendants' Motion for a Finding of Contempt and the Imposition of Sanctions, filed July 7, 2005 (dkt. no. 754), is WITHDRAWN; "Plaintiffs' Motion to Strike Def's Motion for Contempt," filed July 20, 2005 (dkt. no. 786), is DENIED AS MOOT; Defendants' Request for Miscellaneous Relief, filed February 17, 2005 (dkt. no. 711), is DENIED AS MOOT; the Health District Defendants' Motion for a Protective Order, filed August 30, 2005 (dkt. no. 820), joined by the San Juan County defendants on October 6, 2005 (dkt. no. 836), is DENIED AS MOOT; Plaintiffs' Motion to Amend and Supplement the Complaint, filed March 25, 2005 (dkt. no. 716), is DENIED; Plaintiffs' Rule 60 Motion to be Relieved of the June 13, 2005 Order of Dismissal, and Stipulated Pre Trial Order, filed July 8, 2005 (dkt. no. 758), is DENIED; "PlaintiffMacArthur [sic], Valdez and Lyman's Motion for the Court to Reconsider June 13, 2005 Order of Dismissal and Motion to Amend/Supplement Their First Amended Complaint," filed August 11, 2005 (dkt. no. 790), is DENIED; "PlaintiffMacArthur [sic], Valdez and Lyman's and Singer, Riggs and Dickson's, Motion for the Court to Appoint a Special Master for the District," filed August 11, 2005 (dkt. no. 793), is DENIED; "Plaintiffs' Application for an immediate Rule 65 Temporary Restraining Order and Preliminary Injunction," filed August 19, 2005 (dkt. no. 798), is DENIED; and Plaintiffs Motion to Use Subpoena Powers, filed September 9, 2005 (dkt. no. 829), is DENIED;

**IT IS FURTHER ORDERED** that plaintiffs Singer, Riggs and Dickson's "Motion to Correct Plaintiffs Motion to Clarify, Reconsider and Amend," on November 9, 2005 (dkt. no. 853), is GRANTED; and

**IT IS FURTHER ORDERED** that a copy of the corrected text of this court's

Memorandum Opinion & Order, filed October 12, 2005 (dkt. no. 837), as reported in the

permanent bound volume 391 of the *Federal Supplement, Second Series*, beginning at page

895 be and hereby is annexed hereto as an Appendix (in .pdf file format), and shall be

entered on the court's docket as an attachment to this Memorandum Opinion & Order and

thereby made available by the Clerk of the Court.

DATED this 15 day of December, 2005.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-70-