IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | | |
|---|---|---|
| DR. STEVEN MACARTHUR, et al., | ) | Civil No.  2:00-CV-584BSJ |
| | ) | |
| Plaintiffs, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER RE: POST-MANDATE** |
| vs. | ) | **MOTIONS** |
| | ) | |
| SAN JUAN COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

```
┌────────────────────────────────────┐
│              FILED                 │
│   CLERK, U.S. DISTRICT COURT       │
│      July 2, 2008 (2:46pm)         │
│        DISTRICT OF UTAH            │
└────────────────────────────────────┘
```

* * * * * * * * *

On July 18, 2007, the United States Court of Appeals for the Tenth Circuit decided

the parties' appeals from this court's October 12, 2005 Memorandum Opinion and Order

denying federal court enforcement of certain interlocutory orders entered by the Navajo

tribal court in favor of plaintiffs Singer, Riggs and Dickson, as well as this court's

December 16, 2005 Memorandum Opinion & Order denying their motion for

reconsideration or relief from judgment.  The clerk of this court received the court of

appeals' mandate on August 27, 2007.  On February 19, 2008, the United States Supreme

Court denied the petition of Singer, Riggs and Dickson for a writ of certiorari.  *See*

*MacArthur v. San Juan County*, 391 F. Supp. 2d 895 (D. Utah), *reconsideration denied*,

405 F. Supp. 2d 1302 (D. Utah  2005), *judgment reversed in part, vacated in part,*

*affirmed in part*,  497 F.3d 1057 (10th Cir. 2007), *cert. denied*, 128 S. Ct. 1229 (2008).

Ordinarily, the denial of certiorari signals the end of the appellate process and often, the end of the litigation itself.

In this case, the San Juan County defendants filed a motion on March 24, 2008 to enjoin further tribal court proceedings and for sanctions (dkt. no. 959), alleging that plaintiffs Singer, Riggs and Dickson were seeking joinder in proceedings before the Navajo Supreme Court in another case, *Ford Motor Company v. Kayenta District Court*, No. SC-CV-33-07, in order to raise the question of tribal court jurisdiction and the enforceability of the interlocutory tribal court orders previously entered in their favor, and urging the Navajo Supreme Court to ignore the rulings of the Tenth Circuit and this court in this case.  Other defendants soon joined in that motion (dkt. nos. 965, 971), and plaintiffs Singer, Riggs and Dickson filed a series of motions and memoranda in response (dkt. nos. 962, 963, 967, 968, 969, 970, 977, 978, 979).

In the interim, on April 2, 2008, the Navajo Supreme Court denied the plaintiffs' motion for joinder in the *Ford Motor* proceeding, thus affording the plaintiffs no further opportunity to  relitigate their jurisdictional issues in that forum.  (*See* Order Denying Motion to Amend Amicus Brief and Appendix and Join Parties in SR-CV-1672-99, dated April 2, 2008, annexed as an exhibit to Truck Insurance's Motion to Join the San Juan County Defendants' Motion to Enjoin Plaintiffs and Their Counsel from Further Proceedings in the Navajo Tribal Court and for Sanctions, filed April 9, 2008 (dkt. no. 971).)  The plaintiffs then filed a Rule 60(b) motion for relief from the effect of the Tenth

Circuit's July 18th decision, asking this court "to alter the holding of its 2005 decision, and grant, under the Plaintiffs' proffered analysis, all relief . . . by issuing an order enforcing all the Navajo Court orders, leaving any problems with mootness or other issues for defendants to work out with the Navajo Court." ("Plaintiffs Rule 60 motion Memorandum in support," filed April 21, 2008 (dkt. no. 982), at 4.)

The pending motions were heard on May 12, 2008.  Having reviewed the motions, memoranda and exhibits submitted by the parties, and having heard the arguments of counsel, the court ruled that plaintiffs Singer, Riggs and Dickson and their attorneys shall be individually enjoined from proceeding in any other forum to relitigate the questions of jurisdiction, immunity and enforceability of tribal court orders already decided by the court of appeals in its July 18th ruling.  (*See* Minute Entry, dated May 12, 2008 (dkt. no. 1005).)  The defendants' motion to enjoin further proceedings was thus granted to that extent.  The court denied the defendants' request for sanctions.  The court also denied the plaintiffs' Rule 60(b) motion.  (*Id.*)

Counsel for the San Juan County defendants submitted a proposed form of order reflecting the court's May 12th rulings.  Plaintiffs' counsel filed a forty-one page written objection to that proposed order, rearguing in detail the plaintiffs' jurisdictional theories and the grounds for relief from the judgment of the court of appeals already asserted by their Rule 60(b) motion, with additional references intended to place the proposed order "in perspective of this Court and its history."  (Plaintiffs' Objection to the Proposed

Order, filed May 29, 2008 (dkt. no. 993) ("Pltfs' Obj."), at 1.)  Defendants' counsel filed responses to the plaintiffs' objection (dkt. nos. 994, 995).

Having reviewed the proposed form of order, plaintiffs' objections thereto, and the defendant's responses, the court has chosen to elaborate further upon the specific rulings made at the May 12th hearing and the reasons therefor in this Memorandum Opinion & Order.

**Plaintiffs' Objections to the Proposed Order**

Plaintiffs' counsel acknowledges the substance of the Tenth Circuit's ruling in this case, namely, that the Navajo tribal court lacked subject matter jurisdiction over the defendants named in the interlocutory tribal court orders that Singer, Riggs and Dickson sought to enforce in this court.  Counsel's objection to the proposed order—and indeed, many of plaintiffs' recent submissions to this court—raises a more fundamental question: *how is it possible for the federal courts to diminish Navajo tribal court authority over non-Indians, particularly in the context of litigation in which the Navajo Nation is not a party?*  Counsel insists that neither this court nor the court of appeals has addressed this question in the opinions already issued in this case, and that the answer to this question casts serious doubt upon the validity and binding effect of the Tenth Circuit's judgment. (Pltf's Obj. at 6, 25-27.)  If anything, plaintiffs argue, the legal status of the Navajo Nation, the federal government's fiduciary relationship with the Navajo Nation, and principles of *res judicata* require that the federal courts summarily enforce orders of the

Navajo tribal courts without further examination or inquiry.  (*Id.* at 17-35.)

The plaintiffs' view of the governing legal framework was aptly summarized by

Felix S. Cohen in the 1942 edition of the *Handbook of Federal Indian Law*:

> The whole course of judicial decision on the nature of Indian tribal
> powers is marked by adherence to three fundamental principles: (1) An Indian
> tribe possesses, in the first instance, all the powers of any sovereign state. (2)
> Conquest renders the tribe subject to the legislative power of the United States,
> and, in substance, terminates the external powers of sovereignty of the tribe,
> *e.g.*, its power to enter into treaties with foreign nations, but does not by itself
> affect the internal sovereignty of the tribe, *i.e.*, its powers of local self-
> government.  (3) These powers are subject to qualification by treaties and by
> express legislation of Congress, but, save as thus expressly qualified, full
> powers of internal sovereignty are vested in the Indian tribes and in their duly
> constituted organs of government.

Felix S. Cohen, *Handbook of Federal Indian Law* 123 (1942) (footnotes omitted); *accord*

*Powers of Indian Tribes*, 55 I.D. 14, 22 (1934), 1 *Opinions of the Solicitor of the Department*

*of the Interior Relating to Indian Affairs 1917-1974* 445, 449.

Plaintiffs' counsel canvasses the treaties and statutes defining the legal relationship

between the United States and the Navajo Nation and finds nothing expressly delimiting

the jurisdiction of the Navajo tribal courts to adjudicate disputes involving tribal members

and non-Indians arising within the boundaries of the Navajo Reservation.  General

statutes such as the Indian Civil Rights Act speak of the rights of *persons*—not solely

tribal members—in dealing with tribal governments, suggesting that the Navajo Nation

has authority to act in relation to *all* persons within its territorial jurisdiction in the

enforcement of its own laws.  More recent legislation, such as the Indian Tribal Justice Act

of 1993 and the Indian Tribal Justice Technical and Legal Assistance Act of 2000, was

framed in terms firmly supportive of tribal self-government and effective tribal court systems, and recognizes "tribal justice systems as the appropriate forums for the adjudication of disputes affecting personal and property rights," 25 U.S.C.A. § 3601(6) (2001), making no distinction between tribal and non-Indian litigants.

Yet the answer to the plaintiffs' more fundamental question lies beyond the "network" of specific Navajo treaties and federal statutes relied upon by plaintiffs' counsel in support of her argument, or the formulation articulated by Cohen years ago that likewise was rooted in the language of treaties and statutes.  As this court previously explained, at least where tribal authority over non-Indians is concerned, the Supreme Court discarded the elegant simplicity of Cohen's analysis in favor of an amorphous legal standard that finds its source not in treaty or statute, but in abstract notions of intergovernmental dependency and subservience.

**The Supreme Court and the Implicit Divestiture of Indian Tribal Authority**

In *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978), the Supreme Court held that all Indian tribes lack inherent jurisdiction to try and punish non-Indians for criminal offenses committed within reservation boundaries because "Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers '*inconsistent with their status*.'"  *Id.* at 208 (quoting *Oliphant v. Schlie*, 544 F.2d 1007, 1009 (9th Cir. 1976) (emphasis supplied by the Court)). "'Indian law,'" *Oliphant* explained,

-6-

> draws principally upon the treaties drawn and executed by the Executive
> Branch and legislation passed by Congress. These instruments, which
> beyond their actual text *form the backdrop for the intricate web of judicially
> made Indian law*, cannot be interpreted in isolation but *must be read in light
> of the common notions of the day and the assumptions of those who drafted
> them*. . . .
> . . . .
> By submitting to the overriding sovereignty of the United States, Indian
> tribes therefore necessarily give up their power to try non-Indian citizens of
> the United States except in a manner acceptable to Congress. This principle
> would have been obvious a century ago when most Indian tribes were
> characterized by a "want of fixed laws [and] of competent tribunals of
> justice." H. R. Rep. No. 474, 23d Cong., 1st Sess., 18 (1834). It should be
> no less obvious today, even though present-day Indian tribal courts embody
> dramatic advances over their historical antecedents.

*Id.* at 210.[1] After *Oliphant*, "Indian tribes still possess those aspects of sovereignty not

withdrawn by treaty or statute, or *by implication as a necessary result of their dependent

status*." *United States v. Wheeler*, 435 U.S. 313, 323 (1978) (emphasis added). This

"implicit divestiture" theory bears most heavily upon the scope of Indian tribal authority

over non-Indians. Indeed, "The areas in which such implicit divestiture of sovereignty

has been held to have occurred are those involving the relations between an Indian tribe

and nonmembers of the tribe." *Id.* at 326.

For the last thirty years, then, the *Oliphant* Court's "intricate web of judicially

made Indian law" has included this implicit divestiture theory, the full scope and extent of

---

[1] *Oliphant* insisted that the implied divestiture of tribal authority over non-Indians comports with "the commonly shared presumption of Congress, the Executive Branch, and lower federal courts,"at least as the Court was able to discern that presumption. 435 U.S. at 206. *Cf.* Matthew L.N. Fletcher, *The Supreme Court and the Rule of Law: Case Studies in Indian Law*, 55 Fed. Law. 26, 31 (Mar./Apr. 2008) (noting that *Oliphant* "relied on the legislative history of congressional bills that were never enacted and opinions of the Interior Department's solicitor that had been withdrawn.")

which the Court itself still struggles to delineate.  *See, e.g.*, *Plains Commerce Bank v.*

*Long Family Land & Cattle Co., Inc.*, ___ U.S. ___, No. 07-411 (decided June 25, 2008).

And it is this "intricate web of judicially made Indian law" that holds the answer to the

plaintiffs' fundamental question concerning the federal courts and the Navajo Nation's

authority over non-Indian litigants.

        While *Oliphant* held the implicit divestiture of tribal criminal jurisdiction over

non-Indians to be complete, the Court has expressly rejected the assertion that Indian

tribes had likewise been completely divested of inherent *civil* jurisdiction over non-

Indians within reservation boundaries.  *See National Farmers Union Ins. Cos. v. Crow*

*Tribe of Indians*, 471 U.S. 845, 854-55 (1985).

> To be sure, Indian tribes retain inherent sovereign power to exercise some
> forms of civil jurisdiction over non-Indians on their reservations, even on
> non-Indian fee lands.  A tribe may regulate, through taxation, licensing, or
> other means, the activities of nonmembers who enter consensual
> relationships with the tribe or its members, through commercial dealing,
> contracts, leases, or other arrangements.  *Williams v. Lee*, *supra*, at 223;
> *Morris v. Hitchcock*, 194 U.S. 384; *Buster v. Wright*, 135 F. 947, 950
> (CA8); see *Washington v. Confederated Tribes of Colville Indian*
> *Reservation*, 447 U.S. 134, 152 -154.  A tribe may also retain inherent
> power to exercise civil authority over the conduct of non-Indians on fee
> lands within its reservation when that conduct threatens or has some direct
> effect on the political integrity, the economic security, or the health or
> welfare of the tribe. See *Fisher v. District Court*, 424 U.S. 382, 386 ;
> *Williams v. Lee*, *supra*, at 220; *Montana Catholic Missions v. Missoula*
> *County*, 200 U.S. 118, 128 -129; *Thomas v. Gay*, 169 U.S. 264, 273.

*Montana v. United States*, 450 U.S. 544, 565-566 (1981) (footnote omitted).  "But tribes

do not, *as a general matter*, possess authority over non-Indians who come within their

borders: '[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.' *Montana*, at 450 U. S., at 565." *Plains Commerce Bank*, slip op. at 9 (emphasis added).

> As we explained in *Oliphant v. Suquamish Tribe*, 435 U. S. 191 (1978), the tribes have, by virtue of their incorporation into the American republic, lost "the right of governing . . . person[s] within their limits except themselves." *Id.*, at 209 (emphasis and internal quotation marks omitted).
>
> This general rule restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the nonmember's activity occurs on land owned in fee simple by non-Indians—what we have called "non-Indian fee land." *Strate v. A–1 Contractors*, 520 U. S. 438, 446 (1997) (internal quotation marks omitted).

*Id.*

At this point, *Oliphant*, *Montana*, and their progeny have drastically limited Indian tribal civil authority over non-Indian activities within reservation boundaries.  In this case, the Tenth Circuit read those cases as placing the on-reservation employment activities of the San Juan Health Services District beyond the civil regulatory and adjudicative authority of the Navajo Nation, and it held that the Navajo district court lacked subject-matter jurisdiction over the plaintiffs' claims against the Health District and its officers, directors and employees as well as various San Juan County officials also named as defendants.   *MacArthur*, 497 F.3d at 1072-76.  Plaintiffs' counsel now seeks to undo that ruling by challenging the authority of the federal courts to decide the jurisdictional issue in the first place.

**Tribal Jurisdiction Does Not Present a "Political Question"**

Plaintiffs' counsel has repeatedly asserted that the scope of the jurisdiction of the Navajo tribal courts presents a non-justiciable "political question" committed to the Legislative and Executive Branches of the federal government. Yet she points to no pertinent legal authority that lends support to that view. To the contrary, plaintiffs' counsel has repeatedly cited to *National Farmers Union Ins. Co. v. Crow Tribe*, 471 U.S. 845 (1985), which observed that the Supreme Court "has frequently been required to decide questions concerning the extent to which Indian tribes have retained the power to regulate the affairs of non-Indians." *Id.* at 851. She has also insisted that the question of Navajo jurisdiction in this case be examined under a "*National Farmers* analysis." *See id.* at 855-56 ("[T]he existence and extent of a tribal court's jurisdiction will require a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.").

Certainly the "network" of specific Navajo treaties and federal statutes relied upon by plaintiffs' counsel bears upon the question of the scope of Navajo tribal civil authority, as *National Farmers* suggests. But as the Supreme Court recently explained, much of the existing legal authority defining the subject-matter jurisdiction of Indian tribal courts over non-Indian litigants consists of "'judicially made' federal Indian law," that is, federal case law precedent representing a species of "federal common law"—"which 'common law' federal courts develop as 'a "necessary expedient" when Congress has not "spoken to a

-10-

*particular* issue."'" *United States v. Lara*, 541 U.S. 193,  207 (2004) (quoting *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 233-237 (1985) (quoting "*Milwaukee v. Illinois*, 451 U.S. 304, 313-315 (1981)) (emphasis supplied by Court)).[2]

That plaintiffs' counsel fundamentally disagrees with the Supreme Court's reading of the pertinent treaties and statutes does not deprive the Court's case law of its binding precedential effect upon the lower federal courts, including the Tenth Circuit and this court.  Nor may we overrule or simply ignore what the Supreme Court has said.

### The Navajo Nation is Not a "Necessary Party" to the Determination of the Jurisdictional Issue

Plaintiffs' counsel queries how the subject-matter jurisdiction of the Navajo courts may be determined in the context of federal civil litigation to which the Navajo Nation itself is not a party, pointing to the Tenth Circuit's recent opinion in *Miner Electric Co., Inc. v. Muscogee (Creek) Nation*, 505 F.3d 1007 (10th Cir. 2007).

In *Miner Electric*, non-Indian plaintiffs sued the Muscogee (Creek) Nation in federal district court, challenging a civil forfeiture order issued by the tribal court and seeking declaratory and injunctive relief against its enforcement.  The tribe moved to

---

[2]In essence, plaintiffs' counsel disputes the *Lara* Court's premise that Congress has not spoken as to the "particular issue" of Indian tribal authority over non-members, thus leaving room for the development of "federal common law" in *Oliphant*, *Montana*, and later cases.  Plaintiffs insist that Congress has already spoken, and that the pertinent federal treaties and statutes affecting the Navajo Nation recognize—and indeed *mandate*— that the Navajo Nation exercise full civil authority "equally over Indian[s] or non-Indians, on all lands within its borders."  (Pltfs' Obj. at 34.)  This is plainly not a frivolous position, but at least since *Oliphant* in 1978, it remains a dissenting view.  *Cf. Oliphant*, 435 U.S. at 212 (Marshall, J. & Burger, C.J., dissenting) ("In the absence of affirmative withdrawal by treaty or statute, I am of the view that Indian tribes enjoy as a necessary aspect of their retained sovereignty the right to try and punish all persons who commit offenses against tribal law within the reservation.")

dismiss, raising the bar of tribal sovereign immunity.  The Tenth Circuit agreed with the

tribe, holding that "in an action *against an Indian tribe*, we conclude that § 1331 will only

confer subject matter jurisdiction where another statute provides a waiver of tribal

sovereign immunity or the tribe unequivocally waives its immunity."  505 F.3d at 1011

(emphasis added).  At the same time, the court noted that tribal sovereign immunity does

not extend to bar declaratory or injunctive relief against individual tribal officers, citing

*Tenneco Oil Co. v. Sac & Fox Tribe of Indians of Oklahoma*, 725 F.2d 572, 575 (10th

Cir.1984) (ruling that tribal officer defendants were not protected by the tribe's immunity

and that the suit challenging the validity of certain tribal ordinances could go forward

against them).

> *Tenneco* involved two different aspects of an Indian tribe's "sovereignty":
> its immunity from suit and the extent of its power to enact and enforce laws
> affecting non-Indians.  But it does not stand for the proposition, as the
> Miner parties suggest, that an Indian tribe cannot invoke its sovereign
> immunity from suit in an action that challenges the limits of the tribe's
> authority over non-Indians.  On the contrary, we held in *Tenneco* that the
> tribe was immune from suit. *See id.* at 574.  Here, because the Miner parties
> named only the Nation itself as a defendant, we do not reach the question
> whether any of the Nation's officials would be subject to suit in an action
> raising the same claims.

*Miner Electric*, 505 F.3d at 1012.  Nothing in *Miner Electric* or *Tenneco* suggests that a

tribe is a necessary party to any federal court proceeding testing the limits of an Indian

tribe's authority over non-Indians, as plaintiffs' counsel now contends.  (*See* Pltfs' Obj. at

20-22 (reading *Miner Electric*  to say that "Federal Courts have no subject matter

jurisdiction to limit Tribal authority via the federal question statutes, save if the Nation is

a party and waives its sovereignty").)  Nor does it deny due process to decide the

jurisdictional issue in the tribe's absence.[3]

### Seeking Enforcement of Tribal Court Orders Raises the Issue of Tribal Jurisdiction as a "Federal Question"

By bringing a civil action in this court seeking enforcement of the Navajo district

court's interlocutory orders, plaintiffs Singer, Riggs and Dickson invoked the federal

question jurisdiction of this court under 28 U.S.C. § 1331, including the authority to

examine the subject-matter jurisdiction of the Navajo district court over the named non-

Indian defendants.  As the court of appeals explains,

> Plaintiffs also argue that we have no power to do anything other than
> enforce the Navajo district court's orders.  In other words, once the tribal
> court issued its preliminary injunction orders and Plaintiffs arrived at
> federal court to enforce them, the jurisdiction of the federal courts is limited
> to enforcement, which is mandatory on our part. This argument
> misunderstands federal court jurisdiction and the discretion we possess
> under the doctrine of comity.  The question of the regulatory and
> adjudicatory authority of the tribes—a question bound up in the decision to
> enforce a tribal court order—is a matter of federal law giving rise to subject
> matter jurisdiction under 28 U.S.C. § 1331.  *See Nat'l Farmers Union*, 471
> U.S. at 852, 105 S.Ct. 2447; *Wilson v. Marchington*, 127 F.3d 805, 813 (9th
> Cir. 1997).

*MacArthur*, 497 F.3d at 1066 (footnote omitted); *see also Superior Oil Co. v. United*

*States*, 798 F.2d 1324, 1329 (10th Cir. 1986) ("[I]n cases encompassing the federal

---

[3]Most recently, in *Plains Commerce Bank*, the Supreme Court determined the enforceability of a tribal court judgment in the context of a federal declaratory judgment proceeding in which the tribe itself was not joined as a party.  The Cheyenne River Sioux Tribe participated as an *amicus curiae* before the court of appeals, but was not called upon to waive its tribal sovereign immunity in order for the issue of tribal subject matter jurisdiction to be decided by the federal courts.

question whether a tribal court has exceeded its lawful limits of jurisdiction involving an

exercise of civil subject-matter jurisdiction . . . the federal district court is empowered to

review a tribal court decision under 28 U.S.C. § 1331."); *Plains Commerce Bank*, slip op.

at 5 (noting that "whether a tribal court has adjudicative authority over nonmembers is a

federal question.  See *Iowa Mut. Ins. Co. v. LaPlante*, 480 U. S. 9, 15 (1987); *National

Farmers Union Ins. Cos. v. Crow Tribe*, 471 U. S. 845, 852–853 (1985).  If the tribal

court is found to lack such jurisdiction, any judgment as to the nonmember is necessarily

null and void.").[4]

Even assuming that the Navajo district court's orders could be enforced in this

proceeding as a matter of comity,

> recognition of a tribal court judgment *must* be refused where one of two
> circumstances exist.  First, comity must not be granted where the tribal
> court lacked either personal or subject matter jurisdiction. . . .  Second, a
> tribal court judgment must not be enforced where the party against whom
> enforcement was sought was not afforded due process of law. . . .

*Id.* at 1067 (emphasis in original; citations omitted).[5]  "In this case," the *MacArthur* panel

concluded, "we *must* refrain from enforcing much of the Navajo district court's orders

---

[4]Plaintiffs' counsel queries "the source of Constitutional authority for an Article III Court" to limit the
civil authority of an Indian tribe, as in the Tenth Circuit's ruling in this case.  (Pltfs' Obj. at 16.)  Given the fact
that "whether a tribal court has adjudicative authority over nonmembers is a federal question," *Plains Commerce
Bank*, slip op. at 5, the source of Constitutional authority to decide that question is to be found in Article III
itself: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws
of the United States, and Treaties made, or which shall be made, under their Authority[.]" U.S. Const., art. III, §
2.

[5]*Cf.* Robert Laurence, *The Role, If Any, for the Federal Courts in the Cross-Boundary Enforcement of
Federal, State and Tribal Money Judgments*, 35 Tulsa L.J. 1 (1999).

-14-

because that court lacked subject matter jurisdiction (i.e. adjudicatory authority) over nearly all of Defendants' activities." *Id.* (emphasis in original).

Plaintiffs raised a justiciable federal question concerning Navajo civil jurisdiction by seeking to enforce Navajo court orders in a federal district court. That federal question was ultimately decided by the court of appeals.

**The Navajo Courts are Not 'Executive Agreement Claims Settlement Courts'**

Pointing to the Supreme Court's recent decision in *Medellin v. Texas*, ___ U.S. ___, 128 S. Ct. 1346 (decided March 28, 2008), plaintiffs' counsel asserts that by virtue of the Navajo Nation's contract with the Bureau of Indian Affairs concerning the tribe's judicial program, the Navajo courts enjoy the status of "executive agreement claims settlement courts" whose "acts are entitled to full force and effect" in the courts of the United States. (Pltfs' Obj. at 17-18, 22-24.) Plaintiffs do not identify any other such tribunals, and what the label may signify remains unclear.[6]

The gist of the assertion seems to be this: plaintiffs posit that besides providing financial assistance to the Navajo Nation in aid of its tribal court system, the BIA contract itself mandates that within its reservation boundaries, the Navajo Nation must exercise

---

[6]*Medellin* does not refer to "executive agreement claims settlement courts." The Court discusses "the making of executive agreements to settle civil claims between American citizens and foreign governments or foreign nationals," but does so in terms of "[t]he Executive's narrow and strictly limited authority" in that regard, without reference to claims settlement courts or other tribunals. 128 S. Ct. at 1371, 1372 (citing *American Ins. Assn. v. Garamendi*, 539 U. S. 396, 415 (2003); *Dames & Moore v. Regan*, 453 U. S. 654, 679–680 (1981); *United States v. Pink*, 315 U. S. 203, 229 (1942); and *United States v. Belmont*, 301 U. S. 324, 330 (1937)). *Medellin* held that a decision of the International Court of Justice was not automatically or directly enforceable as binding federal domestic law in state court proceedings involving criminal defendants who are foreign nationals. How this ruling bears upon the issues now raised by plaintiffs' counsel remains a mystery.

general civil jurisdiction equally over Indians and non-Indians alike —displacing the general rule of *Montana* that, absent a treaty or statute, Indian tribes generally lack authority to regulate the activities of nonmembers within those boundaries. (Pltfs' Obj. at 34-35.) Indeed, the plaintiffs assert that the BIA contract "is a new relationship between the United States and the Navajo Nation" that "alters Article III authority under Article VI of the Constitution," presumably referring to the Supremacy Clause, and that "a judicial doctrine . . . must bow to an Article II, sovereign to sovereign, . . . government to government, binding Article VI, 'executive agreement' . . . ." (*Id.* at 17-18.)

This assertion misses a subtle but critically important distinction: contracts *make law* between the parties in the sense that they create promissory obligations and corresponding rights to performance that are legally enforceable in the courts in the event of a breach. But contracts do not have any *legislative* effect, in the sense of making new legal rules of general application or altering the substantive fabric of the law itself. In this instance, the pertinent legislation is the Indian Self-Determination and Education Assistance Act of 1975, as amended, 25 U.S.C. §§ 450 *et seq.*, which authorizes the making of federal contracts with Indian tribes for a variety of purposes, including the development of more effective tribal court systems. Pursuant to that legislation, the Bureau of Indian Affairs makes contracts with Indian tribes for the funding of social services, such as court services, in fulfillment of the President's constitutional responsibility to "take Care that the Laws be faithfully executed." U.S. Const., Art. II, §3.

But as *Medellin* recently pointed out, "This authority allows the President to execute the laws, not make them."  128 S. Ct. at 1372.

The court has reviewed the copies of the Navajo court program contracts previously submitted by counsel and finds nothing within the four corners of those documents that suggests that the Executive Branch intended to make anything other than a *contract*.  The documents give no indication of any administrative rulemaking consistent with the Administrative Procedure Act.  Nor have they been ratified by the Senate, as would be required of a federal treaty.  They make no mention of any departure from *Montana* or any other judicial precedent dealing with tribal jurisdiction over non-members, or any other change in substantive federal law.  Nor do they in any way suggest that by way of the receipt of federal funds pursuant to those contracts, the Navajo tribal courts are somehow "federalized," rendering their orders and judgments directly enforceable pursuant to the Supremacy Clause of Article VI.

### Plaintiffs' Plea for an Extraordinary Post-Judgment Remedy

Of course, Congress, in the exercise of its "plenary and exclusive" power in Indian affairs remains free to "change 'judicially made' federal Indian law through . . . legislation"—including the general rule of *Montana* and its two very narrowly construed exceptions—but unless and until Congress acts, this "intricate web of *judicially made* Indian law" remains among the "laws . . . of the United States" under which a "federal question" may arise within the meaning of 28 U.S.C. § 1331.  *Lara*, 541 U.S. at 206

(quoting *Oliphant*, 435 U.S. at 206 (emphasis supplied by Court)); *National Farmers*, 471 U.S. at 857 ("§ 1331 encompasses the federal question whether a tribal court has exceeded the lawful limits of its jurisdiction").  And it remains an appropriate footing for the court of appeals' judgment in this case—a judgment that is neither void nor unenforceable.

## CONCLUSION

The plaintiffs may well dispute the rule and reasoning of the Supreme Court's "pathmarking case, *Montana v. United States*, 450 U.S. 544, 564-65 (1981)," and the later cases that follow *Montana*, such as *Nevada v. Hicks*, 533 U.S. 353 (2001), and most recently, *Plains Commerce Bank*.[7]  A number of scholars have penned incisive critiques of the Court's implied diminishment of tribal civil and criminal jurisdiction over non-Indians.[8]  In this case, plaintiffs' counsel has made a credible showing that members of

---

[7]Discord persists on this subject within the Court itself.  *See, e.g.*, *Nevada v. Hicks*, 533 U.S. at 387 (O'Connor, Stevens & Breyer, JJ. concurring in judgment) ("Part II of the Court's decision [in *Hicks*] is unmoored from our precedents"); *Plains Commerce Bank*, slip op. at *1 (Ginsburg, Stevens, Souter & Breyer, JJ., concurring in part and dissenting in part).

[8]*See, e.g.*, Bethany R. Berger, *Justice and the Outsider: Jurisdiction over Nonmembers in Tribal Legal Systems*, 37 Ariz. St. L.J. 1047 (2005); Philip P. Frickey, *Native American Exceptionalism in Federal Indian Law*, 119 Harv. L. Rev. 431 (2005); Frank Pommersheim, *Is There a (Little or Not So Little) Constitutional Crisis Developing in Indian Law?*, 5 U. Pa. J. Const. L. 271 (2003); Sarah Krakoff, *Undoing Indian Law One Case at a Time: Judicial Minimalism and Tribal Sovereignty*, 50 Am. U. L. Rev. 1177 (2001); David H. Getches, *Beyond Indian Law: The Rehnquist Court's Pursuit of States' Rights, Color-Blind Justice and Mainstream Values*, 86 Minn. L. Rev. 267 (2001); Alex Tallchief Skibine, *The Court's Use of the Implicit Divestiture Doctrine to Implement its Imperfect Notion of Federalism in Indian Country*, 36 Tulsa L.J. 267 (2000); Philip P. Frickey, *A Common Law for Our Age of Colonialism: A Judicial Divestiture of Indian Tribal Authority Over Nonmembers*, 109 Yale L. J. 1 (1999); Russel Lawrence Barsh & James Youngblood Henderson, *The Betrayal: Oliphant v. Suquamish Indian Tribe and the Hunting of the Snark*, 63 Minn. L. Rev. 609 (1979); *see also* David H. Getches, *Conquering the Cultural Frontier: The New Subjectivism of the Supreme Court in Indian Law*, 84 Cal. L. Rev. 1573 (1996); Frank Pommersheim, *Tribal Courts and the Federal Judiciary: Opportunities and Challenges for a Constitutional Democracy*, 58 Mont. L. Rev. 313 (1997); Int'l Ass'n of Chiefs of Police, *Improving Safety in Indian Country: Recommendations from the IACP 2001 Summit* (2001), at 9, *available at* http:// www.theiacp.org/research/safetyinindiancountry.pdf ("If the *Oliphant* decision were

(continued...)

Congress and the Supreme Court may not be on the same page as far as the role and powers of Indian tribal courts are concerned,[9] and counsel appears entirely correct in asserting that "nothing Congress or the Executive have done [has] limited Navajo Court authority over anyone, Indian or non-Indian, for injurious acts occurring within the Navajo Nation['s] exterior borders."  (Pltfs' Obj. at 22.)  Nor have the plaintiffs strayed far afield in arguing the importance of giving effect to Navajo tort law as a vital aspect of tribal self-government.  *See, e.g., Smith v. Salish Kootenai College*, 434 F.3d 1127, 1140 (9th Cir. 2006) (en banc) ("The Tribes' system of tort is an important means by which the Tribes regulate the domestic and commercial relations of its members.").  And an argument may well be made that whatever its merits in its own context, *Montana*'s rule and reasoning should find no application at all to the differing historical and legal context of the Navajo Nation and its reservation.[10]

Nothing in this court's May 12th ruling purports to limit the plaintiffs' or their counsel's exercise of their First Amendment rights of free expression concerning these

---

[8](...continued)
reversed, Indian sovereignty over tribal lands would be affirmed, and tribes' ability to protect the safety of their citizens, both Indian and non-Indian alike, would greatly improve.")

[9]*See, e.g.*, Indian Tribal Justice Technical and Legal Assistance Act of 2000, Pub. L. No. 106-559, § 2(6), 114 Stat. 2778, 2778 (*codified as amended at* 25 U.S.C. § 3651(6) (2000)) (finding that "Congress and the Federal courts have repeatedly recognized tribal justice systems as the most appropriate forums for the adjudication of disputes affecting personal and property rights on Native lands").

[10]At least one judge of the court of appeals had earlier observed that "general principles of tribal sovereignty applicable to tribal authority over tribal land should not be extrapolated from *Montana*, a narrow, fact-bound case."  *Jicarilla Apache Tribe v. Supron Energy Corp.* 728 F.2d 1555, 1571 n.6 (10th Cir. 1984) (Seymour, J., dissenting in part), *adopted as opinion en banc*, 782 F.2d 855 (10th Cir.), *cert. denied*, 479 U.S. 970 (1986).

questions.

But having made the strategic choice to pursue enforcement of the Navajo court orders in federal court before the tribal court proceedings had been fully concluded, plaintiffs Singer, Riggs and Dickson raised the "federal question" of the extent of tribal jurisdiction over the non-Indian defendants in a federal forum, short-circuiting the usual exhaustion of Navajo tribal remedies, including review by the Navajo Supreme Court.[11] Having been raised in this forum, the jurisdictional question was ultimately decided by the court of appeals, with an outcome that was adverse to the plaintiffs.

The plaintiffs asked, and they received an answer, albeit one not to their liking.

Their question having been answered by the court of appeals, this court remains bound by the court of appeals' mandate, and cannot now set aside or disregard the *MacArthur* panel's July 18, 2007 ruling.  *See, e.g., Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 306 (1948) ("In its earliest days this Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court."); *Ute Indian Tribe v. State of Utah*, 935 F.Supp. 1473, 1516-18 (D. Utah 1996).[12]

---

[11]As this court has previously observed, the Navajo court orders at issue in this case were not final judgments.  Plaintiffs' Objection now argues that they were, and that principles of *res judicata* should operate to bar re-litigation of the jurisdictional question in the federal courts and render the court of appeals' judgment void.  (Pltfs' Obj. at 27-30.)

Had the matter first been fully concluded in the tribal courts, including review by the Navajo Supreme Court, the non-Indian defendants could still have sought review by the federal courts of the Navajo courts' subject-matter jurisdiction, similar to that obtained most recently by the non-Indian defendant in the *Plains Commerce Bank* case.  Thus it appears that either way, the tribal jurisdictional issue would ultimately have been resolved by the Tenth Circuit (or the United States Supreme Court), not by the Navajo Supreme Court.

[12]In this Circuit, "the rule is well established that a district court must comply strictly with the mandate

(continued...)

-20-

The parties likewise are bound by the terms of the court of appeals' judgment, and as between these parties, this matter is at an end.

The relief granted by this court at the May 12th hearing bears not upon the Navajo courts—or any other tribunal—but directly upon *these plaintiffs and their counsel*.  In aid of the enforcement of the court of appeals' judgment and mandate, this court has ordered *these plaintiffs* not to pursue further judicial enforcement of the Navajo court orders at issue in this proceeding as against the named defendants in any other forum, including the Navajo tribal courts; nor may *these plaintiffs* prosecute claims against the named defendants in the Navajo tribal courts that the court of appeals has already determined to be beyond the tribal courts' jurisdictional reach.

This relief ensures that what the court of appeals has laid to rest remains at rest, at least as among the parties to this proceeding.

At this point, if the rule of *Montana*—as extended by the Tenth Circuit in this case—is to be undone, it will likely be Congress that must undo it.  *See, e.g.,* Nicole E.

---

[12](...continued)

rendered by the reviewing court." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1534 (10th Cir.), *cert. denied*, 506 U.S. 956 (1992) (citing *Laffey v. Northwest Airlines, Inc.*, 642 F.2d 578, 584-85 (D.C. Cir. 1980) (stating that district court has 'no power to reconsider issues laid to rest' on prior appeal)."   The principle is one of long standing:

> Whatever was before the [superior] Court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate.  They cannot vary it, or examine it for any other purpose than execution; nor give any other or further relief; nor review it upon any matter decided on appeal, for error apparent; nor intermeddle with it, further than to settle so much as has been remanded.

*Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 492 (1838).

Ducheneaux, Note, *Smith v. Salish Kootenai College: Self-Determination as Governing Principle or Afterthought in Tribal Civil Jurisdiction Jurisprudence?* 68 Mont. L. Rev. 211 (2007).  In any event, the court of appeals' judgment and mandate remain the law of this case as to these plaintiffs and the named defendants.

Therefore,

**IT IS ORDERED** that the defendants' motion to enjoin further tribal court proceedings and for sanctions (dkt. no. 959), is GRANTED IN PART, and only to this extent: plaintiffs Singer, Riggs and Dickson, individually and through their counsel of record, are hereby permanently enjoined from seeking to enforce certain orders entered in *Donna Singer, et. al. v. San Juan County, et al.*, Case No. SR-CV-162-99-CV (Navajo Nation District Court, Shiprock District), namely (1) the "Findings, Opinion and Judgment at Preliminary Injunction," dated December 28, 1999, (2) the "Order Denying Defendants' Motion to Dissolve or Modify the Preliminary Injunction Order," entered March 1, 2000, and (3) the "Special Order in Aid to Satisfaction of Preliminary Injunction," signed March 6, 2000, in any judicial proceeding before any other court as against the defendants named in this action; and they are permanently enjoined from prosecuting any claim for damages or other relief against these named defendants in the Navajo tribal courts as to which the court of appeals has determined that the tribal courts lack subject-matter jurisdiction in *MacArthur v. San Juan County,* 497 F.3d 1057 (10th Cir. 2007); in all other respects, the defendants' motion is DENIED;

-22-

    **IT IS FURTHER ORDERED** that plaintiffs' motion for a more definite statement (dkt. no. 962), "Plaintiffs' motion to dismiss the Defendants' motion for an Order to Show Cause and strike For Mootness" (dkt. no. 967), and Plaintiffs' Rule 60 Motion (dkt. no. 981), are hereby DENIED;

    **IT IS FURTHER ORDERED** that plaintiffs' motions for an extension of time (dkt. nos. 969, 998), are hereby DENIED AS MOOT; and

    **IT IS FURTHER ORDERED** that plaintiffs' Motion for Further Briefing in Light of *Prairie Commerce Bank v. Long Family Land & Cattle Co.* (dkt. no. 1002), and "Plaintiffs' Motion to Strike Mrs. Cox's (994) and Mr. Harrison's (995) Responses to Plaintiffs' Objection to the Proposed Order to Enjoin and for Sanctions" (dkt. no. 1007), are DENIED.

    DATED this **1** day of July, 2008.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge

-23-